**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY;

THE STATE OF ALABAMA,
By and through its Attorney General, STEVE
MARSHALL;

THE STATE OF FLORIDA,                                    CIVIL ACTION NO. _____
By and through its Attorney General, ASHLEY
MOODY;

THE STATE OF GEORGIA,
By and through its Attorney General,
CHRISTOPHER M. CARR;

THE COMMONWEALTH OF KENTUCKY,
By and through its Attorney General, DANIEL
CAMERON;

THE STATE OF MISSISSIPPI,
By and through its Attorney General, LYNN
FITCH;

THE STATE OF SOUTH DAKOTA,
By and through its Governor, KRISTI NOEM;

THE STATE OF TEXAS,
By and through its Attorney General, KEN
PAXTON;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General, PATRICK
MORRISEY;

THE STATE OF WYOMING,
By and through its Attorney General,
BRIDGET HILL,

                                         PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR. in his official capacity
as President of the United States;

CECILIA ROUSE, in her official capacity as
Chairwoman of the Council of Economic
Advisers;

SHALANDA YOUNG, in her official capacity
as Acting Director of the Office of Management
and Budget;

KEI KOIZUMI, in his official capacity as
Acting Director of the Office of Science and
Technology Policy;

JANET YELLEN, in her official Capacity as
Secretary of the Treasury;

DEB HAALAND, in her official capacity as
Secretary of the Interior;

TOM VILSACK, in his official capacity as
Secretary of Agriculture;

GINA RAIMONDO, in her official capacity as
Secretary of Commerce;

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services;

PETE BUTTIGIEG, in his official capacity as
Secretary of Transportation;

JENNIFER GRANHOLM, in her official
capacity as Secretary of Energy;

BRENDA MALLORY, in her official capacity
as Chairwoman of the Council on
Environmental Quality;

MICHAEL S. REGAN, in his official capacity
as Administrator of the Environmental
Protection Agency;

GINA MCCARTHY, in her official capacity as
White House National Climate Advisor;

BRIAN DEESE, in his official capacity as
Director of the National Economic Council;

JACK DANIELSON, in his official capacity as
Executive Director of the National Highway
Traffic Safety Administration;

U.S. ENVIRONMENTAL PROTECTION
AGENCY;

U.S. DEPARTMENT OF ENERGY;

U.S. DEPARTMENT OF
TRANSPORTATION;

U.S. DEPARTMENT OF AGRICULTURE;

U.S. DEPARTMENT OF THE INTERIOR;

NATIONAL HIGHWAY TRAFFIC SAFETY
ADMINISTRATION;

INTERAGENCY WORKING GROUP ON
SOCIAL COST OF GREENHOUSE GASES,

DEFENDANTS.

## **COMPLAINT**

The States of Louisiana, Alabama, Florida, Georgia, Kentucky, Mississippi, South Dakota, Texas, West Virginia, and Wyoming bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## **INTRODUCTION**

1.    This case arises from President Biden's recent unilateral executive action targeting what even staunch environmentalists acknowledge is the "most important number you've never heard of." Frank Ackerman & Elizabeth A. Stanton, *The Social Cost of Carbon: A Report for the Economics for Equity and Environment Network* 2 (Apr. 1, 2010), https://bit.ly/3mZJWOQ. That number—or, more accurately, that set of numbers—are estimates of the monetized value of social costs attendant to

emissions of three greenhouses gases: carbon dioxide, methane, and nitrous oxide. Those estimates have come to be known as the Social Cost of Carbon (SCC), the Social Cost of Methane (SCM), and the Social Cost of Nitrous Oxide (SCN). This Complaint refers to estimates of the monetized value for emissions of all three greenhouse gases collectively as "SC-GHG Estimates."

2.      Why are those estimates so important? Two reasons. First, those gases are ubiquitous. Carbon dioxide, methane, and nitrous oxide are by-products of activities that make life in America what it is today, including energy production, agricultural production, industrial production, transportation, construction, and waste disposal. They are among the most common and prevalent by-products of human economic activity. Consider each gas briefly in turn.

3.      According to the Environmental Protection Agency, "[c]arbon dioxide enters the atmosphere through burning fossil fuels (coal, natural gas, and oil), solid waste, trees and other biological materials, and also as a result of certain chemical reactions (e.g., manufacture of cement). Carbon dioxide is removed from the atmosphere (or 'sequestered') when it is absorbed by plants as part of the biological carbon cycle." EPA, *Overview of Greenhouse Gases*, *at* https://bit.ly/3gmlA0p. Carbon dioxide is also emitted when humans and other respiratory organisms breathe. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 558 n.2 (2007) ("It follows that everything airborne, from Frisbees to flatulence, qualifies as an 'air pollutant.'") (Scalia, J., dissenting).

4.      EPA says that "[m]ethane is emitted during the production and transport of coal, natural gas, and oil. Methane emissions also result from livestock and other agricultural practices, land use and by the decay of organic waste in municipal solid waste landfills." *Overview of Greenhouse Gases*, *supra.* According to EPA, about 27 percent of methane emissions come from "enteric fermentation," *i.e.*, livestock manure and flatulence. About 30 percent of methane emissions come from "natural gas and petroleum systems." EPA, *Methane Emissions*, *at* https://bit.ly/3mYJRLr. Methane is the principal component of natural gas.

5.      And EPA says that "[n]itrous oxide is emitted during agricultural, land use, industrial activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater." *Overview of Greenhouse Gases*, *supra*. According to EPA, about 75 percent of nitrous oxide emissions come from "agricultural soil management activities, such as application of synthetic and organic fertilizers and other cropping practices, the management of manure, or burning of agricultural residues"—in other words, fertilizing crops. EPA, *Nitrous Oxide Emissions*, *at* https://bit.ly/3uZNIdW.

6.      The second reason those estimates are so important: President Biden recently signed Executive Order 13990, which requires his agencies to use the SC-GHG Estimates when conducting a cost/benefit analysis for every regulatory action—and, vaguely, "other relevant agency actions." *See* EO 13990, §5(b)(ii) ("The Working Group shall…publish an interim SCC, SCN, and SCM…, which agencies *shall use* when monetizing the value of changes in greenhouse gas emissions resulting from *regulations* and *other relevant agency actions* until final values are published") (emphases added). Because those gases are ubiquitous, the SC-GHG Estimates are potentially relevant to the cost/benefit analysis for *every* federal rulemaking and a host of "other relevant agency actions" (including leasing and permitting)—covering topics as diverse as vending machines, dishwashers, dehumidifiers, microwave ovens, residential water heaters, residential refrigerators and freezers, fluorescent lamps, residential clothes dryers, room air conditioners, residential furnaces, residential air conditioners, and battery chargers, just to name a few. In other words, federal agencies must now use the SC-GHG Estimates to calculate regulatory costs and benefits for virtually everything that States and their citizens encounter every day. That means federal agencies will use the SC-GHG Estimates to assign massive— even existential—costs to every regulatory action and "other relevant action," thereby fundamentally transforming the way States conduct business and Americans live. It's no exaggeration to say the SC-GHG Estimates are the most expansive, and potentially most expensive, federal regulatory initiative in history.

7.      Despite their sweeping nature and pervasive effects, the SC-GHG Estimates have never been subject to a proper notice-and-comment process. The federal government's first stab at crafting SC-GHG estimates occurred during the Obama Administration. Those efforts did not follow notice-and-comment procedures that the Administrative Procedure Act requires. Worse yet, those estimates flowed from economic assumptions and methods that broke from statutory and bipartisan Executive Branch policy requiring cost/benefit analysis to (1) focus on domestic (rather than global) effects, and (2) use accepted discount rates for economic forecasts. The Obama Administration's estimates flouted both requirements.

8.      Section 5 of President Biden's EO 13990 picks up right where the Obama Administration left off. His Order purports to establish an Interagency Working Group on the Social Cost of Greenhouse Gases (IWG or Working Group) that, as directed by the Order, issued SC-GHG Estimates within 30 days of the Order. But those Biden SC-GHG Estimates are little more than the Obama Administration's estimates adjusted for inflation. That means the Biden SC-GHG Estimates inherited the same host of procedural and substantive flaws that infected the Obama Administration's estimates.

9.      In short, Section 5 of EO 13990 will remake our federalism balance of power, American life, and the American economy by directing all federal agencies to employ in all their "decisionmaking," including rulemaking, a numeric value for the costs of greenhouse gas emissions that will ensure the most pervasive regulation in American history. The Founders ratified a written Constitution, and Congress enacted the Administrative Procedure Act, to prevent precisely this kind of unilateral and arbitrary attack on State sovereignty and individual liberty. Section 5 of Executive Order 13990 and any regulatory action incorporating the Biden SC-GHG Estimates must be vacated and enjoined.

## PARTIES

10.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Beneath the land in Louisiana's borders, and under the waters of the adjoining Gulf of Mexico, lies vast stores of oil and natural gas. Louisiana is the nation's number two producer of oil, producing almost 1.6 million barrels a day in October 2017 (including production from the Federal Outer Continental Shelf). This represents 16.1 percent of the nation's crude oil production. Louisiana is also in the top five of the nation's producers of natural gas, a critical bridge fuel that supplies the nation's electricity plants, among other critical infrastructure. The energy industry is a leading employer of Louisiana's citizens. Louisiana is also home to robust chemical manufacturing and agricultural industries that provide high-paying jobs to its citizens. The SC-GHG Estimates will directly affect these industries by increasing their regulatory burdens and driving up the price of the electricity they need to stay in business. Additionally, the State must purchase massive quantities of energy in the exercise of its sovereign functions and relies upon such energy to be affordable. Louisiana and its parishes and municipalities receive hundreds of millions of dollars every year from leasing sales under the Outer Continental Shelf Lands Act (OCSLA), the Gulf of Mexico Energy Security Act (GOMESA), and the Mineral Leasing Act (MLA). Critical coastal-restoration and hurricane-protection projects are funded in part by the proceeds of oil and gas lease sales held, and royalties paid, in accordance with those statutes. Those funds are vital to preserving Louisiana's coastline and protecting its ports, through which billions of dollars in U.S. Gross Domestic Product pass annually bringing fuel and food to the rest of the country. Oil and gas development and production are key parts of Louisiana's economy—generating substantial tax revenue, investment, and jobs, all of which Executive Order 13990 will directly harm. Most fundamentally, the SC-GHG Estimates will reach into the lives of each of Louisiana's citizens and harm their personal and economic well-being. Without congressional authorization, the SC-GHG

Estimates will allow federal agencies to control aspects of—and increase prices for—family cars, goods and services sold in retail stores, cooking fuels, refrigerators, microwaves, and virtually every other aspect of Louisiana's families' personal lives. Plaintiff Jeff Landry is the Attorney General of the State of Louisiana. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

11.     Plaintiff State of Alabama is a sovereign state of the United States of America. Alabama sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Steve Marshall is the Attorney General of the State of Alabama. He is authorized by Alabama law to sue on the State's behalf. His offices are located at 501 Washington Avenue, Montgomery, Alabama 36130.

12.     Plaintiff State of Florida is a sovereign state of the United States of America. Florida sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Ashley Moody is the Attorney General of the State of Florida. She is authorized by Florida law to sue on the State's behalf. Her offices are located at The Capitol, PL-01, Tallahassee, Florida 32399.

13.     Plaintiff State of Georgia is a sovereign state of the United States of America. Georgia sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Christopher M. Carr is the Attorney General of the State of Georgia. He is authorized by Georgia law to sue on the State's behalf. His offices are located at 40 Capitol Square SW, Atlanta, Georgia 30334.

14.    Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Kentucky's economy depends on the robust mining of its most precious natural resource—coal. For decades, Kentucky has been one of the top coal-producing states, and it remains among the top five.[1] Coal naturally occurs in nearly half of Kentucky's counties, including 20 counties in the Western Kentucky Coal Field and 37 counties in the Eastern Kentucky Coal Field.[2] Across all four quarters of 2020, Kentucky mined over 23 million tons of coal.[3] This represents an estimated 36% of total U.S. coal production.[4] Despite more than 200 years of continuous mining, Kentucky still has more than 300 billion tons of remaining coal resources.[5] In 2019, about 73% of Kentucky's electricity net generation was coal-fired, the fourth-largest share of any state after West Virginia, Wyoming, and Missouri.[6] In Kentucky, coal literally keeps the lights on.[7] Kentucky also exports its coal resources to neighboring states and to other countries, exporting nearly half of the coal produced in Kentucky.[8] In 2019, Kentucky had the ninth-lowest average electricity retail price of any state and the second-lowest price for a state east of the Mississippi River, and keeping energy costs low benefits Kentucky's economy.[9] Combined with Kentucky's centralized location, Kentucky's low energy prices have helped attract manufacturing industries to the state, including the manufacture of motor vehicles; food and beverages; tobacco products; and chemicals, as well as agriculture and forestry.[10] Kentucky is currently

---

[1] *See* U.S. Energy Information Administration, "Coal FAQ," https://bit.ly/2RHgZvs.

[2] *See* University of Kentucky, *Kentucky Ecological Survey: Coal Fact Sheet*, https://bit.ly/3gpbOuq.

[3] *See* Kentucky Energy & Environment Cabinet, "Quarterly Coal Dashboard," https://bit.ly/32tVnVt.

[4] *See* U.S. Energy Information Administration, "Coal FAQ" *supra*.

[5] *See* University of Kentucky, *supra*.

[6] *See* U.S. Energy Information Administration, "Kentucky State Energy Profile," https://bit.ly/32K5xlj.

[7] *See* Kentucky Energy & Environment Cabinet, *supra* (noting that 79.8% of the electric power consumed in the Commonwealth is coal-generated power).

[8] *See* U.S. Energy Information Administration, "Kentucky State Energy Profile," *supra*.

[9] *See id.*

[10] *See id.*

the number one producer in cars, light trucks, and SUVs per capita.[11] Kentucky is a top producer of stainless steel and is home to the largest stainless steel mill in North America.[12] Kentucky is also home to one of the fastest growing aluminum smelting industries.[13] These types of heavy manufacturing require significant energy resources, and all of these industries contribute greatly to Kentucky's economy and the employment of its citizenry. Kentucky has a special interest in keeping energy costs low; higher energy costs discourage future growth in Kentucky's manufacturing industry, resulting in considerable economic losses and fewer job opportunities for employing Kentuckians. Coal production is a key part of Kentucky's economy. The coal industry provides employment, fuel, tax revenue, and economic growth—all of which Executive Order 13990 will directly harm. Plaintiff Daniel Cameron is the Attorney General of the Commonwealth of Kentucky. He is authorized by Kentucky law to sue on the Commonwealth's behalf. His offices are located at 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601.

15.     Plaintiff State of Mississippi is a sovereign state of the United States of America. Mississippi sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Lynn Fitch is the Attorney General of Mississippi. She is authorized by Mississippi law to sue on the State's behalf. Her offices can be reached at P.O. Box 220, Jackson, Mississippi 39205.

16.     Plaintiff State of South Dakota is a sovereign state of the United States of America. South Dakota sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be

---

[11] *See* Kentucky Cabinet for Economic Development, "Existing Industries," https://bit.ly/3ap9zUa.
[12] *See* Josh Shepherd, "Stainless Steel's Kentucky Home, The Lane Report (July 9, 2015), https://bit.ly/3arytCG.
[13] *See* David Serchuk, "Aluminum: Kentucky's fast-growing, stealth mega-industry" Louisville Insight (Aug. 15, 2014), https://bit.ly/3tEUBRB.

harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Kristi Noem is the Governor of South Dakota. She is authorized by South Dakota law to sue on the State's behalf. Her General Counsel's offices can be reached at 500 East Capitol Avenue Pierre, South Dakota 57501-5070.

17.     Plaintiff State of Texas is a sovereign state of the United States of America. Texas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Ken Paxton is the Attorney General of Texas. He is authorized by Texas law to sue on the State's behalf. His offices can be reached at P.O. Box 12548 (MC 009), Austin, Texas 78711-2548.

18.     Plaintiff State of West Virginia is a sovereign state of the United States of America. West Virginia sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The State will be harmed by the imminent increase in energy prices, infringement upon its sovereign functions, and economic injury to its citizens directly caused by the Biden SC-GHG Estimates. Plaintiff Patrick Morrisey is the Attorney General of West Virginia. He is authorized by West Virginia law to sue on the State's behalf. His offices are located at State Capitol, Bldg 1, Room E-26, Charleston, WV 25305.

19.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, proprietary, and *parens patriae* interests. Nearly fifty percent of Wyoming's total land mass is owned by the federal government and, consequently, a federal authorization of some kind is required for nearly every significant economic activity in the state. This is particularly true for mineral development activities, as the federal government is the largest mineral rights owner in the state. Wyoming has been the nation's leading coal producer since 1986, providing approximately 40 percent of the America's thermal coal requirements. In addition, Wyoming ranked

eighth nationally in production of both crude oil and natural gas in 2019, and in 2020, Wyoming was first in natural gas production on public lands and second in oil production on public lands. In 2020, public lands in Wyoming produced 1.2 trillion cubic feet of natural gas and 43.5 million barrels of oil. Mineral production, particularly on public lands, provides significant revenues for the state. For example, in Fiscal Year 2020, the State received a total of $488,602,812 from federal mineral sales, bonuses, rentals, and royalties. In turn, the minerals industry is one of the state's largest employers. For example, in 2019 Wyoming's petroleum industry directly employed over 19,000 people with an annual payroll of nearly $1.12 billion. Mineral development and production is the very foundation of Wyoming's economy—generating substantial tax revenue, investment, and jobs, all of which Executive Order 13990 will directly harm. Bridget Hill is the Attorney General of Wyoming. She is authorized by Wyoming law to sue on the State's behalf. Her offices are located at 109 State Capitol, Cheyenne, Wyoming 82002.

20.     Defendant Joseph R. Biden, Jr., is President of the United States. On January 20, 2021, he issued Executive Order 13990, purporting to authorize the Working Group to publish binding interim values for the social cost of carbon dioxide, nitrous oxide, and methane. He is sued in his official capacity.

21.     Defendant Cecilia Rouse is the Chairwoman of the Council of Economic Advisers, an entity within the Executive Office of the President (EOP). 15 U.S.C. §1023. She serves as co-chair of the Working Group. She is sued in her official capacity.

22.     Defendant Shalanda Young is the Acting Director of the Office of Management and Budget, an office within the EOP. 31 U.S.C. §501. She serves as co-chair of the Working Group. She is sued in her official capacity.

23.      Defendant Kei Koizumi is the Acting Director of the Office of Science and Technology Policy, an office within the EOP. 42 U.S.C. §6611. He is co-chair of the Working Group. He is sued in his official capacity.

24.      Defendant Janet Yellen is the Secretary of the Treasury and a member of the Working Group. She is sued in her official capacity.

25.      Defendant Deb Haaland is the Secretary of the Interior and a member of the Working Group. She is sued in her official capacity.

26.      Defendant Tom Vilsack is the Secretary of Agriculture and a member of the Working Group. He is sued in his official capacity.

27.      Defendant Gina Raimondo is the Secretary of Commerce and a member of the Working Group. She is sued in her official capacity.

28.      Defendant Xavier Becerra is the Secretary of Health and Human Services and a member of the Working Group. He is sued in his official capacity.

29.      Defendant Pete Buttigieg is the Secretary of Transportation and a member of the Working Group. He is sued in his official capacity.

30.      Defendant Jennifer Granholm is the Secretary of Energy and a member of the Working Group. She is sued in her official capacity.

31.      Defendant Brenda Mallory is the Chairwoman of the Council on Environmental Quality and a member of the Working Group. She is sued in her official capacity.

32.      Defendant Michael S. Regan is the Administrator of the Environmental Protection Agency, an agency of the federal government responsible for implementing certain environmental statutes. He is a member of the Working Group and is sued in his official capacity.

33.      Defendant Gina McCarthy is the White House National Climate Advisor and a member of the Working Group. She is sued in her official capacity.

34.     Defendant Brian Deese is the Director of the National Economic Council and a member of the Working Group. He is sued in his official capacity.

35.     Defendant Jack Danielson is the Executive Director of the National Highway Traffic Safety Administration. He is sued in his official capacity.

36.     Defendant U.S. Environmental Protection Agency (EPA) is a federal cabinet agency responsible for implementing and enforcing a subset of environmental statutes. It is an agency for purposes of the Administrative Procedure Act, 5 U.S.C. §552(f).

37.     Defendant U.S. Department of Energy (DOE) is a federal cabinet agency responsible for implementing and enforcing a subset of energy-related statutes. It is a Department of the Executive Branch, 5 U.S.C. §101, and an agency for purposes of the APA, 5 U.S.C. §552(f).

38.     Defendant U.S. Department of Transportation (DOT) is a federal cabinet agency responsible for implementing and enforcing a subset of transportation-related statutes. It is a Department of the Executive Branch, 5 U.S.C. §101, and an agency for purposes of the APA, 5 U.S.C. §552(f).

39.     Defendant U.S. Department of Agriculture (USDA) is a federal cabinet agency responsible for implementing and enforcing a subset of agriculture-related statutes. It is a Department of the Executive Branch, 5 U.S.C. §101, and an agency for purposes of the APA, 5 U.S.C. §552(f).

40.     Defendant U.S. Department of the Interior (DOI) is a federal cabinet agency responsible for implementing and enforcing, among other things, a subset of statutes relating to the country's interior lands. It is a Department of the Executive Branch, 5 U.S.C. §101, and an agency for purposes of the APA, 5 U.S.C. §552(f).

41.     Defendant National Highway Traffic Safety Administration (NHTSA) is a federal agency within the Department of Transportation. NHTSA is responsible for administering and

enforcing a subset of statutes relating to automobile safety and design. It is an agency for purposes of the APA, 5 U.S.C. §552(f).

42.     Defendant Interagency Working Group on Social Cost of Greenhouse Gases, United States Government is a federal agency within the meaning of 5 U.S.C. §551(1).

## JURISDICTION & VENUE

43.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 2201; 5 U.S.C. §§701-706.

44.     This Court may grant declaratory and injunctive relief under 5 U.S.C. §706, 28 U.S.C. §§2201 and 2202, and its inherent equitable powers.

45.     Venue is proper in this district because Defendants are United States agencies or officers sued in their official capacities, the State of Louisiana is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See* 28 U.S.C. §1391(e)(1).

## BACKGROUND

I.     **Federal Rulemaking Must Comply with the Administrative Procedure Act and Contain a Transparent Cost/Benefit Analysis.**

46.     It's no secret that the structure and scope of today's federal administrative state exceeds anything the Founders could have envisioned. Just as well known are the consequences when the administrative state goes unchecked: "The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people." *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). What's more, federal agency actions that improperly upset the "allocation of powers in our federal system" harm "the integrity, dignity, and residual sovereignty of the States." *Bond v. United States*, 564 U.S. 211, 221 (2011).

47.     But if agencies respect existing guardrails, they can mitigate those problems. Take the Administrative Procedure Act. Subject to limited exceptions, the APA requires agencies to notify the public of proposed rules, give the public a chance to comment on them, and meaningfully consider and respond to the public's feedback before adopting a final rule. 5 U.S.C. §553. And courts can review and set aside rules that are (among other things) arbitrary, capricious, an abuse of discretion, in excess of the agency's statutory jurisdiction or authority, or not in accordance with law. *See* 5 U.S.C. §706(2).

48.     Beyond that, for the better part of 50 years, Presidents of both parties have hewed to a bipartisan consensus that agencies must conduct a cost/benefit analysis as an indispensable part of effective federal rulemaking. Presidents Nixon, Ford, Carter, Reagan, and Clinton each issued orders requiring agencies to perform a cost/benefit analysis of federal rules. *See* Nina A. Mendelson & Jonathan B. Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J.L. & Pub. Pol'y 447, 454-57 (2014). For example, President Reagan issued Executive Order 12291, 46 Fed. Reg. 13,193 (Feb. 17, 1981), specifying that covered agencies may not undertake any "[r]egulatory action" unless "the potential benefits to society … outweigh the potential costs," *id.* §2(b). Under EO 12291, the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget conducts a centralized review of all proposed rules, including agencies' cost/benefit analyses, before proposed and final rules are published in the Federal Register.

49.     President Clinton took President Reagan's cost/benefit mandate a step further in Executive Order 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), which instructs that "[i]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." EO 12866, §1(a). EO 12866 specifies that "[c]osts and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider." *Id.*

50.    To ensure federal agencies used a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions," President George W. Bush's Office of Management and Budget issued Circular A-4 in 2003. Circular A-4, at 1. Circular A-4 gives "highly detailed guidance to the agencies on the key elements of a 'good regulatory analysis' under Executive Order 12,866, including a clear baseline for comparative purposes, specifically stated assumptions, an assessment of the sensitivity of the analytical results to changes in those assumptions, and attention to ancillary impacts." Mendelson & Wiener, *supra*, at 457-58.

51.    Circular A-4 is no fly-by-night document. OMB issued Circular A-4 only after an extensive peer and interagency review and a public notice-and-comment process. *See* Circular A-4, at 1 ("In developing this Circular, OMB first developed a draft that was subject to public comment, interagency review, and peer review."); 68 Fed. Reg. 58,366 (Oct. 9, 2003); OMB, *Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations*, 68 Fed. Reg. 5492 (Feb. 3, 2003) ("OMB seeks public comment on *all aspects* of this Draft Report.") (emphasis added), *id.* at 5513 ("Before issuing the Circular, this draft will go through a process of peer review, public comment and interagency review."); *see also* Cong. Research Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* 5-7 (Dec. 9, 2014).

52.    Circular A-4 contains two instructions of particular relevance here. *First*, Circular A-4 gives specific instructions on the discount rates that agencies should use when determining costs and benefits. Discount rates matter in economic analysis because "[b]enefits and costs do not always take place in the same time period. When they do not, it is incorrect simply to add all of the expected net benefits or costs without taking account of when the[y] actually occur." Circular A-4, at 31. "If benefits or costs are delayed or otherwise separated in time from each other, the difference in timing should be reflected in" an agency's "analysis." *Id.* "Benefits or costs that occur sooner are generally more valuable" because people "plac[e] a higher value on current consumption than on future

consumption." *Id.* at 32. "To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing. The further in the future the benefits and costs are expected to occur, the more they should be discounted." *Id.* "When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits." *Id.*

53.     Based on those economic realities, Circular A-4 instructs agencies to apply discount rates of both 3 percent and 7 percent when doing cost/benefit analysis. OMB did not pluck those numbers from thin air. Rather, the Executive Branch had used a 7 percent rate for more than a decade before Circular A-4 that itself was the product of "extensive internal review and public comment." Circular A-4, at 33. The Executive Branch had long used a 7 percent discount rate because it "reflects the returns to real estate and small business capital as well as corporate capital." *Id.* A 7 percent discount rate thus "approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* But Circular A-4 also recognizes, based on material accumulated in OMB's extensive internal and public review, that a lower discount rate may be appropriate in certain circumstances. So Circular A-4 instructs agencies also to "provide estimates of net benefits using both 3 percent and 7 percent." *Id.* at 34.

54.     *Second*, Circular A-4 directs agencies to consider domestic—rather than global—effects: "Your analysis should focus on benefits and costs that accrue *to citizens and residents of the United States*. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." *Id.* at 15 (emphasis added); *see also Wyoming v. United States Dep't of the Interior*, 2020 WL 7641067, at *21 (D. Wyo. Oct. 8, 2020) (noting that Circular A-4 mandates a national focus); *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018) ("While Plaintiffs argue that the same Circular directs BLM to encompass 'all the

important benefits and costs likely to result from the rule,' including 'any important ancillary benefits,' it does not specifically mandate that agencies consider global impacts.").

## II. President Obama's Administration Sidestepped Those Bipartisan Good-Regulation Mandates When Estimating Monetary Values for the SC-GHG.

55.     The dispute here arises against that well-established backdrop but traces its roots back more than a decade. Back then, environmental activists began urging federal agencies to estimate a monetary cost for increases in carbon dioxide emissions—the social cost of carbon, or SCC—as part of their regulatory cost/benefit analysis for various rulemakings. No statute expressly requires agencies to consider the SCC in rulemaking, but in 2008 the Ninth Circuit required NHTSA to account for the economic effects of a reduction in carbon dioxide emissions when analyzing the regulatory impact of national fuel economy standards. *See Ctr. For Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008).

56.     Seeing an opening based on the Ninth Circuit's opinion, President Obama convened an Interagency Working Group (IWG) in 2009 to establish SCC estimates that *all* agencies would be required to use in their rulemakings. From 2009 to 2016, the IWG released several iterations of the SCC estimates. Then in 2016, the IWG also issued values for the Social Cost of Methane (SCM) and the Social Cost of Nitrous Oxide (SCN). The Obama IWG's processes underlying each of its SCC and SC-GHG Estimates broke from longstanding APA and Circular A-4 requirements. That matters here because—as discussed below—the Biden SC-GHG Estimates that this Complaint challenges pick up right where the flawed Obama SC-GHG estimates left off.

57.     Start by considering the IWG's interim SCC estimates from early 2009. The IWG "did *not* undertake any original analysis. Instead, it combined SCC estimates from the existing literature to use as interim values." IWG 2010 Technical Support Document at 4 (Feb. 2010), https://bit.ly/2RNRoBh (describing 2009 IWG process) (emphasis added). Agencies were to use the interim values "until a more comprehensive analysis could be conducted." *Id.* And even though the

IWG did not solicit public comments in developing the interim SCC values, it still immediately included the estimates in agencies' rulemakings.

58.     Not until the Fall of 2009 did the IWG first try to develop SCC values through original analysis. That analysis involved evaluating more of the technical literature, considering key assumptions and modeling inputs (including discount rates) underlying the resulting SCC values, and running select models to generate the SCC values. A few months later, in the spring of 2010, the IWG issued a technical support document in which it presented its final SCC values and described its methodologies. *Id.* That document disclosed that the IWG used OMB's well-respected Circular A-4 as a starting point but expressly departed from its longstanding methodology in two key ways that resulted in inflated 2010 SCC values. First, the IWG focused on global rather than domestic effects. *Id.* at 10. Second, the IWG settled on discount rates of 2.5, 3, and 5 percent—much lower discount rates than Circular A-4's 3 and 7 percent.[14] *Id.* at 23.

59.     The IWG departed not only from Circular A-4 but also from the APA because it never solicited public comments on the technical support document when it developed the 2010 SCC estimates. Compounding the problem, agencies then applied the 2010 SCC estimates in dozens of rulemakings between 2010 and 2013 without requesting comment on the IWG's 2010 SCC estimates or underlying methodologies.

60.     In 2013, the IWG issued a revised technical support document to present adjustments to the 2010 SCC estimates. In that document, the IWG stuck with its underlying methodologies but

---

[14] "Regulatory Impact Analyses typically simplify comparison of costs and benefits by valuing the streams of future costs and benefits as 'present values.' One debate involves how, in calculating present values, to reflect society's valuation of future benefits compared with values today. Economists use 'discount rates' for these calculations. Higher discount rates give less present value than lower discount rates to benefits or costs that accrue in the future. For climate change, this debate has especially strong implications, because many of the benefits of GHG mitigation would occur generations after the year of emission control." Cong. Research Serv., *Social Costs of Carbon/Greenhouse Gases: Issues for Congress*, IF 10625, at 2 (Sept. 24, 2017), https://bit.ly/32xu8t6.

applied new versions of the underlying models. *See* IWG 2016 TSD at 3. That updated modeling ultimately resulted in a 2013 SCC estimate that was nearly a twofold increase over the 2010 SCC estimate. But even then, the IWG did not solicit public comments on the 2013 technical support document.

61.     The doubling of the SCC estimate in 2013 attracted such stakeholder attention that OMB had no real choice but to initiate its very first public review and comment period for the IWG's SCC estimates. In November 2013, OMB opened a 60-day comment period on the IWG's 2013 SCC estimates and methodologies and later extended the period for an additional 30 days (to February 2014). *See* 78 Fed. Reg. 70,586 (Nov. 26, 2013); 79 Fed. Reg. 4359, 4359 (Jan. 27, 2014). Not surprisingly, members of the public raised concerns with the underlying models that produced the SCC estimates. OMB received over 100 unique comments and thousands of other form-letter comments. *See* GAO-14-663, at 18-19. "The comments covered a wide range of topics including the technical details of the modeling, the aggregation and presentation of the results, and the process by which the SCC estimates were derived." IWG, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* at 4-5 (July 2015).

62.     Equally unsurprising—OMB rejected and ignored the comments. First, OMB rejected comments on the modeling, calling them "out of scope." *See* Response to Comments, Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 3 (July 2015) ("OMB clarified that it was not requesting comments on the three peer-reviewed IAMs themselves."). Second, by its own admission, the Obama Administration affirmatively decided not to address "thoughtful" and "technical" comments it received on issues *other than* modeling—even though those comments arrived in direct response to OMB's request for comments. *See* Written Statement of Dr. Patrick J. Michaels, H. Comm. On Nat. Resources. *Hearing on an Analysis of the Obama Administration's Social Cost of Carbon* 2 (July 22, 2015), https://bit.ly/2PIsEtc ("Of the 140 unique sets of comments received ... the IWG

adopted none."). Instead, the IWG recommended continuing to use the 2013 SCC estimates "until revisions based on the many thoughtful public comments we have received and the independent advice of the Academies can be incorporated into the estimates[.]" *Id.* at 41 (emphasis added). Perhaps least surprising of all—neither OMB nor IWG ever did address the "thoughtful" and "technical" public comments, and thus never revised the SCC values in response to them.[15] *See* Michaels, *supra*, at 2 (noting IWG ignored public input and continued to rely on the substantively unchanged "interim" methodology, which rested on a "set of flimsy, internally inconsistent excuses and amounts to a continuation of the IWG's exclusion of the most relevant science—an exclusion which assures that low, or even negative values of the social cost of carbon (which would imply a net benefit of increased atmospheric carbon dioxide levels), do not find their way into cost/benefit analyses of proposed federal actions").

63.     Even so, the IWG did seek technical assistance and input from the National Academy of Sciences (NAS). And in 2016, after NAS issued an interim report, the IWG issued a revised technical support document. But it was limited—it addressed only NAS's specific recommendations to enhance the presentation and discussion of uncertainty. NAS was to release a final in-depth report in 2017 with longer-term recommendations for a more comprehensive update to the SCC estimates and methodologies. As a result, the SCC estimates themselves remained unchanged in the 2016 technical support document.[16] *See* IWG 2016 TSD at 2.

---

[15] In 2015, the IWG did issue another revised technical support document, but only to make two "minor technical corrections." Response to Comments, at 41.

[16] In the 2016 technical support document, IWG held off on its more comprehensive review to wait for a National Academies of Sciences, Engineering, and Medicine report. IWG, *Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis* 29 (Aug. 2016), https://bit.ly/3swYfLW ("The Academies' final report (expected in early 2017) will provide longer term recommendations for a more comprehensive update.").

64.     Finally, in August 2016, the IWG issued an addendum to its last updated technical support document. That addendum did not change the SCC estimates, but it did establish estimates for the SCM and SCN using methods consistent with those used to establish the SCC estimates.

65.     Whatever else might be said about the IWG's process, it was not a model of reasoned decisionmaking. It suffered from at least six specific flaws.

66.     First, the SCC estimates were harshly criticized by the National Resource Council of NAS as "suffer[ing] from uncertainty, speculation, and lack of information about (1) future emissions of GHGs; (2) the effects of past and future emissions on the climate system, (3) the impact of changes in climate on the physical and biological environment, and (4) the translation of these environmental impacts into economic damages." 79 Fed. Reg. 32,050, 32,094 (June 3, 2014).

67.     Second, the interagency process failed many key good-government transparency standards by failing to disclose the personnel involved or whether outside consultants participated. Those failures violated longstanding OMB guidelines. *See* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8,452 (Feb. 22, 2002).

68.     Third, commentators noted that the analysis for the final SCC estimates relied on flawed and arbitrary damages functions: "These damage functions translate variables, such as projected sea level rise, to estimated economic damages. By their nature, we know very little about the correct functional form of damage functions. According to a well-known economist, '[the model] developers ... can do little more than make up functional forms and corresponding parameter values. And that is pretty much what they have done.'" Chamber of Commerce, IQA Pet., Doc. No. 0079-A2, at 12 (quoting R.S. Pindyck, *Climate Change Policy: What do the Models Tell Us?*, NBER Working Paper Series, WP 19244, at 11 (July 2013)). Even Obama Administration agencies themselves noted that the SCC was not ready for prime time, but continued to implement it anyway. DOE, *Energy*

*Conservation Program: Energy Conservation Standards for Commercial Refrigeration Equipment*, 78 Fed. Reg. 55,890, 55,947 (Sept. 11, 2013) ("The 2009 National Research Council report mentioned above points out that there is tension between the goal of producing quantified estimates of the economic damages from an incremental ton of carbon and the limits of existing efforts to model these effects. There are a number of concerns and problems that should be addressed by the research community, including research programs housed in many of the Federal agencies participating in the interagency process to estimate the SCC. The interagency group intends to periodically review and reconsider those estimates to reflect increasing knowledge of the science and economics of climate impacts, as well as improvements in modeling.").

69.    Fourth, though the relevant statutes direct agencies to consider domestic—not global—costs and benefits, the 2013 SCC estimates measured global harms rather than harms to the United States. Mercatus Center Comments (Nov. 2013), Doc. No. 072-A1, at 2 ("It must also be noted that between 77 and 93 percent of the benefits from reductions in CO2 emissions resulting from this regulation will be captured by foreigners, not by Americans .... While global benefits are useful general information, they should be excluded from the calculation of net benefits from the rule because these are not benefits to American taxpayers, whom the DOE is tasked to serve ....").

70.    Fifth, the IWG did not put the interim or final SCC estimates out for public review and comment. Instead, the Administration followed a piecemeal approach in which "[t]he interim estimates first appeared—and, thus, were first available for public review—in August 2009 in the Department of Energy's final rule on energy standards for vending machines." U.S. Gov't Accountability Office, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates*, GAO-14-663, at 6 (July 2014) (citing Energy Conservation Program: Energy Conservation Standards for Refrigerated Bottled or Canned Beverage Vending Machines, 74 Fed. Reg. 44,914 (Aug. 31, 2009)).

Agencies later incorporated the interim SCC estimates into eight regulatory actions "that sought public comments to inform the development of final estimates for future use." *Id.*

71.     Nor did notice-and-comment rulemaking occur for the IWG's final 2010 SCC estimates or associated technical support document, when IWG first conducted its own original analysis. Despite that failure, multiple agencies applied the 2010 SCC estimates in dozens of rulemakings and other regulatory actions between 2010 and 2013, but those actions failed to sufficiently alert the public to these buried values and the further buried methodology used to calculate them.

72.     To be sure, IWG (through OMB) did once accept public comment on an iteration of a technical support document. But when it did, as explained, it rejected (or ignored) comments on the models underlying the technical support document by claiming those comments were out of scope— not by addressing them on the merits. That means the public never got to comment on the key part of SCC estimates. Response to Comments, Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 3 (July 2015) ("OMB further clarified that it was not requesting comments on the three peer reviewed [integrated assessment models, or] IAMs themselves."). And the IWG did not address many of the more technical or thoughtful comments; it refused to change the SCC in any substantive way "until revisions based on the many thoughtful public comments we have received and the independent advice of the Academies can be incorporated into the estimates." *Id.* at 5. But, as noted, those revisions were never made.

73.     The lack of public review and comment is even more egregious for the SCM and SCN estimates because they were not released until the 2016 technical support document SC-GHG addendum. Not only were they never put out for public comment—they were subject to public scrutiny only in a single DOE rulemaking. *See* Cong. Research Serv., R44657, *Federal Citations to the*

*Social Cost of Greenhouse Gases* at 13 (Mar. 21, 2017), https://bit.ly/32iHrxr; 82 Fed. Reg. 5650 (Jan. 18, 2017).

74.     Sixth, many have noted the sheer substantive uncertainty upon which the SC-GHG estimates were grounded. *See, e.g.*, Cong. Research Serv., *Attaching a Price to Greenhouse Gas Emissions with a Carbon Tax or Emissions Fee: Considerations and Potential Impacts* 6-8 (Mar. 22, 2019), https://bit.ly/3v1oifZ ("One potential challenge of relying on SC-CO2 estimates to set a carbon fee are methodological concerns. ... No estimates of impacts are comprehensive at this time, and many of the risks are difficult to estimate and value. ... In addition, the element of time in climate change impacts particularly complicates the valuation. ... Economists do not agree on the appropriate discount rate(s) to use for a multi-generational, largely non-market issue such as human-induced climate change.").

75.     Though executive agencies subject to EO 12866 were compelled to use the IWG's final SC-GHG estimates, the numbers received a cold reception from the Federal Energy Regulatory Commission, which declined to use the SC-GHG. FERC found that "it would not be appropriate or informative to use" IWG's SC-GHG estimates "for three reasons: the lack of consensus on the appropriate discount rate leads to 'significant variation in output[,]' the tool 'does not measure the actual incremental impacts of a project on the environment[,]' and 'there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes.'" *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016) (quoting *Dominion Cove Point LNG, LP*, 151 F.E.R.C. ¶61,095 (2015)). The D.C. Circuit upheld FERC's "finding [that] the tool [is] inadequately accurate." *Id.*

## III.     The Trump Administration Reverts to Prior, Bipartisan Good-Regulation Practices to Recalculate the SC-GHG Estimates.

76.     Recognizing the substantive and procedural flaws in the IWG's SC-GHG estimates, President Trump issued Executive Order 13783, which disbanded the IWG and rescinded its technical

support documents setting out the SC-GHG estimates. EO 13783 also directed agencies to return to using OMB Circular A-4 to guide their monetization of the value of changes in greenhouse gas emissions.

77.     In accordance with EO 13783, agencies in the Trump Administration employed Circular A-4's longstanding discount rates and focus on domestic costs and benefits.

78.     For example, the EPA promulgated new SCC values that it based upon Circular A-4's widely accepted methodology. Kate C. Shouse, Cong. Research Serv., *EPA's Proposal to Repeal the Clean Power Plan: Benefits and Costs*, at 9 (Feb. 28, 2018), https://bit.ly/3v1pmjZ. Under this model, EPA found the SCC to be $7 per metric ton at a 3 percent discount rate and $1 per metric ton at a 7 percent discount rate. GAO-20-254, at 57-58. EPA also determined the SCM to be $184 per metric ton at a 3 percent discount rate and $57 per metric ton at a 7 percent discount rate. *Id.* NHTSA employed this methodology to determine that the SCN was $2,820 per metric ton. GAO, GAO-20-254, *Social Cost of Carbon:  Identifying a Federal Entity to Address the National Academies' Recommendations Could Strengthen Regulatory Analysis*, at 58 n.3 (June 2020), https://bit.ly/3xaCjcY.

IV.    **President Biden Issues Executive Order 13990, Shunning Longstanding Bipartisan Good-Regulatory Practices.**

79.     On January 20, 2021, President Biden issued Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis." 86 Fed. Reg. 7037 (Jan. 20, 2021).

80.     Section 5 of EO 13990 directs all federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. at 7040. To this end, EO 13990 provides that "[t]here is hereby established an interagency Working Group on the Social Cost of Greenhouse Gases (the 'Working Group'). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group." *Id.* The Order provides that "[t]he

Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council." *Id.*

81.     The key provision of EO 13990 regarding SC-GHG is §5(b)(ii)(A), which provides that "the Working Group shall … publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies *shall* use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." *Id.* (emphasis added). This provision strips all federal agencies of discretion when it comes to SC-GHG Estimates. Its directive is unambiguous: Agencies "shall" use the Working Group's values in "regulations and other relevant agency actions" as soon as they are published. *Id.*

82.     EO 13990 cites no statutory authority for its creation of the Working Group. Nor does EO 13990 cite statutory authority for the directive to agencies to treat the Working Group's interim SC-GHG Estimates as binding.

## V.     The Biden Working Group Releases SC-GHG Estimates Effectively Identical to the Discredited Obama Administration's SC-GHG Values.

83.     On February 26, 2021, the Working Group released the SC-GHG estimates that EO 13990 commands agencies to use. *See* Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb. 26, 2021), https://bit.ly/3nc5gB3 ("Biden SC-GHG Estimates").

84.     The Biden SC-GHG Estimates are identical to those issued by the Obama Administration in the 2016 Technical Support Document and addendum, adjusted for inflation. The

Biden SC-GHG Estimates represent a radical departure from the Trump Administration's values—comparing 2020 values using a 3 percent discount rate, they raise the social cost of carbon from $7 (2018 dollars) per metric ton to $51 per metric ton (2020 dollars); the social cost of methane from $184 per metric ton (2018 dollars) to $1,500 per metric ton (2020 dollars); and the social cost of nitrous oxide from $2,800 per metric ton (2018 dollars) to $18,000 per metric ton (2020 dollars).

85.     Despite EO 13990's directive to the Working Group to "solicit public comment; engage with the public and stakeholders; [and] seek the advice of ethics experts," the Working Group did not solicit or receive such comments or input before publishing the binding Biden SC-GHG Estimates.

86.     The Biden SC-GHG Estimates define the "social cost of greenhouse gases" as "the monetary value of the net harm to society associated with adding a small amount of that GHG to the atmosphere in a given year." *Id.* at 2. The Working Group admits that the task of calculating SC-GHG is inherently a matter of policy and value judgments rather than science. *See, e.g.*, *id.* at 27. Additionally, the Working Group acknowledges that it engages in an inherently legislative function by balancing "affected interests" such as "net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services." *Id.* at 2.

87.     Additionally, the Working Group admits that it has tried, in a thirty-day process with no public comment, to predict the effects of "political destabilization and global migration," along with developments in technology, industrial policy, and geopolitics. *See, e.g.*, *id.* at 15, 30.

88.     Two of the Biden SC-GHG Estimates' most significant changes from the previous Administration's values are (1) their approach to discount rates, and (2) their focus on global effects.

89.     As in all forward-looking economic estimates, the discount rate is essential to the Biden SC-GHG Estimates. The lower the percentage discount rate, the higher the current cost of the

emission. *See id.* at 17 ("Given the long time horizon over which the damages are expected to occur, the discount rate has a large influence on the present value of future damages."); *see also id.* at 5 (noting range of SCC varied from $14 per metric ton to $152 per metric ton depending on discount rate used). Despite the key importance of the discount rate, the Working Group effectively acknowledged the inadequacy and inherently legislative nature of its rates: "[T]he choice of a discount rate ... raises highly contested and exceedingly difficult questions of science, economics, ethics, and law." *Id.* at 17; *see also id.* at 3 (discount rates rest in part on "intergenerational ethical considerations"); *id.* at 27 ("[T]he range of discount rates reflects both uncertainty and, at least in part, different policy or value judgments.").

90.     Further demonstrating the nonscientific, legislative nature of estimating SC-GHG, different political entities reach widely differing conclusions about the appropriate SCC range, with values ranging from $1-$7 per metric ton in the Trump Administration to $125 per metric ton in New York (using a 2 percent discount rate) to $107-$348 per metric ton in Canada to over $800 per metric ton in Germany. *Id.* at 35; *see also* Gernot Wagner *et al.*, Eight Priorities for Calculating the Social Cost of Carbon, NATURE (Feb. 19, 2021), *at* https://go.nature.com/2RQXiBL.

91.     The Biden SC-GHG Estimates instruct agencies to use the 3 percent discount rate as a baseline, but also encourage them to use a lower discount rate, which would substantially increase cost estimates. The Biden SC-GHG Estimates also authorize agencies to use a 2.5 percent and 5 percent discount rate. The Biden SC-GHG Estimates do not allow agencies to use the standard 7 percent discount rate authorized by Circular A-4. Indeed, while Circular A-4 sets out a process to guide agencies in determining costs and benefits, the Biden SC-GHG Estimates specifically prescribe the exact baseline cost value. Thus, under Circular A-4, the agencies remain in the driver's seat to exercise their statutorily vested responsibilities, while under the Biden SC-GHG Estimates, the IWG has dictated a specific number, usurping the authority vested in agencies by statute.

92.     The Biden SC-GHG Estimates declare the SCC to be $51 per metric ton, the SCM to be $1,500 per metric ton, and the SCN to be $18,000 per metric ton, *id.* at 4-6—a six- to eight-fold increase over the Trump Administration's SC-GHG Values of $7 per metric ton, $184 per metric ton, and $2,800 per metric ton, respectively. The Biden SC-GHG Estimates for carbon, methane, and nitrous oxide also increase over time—to $85, $3100, and $33,000 respectively in 2050. The Working Group, however, immediately admits that these numbers are not the correct values, though in its view they "underestimate" the cost. *Id.* at 4.

93.     According to EPA, in 2019—the most recent year for which data is available—the United States emitted 5.274 billion metric tons of carbon dioxide, 660.1 million metric tons of methane, and 457.8 million metric tons of nitrous oxide. EPA, *Draft Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2019* 2-3 (Feb. 12, 2021) (Table 2-1), https://bit.ly/3dxdiRO.

94.     Assuming emission rates hold constant between 2019 and 2020, using the Working Group's estimates of the social costs of those three gases, the total social cost of carbon in 2020 was approximately $269 billion, the social cost of methane in 2020 was approximately $990 billion, and the social cost of nitrous oxide in 2020 was approximately $8.24 trillion. Collectively, using the Working Group's values at the principal discount rate of 3 percent, the collective social cost of all three gases in 2020 would be approximately $9.5 trillion. This number gives some idea of the magnitude of the regulatory costs on the States and the American economy that the Interim Values would justify. And the Working Group authorizes agencies to employ discount rates lower than 3 percent, which would greatly increase the social cost values.

95.     The Biden SC-GHG Estimates will directly, imminently, and inevitably entail a massive expansion of the federal government's regulatory power and justify unprecedented increases in regulatory restrictions on agriculture, energy, and virtually every other human activity. EO 13990's command that agencies "shall" use these values in their regulatory activity confirms that significant

regulatory infringements upon the States and their citizens will occur imminently. The costs to the national economy caused by the Biden SC-GHG Estimates will be in the hundreds of billions or trillions of dollars. Those costs pose existential threats to Plaintiff States and their citizens.

## VI.  The Working Group Published the Biden SC-GHG Estimates Without Complying with the Administrative Procedure Act's Notice-and-Comment Requirements.

96.     The Biden SC-GHG Estimates are final agency action for purposes of the Administrative Procedure Act because they "mark[] the consummation of the agency's decisionmaking process" and "legal consequences" will flow from them. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

97.     Agency action must be set aside if it is taken "without observance of procedure required by law." 5 U.S.C. §706(2)(D). Unless covered by an exception, all agency rules must go through the APA's notice-and-comment process. *Texas v. United States*, 2021 WL 723856, at *43 (S.D. Tex. Feb. 23, 2021). A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," including "the approval or prescription . . . of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. §551(4). This includes "virtually every statement an agency can make." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983). No exemption to notice-and-comment procedures applies here because the Biden SC-GHG Estimates are not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. §553(b)(A); *see also Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (exceptions to notice and comment "must be narrowly construed"); *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) ("'Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated.'"). Rather, they set out a substantive rule of decision that agencies must follow when regulating. *See Prof'ls.*

*& Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *Texas*, 809 F.3d at 171 ("'[I]f a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.'"). The Biden SC-GHG Estimates did not go through notice and comment nor are they subject to a notice-and-comment exception. Accordingly, they must be vacated. 5 U.S.C. §706(2)(D).

98.     Additionally, an agency must "follow the same process to revise a rule as it used to promulgate it." *Clean Water Action v. United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015)). The Biden SC-GHG Estimates effectively repeal key provisions of two regulatory actions that went through notice-and-comment rulemaking.

99.     First, Circular A-4 was promulgated after an exhaustive process that included public comments. *See* 68 Fed. Reg. at 58,366 ("The draft was subject to public comment, external peer review, and interagency review."); *see also* Circular A-4, at 1 (detailing public comment period); OMB, *Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations*, 68 Fed. Reg. 5492 (Feb. 3, 2003) (detailing comment period); *id.* at 5513 (same); Cong. Research Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* 5-7 (Dec. 9, 2014) (same).

100.     Second, the Biden SC-GHG Estimates modify the requirements of the Council on Environmental Quality's (CEQ) recent NEPA final rule, which amended the causation standard to exclude effects that "are remote in time, geographically remote, or the product of a lengthy causal chain." CEQ, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304, 43,375 (July 16, 2020). The Biden SC-GHG Estimates *sub silentio* reject this standard, which was promulgated after an extensive notice-and-comment period in which CEQ issued both an Advanced Notice of Proposed Rulemaking and a proposed rule—and received over 1

million comments.[17] Without any mention of this causation standard, the IWG instead broadens the geographic and temporal scope of considered effects beyond any causation standard ever employed in federal regulatory analysis. Although "agencies may amend rules," they must "use the same procedures when they amend … a rule as they used to issue the rule in the first instance." *Clean Water Action*, 936 F.3d at 313-14 (quoting *Perez*, 575 U.S. at 101). Because the IWG failed to do so, the Biden SC-GHG Estimates were promulgated "without observance of procedure required by law." 5 U.S.C. §706(2)(D).

## VII.    The Biden SC-GHG Estimates Are Arbitrary and Capricious under the APA.

101.    The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas*, 2021 WL 723856, at *39. "This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.* "More specifically, 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.*

102.    The Biden SC-GHG Estimates are arbitrary and capricious because the IWG readopted an obsolete and flawed methodology without considering changed circumstances in a rushed thirty-day sprint to impose a rule that will fundamentally reorder the U.S. economy. *Cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each

---

[17] EO 13990 purports to withdraw CEQ's 2020 guidance by fiat. But, as discussed throughout this Complaint, an Executive Order cannot override the APA's procedures. The guidance, which was promulgated after notice and comment, remains in force until *lawfully* rescinded. *See Clean Water Action*, 936 F.3d at 313.

new administration. The APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations."). Several aspects of the Biden SC-GHG Estimates are independently sufficient reasons to vacate the rule as arbitrary and capricious.

103. *First*, the Biden SC-GHG Estimates fail to consider the positive externalities of energy production. Affordable energy promotes economic development, jobs, economic independence, energy independence, and a peaceful geopolitical climate. The Working Group did not consider any of those factors. Instead, it went out of its way to continue the flawed practice of relying upon integrated assessment models (IAMs) that arbitrarily refuse to consider the potential benefits of a warming climate. For example, the DICE model focuses exclusively upon increased mortality from warming-related diseases but ignores decreased mortality from wintertime mortality. *See* Susan E. Dudley *et al.*, *The Office of Management and Budget's Draft 2010 Report to Congress on the Benefits and Costs of Federal Regulations*, at 12, GW Regulatory Studies Center, https://bit.ly/3euQiCf. Both the IWG and the underlying models systematically refuse to consider the economic and health benefits, indicating a determination to bend science to a particular policy outcome.

104. *Second*, the Working Group failed to consider or even once mention whether "there was 'legitimate reliance' on the" prior administration's method of focusing on domestic effects and using higher discount rates. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). That was arbitrary and capricious; when, as here, "an agency changes course … it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). The Biden SCC Estimates will affect a number of cooperative federalism programs, and Plaintiff States have taken actions in reliance upon the previous Administration's SCC findings. *See, e.g.*, 24 C.F.R. §58.1 *et seq.* (State recipients of HUD assistance must assume responsibility for environmental review). But the IWG never once addresses

these significant interests that will be undone by the radically higher Biden SC-GHG Estimates. It missed—or altogether ignored—this important part of the problem. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

105.    *Third*, the Trump Administration made specific factual findings justifying its reliance on Circular A-4 in several regulatory proceedings. *See, e.g.*, EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal*, at 42-46 (Oct. 2017) (hereinafter "2017 RIA"), https://bit.ly/2QGzakr. Because it was contradicting these prior findings of fact, IWG was required to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But it failed to do so and instead rushed out the Biden SC-GHG Estimates in order to comply with Executive Order 13990's arbitrary deadline. The rushed nature of the Biden SC-GHG Estimates demonstrates that their cursory reasons are pretext. The real reason they rushed these estimates of vast economic significance out the door? To score political points. No other reason is offered for the hurried nature of this regulatory process. Thirty days "did not leave much time for reflection and analysis." *Texas*, 2021 WL 723856, at *41. And the "significant mismatch" between the decision and the administrative rationale indicates a lack of reasoned decisionmaking and pretext. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process. It is rare to review a record as extensive as the one before us when evaluating informal agency action—and it should be. But having done so for the sufficient reasons we have explained, we cannot ignore the disconnect between the decision made and the explanation given.").[18]

---

[18] Plaintiff States intend to seek discovery about why the Working Group did not field public comment, and about other aspects of this opaque process.

106.    *Fourth*, the IWG fails to justify its focus on global rather than domestic costs. Circular A-4 provides that analysis of economically significant proposed and final regulations "should focus on benefits and costs that accrue to citizens and residents of the United States." Circular A-4, at 15. The IWG explicitly rejects this process not by acknowledging that it is repudiating Circular A-4, but instead by attempting to argue that its global focus is somehow consistent with Circular A-4's provision of a domestic framework. *But see Fox Television Stations*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *Dep't of Homeland Sec.*, 140 S. Ct. at 1913 ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'").

107.    *Fifth*, the IWG fails to provide reasoning behind the chosen discount rates. Years of prior Executive Branch cost/benefit analysis had settled on standard discount rates of 3 percent and 7 percent. IWG fundamentally changes this decades-long practice based on the thinnest reasoning. The IWG directs agencies to cut out the 7 percent discount rate entirely and exclusively employ low discount rates. But, as Circular A-4 explained, the 7 percent rate is essential to reasoned decisionmaking because "it is a broad measure that reflects the returns to real estate and small business capital as well as corporate capital" and "approximates the opportunity cost of capital." Circular A-4, at 33. Therefore, the 7 percent discount rate "is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* The IWG does not attempt to assert that the fundamentals of economics have changed in a manner to alter the importance of the 7 percent discount rate. Instead, it ignores the effects that regulations will have on "the use of capital in the private sector," an indispensable variable when calculating regulatory costs. This reliance on low discount rates arbitrarily inflates the Biden SC-GHG Estimates and ignores the

reasoned economic models employed in cost/benefit analysis for decades. Indeed, by ignoring the private sector, these lower discount rates will endanger rather than help future generations by "crowding out private investments with a higher rate of return." *See* Dudley, *supra*, at 15 ("Future generations may well question why government policy limited them to receiving only a 3 percent rate of return, when investments with much higher rates of return were available and would have done far more to improve their welfare.").

108.    *Sixth*, the Biden SC-GHG Estimates are based on models and calculations developed during the Obama Administration's flawed 2010 to 2016 processes. Those models were flawed then; they remain flawed now, and they're obsolete too. Indeed, the inadequacy of the models underlying the Biden SC-GHG Estimates appears to be the only thing that all interested parties agree upon. Agencies selecting regulatory values need not choose the same numbers a court would, but they must rely upon "some relevant and creditable methodological evidence." *Settling Devotional Claimants v. Copyright Royalty Bd.*, 797 F.3d 1106, 1121 (D.C. Cir. 2015). The IWG, by contrast, merely readopted a previous measure based on models it *admits* are insufficient just so it could comply with Executive Order 13990. Such an "arbitrary splitting of the baby" is not reasoned decisionmaking. *Id.* at 1109 ("King Solomon was not subject to the Administrative Procedure Act.").

109.    *Seventh*, the IWG issued the Biden SC-GHG Estimates without considering the statutory factors and restraints under which agencies must operate. For example, the IWG does not consider that statutes require a focus on *domestic* considerations—not global ones—in regulating energy. Take the Environmental Policy and Conservation Act (EPCA). Its text and history demonstrate that its purpose is to guarantee this Nation's welfare and energy conservation, not the wellbeing of other countries. 42 U.S.C. §6295(o)(2)(B)(i)(VI) (referring to "the need for *national* energy and water conservation") (emphasis added). To this end, EPCA authorizes DOE to conduct only a national analysis. This plain textual directive to consider national effects, coupled with silence on

global effect, confirms that DOE may consider only national costs in regulating. *Cf. Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Similarly, the Clean Air Act instructs agencies "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the *productive capacity* of *its population*." 42 U.S.C. §7401(b)(1) (emphasis added); *see also* 42 U.S.C. §4331(b)(2) (NEPA directive to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings") (emphasis added). Just as FERC found in 2015 that "it would not be appropriate or informative to use" the Obama IWG's SC-GHG estimate, *EarthReports, Inc.*, 828 F.3d at 956, the Biden IWG's estimates are equally (or more) flawed; the Biden SC-GHG Estimates, for example, still do not consider the national focus Congress set out in these pathmarking environmental statutes. Because the IWG relies "on factors which Congress had not intended it to consider," the Biden SC-GHG Estimates are arbitrary and capricious. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43).

110.    *Eighth*, neither this iteration of the IWG nor the Obama Administration's process considered the significant costs to Federal-State relations and significant burdens that these SC-GHG Estimates impose on State sovereignty. The higher Biden SC-GHG Estimates that the IWG has imposed will encroach on the States' traditional police power. As of mid-2016, the SC-GHG was employed in "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have used the SCC or SCM in their analyses." Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017). These regulatory actions encroach into nearly every facet of life regulated, if at all, by the States; these include federal regulatory action on vending machines, dishwashers, dehumidifiers, microwave ovens, residential water heaters, residential refrigerators and freezers, fluorescent lamps, residential clothes dryers, room air conditioners,

residential furnaces, residential air conditioners, and battery chargers. Apart from displacing States' traditional sovereign authority over those areas and other agriculture and energy regulation, the SCC will significantly restructure the cooperative federalism programs the States have come to rely on and that were key to the enactment of fundamental environmental and energy statutes. States have a significant role to play in conducting NEPA analysis, preparing and submitting implementation plans, and a myriad of other cooperative regulatory programs. *See infra*. The IWG has never considered how its fundamental changes to SC-GHG will affect these programs and impose significant burdens on the States.

111.    *Ninth*, the IWG failed to consider the effects that increased Biden SC-GHG Estimates will have upon State revenues. The Biden SC-GHG Estimates will result in significantly fewer tracts of land being made available for lease sales. And they will greatly increase the difficulty of obtaining development permits under OCSLA and the MLA due to the distortions caused in the environmental impact statements required for public lands and water development. *See infra*. States rely heavily upon the revenue from these lease sales and development royalties to fund environmental restoration projects. This constitutes yet another important aspect of the problem that IWG failed to recognize. States will also be required to shoulder increased regulatory costs, increased costs of projects due to the delays in NEPA studies, and increased shared costs imposed under the Stafford Act and HUD programs by the Corps of Engineers for projects related to disaster preparedness, response, and recovery. The Biden SC-GHG Estimates will also affect other industrial and farming practices and ultimately increase costs that consumers and the States for pay for food, bottled water, supplies, and other commodities.

112.    In sum, the IWG's SC-GHG was not reasoned in 2016, and it is even less so today.

**VIII. The Biden SC-GHG Estimates Are Contrary to Law.**

113. Under the APA, an agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). SC-GHG contravenes several statutes by directing agencies to consider factors Congress did not authorize them to consider and causing delays in mandatory energy development on public lands and waters.

114. The Biden SC-GHG Estimates contravene EPCA, which directs DOE to focus on only national effects, not global ones. To this end, EPCA authorizes the Secretary of Energy to conduct a cost/benefit analysis expressly limited to "the need for national energy and water conservation." 42 U.S.C. §6295(o)(2)(B)(i)(VI).

115. The Biden SC-GHG Estimates contravene the Clean Air Act, which instructs agencies "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the productive capacity of *its population*." 42 U.S.C. §7401(b)(1) (emphasis added). It also directs that most standards include economic considerations in standard-setting. *See, e.g.*, 42 U.S.C. §§7411 (standards of performance for source categories requiring them to take into account cost of achieving reductions and non-air quality health and environmental impacts and energy requirements *after notice and comment*), 7412 (requiring consideration of costs and energy among other factors in establishing technology and residual risk standards applicable to hazardous air pollutant emissions *after notice and comment*), 7479 (requiring consideration of energy, environmental impacts and other costs in establishing case-by-case technology requirements *after notice and comment*).

116. The Biden SC-GHG Estimates contravene NEPA, which directs agencies to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. §4331(b)(2) (emphasis added). NEPA's structure also confirms that agencies may consider only national costs. When Congress authorizes agencies to consider international benefits and costs, it does so expressly as it did in NEPA's provision about international agreements. That authorizes the

Executive Branch to "lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." 42 U.S.C. §4332(F). Congress allows agencies to consider global effects only by clear statutory commands.

117.   The Biden SC-GHG Estimates contravene the MLA, which directs the Secretary of the Interior to "'promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise,'" "'obtain for the public reasonable financial returns on assets belonging to the public,'" *Wyoming*, 2020 WL 7641067, at *8, and "provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas," *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984). The Biden SC-GHG Estimates will inevitably lead to fewer lease-sale and permit approvals due to the flawed Environmental Impact Statements that the Secretary must prepare, under Executive Order 13990, in reliance upon the IWG's work. The Biden SC-GHG Estimates thus contravene the Secretary's duty to ensure the expeditious development of public land. And the SC-GHG Estimates require BLM to contravene the MLA by relying upon global costs rather than national costs. *See Wyoming*, 2020 WL 7641067, at *20 ("[T]he Court questions whether the 'social cost of methane' – particularly on a global scale – is a factor Congress intended BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority. It seems an unreasonable stretch to interpret BLM's authority under the MLA to require lease provisions 'for the safeguarding of the public welfare' (30 U.S.C. § 187) as congressional intent that the BLM consider this ancillary air quality benefit.").

118.   The Biden SC-GHG Estimates contravene OCSLA by disrupting its carefully crafted statutory leasing program, which promotes the development of resources on the Outer Continental Shelf. 43 U.S.C. §§1332, 1337, 1340, 1344, 1345, 1351. By inevitably restricting the number of land

sales that will made available, and making it harder to obtain drilling permits, the Biden SC-GHG Estimates contravene the Secretary of the Interior's duty to make the Outer Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development").

## IX.    The President and the IWG Lack Authority to Promulgate and Enforce the SC-GHG.

119.    The Biden SC-GHG Estimates are also beyond the statutory authority of the President, the IWG, and any agency that seeks to employ them. Considering global effects in cost/benefit analysis is a decision of major national magnitude. Indeed, as all sides recognize, the methodology behind any SC-GHG Estimates will fundamentally transform regulatory analysis and the national economy. Yet neither the President nor the IWG points to statutory authority authorizing SC-GHG values to consider global effects. Indeed, as discussed, whenever statutes speak of considering effects in the regulatory context, they specify domestic effects.

120.    "In order for an executive or independent agency to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) (citing *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218 (1994); Stephen A. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986)). On topics touching SC-GHG analysis, Congress has expressly legislated with an eye toward only domestic effects and has legislated against

the backdrop of OMB's longstanding standard 3 percent and 7 percent discount rates. The Executive cannot "bring about an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.*, 573 U.S. at 324; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (rejecting Executive claim to "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization). But that is precisely what President Biden has done through fiat. If Congress wishes to authorize the President to implement sweeping new costs for greenhouse gas effects—and test the limits of its power under the nondelegation doctrine and the Federal Government's power under the Commerce Clause and Tenth Amendment—it must do so clearly. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) ("Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."); *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984) ("Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance.").

## X.   The Biden SC-GHG Estimates and Executive Order 13990 Will Result in Direct, Concrete Harm to Plaintiff States.

121.   The challenged actions will cause harm to Plaintiff States' sovereign, proprietary, and *parens patriae* interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518-520 (2007) (States afforded "special solicitude" in standing inquiry); *see also Texas*, 809 F.3d at 151-55 (same).

122.   Plaintiff States are substantial producers of energy and rely upon the tax revenue from energy production to perform sovereign functions. Regulatory programs such as NAAQS and regulation of power plants will necessarily increase in stringency due to the increased Biden SC-GHG Estimates.

123.     SC-GHG will impose additional duties upon Plaintiff States when exercising their cooperative federalism functions and administering environmental and energy regulatory programs. The Biden SC-GHG Estimates have a direct and imminent impact on state agencies under cooperative federalism programs such as the National Ambient Air Quality Standards (NAAQS), 42 U.S.C. §7410; point-source power plant implementation and enforcement, 42 U.S.C. §7411; Housing and Urban Development assistance environmental review, 24 C.F.R. §§58.1, 58.4; Federal Highway Administration highway project environmental review, 23 U.S.C. §327; and other NEPA reviews States undertake as "joint lead agencies" with the federal government, *see, e.g.*, 42 U.S.C. §4332(D); 40 C.F.R. §1501.7(b). SC-GHG will impose additional obligations on the States and compel them to employ an illegal methodology as a condition of approving significant funding and State environmental implementation plans. States will now have to employ the Biden SC-GHG Estimates in their sovereign capacities, despite the legal objections of State officers. And state-led road and bridge construction and other critical infrastructure projects—including environmental protection and hurricane resiliency and recovery projects—may be delayed and will face an increased risk of being subjected to legal challenges due the illegal methodology incorporated into the NEPA studies.

124.     Further demonstrating the concrete harm being wrought by the IWG's SCC-GHG Estimates, EPA has publicly released a final rule imposing more stringent NAAQS good-neighbor Federal Implementation Plans (FIPs) upon several states, including Louisiana, Kentucky, and Texas, under the Clean Air Act. *See* EPA, *Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS* (Mar. 15, 2021), https://bit.ly/3ehDkY9. This rule explicitly relies upon the revised SCC-GHG Estimates in calculating the costs and benefits and justifying the increased stringency. *See id.* at 342 ("We emphasize the importance and value of considering the benefits calculated using all four SC-CO2 estimates. As discussed in Chapter 5 of the RIA and in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (IWG

2021), a consideration of climate benefits calculated using discount rates below 3 percent, including 2

percent and lower, are also warranted when discounting intergenerational impacts."); *see also id.* at 27,

343, 344, 345, 346.

125.    States have standing to challenge alterations to such cooperative federalism programs.

*See State of Fla. v. Weinberger*, 492 F.2d 488, 494 (5th Cir. 1974) ("It seems clear that, considerations of

ripeness and sovereign immunity aside, the State of Florida has standing, arising from its clear interest

both in the manner in which the Medicaid program is administered vis-a-vis its citizens and in being

spared the reconstitution of its statutory program, to litigate the merits of this case."); *see also New Jersey*

*v. Env't Prot. Agency*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) ("EPA's actions injure states when those

actions necessitate changes to state laws and make 'the states' task of devising an adequate SIP' 'more

difficult and onerous.'"); *W. Virginia v. E.P.A.*, 362 F.3d 861, 868 (D.C. Cir. 2004) ("The NOx SIP

Call directs each state to revise its SIP in accordance with EPA's NOx emissions budget for the state.

The lower the emissions budget, the more difficult and onerous is the states' task of devising an

adequate SIP. ... This injury is sufficient to confer standing."); *City of Davis v. Coleman*, 521 F.2d 661,

672 (9th Cir. 1975) (municipality has standing and was within zone of interests to challenge federal

agency procedure under NEPA because "statute expressly contemplates that state and local

governments are to play an important role in the effectuation of national environmental policy"); *State*

*of N.M. v. U.S. Dep't of Hous. & Urb. Dev.*, 1987 WL 109007, at *2 (10th Cir. Jan. 7, 1987) ("This

congressional intention to involve the states in the preparation and promulgation of standards

supports the conclusion that New Mexico has standing to challenge HUD standards. To conclude

otherwise would frustrate the congressional policy to encourage the cooperation of the states in the

development and enforcement of HUD standards."); *State of Louisiana Through Dep't of Com. & Indus.*

*v. Weinberger*, 404 F. Supp. 894, 896 (E.D. La. 1975).

126.    The Biden SC-GHG Estimates increase the reach of federal regulation into areas traditionally regulated by the States, harming the States' reserved power to regulate and promote the health, safety, morals, and general welfare of their people.

127.    Several Plaintiff States derive substantial revenue from oil and gas leasing on federal lands and the Outer Continental Shelf. Those revenues will shrink because the Biden SC-GHG Estimates will limit the scope of public lands and waters that BLM and BOEM make available for exploration and development. *See Dep't of Energy v. State of Louisiana*, 690 F.2d 180, 187 (Temp. Emer. Ct. App. 1982); *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1373 (W.D. La. 1981), *aff'd sub nom.* 690 F.2d 180 ("[T]he [Supreme] Court recognized the principle that lost tax revenues could confer standing where there existed 'some fairly direct link between the state's status as a collector and recipient of revenues, and the legislative or administrative action being challenged.'"). In addition, the net revenues and royalties derived from those leases that survive the Biden Administration's assault will be diminished by the increased costs of production.

128.    The Biden SC-GHG Estimates threaten the coastline of Plaintiff State of Louisiana by directly reducing the funds necessary to restore and maintain the State's coastal lands. *Cf. Massachusetts*, 549 U.S. at 519 & n.17 (State's "independent interest 'in all the earth and air within its domain'" and "well-founded desire to preserve its sovereign territory" supports standing).[19] The deprivation of those funds directly harms Louisiana's territory. Louisiana is losing swaths of coastal land—nearly two thousand square miles and counting—due to follow-on effects from environmental catastrophes. *See* LCPRA, "Coastal Crisis," https://bit.ly/3ewyqZ3; *see also* USGS, Land Area Change in Coastal

---

[19] OCSLA leases themselves often provide essential materials for the restoration of Louisiana's coastline. *See, e.g.*, "BOEM Announces Restoration Project for Louisiana's Gulf Coast" (June 4, 2019), https://bit.ly/3bFNC4p ("BOEM has issued 58 leases to convey over 162 million cubic yards of OCS sand for projects to restore approximately 346 miles of the U.S. Atlantic and Gulf Coasts. Approximately 63 million cubic yards of OCS sand have been leased to restore Louisiana's coast.").

Louisiana (1932 to 2016), https://bit.ly/38ySDcU ("To put these numbers into perspective, this equates to long-term average loss rates of approximately an American football field's worth of coastal wetlands within 34 minutes when losses are rapid to within 100 minutes at more recent, slower rates.").

129.    The Biden SC-GHG Estimates will threaten the economic well-being of Plaintiff Commonwealth of Kentucky by directly reducing Kentucky's coal severance tax revenues. Kentucky law imposes a 4.5% tax on the gross value of all coal severed or processed for the privilege of severing or processing coal within this Commonwealth. *See* Ky. Rev. Stat. §143.020. A portion of the coal severance tax is returned to coal-producing and coal-impacted counties through a local government economic assistance fund and the local government economic development fund. *See* Ky. Rev. Stat. §42.4585. Fifty perfect of the remaining revenues go to the state's general fund. *See* Ky. Rev. Stat. §42.4582. In fiscal year 2020, Kentucky's coal severance tax annually accounted for $58.8 million dollars of Kentucky's General Fund receipts.[20] But that number is markedly down from past years, and continues to decline.[21] EO 13990 is the death knell. When Kentucky's coal-severance revenues decline, Kentucky's coal-producing counties, and Kentuckians as a whole, suffer through higher taxes and the loss of essential services funded through state revenues.

130.    Plaintiff States also have *parens patriae* standing based on the economic injuries that their citizens will be suffer as a result of the Biden SC-GHG Estimates. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general"). Plaintiff States' citizens derive enormous benefits from tax revenues and employment from leases issued under the MLA and OCSLA. *See, e.g.,* Loren C. Scott, The Energy Sector: Still an Economic Engine for the Louisiana Economy – An Update (Apr. 2018), https://bit.ly/3tKyKIJ

---

[20] *See* Letter from John T. Hicks, State Budget Director to J. Michael Brown, Office of the Governor, *et al.* (Dec. 9, 2020), https://bit.ly/3n3CS3P.

[21] *See id.*

(comprehensively outlining benefits of energy sector to Louisiana's economy in the form of tax revenues and jobs).

131.   The SC-GHG values will also harm the economic well-being of Plaintiff States' citizens by justifying tighter, job-killing regulations. This is no mere speculative harm. During the Obama Administration, the IWG's SC-GHG estimates were employed to justify unprecedented regulatory actions in a diverse array of industries. For example, DOE relied on the SC-GHG's global emphasis to justify tighter energy-efficiency standards for vending machines, dishwashers, microwave ovens, and several other appliances. *See* 75 Fed. Reg. 45,693 (Jan. 8, 2010); 74 Fed. Reg. 44,914 (Aug. 31, 2009).[22] The values were also used to increase regulation of mercury emissions and industrial boilers and heaters. *See, e.g.*, 76 Fed. Reg. 15,607 (Mar. 21, 2011); 76 Fed. Reg. 15,554 (Mar. 21, 2011); 76 Fed. Reg. 13,852 (Mar. 14, 2011). The values were used to justify aggressive regulation of natural gas. *See, e.g.*, 81 Fed. Reg. 35,824 (June 3, 2016); 77 Fed. Reg. 49,490 (Aug. 16, 2012). Industrial waste incineration and steam generation units were subject to the SC-GHG values. *See* 77 Fed. Reg. 9304 (Feb. 16, 2012); 76 Fed. Reg. 80,452 (Dec. 23, 2011). And pipelines, which are vital to several of Plaintiff States' economies, *see, e.g.*, TC Energy, Operations Map (updated Dec. 2019), https://bit.ly/3sgPuFI,[23] were targeted by IWG's SC-GHG estimates, *see* 81 Fed. Reg. 20,722 (Apr. 8, 2016).

132.   The SC-GHG values will also harm the economic well-being of Plaintiff States' farmers because EPA has indicated that "[m]ethane emissions also result from livestock and other agricultural practices and by the decay of organic waste in municipal solid waste landfills"—and

---

[22] DOE also relies on EO 13990 to justify a major revision to the Process Rule that will result in tighter energy efficiency standards under EPCA. *See* 86 Fed. Reg. 18, 901, 18,902-904, 18,911 (Apr. 12, 2021).

[23] *See also* Loren C. Scott, *The Energy Sector: Still an Economic Engine for the Louisiana Economy – An Update* 54 (Apr. 2018), https://bit.ly/3tKyKIJ ("Weekly wages in the pipeline industry were $1,673---26 percent higher than the average manufacturing wage.").

approximately 27 percent of methane emissions come from "enteric fermentation," i.e., livestock manure and flatulence. The IWG's values will thus directly contribute to increased regulatory costs to Plaintiff States' agricultural industry. *See* EPA, *Overview of Greenhouse Gases*, https://bit.ly/3dSsV4U.

133.    The SC-GHG values will directly harm the thriving chemical manufacturing industries in several Plaintiff States. Louisiana, for example, has seen a massive increase in chemical exports since 2015. *See* David E. Dismukes, *2020 Louisiana business climate outlook: the view from energy sector* (Nov. 21, 2019), https://bit.ly/3sroy6k. And Louisiana has become the third largest producer of chemicals in the nation, thanks in part to the State's natural gas production output. *See* Loren C. Scott, *The Energy Sector: Still an Economic Engine for the Louisiana Economy – An Update* 10, 18 (Apr. 2018), https://bit.ly/3tKyKIJ. The chemical industry provides some of the highest paying jobs in Louisiana and adds billions of value to Louisiana's manufacturing sector. *See id.* at 36. The SC-GHG Estimates will directly harm this thriving industry through direct regulatory costs and indirectly harm it by raising the price of the natural gas the industry relies on. *See id.*

134.    Finally, the price of electricity, which Plaintiff States' citizens and businesses rely on every day, will be increased by the SC-GHG Estimates—as emphatically demonstrated by the increased regulatory costs justified by the previous IWG's SC-GHG values. *See, e.g.*, 80 Fed. Reg. 64,661 (Oct. 23, 2015); 77 Fed. Reg. 9304 (Feb. 16, 2012).

135.    The Working Group's avoidance of the APA's procedures has also injured the Plaintiff States in their sovereign, quasi-sovereign, and proprietary capacities by depriving them of the opportunity to participate in notice-and-comment rulemaking—or to provide input of any kind— about the Biden SC-GHG Estimates.

136.    The Biden SC-GHG Estimates also harm Plaintiff States in their capacities as purchasers of energy. Plaintiff States purchase massive quantities of energy in performing their sovereign duties. The SC-GHG will directly and imminently lead to higher energy prices harming

Plaintiff States' ability to exercise their sovereign functions.[24] *See Texas*, 809 F.3d at 155 ("At least one state—Texas—has satisfied the first standing requirement by demonstrating that it would incur significant costs."); *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Failure to Follow Notice and Comment Procedures)
### 5 U.S.C. §706

137.    Plaintiff States repeat and re-allege the allegations in paragraphs 1-136 as if set forth fully herein.

138.    A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

139.    The Biden SC-GHG Estimates are final agency action.

140.    The Biden SC-GHG Estimates are substantive rules issued without the notice-and-comment procedures required by 5 U.S.C. §553.

141.    Because the Biden SC-GHG Estimates are substantive rules and do not fit an exception to the APA's notice-and-comment requirement, they must be vacated and enjoined.

### COUNT II
### Administrative Procedure Act
### (The Biden SC-GHG Estimates Are Arbitrary and Capricious)
### 5 U.S.C. §706

142.    Plaintiff States repeat and re-allege the allegations in paragraphs 1-141 as if set forth fully herein.

---

[24] For example, the previous SC-GHG Values were used in the Obama Administration to justify stringent CAFE standards under the Clean Air Act. *See, e.g.*, 80 Fed. Reg. 40,138 (July 13, 2015); 75 Fed. Reg. 25,324 (May 7, 2010).

143.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

144.     The Biden SC-GHG Estimates ignore important aspects of the problem including the positive externalities of energy production, reliance interests, specific factual findings by the previous Administration, OMB Circular A-4's recommendations about domestic effects, settled Executive Branch practice regarding discount rates, significant shortcomings in the IAMs underlying the Biden SC-GHG Estimates, various statutes compelling a focus on domestic effects rather than global effects, costs to Federal-State relations, and costs to State revenues.

145.     Because the Biden SC-GHG Estimates are arbitrary and capricious, they must be vacated and enjoined.

### COUNT III
### Administrative Procedure Act
### (The Biden SC-GHG Estimates Are Contrary to Law)
### 5 U.S.C. §706

146.     Plaintiff States repeat and re-allege the allegations in paragraphs 1-145 as if set forth fully herein.

147.     A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

148.     The Biden SC-GHG Estimates contravene EPCA by directing agencies to consider global effects of greenhouse gases. *See* 42 U.S.C. §6295(o)(2)(B)(i)(VI).

149.     The Biden SC-GHG Estimates contravene the Clean Air Act by directing agencies to consider the global effects of greenhouse gases. *See* 42 U.S.C. §7401(b)(1).

150.     The Biden SC-GHG Estimates contravene NEPA by directing agencies to consider the global effects of greenhouse gases 42 U.S.C. §4331(b)(2).

151.    The Biden SC-GHG Estimates contravene the MLA by causing delayed and reduced numbers of oil and gas lease sales and permits based upon unlawful considerations. *See* 30 U.S.C. §226.

152.    The Biden SC-GHG Estimates contravene OCSLA by disrupting its carefully crafted statutory leasing program, which promotes the development of resources on the Outer Continental Shelf. *See* 43 U.S.C. §§1332, 1337, 1340, 1344, 1345, 1351.

## COUNT IV
## Ultra Vires
## (Actions Beyond Authority Conferred by Congress)

153.    Plaintiff States repeat and re-allege the allegations in paragraphs 1-152 as if set forth fully herein.

154.    Ultra vires review is available to challenge "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996)).

155.    Because no statute authorizes the President or IWG to employ a global-effects measure and discount rates deviating from the standard 3 percent and 7 percent discount rates, Section 5 of Executive Order 13990 and the Biden SC-GHG Estimates are ultra vires and must be enjoined.

**WHEREFORE**, Plaintiff States ask this Court to enter judgment in their favor and to provide the following relief:

a.  A declaratory judgment holding that federal agencies may not use the Biden SC-GHG Estimates;

b.  A declaratory judgment holding that the Biden SC-GHG Estimates are invalid substantive rules with putative legal effect for agency actions because they were not promulgated through the APA's notice-and-comment rulemaking process;

c.  A declaratory judgment holding that the Biden SC-GHG Estimates are arbitrary and capricious under the APA;

d.  A declaratory judgment holding that the Biden SC-GHG Estimates are contrary to law;

e.  A declaratory judgment and permanent injunction finding the Biden SC-GHG Estimates are invalid and setting them aside;

f.  An injunction prohibiting any federal officer or agency from relying upon the Biden SC-GHG Estimates in any agency action;

g.  An injunction prohibiting the Working Group Defendants from continuing to implement illegal actions;

h.  An injunction prohibiting the Agency Defendants from adopting, employing, treating as binding, or relying upon the work product of the Working Group;

i.  All other relief to which Plaintiff is entitled, including but not limited to attorneys' fees and costs.

Respectfully submitted,

Dated: April 22, 2021

_/s/_____

TYLER R. GREEN*
DANIEL SHAPIRO*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423


*Counsel for Plaintiff States*


OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.*
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

ASHLEY MOODY
  Attorney General of Florida
Rachel Siegel*
  Deputy Solicitor General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
Tel: (850) 414-3300
Fax: (850) 410-2672
rachel.siegel@myfloridalegal.com
*Counsel for the State of Florida*

CHRISTOPHER M. CARR
  Attorney General of Georgia
Andrew A. Pinson*
  Solicitor General

ELIZABETH B. MURRILL
  Solicitor General
J. SCOTT ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

DANIEL CAMERON
  Attorney General of Kentucky
Victor Maddox
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330

LYNN FITCH
  Attorney General of Mississippi
Justin L. Matheny*
  Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

Mark Miller*
  General Counsel to South Dakota Governor
Kristi Noem
500 East Capitol Avenue
Pierre, South Dakota 57501-5070
Mark.Miller@state.sd.us
*Counsel for the State of South Dakota*

KEN PAXTON
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Judd E. Stone II*
  Solicitor General
Patrick Sweeten*
  Deputy Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 009)

Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*

PATRICK MORRISEY
   West Virginia Attorney General
Lindsay S. See*
   Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

BRIDGET HILL
   Attorney General of Wyoming
James Kaste*
   Deputy Attorney General
Travis Jordan*
   Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov

*Pro Hac Vice admission application forthcoming