# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

THE STATE OF LOUISIANA, *et al.*,

        Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States,
*et al.*,

        Defendants.[1]

Case No. 2:21-cv-01074-JDC-KK

## DEFENDANTS' MEMORANDUM IN
## SUPPORT OF MOTION TO DISMISS

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER C. VAN HOOK
Acting United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

*Attorneys for Defendants*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Dr. Eric S. Lander (Director of the Office of Science and Technology Policy), is automatically substituted as a Defendant in his official capacity for his predecessor, Acting Director Kei Koizumi.

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

BACKGROUND................................................................................................. 3

I.      Factual Background .............................................................................. 3

        A.      Requiring cost-benefit analysis is a longstanding presidential practice. ..........................3

        B.      Federal agencies assess the costs and benefits of changes in greenhouse gas
                emissions when conducting cost-benefit analyses. .................................................5

                1.      Past Federal Estimates of the Social Cost of Greenhouse Gases .......................5

                2.      Executive Order 13990 and the Working Group's 2021 Interim
                        Estimates..........................................................................................11

II.     Procedural Background ...................................................................... 13

ARGUMENT.................................................................................................... 13

I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION................................14

        A.      Plaintiffs lack Article III standing. .................................................................14

                1.      The possibility that Plaintiffs will suffer a future injury—let alone an
                        injury actually caused by the Executive Order—is speculative. .......................15

                2.      Any injury would be traceable to future, hypothetical agency actions,
                        not to the Executive Order or the Interim Estimates. ...................................21

                3.      Plaintiffs' alleged injuries are not redressable by a victory in this
                        lawsuit. ...........................................................................................23

                4.      Plaintiffs' remaining, miscellaneous bases for standing are meritless. ............26

        B.      Plaintiffs' claims are not ripe. ......................................................................30

        C.      Plaintiffs lack a cause of action. ...................................................................37

                1.      Plaintiffs do not challenge any final agency action. ...................................37

                2.      Neither the President nor the Working Group is an "agency" subject
                        to APA litigation.................................................................................39

                3.      Plaintiffs cannot evade the APA's limitations on judicial review by
                        invoking an equitable, non-statutory *ultra vires* cause of action..........................42

i

II.    **PLAINTIFFS' CLAIMS ARE MERITLESS.**..................................................**44**

    A.    Plaintiffs' statutory claims are meritless. ..................................................45

    B.    Plaintiffs' *ultra vires* claims are duplicative and meritless. ....................47

    C.    Plaintiffs' notice-and-comment claims are meritless..............................47

    D.    Any remaining claims against the Defendants other than the President or the Working Group should be dismissed for failure to state a claim...................50

**CONCLUSION**..................................................................................................**50**

## TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ...................................................................................................31

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ..................................................................................................26

*Am. Airlines, Inc. v. Herman,*
176 F.3d 283 (5th Cir. 1999) .....................................................................................43

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) .....................................................................................................42

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ..................................................................................................37

*Arias v. DynCorp,*
752 F.3d 1011 (D.C. Cir. 2014) .................................................................................28

*Armstrong v. Exec. Off. of the President,*
90 F.3d 553 (D.C. Cir. 1996) .....................................................................................41

*ASARCO Inc. v. Kadish,*
490 U.S. 605 (1989) ..................................................................................................16

*Barber v. Bryant,*
860 F.3d 345 (5th Cir. 2017) .....................................................................................15

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991) .....................................................................................................43

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................*passim*

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ...............................................................33, 47, 49, 50

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021) .....................................................................................26

*California v. Bernhardt,*
472 F. Supp. 3d 573 (N.D. Cal. 2020), *appeal filed,* No. 20-16793
(9th Cir. Sept. 16, 2020) ...............................................................................18, 25, 32

*California v. Texas,*
Nos. 19–840, 19–1019, --- S. Ct. ----, 2021 WL 2459255 (U.S. June 17, 2021) ...........21, 42

*California v. Trump,*
   No. 19-cv-960 (RDM)--- F. Supp. 3d ----, 2020 WL 1643858 (D.D.C. Apr. 2, 2020)................18, 46

*Center for Biological Diversity v. National Highway Traffic Safety Administration,*
   538 F.3d 1172 (9th Cir. 2008)....................................................................................*passim*

*Choice Inc. of Texas v. Greenstein,*
   691 F.3d 710 (5th Cir. 2012) ...............................................................................................31

*City of Arlington v. FCC,*
   668 F.3d 229 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013).............................................49, 50

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................................................15, 16

*CREW v. Off. of Admin.,*
   566 F.3d 219 (D.C. Cir. 2009)..............................................................................................41

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ..............................................................................................................16

*EarthReports, Inc. v. FERC,*
   828 F.3d 949 (D.C. Cir. 2016)..............................................................................................33

*Ehm v. Nat'l R.R. Passenger Corp.,*
   732 F.2d 1250 (5th Cir. 1984)..............................................................................................40

*El Paso Cty., Texas v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ...............................................................................................28

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) ..............................................................................................................36

*Exxon Chems. Am. v. Chao,*
   298 F.3d 464 (5th Cir. 2002) .........................................................................................43, 47

*Fed. Forest Res. Coal. v. Vilsack,*
   100 F. Supp. 3d 21 (D.D.C. 2015) .................................................................................16, 17

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) .................................................................................................25, 26, 40

*Gen. Fin. Corp. v. FTC,*
   700 F.2d 366 (7th Cir. 1983) ...............................................................................................42

*Gov't of Manitoba v. Bernhardt,*
   923 F.3d 173 (D.C. Cir. 2019)........................................................................................26, 27

iv

*Harris Cnty. v. MERSCORP Inc.*,
   791 F.3d 545 (5th Cir. 2015) ..................................................................................37, 42

*Helicopter Ass'n Int'l, Inc. v. FAA*,
   722 F.3d 430 (D.C. Cir. 2013) ..................................................................................19

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014) ......................................................................32

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) ....................................................................................28

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ....................................................................................28

*Johnson v. Missouri*,
   142 F.3d 1087 (8th Cir. 1998) ...........................................................................30, 31

*Lance v. Coffman*,
   549 U.S. 437 (2007) ..................................................................................................28

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ...........................................................................................42, 43

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ..................................................................................................48

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................14, 15, 23, 28

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S 871 (1990)............................................................................................17, 31

*Luminant Generation Co. v. EPA*,
   757 F.3d 439 (5th Cir. 2014) ...........................................................................38, 39

*Lundeen v. Mineta*,
   291 F.3d 300 (5th Cir. 2002) ...........................................................................44, 47

*M.S. v. Brown*,
   902 F.3d 1076 (9th Cir. 2018) ..................................................................................25

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*,
   811 F.3d 542 (2d Cir. 2016) .....................................................................................41

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) .....................................................................................27, 29, 30

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) .................................................................. 40, 41, 46

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) .................................................................. 25

*Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley,*
    112 F.3d 1332 (8th Cir. 1997) .................................................................. 31

*N.J. Conservation Found. v. FERC,*
    353 F. Supp. 3d 289 (D.N.J. 2018) .................................................................. 36

*Nat'l Ass'n of Home Builders v. EPA,*
    667 F.3d 6 (D.C. Cir. 2011) .................................................................. 17, 35

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) .................................................................. 5, 19, 20

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) .................................................................. 48

*Nat'l Org. for Women, Inc. v. Scheidler,*
    510 U.S. 249 (1994) .................................................................. 46

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) .................................................................. 2, 31, 32, 33

*Nat'l Sec. Comm'n on A.I.,*
    466 F. Supp. 3d 100 (D.D.C. 2020) .................................................................. 40

*Nat'l Treasury Emps. Union v. Reagan,*
    685 F. Supp. 1346 (E.D. La. 1988) .................................................................. 32

*Nat'l Truck Equip. Ass'n v. NHTSA,*
    711 F.3d 662 (6th Cir. 2013) .................................................................. 5

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) .................................................................. 26

*Norton v. S. Utah Wilderness, All.,*
    542 U.S. 55 (2004) .................................................................. 39

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) .................................................................. 43

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .................................................................. 31, 32, 34

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ........................................................................28

*Peoples Nat. Bank v. Off. of the Comptroller of the Currency of the U.S.,*
    362 F.3d 333 (5th Cir. 2004) .................................................................38, 39

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ........................................................................................49

*Pros. & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ..........................................................................48

*Pub. Citizen, Inc. v. Trump,*
    435 F. Supp. 3d 144 (D.D.C. 2019).............................................................17

*Renal Physicians Ass'n v. HHS,*
    489 F.3d 1267 (D.C. Cir. 2007) ...................................................................25

*Reno v. Cath. Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ..................................................................................31, 32

*Rochester Tel. Corp. v. United States,*
    307 U.S. 125 (1939) ......................................................................................38

*S. La. Env't Council, Inc. v. Sand,*
    629 F.2d 1005 (5th Cir. 1980) ......................................................................29

*Sackett v. EPA,*
    566 U.S. 120 (2012) ................................................................................37, 38

*Sanderson Farms, Inc. v. NLRB,*
    651 F. App'x 294 (5th Cir. 2016) ...........................................................43, 44

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ......................................................................................28

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ........................................................................37

*Sierra Club v. Sigler,*
    695 F.2d 957 (5th Cir. 1983) ........................................................................21

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976)..................................................................................18, 21

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971) ...................................................................41

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 1544 (2019) .......................................................38

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ...........................................................................................................*passim*

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..........................................................................................................17

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ............................................................................................15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................15, 16, 17, 30

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) ............................................................................................37

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .........................................................................................26

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.,*
    201 F.3d 551 (5th Cir. 2000) ............................................................................................48

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ..................................................................................37, 38, 39

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ............................................................................................33

*Texas v. United States,*
    523 U.S. 296 (1998) ........................................................................................................31

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................................................48

*Town of Chester v. Laroe Ests., Inc.,*
    137 S. Ct. 1645 (2017) ....................................................................................................29

*Trump v. New York,*
    141 S. Ct. 530 (2020) ................................................................................................2, 30

*Trump v. Sierra Club,*
    140 S. Ct. 1 (2019) .........................................................................................................44

*U.S. Postal Serv. v. Gregory,*
    534 U.S. 1 (2001) .....................................................................................................46, 50

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) .................................................................................50

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..............................................................................................30

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..............................................................................................36

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ..............................................................................................15

*Wild Va. v. Council on Envt'l Quality,*
    No. 3:20-cv-00045, 2021 WL 2521561 (W.D. Va. June 21, 2021) ....................34, 35

*WildEarth Guardians v. Bernhardt,*
    No. 17-cv-80, 2021 WL 363955 (D. Mont. Feb. 3, 2021), *appeal filed*, No. 21-35262
     (9th Cir. Apr. 7, 2021) ........................................................................................32

*Williams v. Van Buren,*
    117 F. App'x 985 (5th Cir. 2004) .........................................................................48

*Wyoming v. Dep't of the Interior,*
    493 F. Supp. 3d 1046 (D. Wyo. 2020) .................................................................32

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ..............................................................................................27

*Yakus v. United States,*
    321 U.S. 414 (1944) ..............................................................................................21

*Zero Zone, Inc. v. U.S. Dep't of Energy,*
    832 F.3d 654 (7th Cir. 2016) .........................................................................*passim*

## STATUTES

5 U.S.C. § 551 ...............................................................................................................39

5 U.S.C. § 553 .........................................................................................................47, 48

5 U.S.C. § 701 .......................................................................................................39, 42

5 U.S.C. § 703 ...............................................................................................................42

5 U.S.C. § 704 .................................................................................................37, 39, 42

5 U.S.C. § 706 .........................................................................................................42, 49

15 U.S.C. § 717f .............................................................................................................35

15 U.S.C. § 717r ......................................................................................................36

28 U.S.C. § 2201 .....................................................................................................42

28 U.S.C. § 2202 .....................................................................................................42

42 U.S.C. § 4321 .....................................................................................................29

42 U.S.C. § 4331 .....................................................................................................46

42 U.S.C. § 6295 .................................................................................................36, 46

42 U.S.C. § 7401 .....................................................................................................46

42 U.S.C. § 7479 .....................................................................................................46

42 U.S.C. § 7607 .....................................................................................................36

49 U.S.C. § 32902 .....................................................................................................6

## RULES

Fed. R. Civ. P. 12 ....................................................................................................45

## REGULATIONS

40 C.F.R. § 1502.22 ................................................................................................29

Bureau of Land Mgmt., *Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements,*
83 Fed. Reg. 49184 (Sept. 28, 2018) .....................................................................11

Dep't of Energy, *Energy Conservation Program: Energy Conservation Standards for Battery Chargers and External Power Supplies,*
77 Fed. Reg. 18478 (Mar. 27, 2012) ......................................................................50

Dep't of Energy, *Energy Conservation Program: Energy Conservation Standards for Certain Consumer Products,*
73 Fed. Reg. 62034 (Oct. 17, 2008) .........................................................................7

EPA, *Endangerment & Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act,*
74 Fed. Reg. 66496 (Dec. 15, 2009) .........................................................................5

EPA, *Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews,*
76 Fed. Reg. 52738 (Aug. 23, 2011) ...................................................................8, 50

EPA, *Regulating Greenhouse Gas Emissions Under the Clean Air Act,*
73 Fed. Reg. 44354 (July 30, 2008) ..........................................................................7

EPA & NHTSA, *Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2,*
81 Fed. Reg. 73478 (Oct. 25, 2016) ................................................................................49, 50

EPA & NHTSA, *Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards,*
74 Fed. Reg. 49454 (Sept. 28, 2009) ................................................................................7, 49

NHTSA, *Average Fuel Economy Standards for Light Trucks Model Years 2008-2011,*
71 Fed. Reg. 17566 (Apr. 6, 2006) ................................................................................6

Notice of Inquiry, *Certification of New Interstate Natural Gas Facilities,*
86 Fed. Reg. 11272 (Feb. 24, 2021) ................................................................................35, 36

OMB, *Notice of Availability,*
78 Fed. Reg. 70586 (Nov. 26, 2013) ................................................................................9

OMB, *Notice of Availability and Request for Comment* on "*Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under E.O. 13990,*
86 Fed. Reg. 24669 (May 7, 2021) ................................................................................12

## EXECUTIVE ORDERS

Exec. Order No. 12044, *Improving Government Regulations,*
43 Fed. Reg. 12661 (Mar. 23, 1978) ................................................................................3

Exec. Order No. 12291, *Federal Regulation,*
46 Fed. Reg. 13193 (Feb. 17, 1981) ................................................................................3, 40

Exec. Order No. 12866, *Regulatory Planning and Review,*
58 Fed. Reg. 51735 (Sept. 30, 1993) ................................................................................*passim*

Exec. Order No. 13563, *Improving Regulation and Regulatory Review,*
76 Fed. Reg. 3821 (Jan. 18, 2011) ................................................................................4

Exec. Order No. 13771, *Reducing Regulation and Controlling Regulatory Costs,*
82 Fed. Reg. 9339 (Jan. 30, 2017) ................................................................................4

Exec. Order No. 13783, *Promoting Energy Independence and Economic Growth,*
82 Fed. Reg. 16093 (Mar. 28, 2017) ................................................................................10, 11

Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis,*
86 Fed. Reg. 7037 (Jan. 20, 2021) ................................................................................*passim*

## OTHER AUTHORITIES

Alex Marten, *Incremental CH$_4$ and N$_2$O Mitigation Benefits Consistent with the U.S. Government's SC-CO$_2$ Estimates,* 15(2) Climate Policy 272 (2015) ................................................................................9

Comment on the Use of Social Cost of Carbon, FERC NOI, Docket Number
    PL 18-1-000 C (Apr. 26, 2021)................................................................................35

Curtis W. Copeland, Cong. Research Serv., RL32397, *Federal Rulemaking: The Role of the Office of
    Information and Regulatory Affairs* (June 9, 2009) ........................................................3

Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021),
    https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf............34

EPA, *Climate Change*,
    https://www.epa.gov/climate-change ..........................................................................24

EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal* (2017) ...................10

EPA, *Whitepaper on Valuing Methane Emissions Changes in Regulatory Benefit-Cost Analysis, Peer
    Review Charge Questions, and Responses: EPA Summary and Response* (Oct. 1, 2015) ...................9

GAO, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates* (July 2014) .......................7

Katharine Hayhoe et al., *Our Changing Climate in Impacts, Risks, and Adaptation in the United States:
    Fourth National Climate Assessment, Volume II* (2018) ...............................................5

National Academies of Sciences, Engineering, and Medicine, *Valuing Climate Damages: Updating
    Estimation of the Social Cost of Carbon Dioxide* (2017) ...............................................10

OMB, *Circular A-4* (2003),
    https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf........ 4, 5, 49

OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs)*
    (June 3, 2021),
    https://www.whitehouse.gov/wp-content/uploads/2021/06/Social-Cost-of-
    Greenhouse-Gas-Emissions.pdf .........................................................................*passim*

Working Group, *Addendum to Technical Support Document on Social Cost of Carbon for Regulatory
    Impact Analysis under E.O. 12866: Application of the Methodology to Estimate the Social Cost of
    Methane and the Social Cost of Nitrous Oxide* (Aug. 2016) .........................................9, 10

Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis
    Under E.O. 12866* (July 2015) ...............................................................7, 9, 49, 50

Working Group, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis
    Under E.O. 12866* (Feb. 2010) ...............................................................7, 8

Working Group, *Technical Support Document: Technical Update of the Social Cost of Carbon for
    Regulatory Impact Analysis Under E.O. 12866* (Aug. 2016) ........................................10

Working Group, *Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis
    Under E.O. 12866* (Nov. 2013) ...............................................................8

Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide:*
  *Interim Estimates under E.O. 13990* (Feb. 2021) .........................................................................12, 18, 24, 29

USDA, *Climate Solutions,*
  https://www.usda.gov/topics/climate-solutions ...............................................................................................24

**INTRODUCTION**

The President of the United States has long exercised his constitutional authority, when not in conflict with any legislative command to the contrary, to manage the rulemaking functions of the Executive Branch—including, for decades, by requiring and supervising agency use of cost-benefit analysis in rulemaking. In particular, following court decisions recognizing that the costs and benefits of changes in greenhouse gas emissions can be an important consideration to account for in many agency rules, President Obama, President Trump, and now President Biden have each acted to standardize the estimated monetization of those costs and benefits across the Executive Branch.

Despite this history, Plaintiffs now challenge Section 5 of Executive Order 13990, by which President Biden reconstituted the Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"), as a violation of the Administrative Procedure Act (APA) and otherwise *ultra vires*. Ex. 1, Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021) ("the Executive Order" or "E.O. 13990"). The Working Group's primary mission is to prepare updated monetary estimates, for use in agency cost-benefit analyses, which "capture the full costs of greenhouse gas emissions as accurately as possible." *Id.* § 5(a). Plaintiffs also challenge the "Interim Estimates" of those costs, which will be in effect until the Working Group publishes final updated estimates. *See id.* § 5(b)(ii)(A).

Although Plaintiffs clearly disagree with the policy goals behind Executive Order 13990, Article III requires more than political disagreement—it requires an actual or imminent injury in fact, traceable to the challenged provision of the Executive Order, and redressable by the relief they seek. There, Plaintiffs fall short, because even though their legal theories are tied to the Executive Order and the Interim Estimates, their alleged injuries are not. Instead, Plaintiffs' allegations of injury all stem from fears that hypothetical future regulations, which may be issued in reliance on the Interim Estimates, will one day cause them (or their citizens, or in-state businesses) a variety of possible harms. In Plaintiffs' words, they fear that the Interim Estimates might be used by federal agencies, in the future, to "justify unprecedented increases in regulatory restrictions on agriculture, energy, and virtually every other human activity." Compl. ¶ 95.

1

As is self-evident from those sweeping allegations, at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). President Biden, to be sure, has made clear his desire that agencies use the Interim Estimates in monetizing the costs of greenhouse gases. But the Interim Estimates will typically be used only for internal Executive Branch purposes, and when they *are* relied upon to justify a substantive rule, they will rarely be outcome-determinative, and will generally be subject to notice and comment. Accordingly, any prediction as to the consequences of the Interim Estimates is "no more than conjecture" at this time. *Id.* In any event, Plaintiffs can challenge future agency regulations when they are actually issued, as long as those regulations cause them some concrete, particularized, and actual or imminent harm. And in those cases, Plaintiffs can argue that the Executive Order or the Interim Estimates led the agency into legal error. But before rushing into court, Plaintiffs must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the [Executive Order] to [their] situation in a fashion that harms or threatens to harm [them]." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Accordingly, all claims should be dismissed for lack of Article III standing, lack of ripeness, or the lack of any cause of action.

Even if Plaintiffs could overcome these fundamental threshold defects of jurisdiction and justiciability, all of Plaintiffs' claims are meritless; they suffer from a fundamental misunderstanding of the Executive Order and its place within the broader federal regulatory process. In particular, contrary to Plaintiffs' assertion that E.O. 13990 "usurp[s] the authority vested in agencies by statute," Compl. ¶ 91, in fact, the Executive Order expressly provides (more than once) that it does not "impair or otherwise affect the authority granted by law to an executive department or agency," E.O. 13990 § 8(a)(i). In any case, since the Reagan era, every President has supervised a centralized process for the review of proposed regulations and, by executive order, required agencies to submit cost-benefit analyses that align with the President's policymaking principles. And beginning under President George W. Bush, agencies have used estimates of the social cost of greenhouse gas emissions when

preparing those analyses.  Plaintiffs offer nothing that would justify a court-ordered halt to these long-settled and salutary good-government procedures.

Plaintiffs may disagree generally with federal climate policy.  But the remedy for that policy disagreement must come from the political branches.  All of Plaintiffs' claims should be dismissed.

## BACKGROUND

### I.   Factual Background

#### A.   Requiring cost-benefit analysis is a longstanding presidential practice.

Because rulemaking requires federal agencies to exercise their discretion in making policy judgments, every President since President Nixon has imposed some requirement for federal agencies to assess the predictable consequences of proposed rules.  *See* Curtis W. Copeland, Cong. Research Serv., RL32397, *Federal Rulemaking: The Role of the Office of Information and Regulatory Affairs*, at 5-6 (June 9, 2009).  In 1978, President Carter issued E.O. 12044, which established a requirement to provide a regulatory analysis for a subset of impactful rules.  *See* Exec. Order No. 12044, *Improving Government Regulations*, 43 Fed. Reg. 12661 (Mar. 23, 1978).  Then, in 1981, President Reagan took a decisive step to combine comprehensive regulatory-analysis principles with centralized regulatory review when he issued Executive Order 12291.  *See* Exec. Order No. 12291, *Federal Regulation*, 46 Fed. Reg. 13193 (Feb. 17, 1981).  Among other things, E.O. 12291 set general policies for agencies to follow in issuing new regulations, including an instruction that "to the extent permitted by law, . . . [r]egulatory action shall not be undertaken unless the potential benefits to society . . . outweigh the potential costs."  *Id.* § 2(b).  And, for the first time, it established a centralized review process, requiring agencies to prepare an analysis of major proposed regulations—including the costs and benefits of the proposed rule, and reasonable alternatives—and to submit that analysis to the White House's Office of Management and Budget (OMB).  *See id.* § 3.  Every President since has embraced the core premise of E.O. 12291: that an empirical, monetized assessment of the expected social and economic consequences of federal regulation—in other words, a cost-benefit analysis—should inform policymakers and the public about the predicted effects of significant agency decisions.

Executive Order 12866, issued by President Clinton, established the modern framework for overseeing and coordinating the development of significant rules throughout the Executive Branch.[2] *See* Ex. 2, Exec. Order No. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Sept. 30, 1993). Like its Reagan-era predecessor, E.O. 12866 directs agencies to follow certain principles "unless a statute requires another regulatory approach." *Id.* § 1(a). And it establishes a detailed regulatory-review process to be coordinated by OMB and its Office of Information and Regulatory Affairs (OIRA) in which all agencies, save "independent regulatory agencies," must participate. *Id.* § 3(b). For significant regulatory actions,[3] E.O. 12866 requires an assessment of the anticipated costs and benefits of the agency's proposal. *See id.* §§ 6(a)(3)(B)-(C). The agency must also provide OIRA with a written explanation of why it opted for the proposed action and how it best meets the need for the action. *See id.* §§ 6(a)(3)(B)(i)-(ii), (C)(iii). OIRA then reviews the agency's action. *See id.* § 6(b)(2). If an agency publishes a proposed rule, one product of this process, often called a Regulatory Impact Analysis (RIA), is published alongside the Notice of Proposed Rulemaking. *See id.* § 6(a)(3)(E).

OMB guidance, in particular OMB Circular A-4, sets out detailed recommendations to assist agencies in developing RIAs that comply with E.O. 12866. *See* OMB, *Circular A-4* (2003) https://perma.cc/CVU2-QUCE. Among other things, Circular A-4 emphasizes that agencies "should monetize quantitative estimates whenever possible." *Id.* at 27. Furthermore, as Circular A-4 explains, a good cost-benefit analysis will monetize more than just direct effects: Agencies should include "any important ancillary benefits and countervailing risks." *Id.* at 26. And because the costs and benefits of regulations often accrue well into the future, the guidance describes how agencies

---

[2] Each President since President Clinton has made modifications to this process. *See, e.g.* Exec. Order No. 13563, *Improving Regulation and Regulatory Review*, § 4, 76 Fed. Reg. 3821, 3822 (Jan. 18, 2011) (President Obama instructing agencies to "consider regulatory approaches that reduce burdens and maintain flexibility"); Exec. Order No. 13771, *Reducing Regulation and Controlling Regulatory Costs*, § 3(b), 82 Fed. Reg. 9339, 9340 (Jan. 30, 2017) (President Trump requiring regulations to be included in the Unified Regulatory Agenda or approved by the OMB Director prior to issuance).

[3] For purposes of E.O. 12866, significant regulatory actions include those that would create inconsistencies or otherwise interfere with other agency action, alter certain budgetary impacts, raise novel issues, or are "likely to result in a rule that may have an annual effect on the economy of $100 million or more" or adversely affect the economy or its components. E.O. 12866, § 3(f) (cleaned up).

should consider those future effects—namely, by choosing appropriate discount rates[4] and selecting an end point "far enough in the future to encompass all the significant benefits and costs likely to result from the rule." *Id.* at 31-32.

Importantly, RIAs do not bind an agency's exercise of its statutory discretion. *See* E.O. 12866, prmbl. And because RIAs, standing alone, place no judicially enforceable limits on an agency's ability to choose among regulatory alternatives, the cost-benefit analysis in an agency's RIA is generally not subject to judicial review. *See, e.g., Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not . . . provide a basis for rejecting final agency action."). Only in specific circumstances—such as when Congress specifies that agencies must consider costs and benefits, or when an agency chooses to adopt or justify a rule based on the cost-benefit analysis in its RIA—will an agency's cost-benefit analysis be subject to arbitrary-and-capricious review under the APA. *See, e.g., Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012).

### B. Federal agencies assess the costs and benefits of changes in greenhouse gas emissions when conducting cost-benefit analyses.

#### 1. Past Federal Estimates of the Social Cost of Greenhouse Gases

There is a broad scientific consensus that human-source emissions of greenhouse gases (GHGs) are primary contributors to climate change. *See* Katharine Hayhoe et al., *Our Changing Climate in Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, at 73 (2018); *see also* EPA, *Endangerment & Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496 (Dec. 15, 2009) (finding that motor-vehicle emissions of greenhouse gases "endanger both the public health and the public welfare of current and future generations"). To quantify how future emissions of GHGs are expected to impact our society, experts have developed methods for estimating the net impacts—the good and the bad—of additional emissions of GHGs, including carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$). The resulting estimates—monetary values of the net damages anticipated to result from one additional ton

---

[4] A discount rate is an interest rate used to convert future monetary sums into present-value equivalents. *See* OMB, *Circular A-4*, at 31-32. The higher the discount rate, the less value a future sum will have in present-day terms.

of emissions of a particular gas in a given year—are described in scientific literature as the "social costs" of a greenhouse gas. Since 2007, following the Ninth Circuit's decision in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008), federal agencies have employed estimates of the social cost of greenhouse gases (SC-GHG) to value projected reductions or increases in greenhouse gas emissions when preparing cost-benefit analyses.

*Center for Biological Diversity* involved a fuel economy rule issued by the National Highway Traffic Safety Administration (NHTSA). *See id.* at 1180-81. The rule was issued pursuant to the Energy Policy and Conservation Act of 1975 (EPCA), which directs the Secretary of Transportation to set fuel economy standards at "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year." 49 U.S.C. § 32902(a). The EPCA further specifies that the Secretary's decision must be based upon certain statutory considerations, including "economic practicability." *Id.* § 32902(f). To fulfill this requirement, when NHTSA chose among possible standards, the agency relied on the cost-benefit analysis in its RIA. *See* NHTSA, *Average Fuel Economy Standards for Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17566, 17592 (Apr. 6, 2006).

NHTSA's cost-benefit analysis did not include any monetized estimates of the damages associated with GHG emissions. In the agency's view, at that time, the "extremely wide variation in published estimates of damage costs from greenhouse gas emissions" meant that "the value of reducing emissions of $CO_2$ and other greenhouse gases" was "too uncertain to support their explicit valuation and inclusion among the savings in environmental externalities." *Id.* at 17638. Various plaintiffs sued to challenge NHTSA's analysis, arguing that it was arbitrary and capricious for the agency to rely on a cost-benefit analysis that, effectively, assigned a monetary value of zero to the benefit of reducing global $CO_2$ emissions. *See Ctr. for Biological Diversity*, 538 F.3d at 1181.

The Ninth Circuit agreed. While acknowledging that "the record show[ed] that there [was] a range of values" that could be used, the court rejected NHTSA's concern about the uncertainty of the value of $CO_2$ emissions reductions. *Id.* at 1200. As the court saw it, no matter how difficult it was to choose an exact number, "the value of carbon emissions reduction [was] certainly not zero." *Id.* Given the availability of reasonable, non-zero estimates of the value of $CO_2$ reductions, the court found "no

6

evidence to support NHTSA's conclusion that the appropriate course was not to monetize or quantify the value of carbon emissions reduction at all." *Id.* at 1201.

After *Center for Biological Diversity*, at the end of the George W. Bush Administration, agencies began using varying estimates of the social cost of carbon (SC-$CO_2$) to monetize projected changes in $CO_2$ emissions as part of their cost-benefit analyses.[5]  In 2009, seeking to harmonize these estimates across the Executive Branch, OMB convened an interagency process "to develop a transparent and defensible method, specifically designed for the rulemaking process, to quantify avoided climate change damages from reduced $CO_2$ emissions."  Working Group, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (February 2010 TSD)*, at 5 (Feb. 2010).  The resulting working group was constituted by leaders of various agencies, and co-chaired by OMB and the Council of Economic Advisors.  *See February 2010 TSD*, at i.

The Working Group began by analyzing the existing peer-reviewed scientific literature, from which it derived interim global SC-$CO_2$ estimates to recommend for use in agency RIAs.  *See* Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866 (Response to Comments)*, at 3-4 (July 2015).  When agencies used those 2009 interim estimates in rulemaking, they requested comment on "all of the scientific, economic, and ethical issues" implicated by the interim SC-$CO_2$ estimates in anticipation of "establishing improved estimates for use in future rulemakings." *See, e.g.*, EPA & NHTSA, *Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 74 Fed. Reg. 49454, 49612 (Sept. 28, 2009).

In 2010, the Working Group published revised SC-$CO_2$ estimates.  *See February 2010 TSD*, at 28.  In doing so, it relied on three climate-impact models—the DICE model (Dynamic Integrated Climate Economy), the PAGE model (Policy Analysis of the Greenhouse Effect), and the FUND model (Climate Framework for Uncertainty, Negotiation, and Distribution).  *See id.* at 5.  Collectively,

---

[5] *See, e.g.*, *Energy Conservation Program: Energy Conservation Standards for Certain Consumer Products*, 73 Fed. Reg. 62034, 62110 (Oct. 17, 2008) (Dep't of Energy); *Regulating Greenhouse Gas Emissions Under the Clean Air Act*, 73 Fed. Reg. 44354, 44446 (July 30, 2008) (EPA); *see also* GAO, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates*, at 22-23 (July 2014) (listing "[i]ndividually developed agency estimates").

these represented the three most widely cited peer-reviewed models capable of translating future GHG emissions into climate impacts, and climate impacts into monetized damages. *Id.*

While acknowledging differences among these models, the Working Group applied certain standard inputs. It adjusted the models' end year, setting each to run through 2300 in order to adequately capture a significant proportion of future damages. *See id.* at 12-17. The Working Group also chose five socioeconomic and emissions "scenarios"[6] and three discount rates—2.5%, 3%, and 5%—to apply in running the three models.[7] *See id.* at 15-23. It then conducted simulations using these combinations, running each combination 10,000 times to sample across the range of climate impact projections, for a total of 450,000 observations per year. *See id.* at 28. For each discount rate, the Working Group averaged the resulting global SC-$CO_2$ estimates across all models and scenarios. *See id.* The resulting estimates for 2010 (reported in 2007 dollars) were $4.70 at the 5% discount rate, $21.40 at the 3% discount rate, and $35.10 at the 2.5% discount rate. *See id.* Additionally, to represent the damages associated with "low-probability, high-impact" climate damages, the Working Group reported a fourth value, $64.90, which was the 95th percentile SC-$CO_2$ estimate across all of the three models using the 3% discount rate. *Id.*

The Working Group continued to update its estimates and methodology. Following the release of the 2010 SC-$CO_2$ estimates, many agencies that employed the estimates in rulemaking received comments urging consideration of recent, peer-reviewed updates to the DICE, PAGE, and FUND models. *See, e.g.*, EPA, *Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*, 76 Fed. Reg. 52738 (Aug. 23, 2011). The Working Group responded in 2013 by producing revised SC-$CO_2$ estimates. *See Working Group, Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866* (Nov. 2013).

---

[6] These "scenarios" set certain economic, population, and emission trajectories, allowing the models to be sensitive to varying assumptions about the future. *February 2010 TSD*, at 15.

[7] While it noted Circular A-4's recommendation to include a 7% discount rate in most regulatory analyses, the Working Group explained that it would be inappropriate to use such a high discount rate in this context, when accounting for the extended intergenerational effects of SC-$CO_2$ emissions. *See February 2010 TSD*, at 17-23.

The Working Group, acting through OMB, subsequently sought public comment on the methodology underlying its 2013 SC-CO$_2$ estimates. *See* OMB, *Notice of Availability*, 78 Fed. Reg. 70586 (Nov. 26, 2013). Among other things, the Working Group sought comments on its selection of the three models, its method for synthesizing the resulting estimates, the model inputs it used to produce the estimates (such as the discount rates and climate sensitivity parameters), and the general strengths and limitations of its overall methodology. *See id.* After receiving tens of thousands of comments, the Working Group issued a lengthy July 2015 response. *See Response to Comments*, at 4. While its responses broadly defended its earlier methodological choices, the Working Group also committed to seeking further input from the National Academies of Sciences, Engineering, and Medicine regarding the technical merits of its approach and proposals to add additional rigor to the analysis. *See id.* at 5. The Working Group's response was accompanied by a technical revision to its SC-CO$_2$ estimates, which corrected minor errors in its prior revision. *See id.* at 41. The Seventh Circuit later upheld an agency's reliance on the Working Group's 2013 estimates, notwithstanding litigants' methodological objections. *See Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 678 (7th Cir. 2016).

Eventually, the Working Group broadened its focus beyond CO$_2$ emissions, and also issued estimates of the social cost of methane (SC-CH$_4$) and nitrous oxide (SC-N$_2$O). Experts had developed estimates of SC-CH$_4$ and SC-N$_2$O, using the same methodology that the Working Group had used for the SC-CO$_2$. *See* Alex Marten, *Incremental CH$_4$ and N$_2$O Mitigation Benefits Consistent with the U.S. Government's SC-CO$_2$ Estimates*, 15(2) Climate Policy 272 (2015); *see also* Working Group, *Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under E.O. 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide* (*2016 CH$_4$ and N$_2$O Estimates*), at 2-3 (Aug. 2016) (describing methodological approach consistent with that used to derive SC-CO$_2$ estimates). After EPA commissioned an external peer review of the application of these estimates to regulatory analysis, agencies began to employ these estimates in RIAs and seek public comment. *See 2016 CH$_4$ and N$_2$O Estimates*, at 3; *see also* EPA, *Whitepaper on Valuing Methane Emissions Changes in Regulatory Benefit-Cost Analysis, Peer Review Charge Questions, and Responses: EPA Summary and Response*, at 28-29 (Oct. 1, 2015). After further consideration of the peer-reviewed

literature and the public comments received in agency rulemakings, the Working Group published the first federal SC-$CH_4$ and SC-$N_2O$ estimates in August 2016. *See 2016 $CH_4$ and $N_2O$ Estimates*, at 2-3. Following the National Academies' advice, the Working Group also enhanced the discussion of uncertainty around its 2013 SC-$CO_2$ estimates, and deferred further updates until the National Academies could release their final report and recommendations. *See* Working Group, *Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under E.O. 12866*, at 2 (Aug. 2016). In January 2017, the National Academies report was issued, which broadly endorsed the use of SC-GHG estimates, while also outlining recommendations to ensure that these estimates kept up with the latest science. *See* National Academies of Sciences, Engineering, and Medicine, *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide* (2017).

Shortly after his inauguration in 2017, President Trump issued Executive Order 13783, which disbanded the Working Group and withdrew its prior analyses as "no longer representative of governmental policy." Exec. Order No. 13783 § 5(b), *Promoting Energy Independence and Economic Growth*, 82 Fed. Reg. 16093 (Mar. 28, 2017). President Trump further ordered that "when monetizing the value of changes in greenhouse gas emissions resulting from regulations, including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates, agencies shall ensure, to the extent permitted by law, that any such estimates are consistent with the guidance contained in OMB Circular A-4." *Id.* § 5(c).

Although the Trump Administration's policy approach to climate issues differed in many ways from that of the preceding administration, it continued to use standardized estimates of the social costs of greenhouse gases. Pursuant to E.O. 13783, EPA developed interim SC-$CO_2$ estimates by making two (and only two) changes to the Working Group's 2016 estimates: First, it began reporting estimates that attempted to capture only the domestic impacts of climate change, and second, it applied 3% and 7% discount rates. *See* EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal*, at 44 (2017). These interim domestic estimates were intended to be used by EPA and other agencies until a more rigorous estimate of the impacts of climate change to the United States could be developed. *See id.* at 43. Accordingly, although the Working Group had been disbanded, and although

the estimates of the social costs of greenhouse gas estimates were now lower (because of higher discount rates and an exclusive focus on U.S.-domestic damages), agencies continued to estimate the social costs of greenhouse gases in their cost-benefit analyses, as ordered by the President, just as they had done in prior administrations. *See, e.g.*, Bureau of Land Mgmt., *Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements*, 83 Fed. Reg. 49184, 49190 (Sept. 28, 2018) (using "interim values" for the SC-CH$_4$, "adjusted" to comply with E.O. 13783).

**2.** Executive Order 13990 and the Working Group's 2021 Interim Estimates

On January 20, 2021, President Biden issued the latest in this history of Executive pronouncements on employing the social cost of greenhouse gases: Executive Order 13990. Just as President Trump had done in E.O. 13783, President Biden laid out his expectations for agencies estimating the social costs of greenhouse gases:

> It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

E.O. 13990 § 5(a). President Biden also reestablished the Working Group, and directed that it "shall, as appropriate and consistent with applicable law[,] publish an interim SCC, SCN, and SCM within 30 days." *Id.* § 5(b)(ii)(A). E.O. 13990 further stated that "agencies shall use" those interim estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." *Id.* The Executive Order also set a September 1, 2021 deadline to "provide recommendations to the President" regarding the use of

SC-GHG estimates in contexts other than rulemaking, and a January 2022 deadline to publish a more comprehensive update to the cost estimates.  *See id.* § 5(b)(ii)(B)(C).

As directed by the President, on February 26, 2021, the Working Group issued its interim SC-CO$_2$, SC-CH$_4$, and SC-N$_2$O estimates ("the Interim Estimates"), which are identical to the Working Group's 2016 estimates, other than adjustments for inflation.  *See* Ex. 3, Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O. 13990 (February 2021 TSD)*, at 1 (Feb. 2021).  As the Working Group explained, it reviewed the interim SC-GHG estimates that EPA had developed in 2017 for use under E.O. 13783 and found them wanting in several respects.  *See id.* at 3.  For one, they failed to acknowledge that "a global perspective is essential for SC-GHG estimates because climate impacts occurring outside U.S. borders can directly and indirectly affect the welfare of U.S. citizens."  *Id.*  Another failing was their use of high discount rates that "inappropriately underestimate[d] the impacts of climate change" and failed to account for "intergenerational ethical considerations."  *Id.*  But the Working Group also acknowledged significant advances in the relevant scientific literature, and explained that recent studies suggest that the new Interim Estimates "likely underestimate the damages from GHG emissions."  *Id.* at 31.

On May 7, 2021, pursuant to E.O. 13990's directive that the Working Group "solicit public comment[,] engage with the public and stakeholders[, and] seek the advice of ethics experts" in conducting its work, E.O. 13990 § 5(b)(iii) (cleaned up), OMB published a notice in the Federal Register, inviting comments "on the [February 2021 TSD] as well as on how best to incorporate the latest peer-reviewed science and economics literature in order to develop an updated set of SC-GHG estimates."  OMB, *Notice of Availability and Request for Comment* on *"Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under E.O. 13990"*, 86 Fed. Reg. 24669, 24669 (May 7, 2021).  That comment period closed on June 21, 2021.  *Id.*

On June 3, 2021, OIRA published a "Frequently Asked Questions" document to assist agencies in meeting their obligations under E.O. 13990.  Ex. 4, OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs)* (OIRA Guidance), (June 3, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/06/Social-Cost-of-Greenhouse-Gas-

Emissions.pdf.   As that guidance makes clear, the Interim Estimates will be used when agencies prepare cost-benefit analyses "for purposes of compliance with E.O. 12866." *Id.* at 1.   The OIRA Guidance also confirms that where "an applicable statute expressly specifies and requires or excludes an analytic approach," *e.g.*, cost-benefit analysis, that statute "must control" the agency's approach "in taking an agency action," even in the context of the Executive Order. *Id.* at 2.   In other words, where Congress has addressed the issue, "those statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions in the context of the agency action." *Id.*

## II.   **Procedural Background**

Ten states filed this action on April 22, 2021, claiming that Section 5 of E.O. 13990 and the Interim Estimates violate the APA and are otherwise *ultra vires*.   They named as Defendants twenty-three federal entities and officials, including the President.   Defendants now move to dismiss.

## ARGUMENT

Although all of Plaintiffs' claims are meritless, this Court should not reach their merits, because the Court lacks subject-matter jurisdiction under the doctrines of standing and ripeness.   Although Plaintiffs purport to challenge E.O. 13990 and the Interim Estimates, all of their alleged injuries are (1) speculative; (2) caused by future hypothetical agency regulations (rather than the Executive Order or the Interim Estimates); and (3) not likely to be redressed by a victory here.   And if, one day, Plaintiffs *do* face an actual or imminent injury from agency action taken in reliance on the Executive Order, Plaintiffs can challenge that action (including the agency's reliance on the Executive Order) at that time.   On top of all that, Plaintiffs have failed to identify any available cause of action.

Plaintiffs' claims would ultimately fare no better on the merits.   Their understanding of the Executive Order as presidential lawmaking, through which agencies are required to violate federal law, is squarely refuted by the text of the Executive Order and the recent OIRA Guidance interpreting it: the Executive Order is inoperative by its own terms whenever an agency faces conflicting statutory requirements.   And although there were no notice-and-comment obligations here, what matters is that agencies *will* seek comment before issuing binding rules, and that the Working Group has already (and repeatedly) considered and rejected Plaintiffs' methodological concerns.

All of Plaintiffs' claims should be dismissed.

## I.   THE COURT LACKS SUBJECT-MATTER JURISDICTION.

There are many reasons why this case should be dismissed in its entirety, but the two most straightforward are grounded in this Court's subject-matter jurisdiction: standing and ripeness. Despite some variation between the doctrines, the same basic error requires dismissal of Plaintiffs' claims under either. In short, instead of waiting until an agency relies on the Executive Order or the Interim Estimates in a particular agency action, in a manner that causes Plaintiffs some concrete harm, Plaintiffs have instead filed this premature challenge to the Executive Order itself. In doing so, Plaintiffs (in their words) seek to avoid the "significant regulatory infringements" that they expect will be caused by future agency regulations which, collectively, once they are issued, "will fundamentally reorder the U.S. economy" across "a diverse array of industries." Compl. ¶¶ 95, 102, 131. Although Plaintiffs might prefer that the Executive Order and the Interim Estimates be invalidated in their entirety and all at once—rather than litigated in the context of specific agency actions that actually cause Plaintiffs concrete harm—that type of speculative, prophylactic relief is not available from Article III courts. And even if Plaintiffs could overcome both their standing and ripeness problems, they have also failed to identify any cause of action that could support these claims. For all these reasons, this case should be dismissed, in its entirety, for lack of subject-matter jurisdiction.

## A.   Plaintiffs lack Article III standing.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff who seeks to establish standing "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Here, Plaintiffs cannot establish any of them.

1.    **The possibility that Plaintiffs will suffer a future injury—let alone an injury actually caused by the Executive Order—is speculative.**

To support Article III standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) ("For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur."). Where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan*, 504 U.S. at 562).

**a.**    Plaintiffs do not allege that they have *already* suffered any "concrete, particularized," or "actual" injury, *Clapper*, 568 U.S. at 409—instead, this case is solely about "a threatened future injury." *Stringer*, 942 F.3d at 721. But Plaintiffs allege at most a "*possible* future injury," rather than one that is "certainly impending." *Clapper*, 568 U.S. at 409 (first emphasis added). In particular, Plaintiffs allege that the Interim Estimates "are *potentially* relevant" across many different regulatory contexts, Compl. ¶ 6 (emphasis added)—that is, Plaintiffs hypothesize that some agencies might use them to "justify unprecedented increases in regulatory restrictions on agriculture, energy, and virtually every other human activity," *id.* ¶ 95, and that those future, hypothetical agency actions will harm them.

Plaintiffs' theory of injury is entirely speculative. It is premised on a "speculative chain of possibilities," *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017), and the critical links in that chain are quite hard to predict. In particular, Plaintiffs ignore that, while operating within the wide boundaries set by the Executive Order (and by dozens of potentially relevant statutory delegations of authority), agencies taking future action will still be making "policy judgment[s] committed to the[ir] broad and

legitimate discretion"—discretion which, so long as the agencies comply with the APA and their statutory authority, "courts cannot presume either to control or to predict." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (citation omitted). In other words, when it comes to implementing the Executive Order on an agency-by-agency, rule-by-rule basis, "[t]hese policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise . . . policy and myriad other circumstances." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989). Perhaps agencies will issue new, costly regulations. Perhaps not. Plaintiffs offer nothing but conjecture to support the assumption that a cavalcade of new, burdensome regulation is surely forthcoming, and that those hypothetical regulations will surely harm them. The Supreme Court has appropriately been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that. *Cf. id.* at 412 ("[B]ecause § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

The Supreme Court's application of these principles in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), shows why Plaintiffs' speculative fears of a regulatory slippery slope are not enough. "In *Summers*, the Court considered a challenge brought by environmental groups with respect to a Forest Service regulation exempting certain timber salvage sales (those involving less than 250 acres of forest) from the notice and comment period otherwise required for such sales." *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 43 (D.D.C. 2015) ("*FFRC*") (citing *Summers*, 555 U.S. at 490). "In ruling that the plaintiffs lacked standing, the *Summers* Court noted that '[t]he regulations under challenge here neither require nor forbid any action on the part of' the plaintiffs, but rather 'govern only the conduct of Forest Service officials engaged in project planning.'" *Id.* (quoting *Summers*, 555 U.S. at 493). "Ultimately, the Supreme Court found that the plaintiffs lacked standing because they had failed 'to allege that any *particular* timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete' interest of the plaintiffs in the national forests." *Id.* (quoting *Summers*, 555 U.S. at 495) (emphasis added). Thus, the plaintiffs could not challenge the generic regulation, until it was actually applied by the Forest Service, in a specific timber sale, in a way that

caused a concrete injury.  *See Summers*, 555 U.S. at 493 ("[R]espondents can demonstrate standing only if *application* of the regulations by the Government will affect them.") (second emphasis omitted).

E.O. 13990, "like the rule at issue in *Summers*, governs only agency conduct."  *FFRC*, 100 F. Supp. 3d at 44.  Therefore, "under *Summers'* reasoning," Plaintiffs lack standing "unless and until they have been—or certainly will be—harmed by a specific" agency action that was "developed pursuant to" the Executive Order.  *Id.*; *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011) (no standing to challenge designation of a river as "traditional navigable waters" that were "subject to Clean Water Act jurisdiction," as plaintiffs still "face[d] only the *possibility* of regulation"); *FFRC*, 100 F. Supp. 3d at 42 ("Plaintiffs have not identified a *specific* land management plan promulgated pursuant to the [2012] Planning Rule that threatens to harm [them.]").  Plaintiffs might think it more efficient to challenge a broad regulatory framework (like the one at issue in *Summers*) at the outset, rather than waiting for a concrete application.  But Article III has no convenience exception.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  And while a "case-by-case approach . . . is understandably frustrating" to Plaintiffs, it "is the traditional, and remains the normal, mode of operation[s] of the courts."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S 871, 894 (1990).

**b.**  The speculation inherent in Plaintiffs' injury-in-fact theory, indeed, goes deeper than just their assumption that they will be harmed by future, hypothetical agency actions.  For there to be any cognizable harm caused by Section 5 of the Executive Order, Plaintiffs would at least have to show that, in the absence of the Executive Order and the Interim Estimates, the agency would have come to a different regulatory result.  *See, e.g.*, *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 152-53 (D.D.C. 2019) ("[B]ecause the evidence demonstrates that factors unrelated to [the] Executive Order and OMB Guidance have delayed finalization of the V2V and Commercial Water Heating Equipment rules . . . , the Court will now dismiss the action for lack of standing.").  But that is unknowable in advance. Even if it were certain that agencies eventually will regulate in a way that injures Plaintiffs, there is no way to be confident that those future actions (and thus, future injuries) will be causally connected to the Executive Order or the Interim Estimates.

Imagine that Section 5 of the Executive Order and the Interim Estimates were never issued. In that hypothetical world that Plaintiffs desire, agencies would *not* be precluded from considering the social costs of greenhouse gases. After all, as several courts have held, it is consistent with reasoned decision-making for agencies to take the costs of greenhouse gas emissions into account, *see, e.g., Zero Zone*, 832 F.3d at 678—and, at least in some cases, it may be arbitrary and capricious not to, *see, e.g., Ctr. for Biological Diversity*, 538 F.3d at 1203; *California v. Bernhardt*, 472 F. Supp. 3d 573, 611 (N.D. Cal. 2020), *appeal filed*, No. 20-16793 (9th Cir. Sept. 16, 2020).   And Section 1 of E.O. 13990—not challenged here—directs all agencies to "immediately commence work to confront the climate crisis," and to do so "guided by the best science."

In these hypothetical rulemakings, the social cost of greenhouse gas emissions is but one of many factors that an agency might (or might not) consider when regulating the "diverse array of industries," Compl. ¶ 131, that Plaintiffs are concerned about—depending on the policy question at issue, and the statutory delegations of authority that will necessarily guide the agency's approach.  In fact, because these costs have been estimated by others in ranges that may *exceed* those set by the Interim Estimates, Plaintiffs could face *higher* social-cost estimates in the absence of the uniform approach contemplated by E.O. 13990.  *See* Feb. 2021 TSD at 4 (noting that the Interim Estimates "likely underestimate societal damages from GHG emissions").

Thus, not only is it speculative that Plaintiffs will be injured at all, that speculation is further compounded when trying to demonstrate that any injury will stem from the Executive Order or the Interim Estimates—a showing that is required for Plaintiffs to rely on this theory of injury.  *See, e.g., Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 (1976) (plaintiffs lacked standing because "[s]peculative inferences are necessary to connect their injury to the challenged actions" of the government); *California v. Trump*, --- F. Supp. 3d ----, 2020 WL 1643858, at *8 (D.D.C. Apr. 2, 2020) ("[W]ith respect to each of the four regulatory inactions or actions at issue, Plaintiffs cannot show that any material delay in action or any agency action was caused by the Executive Order . . . .").[8]

---

[8] For similar reasons, Plaintiffs cannot demonstrate that their alleged injuries are traceable to the Executive Order, or redressable by its invalidation.  *See infra* at Sections I.A.2., I.A.3.

**c.** Executive Order 13990's place in the broader scheme of regulatory review also shows why it is speculative to assume that it will necessarily dictate policy outcomes that concretely harm Plaintiffs. To be clear, Plaintiffs' concern is not agency cost-benefit analyses in a vacuum, but that the Interim Estimates will be used to "*justify* unprecedented increases in regulatory restrictions," Compl. ¶ 95 (emphasis added). But Plaintiffs overestimate the role that cost-benefit analysis generally (and this Executive Order specifically) plays in *justifying* (as opposed to analyzing or explaining) agency action—as confirmed by recent OIRA Guidance on the subject of E.O. 13990.

Often, agencies prepare a cost-benefit analysis solely as part of the Regulatory Impact Analysis required by E.O. 12866—*not* because it is required by statute, and *not* because that cost-benefit analysis will be relied upon as justification for the agency rule. By definition, in that scenario, the Interim Estimates will have made no substantive difference to the outcome. That is why it is well-settled that a cost-benefit analysis that is undertaken only for purposes of compliance with E.O. 12866 (rather than to justify a rule) is *not* subject to judicial review. *Compare, e.g.*, *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013) ("Executive Order 12,866," which "require[s] that the agency perform cost benefit analyses for each proposed regulation" does not "create[] private rights," so alleged violations of it are not "subject to judicial review"), *with Nat'l Ass'n of Home Builders*, 682 F.3d at 1040 ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable."). E.O. 13990 does not change the fact that in these situations, the agency's cost-benefit analysis will *not* have been the basis for the agency's (hypothetical) action—with that analysis instead having been carried out solely to comply with other, longstanding executive orders that are not challenged here.

Other times, an agency prepares a cost-benefit analysis because it is required (or permitted) to do so by some statute, and the cost-benefit analysis is part of the *justification* for the agency action. But OIRA Guidance confirms that "when applicable statutes require another approach, those statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions[.]" OIRA Guidance, at 2; *see also* E.O. 13990 §§ 5(b)(ii), 8. In other words, the agency is not only authorized, but *required* to deviate from the Interim Estimates, if necessary to comply with a

statute.  Of course, in that situation, the cost-benefit analysis *would* typically be subject to judicial review, at a time when any effect of the action will be more concrete.  *See, e.g.*, *Nat'l Ass'n of Home Builders*, 682 F.3d at 1039-40.  And to facilitate that review, agencies will "respond to any significant comments on [the Interim Estimates] and ensure [their] analysis (including any use of the 2021 interim estimates) is justified as not arbitrary or capricious."  OIRA Guidance, at 2.

Thus, it is unknowable in advance whether any harm caused by future (hypothetical) regulations would have any causal connection to the Executive Order or the Interim Estimates.

**d.**  To make matters even more speculative, even if an agency's cost-benefit analysis is relied upon to justify a rule—and for the reasons above, it often will not be—it is unknowable in advance whether the social costs of greenhouse gases would be outcome determinative even *to the cost-benefit analysis*.  The usual purpose of an agency cost-benefit analysis is to answer a single, yes-or-no question: do the quantifiable benefits of the proposed rule outweigh the quantifiable costs?  It is entirely speculative to assume that, for any (let alone all) future regulations, the costs of a proposed rule would outweigh its benefits *but for* the benefits associated with reducing greenhouse gas emissions.  And any other impact (including an increase in the *magnitude* of the net benefits) will often be immaterial to the agency's ultimate decision.  Likewise, it is even more difficult to speculate as to whether Plaintiffs' *particular* concerns—*e.g.*, the discount rate—would alter the bottom-line question of whether the benefits of a proposed rule, overall, outweigh its costs.  Thus, it is entirely uncertain whether the Executive Order would *ever* be determinative in the decision to issue a rule.  And it is even more speculative to assume that, even if some regulation that meets all of those criteria is issued one day, that that particular regulation will *also* happen to be one that concretely harms Plaintiffs.

**e.**  In short, Plaintiffs' entire theory of standing is based on a portrait of agency regulation that is painted with broad, and often mistaken, strokes.  Plaintiffs seem to imagine a government of regulation by mathematical formula, in which one can simply adjust a single numerical variable on the front end, and every regulation that emerges at the back end will necessarily be altered in some material and predictable way.  But in fact, agencies have broad discretion to exercise independent policy judgment within the boundaries set by Congress in its (often quite general) delegations of authority.

*Cf. Yakus v. United States*, 321 U.S. 414, 425 (1944) ("It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework."). And Plaintiffs' narrative fundamentally misunderstands the relationship between this Executive Order, prior executive orders (like E.O. 12866), and the way that cost-benefit analysis is used—or, more often, not used—to justify agency rules. Ultimately, "cost-benefit analysis is one of several useful decisionmaking tools" that is often available to federal agencies, *Sierra Club v. Sigler*, 695 F.2d 957, 976-77 (5th Cir. 1983), but it only rarely drives the outcome of any particular rulemaking. Accordingly, even if Plaintiffs could somehow show that the future hypothetical regulations they fear were "certainly impending," it remains impossible (absent impermissible speculation) to assume that any such injuries will be attributable to the challenged provisions of the Executive Order. *See, e.g., Simon*, 426 U.S. at 42-43. That is fatal to their standing.

**2.      Any injury would be traceable to future, hypothetical agency actions, not to the Executive Order or the Interim Estimates.**

Even if Plaintiffs could show a "certainly impending" injury, they still cannot satisfy the causation requirement of Article III standing, because none of Plaintiffs' alleged future injuries would be "fairly traceable to the challenged conduct of the defendant," *Spokeo*, 136 S. Ct. at 1547—that is, to Section 5 of the Executive Order, or to the Interim Estimates. Instead, all of Plaintiffs' alleged injuries will be caused, if at all, by future (and currently hypothetical) agency actions. One day, Plaintiffs may have standing to challenge some of those agency actions under the APA—assuming those hypothetical regulations are actually issued, and that they concretely harm Plaintiffs. And Plaintiffs can argue in a future case that an agency erred in its consideration of the costs of greenhouse gases—including by arguing that the estimates relied upon were arbitrary and capricious. But Plaintiffs cannot rely on alleged future injuries from those non-existent regulations to manufacture standing to challenge an Executive Order that *itself* is not the cause of any concrete, particularized injury. *See, e.g., California v. Texas*, --- S. Ct. ----, 2021 WL 2459255, at *7 (U.S. June 17, 2021) (reversing the Fifth Circuit to hold that plaintiff states "failed to show that they have alleged an injury fairly traceable to

the defendant's allegedly *unlawful* conduct," because any injuries were caused by a different statutory provision than the allegedly unlawful provision challenged by plaintiffs) (citation omitted).

Plaintiffs' own allegations confirm their traceability problem. Although Section 5 of E.O. 13990 is the "challenged conduct" that Plaintiffs say is unlawful, *Spokeo*, 136 S. Ct. at 1547, it is hypothetical agency actions that Plaintiffs identify as the source of their (future) injuries.  In their words, Plaintiffs are concerned that they will suffer harm if and when federal agencies rely on the Interim Estimates to "justify[] tighter, job-killing regulations" across "a diverse array of industries." Compl. ¶ 131.  For example, they allege that "regulation of power plants will necessarily increase in stringency due to the increased Biden SC-GHG Estimates." *Id.* ¶ 122.  Plaintiffs further allege that these (hypothesized) regulatory expansions, if and when they happen, will "encroach into nearly every facet of life regulated, if at all, by the States." *Id.* ¶ 110.

Again, even setting aside the speculative nature of these sorts of allegations, *see supra* at Section I.A.1.; *infra* at Section I.B., if they ever come to pass, the "significant regulatory infringements," *id.* ¶ 95, that Plaintiffs fear will have been caused by some hypothetical future regulatory "expansion" by EPA, or the Department of Energy, or some other agency (or combination of agencies)—*not* by the challenged Executive Order, which, by itself, has no effect at all on (for example) the "stringency" of federal "regulation of power plants." *Id.* ¶ 122.  Whatever prognostications one could make about the future of federal energy and environmental policy, Plaintiffs have not identified a single state law or federal regulation has been promulgated, preempted, or altered, in any way, by the Executive Order.

More generally, Plaintiffs assert that "federal agencies will use the SC-GHG Estimates to assign massive—even existential—costs to every regulatory action," and will "thereby fundamentally transform[] the way States conduct business and Americans live." *Id.* ¶ 6.  But any such hypothetical injury would still stem only from future agency action.  So even if it were plausible that some agency will issue (in Plaintiffs' words) "job-killing regulations," *id.* ¶ 131, that would (at most) be a basis for a challenge to those future regulations—not to the Executive Order or the Interim Estimates.

To be sure, the Executive Order requires use of the Interim Estimates in some circumstances. *See* E.O. 13990 §§ 5(b)(ii)(A) (using the word "shall"); OIRA Guidance, at 1.  But that directive is

inoperative whenever an agency faces any conflicting statutory obligation, *see* OIRA Guidance, at 2-3; *see also* E.O. 13990 §§ 5(b)(ii), 8.  In other words, agencies will only ever rely on the Interim Estimates when they have *discretion* to do so—which is why Plaintiffs' alleged future injuries (if any) will be traceable to future agency actions, rather than to the Executive Order or the Interim Estimates.

Plaintiffs try to elide the distinction between the Executive Order and the future, hypothetical regulations that they fear—but their own complaint undermines that effort.  For example, Plaintiffs speculate that the Department of Energy might issue "tighter energy-efficiency standards for vending machines," "increase[d] regulation of mercury emissions and industrial boilers," or "aggressive regulation of natural gas."  Compl. ¶ 131.  But they do not identify any such regulatory initiative that has actually been issued (or will imminently be issued) in reliance in the Interim Estimates.  Nor do Plaintiffs allege that the Executive Order *itself* has changed the way vending machines, industrial boilers, or natural gas are regulated—that is, that there has been any effect that is actually due to the Executive Order that is the target of this lawsuit.  *See, e.g.*, *id.* ¶ 110 ("These *regulatory actions* encroach into nearly every facet of life regulated, if at all, by the States") (emphases added); *id.* ¶ 127 ("[T]he Biden SC-GHG Estimates will limit the scope of public lands and waters that BLM and BOEM make available for exploration and development.").  These allegations acknowledge what is unavoidable from the nature of Plaintiffs' hypothesized injuries: they all stem from potential, future agency actions.  And absent those actions, Plaintiffs will suffer no harm.  Accordingly, as a matter of causation, Plaintiffs lack Article III standing to bring this lawsuit, which challenges only the Executive Order and the Interim Estimates—not any past, present, or future agency regulation.

### 3.      Plaintiffs' alleged injuries are not redressable by a victory in this lawsuit.

**a.**  Even if Plaintiffs could satisfy the injury-in-fact and traceability requirements, they would still lack standing, because it is not "likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (citation omitted).  Plaintiffs seek an "injunction prohibiting the Agency Defendants from adopting, employing, treating as binding, or relying upon the work product of the Working Group."  Compl. at 54, Prayer for Relief, ¶ (h).  That relief would be overbroad—although they are not entitled to any relief, an order declaring the Interim

Estimates to be non-binding would be sufficient to resolve all of Plaintiffs' legal objections. And because Plaintiffs also claim to seek to preserve agency discretion to use the best available science, a proper redressability analysis need only ask whether that narrower relief would redress their harms.

It would not. Even without any binding directive, agencies often may (and sometimes must) consider social costs of greenhouse gases. *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203. And in doing so, whether or not the Interim Estimates are binding, agencies are not likely to ignore them, as they reflect years of cutting-edge work from leading experts and academics in and out of government.

In any event, even if Plaintiffs' broader requests for relief were somehow granted—that is, if agencies were prohibited entirely from relying upon the Interim Estimates—there are many reasons to expect that, given the policy priorities of the President and his Cabinet,[9] agencies will still consider the social costs of greenhouse gases when regulating—even without any binding directive from the President, and even without being able to rely upon the work product of the Working Group. After all, the Working Group is comprised of senior Executive Branch officials who would be expected to continue to play a significant role in consideration of the social costs of greenhouse gases irrespective of their membership in the Working Group (*e.g.*, as the Administrator of EPA, or Director of OMB). In fact, in the absence of the Interim Estimates, some agencies might conduct their own analyses and rely upon *higher* estimates. *See* Feb. 2021 TSD at 4 (noting that the Interim Estimates "likely underestimate societal damages from GHG emissions"). The animating purpose of Section 5 of the Executive Order is to *standardize* consideration of these costs and benefits across the Executive Branch. But in the absence of a uniform approach set by the President, there is no reason to assume that individual agencies will assign lower values—let alone ignore these costs altogether. Instead, they may ultimately adopt the same (or similar) estimates—or higher ones.

---

[9] *See, e.g.*, EPA, *Climate Change*, https://perma.cc/GGN5-YDA6 ("Understanding and addressing climate change is critical to EPA's mission of protecting human health and the environment. EPA tracks and reports greenhouse gas emissions, leverages sound science, and works to reduce emissions to combat climate change."); USDA, *Climate Solutions*, https://perma.cc/AW5T-37XC ("The changing climate presents real threats to U.S. agricultural production, forest resources, and rural economies.").

In other words, vacating Section 5 of the Executive Order would have "no legal impact on the consensus that [the Working Group's] estimates constitute the best available science about monetizing the impacts of greenhouse gas emissions." *California v. Bernhardt*, 472 F. Supp. 3d at 611 (holding that the Department of the Interior's failure to consider the global social cost of methane was arbitrary and capricious); *see also* E.O. 13990 § 1 (in a provision not challenged here, directing agencies to "immediately commence work to confront the climate crisis," and to do so "guided by the best science").   As a result, even if Plaintiffs obtain the relief they seek, it is not "likely, as opposed to merely speculative," that such relief would meaningfully alter any particular regulation (let alone do so in a way that would prevent what otherwise would have been a concrete, particularized injury to these Plaintiffs).   That is independently fatal to Plaintiffs' Article III standing.   *See, e.g.*, *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (no redressability if "the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces").

**b.**   Setting aside the general redressability problem with all of Plaintiffs' claims, at a minimum, Plaintiffs cannot obtain relief against the President.   That provides an additional reason to dismiss all of Plaintiffs' claims against the President, and to dismiss him as a Defendant.   *See, e.g.*, *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief.").

Plaintiffs' core complaint is with Section 5 of the Executive Order—specifically, Section 5(b)(ii)(A)'s provision in which the President states that, when consistent with applicable law, "agencies shall use" the Interim Estimates when monetizing the costs of GHG emissions.   *That* is what the Plaintiffs hope to forestall through this lawsuit.   There can be no question, then, that to grant the relief Plaintiffs seek in the amended complaint, the Court would need to exert control over the manner in which the President exercises his discretionary duties as head of the Executive Branch.

This the Court cannot do.   Enjoining the President directly would violate the longstanding separation-of-powers principle that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality op.) (issuing a "grant of injunctive relief

against the President himself [was] extraordinary, and should have raised judicial eyebrows"). "[F]or the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan v. Clinton,* 100 F.3d 973, 978 (D.C. Cir. 1996) (quoting *Franklin,* 505 U.S. at 827).[10] Accordingly, because the Court cannot award this relief, Plaintiffs' claims against the President are not redressable, and the Court should dismiss him as a Defendant.

### 4. Plaintiffs' remaining, miscellaneous bases for standing are meritless.

Plaintiffs make passing reference to a variety of miscellaneous standing-related theories, asserting (often without further explanation) that "[t]he challenged actions will cause harm to Plaintiff States' sovereign, proprietary, and *parens patriae* interests." Compl. ¶ 121. None of these theories can surmount the fundamental standing defects explained above, because they all rely on: (1) speculation about possible future injuries; (2) harms that, even if they come to pass, would be traceable to future hypothetical regulations, rather than to the Executive Order or the Interim Estimates; and (3) harms that are not likely to be redressed by a favorable decision. But even if the Court was unpersuaded by all of the above arguments from *Defendants,* it remains *Plaintiffs'* burden to demonstrate subject-matter jurisdiction. *Spokeo,* 136 S. Ct. at 1547. And for the reasons below, Plaintiffs' specific standing theories are all meritless, even on their own terms.

**a.** Plaintiffs rely heavily on "*parens patriae* standing." Compl. ¶ 130; *see also id.* ¶¶ 10-19, 121. "The problem for [Plaintiffs] is that, as a general matter, a 'State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Gov't of Manitoba v. Bernhardt,* 923 F.3d 173, 176 (D.C. Cir. 2019) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n.16 (1982)); *accord Brackeen v. Haaland,* 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (op. of Dennis, J.).

---

[10] The same is true for Plaintiffs' claims for declaratory relief against the President. In practice, to subject the President to suits for declaratory relief poses essentially the same concerns as injunctions. *See Franklin,* 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) ("It is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court."). Thus, even when "[t]he only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against . . . the President himself . . . such relief is unavailable." *Newdow v. Roberts,* 603 F.3d 1002, 1013 (D.C. Cir. 2010).

That is because it is the United States, and not the State, that represents the people as *parens patriae* in their relations to the federal government.  *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). Because standing on a *parens patriae* theory is off the table, all of Plaintiffs' standing allegations can be ignored, except for the few that allege a *direct* injury to the states—rather than injury to their citizens or in-state businesses.  *See Manitoba*, 923 F.3d at 178 (discussing "[t]wo types of lawsuits" that states can bring) (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992) (distinguishing between "claims of *parens patriae* standing" and "allegations of direct injury to the State")).  That means that, for example, all of Plaintiffs' allegations about "the economic injuries their citizens will . . . suffer as a result" of the Interim Estimates are irrelevant (even if they were plausible).  Compl. ¶ 130; *see also id.* ¶¶ 10-19, 130-134 (allegations regarding the potential future economic impact of potential future agency regulations on each Plaintiff state's economy).

 **b.**  In the complaint, allegations related to the possibility of a *direct* injury to the states are few and far between.  But even where they occasionally appear—for example, Plaintiffs' assertions that the Interim Estimates will "driv[e] up the price of the electricity" or other goods they purchase, Compl. ¶¶ 10-19, 111, 136—those kinds of interests are shared by virtually every state, every business, every organization, and every person in the United States (even setting aside the obvious speculativeness and traceability problems).  *See, e.g., id.* ¶ 6 (alleging that "the most expansive . . . federal regulatory initiative in history" is forthcoming, which will "fundamentally transform[] the way States conduct business and Americans live," and will affect "virtually everything that States and their citizens encounter every day."); *id.* ¶ 10 (alleging that the Interim Estimates "will allow federal agencies to control aspects of—and increase prices for—family cars, goods and services sold in retail stores, cooking fuels, refrigerators, microwaves, and virtually every other aspect of Louisiana's families' personal lives"); *id.* ¶ 111 ("The Biden SC-GHG Estimates will . . . ultimately increase costs that consumers and the States for pay for food, bottled water, supplies, and other commodities.").

 As a result, even taking Plaintiffs' allegations at face value, unless and until the Executive Order is applied in a future agency action that directly affects these Plaintiffs in some *particularized* way, Plaintiffs' interest in the Executive Order's legality is the same as anyone else's: an "undifferentiated,

generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). But "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974); *see also Hotze v. Burwell*, 784 F.3d 984 (5th Cir. 2015) ("[I]ncreased health-insurance premiums is a paradigmatic 'generalized grievance.'"). And "[v]indicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not of federal-court plaintiffs. *Lujan*, 504 U.S. at 576.

**c.** Plaintiffs devote significant attention to (conclusory) allegations that Executive Order 13990 will cost them "substantial tax revenue." Compl. ¶ 10; *see also id.* ¶¶ 14, 19, 122, 127, 129, 130, 144. But the Fifth Circuit has squarely (and recently) held that "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020); *see also Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) (same); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (same). The reality is that "'virtually all federal policies' will have 'unavoidable economic repercussions.'" *El Paso*, 982 F.3d at 339 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). Accordingly, complaints about such losses typically amount to "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672. So too here.[11]

**d.** In an attempt to identify a specific injury to the states, Plaintiffs suggest that they "will now have to employ the Biden SC-GHG Estimates in their sovereign capacities, despite the legal objections of State officers," in environmental impact statements prepared under the National Environmental Policy Act (NEPA), or as part of cooperative-federalism programs. Compl. ¶ 123. That is incorrect.

---

[11] Plaintiff Louisiana goes one large step further, alleging that the Interim Estimates "threaten the coastline of . . . Louisiana by directly reducing the funds necessary to restore and maintain the State's coastal lands." Compl. ¶ 128. But because Fifth Circuit precedent forbids Plaintiffs from relying on allegations of a general diminution in revenue as an indirect result of federal policy to support their standing, it does not matter what any individual state would have used that revenue to accomplish—even ignoring the speculation inherent in the State of Louisiana's allegation.

The Executive Order applies to "all executive departments and agencies" of the *federal* government, E.O. 13990 § 1—it does not bind *state* agencies.  And no decisions have yet been made as to whether (and to what extent) the Executive Order applies *at all* outside the context of agency regulations.  *See* E.O. 13990 § 5(b)(ii) (the President requesting "recommendations" by September on the applicability of the Interim Estimates outside the context of regulations).  So, at present, any consequences for NEPA or cooperative-federalism programs are entirely speculative.

As for NEPA in particular, that statute does not require *any* agency to conduct a formal cost-benefit analysis when preparing an analysis of environmental impacts, *see S. La. Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1013 n.7 (5th Cir. 1980), and federal agencies frequently do not do so.  *See* 40 C.F.R. § 1502.22; *see also* 42 U.S.C. §§ 4321 *et seq.*  And, at present, Section 5 of the Executive Order only governs when an agency monetizes the cost of greenhouse gas emissions in a cost-benefit analysis.  *See* E.O. 13990 § 5(a), (b)(ii)(A); Feb. 2021 TSD at 9 (the Interim Estimates are "the theoretically appropriate values to use when conducting benefit-cost analyses of policies that affect GHG emissions").  In any event, while this allegation might (at most) be relevant to a future lawsuit challenging the use of the Interim Estimates in a specific agency action that triggers NEPA-related requirements, it cannot provide standing to challenge the Executive Order itself.  After all, "standing is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017).[12]

**e.** Plaintiffs allege generically that they fear "infringement upon [their] sovereign functions." Compl. ¶¶ 11-19; *see also id.* ¶ 9 (calling the Executive Order an "attack on State sovereignty and individual liberty").  But those sorts of abstract appeals to federalism and sovereignty as a basis for standing cannot be reconciled with *Massachusetts v. Mellon*, in which the Supreme Court made clear that Article III jurisdiction is not satisfied by a state plaintiff raising "abstract questions of political power, of sovereignty, of government."  262 U.S. at 485.  The Supreme Court held that the State's "naked contention that Congress has usurped the reserved powers of the several states by the mere enactment

---

[12] These arguments also provide a complete response to Plaintiffs' conclusory allegation that the Interim Estimates improperly (*i.e.*, without notice-and-comment) "modify the requirements of the Council on Environmental Quality's (CEQ) recent NEPA final rule." Compl. ¶ 100.  In fact, those requirements were unchanged by the Executive Order or the Interim Estimates.

of the statute" was insufficient to establish an Article III case or controversy. *Id.* at 483. Instead, Massachusetts was required to allege that a particular sovereign interest was "actually invaded or threatened" by "the actual or threatened operation of the statute," *id.* at 485—precisely the sort of concrete and particularized injury that Plaintiffs lack here, in the absence of any actual or imminent *application* of the Executive Order in a specific regulatory action affecting Plaintiffs concretely.

      **f.** Finally, Plaintiffs allege that Defendants have "injured the Plaintiff States in their sovereign, quasi-sovereign, and proprietary capacities by depriving them of the opportunity to participate in notice-and-comment rulemaking." Compl. ¶ 135. As explained below, Plaintiffs' procedural APA claim fails. *See infra* at Section II.C. But in any case, the Supreme Court has squarely rejected Plaintiffs' argument: "a bare procedural violation, divorced from any concrete harm," is not enough for standing. *Spokeo*, 136 S. Ct. at 1549; *see also Summers*, 555 U.S. at 496 (being "denied the ability to file comments" is "insufficient to create Article III standing"). Plaintiffs cannot bootstrap their way into federal court merely by alleging that Defendants violated the law—that is the basic premise of standing doctrine.

**B.**    <u>**Plaintiffs' claims are not ripe.**</u>

      For reasons that are conceptually distinct but similar in kind to the problems with Plaintiffs' theory of standing,[13] their claims are not ripe. If an agency one day relies on the Interim Estimates to justify some action that actually causes Plaintiffs a concrete injury, they can challenge that specific agency action (including its use of the Interim Estimates) at that time. For both constitutional and prudential reasons, that is the only appropriate way to bring this sort of challenge: in a concrete context, about a specific agency action, which is causing concrete harms, to a specific plaintiff.

      **1.** "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has

---

[13] Standing and ripeness are "[t]wo related doctrines of justiciability," "each originating in the case-or-controversy requirement of Article III." *Trump*, 141 S. Ct. at 535. Although they are "are technically different doctrines," they are "closely related in that each focuses on 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Johnson v. Missouri*, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)).

been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  "The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs.*, 387 U.S. at 149).

**2.**  As for hardship, Plaintiffs' claimed harm rests on speculation that one or more agencies will one day take some action that will cause them injury.  *See supra* at Section I.A.1.  In other words, this lawsuit "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998).  At least "[a]t this time, the timing and type of injury to the [Plaintiffs] cannot be determined" with any confidence or specificity.  *Johnson*, 142 F.3d at 1089.  That creates a ripeness problem: "[a] federal court is neither required nor empowered to wade through a quagmire of what-ifs like the one the State placed before the District Court in this case."  *Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1338 (8th Cir. 1997).

In the context of challenges to federal regulation, the Supreme Court has been especially vigilant about these principles, which is why "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.[14]

For example, in *Ohio Forestry Ass'n v. Sierra Club*, the Supreme Court held that a challenge to a forest plan for a particular National Forest was not ripe.  523 U.S. 726, 732-37 (1998).  The Court noted that the forest plan standing alone caused no hardship: by itself, it "does not give anyone a legal

---

[14] The Supreme Court identified two possible exceptions to this principle, but neither applies here: (1) "a statutory provision providing for immediate judicial review," or (2) "a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately."  *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808 (quoting *Lujan*, 497 U.S. at 891).

right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* at 733. And the plaintiff would "have ample opportunity later to bring its legal challenge" to the plan in the context of a *specific* logging project, "at a time when harm is more imminent and more certain." *Id.* at 734. Likewise, in *National Park Hospitality Ass'n*, the Supreme Court held that a challenge to a National Park Service regulation about concession contracts was not ripe, because "judicial resolution" of the issue "should await a concrete dispute about a particular concession contract." 538 U.S. at 812; *see also Reno*, 509 U.S. at 43 (challenge to immigration regulation not ripe until applied to plaintiffs); *Nat'l Treasury Emps. Union v. Reagan*, 685 F. Supp. 1346 (E.D. La. 1988) (challenge to an Executive Order that "order[ed] government agencies to develop . . . drug testing plans" not ripe "until each agency finalizes the particulars of its own plan").

So too here. Plaintiffs can challenge any future regulation that actually causes them concrete harm, if and when such a regulation is actually issued. That is not just a hypothetical: there have been several cases over the years challenging specific agency actions on the theory that an agency inappropriately accounted for the social costs of greenhouse gases. Several of those cases hold that (at least in some circumstances) an agency *must* consider those costs as part of the agency's cost-benefit analysis.[15] By contrast, one court has held that an agency may *not* consider the global, social costs of greenhouse gases in justifying a specific regulation.[16] And others hold that an agency has a range of

---

[15] *See, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1203 ("NHTSA's decision not to monetize the benefit of carbon emissions reduction was arbitrary and capricious[.]"); *WildEarth Guardians v. Bernhardt*, No. 17-cv-80, 2021 WL 363955, at *10 (D. Mont. Feb. 3, 2021) (holding that the agency "failed to take a 'hard look' at the costs of greenhouse gas emissions"), *appeal filed*, No. 21-35262 (9th Cir. Apr. 7, 2021); *California v. Bernhardt*, 472 F. Supp. 3d at 611 (relying on "the consensus that [the 2016 Working Group's] estimates constitute the best available science about monetizing the impacts of greenhouse gas emissions" to hold that agency's failure to consider global "social cost of methane" was arbitrary and capricious); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1193 (D. Colo. 2014) (holding that the agency failed to justify "not using (or assigning minimal weight to) the social cost of carbon").

[16] *See, e.g.*, *Wyoming v. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1081 (D. Wyo. 2020) ("BLM failed to adequately explain . . . why it was reasonable to use a global emissions metric to quantify the benefits arising from a rule designed to curb domestic waste under the [Mineral Leasing Act].").

available options.[17]   But those varied outcomes, in cases against various agency defendants, with varying statutory constraints on their delegated authority, confirm that it is both impractical and unnecessary to litigate all of these issues now, in this abstract context, with ten plaintiffs suing twenty-three defendants at once, complaining of a wide variety of potential future statutory violations across "a diverse array of industries."   Compl. ¶ 131.   Instead, these claims must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the [Executive Order] to [Plaintiffs'] situation in a fashion that harms or threatens to harm" them.   *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

    **3.**   As for "the fitness of the issues for judicial decision," for similar reasons, "further factual development would . . . 'significantly advance the court's ability to deal with the legal issues presented.'"   *Texas v. United States*, 497 F.3d 491, 498-99 (5th Cir. 2007) (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812).   Much of Plaintiffs' rhetoric is based on misinterpretations of the Executive Order, which is narrower than Plaintiffs suggest.   For example, Plaintiffs assume incorrectly that the Executive Order "usurp[s] the authority vested in agencies by statute."   Compl. ¶ 91.   In reality, the Executive Order and the OIRA Guidance interpreting it confirm that any conflict between a federal statute and the Executive Order must be resolved in favor of the statute.   *See supra* at 22-23 (citing E.O. 13990 §§ 5(b)(ii), 8; OIRA Guidance, at 2-3).   And even in the unlikely event that an agency "tr[ies] to give effect to the Executive Order when to do so is inconsistent with the relevant . . . statute"—despite the text of the Executive Order, and OIRA guidance to the contrary— "an aggrieved party may seek redress through any of the procedures ordinarily available to it," including an APA lawsuit "challenging that specific decision."   *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (holding that "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction" against an executive order).

---

    [17]   *See, e.g., Zero Zone*, 832 F.3d at 677 ("Congress intended that [the Department of Energy] have the authority . . . to consider the reduction in SCC."); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (rejecting argument that agency was obligated to consider social cost of carbon).

In addition, the Executive Order's directive to agencies to use the Interim Estimates applies to cost-benefit analyses of "regulations *and other relevant agency actions* until final values are published," but does not define the phrase "other relevant agency actions."   E.O. 13990 § 5(b)(ii)(A)  (emphasis added).  And the Executive Order elsewhere directs the Working Group to provide "*recommendations* to the President, by no later than September 1, 2021, regarding areas of decision making, budgeting, and procurement" to which social-cost estimates "should be applied."  *Id.* § 5(b)(ii)(C)  (emphasis added).  So all of Plaintiffs' assumptions about how the Executive Order will interact with the NEPA process,  or with cooperative-federalism programs,  or in any context other than E.O. 12866 cost-benefit analyses,  are dependent on future actions and clarification by the Executive Branch.  And if Plaintiffs continue to disagree with the Executive Branch's interpretation of the President's orders, any such disagreement will necessarily  resolve itself—and  may also be subject to challenge—when courts can see how agencies *actually* implement the Executive Order.[18] So, if Plaintiffs fear some future agency overreach that will violate the law, courts can consider those allegations, if and when they arise, in the context of some actual (rather than hypothetical)  agency action,  and "at a time when harm is more imminent and more certain."  *Ohio Forestry Ass'n*, 523 U.S. at 734.

Just last week, a federal court dismissed, on grounds of standing and ripeness, a very similar challenge to a 2020 rule issued by the Council on Environmental Quality (CEQ), which "is the federal agency charged with overseeing the implementation of NEPA" across the Executive Branch.  *Wild Va. v. Council on Envt'l Quality*, --- F. Supp. 3d ----, 2021 WL 2521561, at *2 (W.D. Va. June 21, 2021). Among other things, the CEQ rule "exempts certain categories of activities  from the NEPA process entirely."   *Id.*   Plaintiffs argued that the rule violated the APA.  *Id.* at *3.  Without considering the merits, the court dismissed the suit as unripe, explaining that although "the plaintiffs may have valid

---

[18] Especially before the Working Group's (non-binding) recommendations are delivered to the President, agencies retain substantial discretion in deciding whether, when, and how to use the Interim Estimates outside the context of rulemaking.  The Secretary of the Interior, for example, has already issued guidance stating only that the Working Group's social-cost estimates "can be a useful measure" in some NEPA-related contexts, without *mandating* their use by the agency in any context other than rulemaking.  *See* Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021) https://perma.cc/78K2-FJMC.

concerns about how the 2020 Rule will impact projects in their areas," we "simply do not know how each agency will interpret the 2020 Rule." *Id.* at *11. Instead, "[w]hen a *particular* agency renders a decision on a *particular* project following a procedure that, in the plaintiffs' view, does not meet the requirements of NEPA, the plaintiffs will then be able to pursue a legal challenge" to that specific agency action. *Id.* at *8 (emphases added). Much the same could be said here.

**4.** All of these defects were already apparent from the complaint, but Plaintiffs' subsequent actions highlight them further. Just a few days after they filed this case, Plaintiffs commented as part of a proceeding before the Federal Energy Regulatory Commission (FERC), in which FERC had solicited comments on whether "the [Natural Gas Act (NGA)], NEPA, or other federal statute[s] authorize or mandate the use of Social Cost of Carbon (SCC) analysis by [FERC] in its consideration of certificate applications." Notice of Inquiry, *Certification of New Interstate Natural Gas Facilities*, 86 Fed. Reg. 11268, 11272 (Feb. 24, 2021)); *see also* Ex. 5, Comment on the Use of Social Cost of Carbon, FERC NOI, Docket Number PL 18-1-000 C (Apr. 26, 2021) ("States Comment"). FERC also sought comment on how the Interim Estimates could be "used to determine whether a proposed project is required by public convenience and necessity," 86 Fed. Reg. at 11,272, which is the statutory standard that FERC applies when certifying a new pipeline. *See* 15 U.S.C. § 717f. Plaintiffs argued that considering the "social costs of other greenhouse gases . . . would be in excess of FERC's authority" under the Natural Gas Act. States Comment at 4-5. Plaintiffs also criticized the Interim Estimates specifically, leveling many of the same accusations that appear in their complaint here. *See id.* at 7-12.

FERC is now considering these comments. But the final outcome is unknown and unknowable, until FERC acts. (That is why a notice of *proposed* rulemaking is never final agency action challengeable under the APA—it is "of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).) Ultimately, perhaps FERC will decide that the "public convenience and necessity" standard in the Natural Gas Act permits consideration of the social costs of greenhouse gases. Or perhaps FERC will be persuaded by Plaintiffs' critique that, as a matter of FERC's statutory authority, "[u]tilizing the SCC or SCM is not authorized under the NGA." States Comment at 6. Or perhaps FERC will not take any immediate action at all—a real possibility, given that the previous

comment period "closed on July 25, 2018," and FERC "has, to date, not taken any further action in this proceeding." 86 Fed. Reg. at 11269.

These varying and uncertain possibilities confirm the incoherence of Plaintiffs' approach to this litigation. Unless and until FERC knows how it is going to regulate in this area—or, for that matter, whether FERC is going to regulate at all—it is both practically and legally impossible to litigate the question of whether FERC's future, possible consideration of the social costs of greenhouse gases would violate the Natural Gas Act or the APA. That sort of problem—which would foreclose any challenge to FERC's preliminary consideration of those questions, *see Bennett*, 520 U.S. at 178—is not cured by purporting to focus *this* lawsuit on the Executive Order.[19]

At a higher level of generality, this problem is not limited to FERC. In any future challenge to a future agency action taken by one or more of the twenty-three Defendants in this lawsuit, Plaintiffs may have unique claims, and the government may have unique defenses—all of which are likely to vary from case to case, statute to statute, and agency to agency. As one obvious example, some statutes require an agency to consider costs and benefits.[20] Some statutes forbid it.[21] Some leave the matter to agency discretion.[22] Likewise, some statutes specify which factors an agency must consider, while

---

[19] To make matters worse, federal district courts lack jurisdiction over challenges to FERC orders under the Natural Gas Act—those claims are filed directly in the court of appeals, after exhausting administrative remedies. *See* 15 U.S.C. § 717r(b); *N.J. Conservation Found. v. FERC*, 353 F. Supp. 3d 289, 299 (D.N.J. 2018) ("[T]he law is indeed 'well-settled' that the NGA's exclusivity provision has broad reach over challenges brought against FERC, including constitutional claims."). That Plaintiffs could *never* challenge FERC's interpretation of the Natural Gas Act in this (or any other) district court demonstrates how relying on the possibility of future agency action as the basis for jurisdiction here would be particularly inappropriate, and further illustrates the need for agency-specific and rule-specific challenges to any future agency reliance on the Interim Estimates. This same problem inheres in Plaintiffs' allegations regarding use of SC-GHG in a recent EPA rulemaking, *see* Compl. ¶ 124, because the relevant statute, the Clean Air Act, provides for exclusive review in the courts of appeals, *see* 42 U.S.C. § 7607(b)(1).

[20] 42 U.S.C. § 6295(o)(2)(B)(i) ("In determining whether a standard is economically justified, the Secretary shall . . . determine whether the benefits of the standard exceed its burdens . . . .").

[21] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) ("The text of § 109(b), interpreted in its statutory and historical context and with appreciation for its importance to the CAA as a whole, unambiguously bars cost considerations from the NAAQS-setting process.").

[22] *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) ("[I]t was well within the bounds of reasonable interpretation for the EPA to conclude that cost-benefit analysis is not categorically

others leave that to the agency.[23]   A court's assessment of the legality of an agency's reliance on the Interim Estimates will necessarily be informed by the specific statutory directives that Congress has provided to guide the agency's actions.   The Court cannot meaningfully engage with Plaintiffs' arguments *en masse*, divorced from the context of particular agencies operating under specific statutory delegations of authority.

## C.   Plaintiffs lack a cause of action.

As explained above, the Court lacks subject-matter jurisdiction over all of Plaintiffs' claims under the doctrines of standing and ripeness.   But Plaintiffs' justiciability problems do not stop there. As always, "[t]o raise a claim in federal court, plaintiffs must demonstrate both that a federal court will have jurisdiction over their claim, and also that they (the plaintiffs) have a right of action to initiate that claim." *Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015).   Here, all of Plaintiffs' claims fail for the lack of any "final agency action," 5 U.S.C. § 704—and, as to all Defendants other than the President and the Working Group, any action at all.   And whatever might be said about the President or the Working Group's actions, neither is an "agency" subject to the APA.   Nor is there any basis for this Court to imply an *ultra vires* cause of action.   Accordingly, even if Plaintiffs otherwise satisfied Article III, all of their claims should still be dismissed for the lack of any cause of action.

### 1.   Plaintiffs do not challenge any final agency action.[24]

The Administrative Procedure Act "provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'" *Sackett v. EPA*, 566 U.S. 120, 125 (2012) (quoting 5 U.S.C. § 704).   "Final agency actions are actions which (1) 'mark the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett*

---

forbidden."); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 509 (1981) ("[C]ost-benefit analysis by OSHA is not required by the statute . . . .").

[23] *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1027 (5th Cir. 2019) ("[T]he agency has explicitly factored into its BAT determination the regulation of wastestreams other than leachate, which contravenes the plain text and structure of the Act.").

[24] In the Fifth Circuit, the question of whether agency action is "final" goes to the Court's subject-matter jurisdiction.   *Texas v. EEOC*, 933 F.3d 433, 440-41 n.8 (5th Cir. 2019).

*v. Spear*, 520 U.S. 154, 178 (1997)).  "Conversely, a non-final agency order is one that 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'"  *Peoples Nat. Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

On the first *Bennett v. Spear* requirement, it is hard to say that the Interim Estimates represent the "consummation of the agency's decisionmaking process" in any meaningful sense, 520 U.S. at 177-78, given that they have no significance unless and until they are actually used in some future rulemaking.  In a way, they mark only the (potential) *beginning* of dozens of separate regulatory processes, which may eventually culminate in the issuance of regulations that *are* final agency action.

But even setting that aside, Plaintiffs' failure to satisfy the second *Bennett* requirement is particularly clear.  In short, the problem for Plaintiffs is that none of their "rights or obligations have been determined"; nor do Plaintiffs face any "legal consequences" from the Executive Order or the Interim Estimates.  520 U.S. at 178 (citation omitted).  The second *Bennett* prong examines finality "from the regulated parties' perspective," *not* "from the agency's perspective."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 1544 (2019); *see also, e.g.*, *Sackett*, 566 U.S. at 126 ("By reason of the order, *the Sacketts* have the legal obligation to 'restore' their property according to an Agency-approved Restoration Work Plan.") (emphasis added); *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (agency action not "final" because it "does not itself determine *Luminant's* rights or obligations") (emphasis added); *Peoples Nat. Bank*, 362 F.3d at 337 (asking whether the agency action "itself adversely affect[s] *complainant*" or instead "only affects his rights adversely on the contingency of future administrative action") (emphasis added).[25]

---

[25] Despite some broad dicta, *Texas v. EEOC* is not to the contrary.  In that case, the Fifth Circuit held that agency guidance was final agency action because the challenged guidance "ha[d] the effect of committing the agency itself to a view of the law that, in turn, force[d] the plaintiff either to alter its conduct, or expose itself to potential liability."  933 F.3d at 446.  And in the Fifth Circuit's view, there the challenged action "produc[ed] legal consequences and determin[ed] rights and obligations *of regulated parties*."  *Id.* (emphasis added); *see also id.* at 447 ("[T]he Guidance imposes a regulatory burden on Texas to comply with the Guidance to avoid enforcement actions.").  Here, by contrast, the obligations that E.O. 13990 imposes on agencies do not implicate regulated parties.

Here, neither the Executive Order nor the Interim Estimates requires *Plaintiffs* to do anything. To be sure, *agencies* may, at least in some circumstances, be bound by the Executive Order, but that has no "direct and appreciable legal consequences" for anyone outside of the Executive Branch. *Bennett*, 520 U.S. at 178. By contrast, if and when some agency relies upon the Executive Order or the Interim Estimates to justify the issuance of a new, legally-binding regulation, which is applied in a manner that affects *Plaintiffs'* legal rights and obligations in a concrete way, they can sue. *See Peoples Nat. Bank*, 362 F.3d at 337 ("This intra-agency procedural rule should not be reviewed by a court until it has been utilized and resulted in a final agency action."); *Luminant*, 757 F.3d at 444 (notice of violation of the Clean Air Act issued by EPA to plaintiff not final agency action where plaintiff "may challenge the adequacy of the notices before the district court as a defense to the enforcement action"). But here, all of Plaintiffs' claims fail for the lack of any final agency action.

At a minimum, whatever can be said about the President or the Working Group, all of the other Defendants should plainly be dismissed for the lack of any "final agency action," 5 U.S.C. § 704—indeed, any "agency action" at all, *id.* § 551(13). Plaintiffs do not allege that any of those Defendants did *anything*—let alone anything that would qualify as a "circumscribed, discrete agency action[]" challengeable under the APA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-63 (2004). For example, other than the caption and the "Parties" section, there are *zero* references in the complaint to Secretary of the Treasury Janet Yellen. Accordingly, at a minimum, all Defendants other than the President and the Working Group should be dismissed for lack of any final agency action.

### 2.    Neither the President nor the Working Group is an "agency" subject to APA litigation.[26]

A plaintiff may sue under the APA only if he challenges an action that was taken by an "agency," which is a term of art under the APA. 5 U.S.C. § 701(b)(1); *see also id.* § 551(1). The Supreme Court has squarely held that "the President is not an agency," and so his actions, whether final or not,

---

[26] The Fifth Circuit has held that other, similar limitations on the scope of APA review are jurisdictional, *see Texas v. EEOC*, 933 F.3d at 440-41 n.8, which suggests that this one is too. In any case, that question is purely academic here: either under Rule 12(b)(1) or Rule 12(b)(6), Plaintiffs' APA claims against the President and the Working Group should be dismissed because neither is an "agency" within the meaning of the APA.

are not subject to APA review. *Franklin*, 505 U.S. at 796.  So Plaintiffs have an APA cause of action here only if the Working Group is an "agency" under the APA.

It is not.  In *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993), the D.C. Circuit explained why a similar Executive Branch entity, President Reagan's Task Force on Regulatory Relief, was not an "agency."[27]  The Task Force, whose members included the Vice President, various department heads, the Director of OMB, and several other White House officials, was directed to oversee the new regulatory review process established by Executive Order 12291. *Id.* at 1289-90.  Virtually all aspects of that process—including, for example, the preparation of "uniform standards" for agency cost-benefit analysis, and the resolution of "any issues raised" in the process—were "subject to the direction of the Task Force."  E.O. 12291 §§ 3(e)(1), 6(a)(2).

Still, the D.C. Circuit concluded that the Task Force lacked "substantial independent authority," and so did not qualify as an agency. *Meyer*, 981 F.2d at 1297-98.  For one, the Task Force's "lack of a separate staff" offered a "strong indicator" that the Task Force was not an independent actor distinct from the President.  *Id.* at 1296.  Further, that the President had staffed the Task Force with officials who reported directly to him suggested that the Task Force's members were acting as functional equivalents of assistants to the President, and would not exercise any delegated authority "unless they already knew the President's views." *Id.* at 1294-95.  Most importantly, though, the Task Force was not authorized to give directions to the Executive Branch independently of the President. *See, e.g., id.* at 1294 ("When the Task Force wished directions given to the executive branch, it found it necessary to advise the President to put such instructions in another Executive Order.").  Wary of adopting a rule that would create an agency anytime the President convened "a group of cabinet

---

[27] To be precise, *Meyer* considered the definition of "agency" under the Freedom of Information Act (FOIA).  But its analysis remains instructive here, because FOIA incorporates and expands upon the APA's definition, meaning that "all APA agencies are FOIA agencies, but not vice-versa." *EPIC v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020); *see also Ehm v. Nat'l R.R. Passenger Corp.*, 732 F.2d 1250, 1252 (5th Cir. 1984) (same).

officers and perhaps White House staff in some sort of committee . . . to screen . . . regulatory issues," the D.C. Circuit concluded that the Task Force was not an agency.  *Id.* at 1297.

Other courts have likewise held that an entity established solely to assist the President in his duties—even one that is seemingly powerful—is not an "agency."  *See, e.g.*, *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542 (2d Cir. 2016) (National Security Council); *CREW v. Off. of Admin.*, 566 F.3d 219 (D.C. Cir. 2009) (White House Office of Administration).  Crucially, such entities lack "statutory grants of authority" and thus their authority does not "flow from a source *independent* from the President."  *Main St. Legal Servs.*, 811 F.3d at 558 (emphasis added); *see also Soucie v. David*, 448 F.2d 1067, 1073, 1075 (D.C. Cir. 1971) ("agency" found where *Congress* "delegate[ed] some of its own broad power of inquiry," and so had bestowed "substantial independent authority").  Indeed, some have questioned "whether a President can ever be said to have delegated his own authority in a way that renders it truly independent of him."  *Main St. Legal Servs.*, 811 F.3d at 558.

Given these standards, the Working Group is not an agency under the APA.  No statute establishes it, nor delegates it any legislative authority.  Instead, what authority the Working Group has flows solely and directly from the President, via the Executive Order that created it.  Further, like the Task Force in *Meyer*, the Working Group has no dedicated staff.  Most importantly, the Working Group lacks any substantial authority that is independent from the President himself.  *Cf. Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (finding no agency status where a unit of the Executive Office of the President does not "play[] a substantive role apart from that of the President").  Its sole function is to assist the President in his management of the Executive Branch, by implementing an Executive Order that he issued, and in setting SC-GHG estimates that are consistent with the President's policy priorities—which agencies can use in developing regulations when *already* permitted by some *separate* source of statutory authority.  That is a project that (at least as a matter of legal authority) the President could have accomplished alone.  It matters not that E.O. 13990 gives the Working Group an important practical role in parts of the regulatory process—the National Security Council and the White House Counsel's Office, for example, also have such powers (or more), but are not "agencies" under the APA.  *Cf. Main St. Legal Servs.*, 811 F.3d at 562

("[E]xecutive orders providing for the NSC to formulate or give policy direction . . . do not reach beyond the NSC's advisory coordinating function.").

For these reasons, neither the President nor the Working Group is an "agency" within the meaning of 5 U.S.C. § 701(b)(1). Therefore, at a minimum, all of the APA and statutory claims against the President and the Working Group should be dismissed for the lack of any APA cause of action.

### 3. Plaintiffs cannot evade the APA's limitations on judicial review by invoking an equitable, non-statutory *ultra vires* cause of action.

That leaves (at most) Plaintiffs' claim for non-statutory *ultra vires* review of the President's action in issuing Section 5 of Executive Order 13990 and the Working Group's action in adopting the Interim Estimates.[28] Substantively, this claim—that "no statute authorizes the President or IWG to employ a global-effects measure and discount rates deviating from the standard 3 percent and 7 percent discount rates," Compl. ¶ 155—is entirely duplicative of Plaintiffs' APA claims. *See* 5 U.S.C. § 706(2)(C) (authorizing courts in APA cases to "decide all relevant questions of law," and "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). Thus, Plaintiffs transparently seek to evade the requirements Congress imposed for review of their claims. *See supra* at Sections II.C.1.-C.2. (discussing limits on APA review).

Such an end-run around the APA is inappropriate. *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action . . . .") (citing 5 U.S.C. §§ 703, 704)). In rare, historical instances, courts have occasionally found that *ultra vires* review may be available where, because Congress has failed to provide a statutory cause of action, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). Thus, in *Leedom v. Kyne*, 358 U.S. 184 (1958), the Supreme Court permitted a challenge to the

---

[28] Although the complaint also briefly references the Declaratory Judgment Act, Compl. ¶ 44 (citing 28 U.S.C. §§ 2201-2202), that Act "alone does not create a federal cause of action." *Harris Cnty.*, 791 F.3d at 552; *see also California v. Texas*, --- S. Ct. ----, 2021 WL 2459255, at *6 (June 17, 2021) ("The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction.").

National Labor Relations Board's certification of a bargaining unit in a manner that clearly exceeded its statutory authority.  Because the Board's certification was "[p]lainly" an "attempted exercise of power that had been specifically withheld" and that "deprived . . . employees of a 'right' assured to them by Congress," the Court exercised jurisdiction over a suit "to prevent deprivation of a right so given." *Id.* at 189; *accord Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) (clarifying that in *Kyne*, denial of review would have left no other opportunity for review).

 To be sure, the Fifth Circuit has recognized that *ultra vires* review of the sort conducted in *Kyne* can be an "exception" to the APA's final-agency action rule. *Exxon Chems. Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002).  But the Fifth Circuit (like others) strictly limits the availability of *ultra vires* review: This "implicit but narrow exception" permits a court to assess the legality of federal action only "'when an agency exceeds the scope of its delegated authority or violates a clear statutory mandate,'" *and* the plaintiff otherwise "would be deprived of a meaningful opportunity for judicial review." *Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 297 (5th Cir. 2016) (quoting *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999)).  These are high bars, rendering *ultra vires* claims "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  Unsurprisingly, then, *Kyne* is a "rarely invocable precedent." *Am. Airlines*, 176 F.3d at 294.

 These principles apply straightforwardly here.  *Ultra vires* review is "inapposite" because "the APA expressly provides [Plaintiffs] with a meaningful and adequate opportunity for judicial review of the validity of" final agency actions. *Am. Airlines*, 176 F.3d at 293.  If and when some agency relies upon the Executive Order or the Interim Estimates to justify some agency action that concretely harms Plaintiffs, they will be able to obtain judicial review under the APA. *Cf. id.* at 294 ("If and when the Administrative Review Board finds that American has violated the Act and its regulations, American will have, in the court of appeals, 'an unquestioned right to review of both the regulation and its application.'" (quoting *MCorp*, 502 U.S. at 43-44)).  And that review will be "meaningful." *Exxon Chems.*, 298 F.3d at 469.  Thus, it would be inappropriate to permit Plaintiffs to use a duplicative,

non-statutory *ultra vires* claim to wedge their way out of the strictures Congress has placed on the APA's general cause of action.[29]

In any case, even ignoring their meaningful alternative remedy, Plaintiffs' claims do not even trigger the basic premise for the (potential) availability of *ultra vires* review. That is because, even read generously, Plaintiffs' claims "simply involve a dispute over statutory interpretation," rather than "a plain violation of an unambiguous and mandatory provision of the statute" that "is of a *summa* or *magna* quality." *Lundeen v. Mineta*, 291 F.3d 300, 312 (5th Cir. 2002) (internal quotation marks and citations omitted). None of the statutory authorities that Plaintiffs cite contain a clear statutory prohibition against the publication of the Interim Estimates. *See infra* at Section II.A. And even if one did, the Executive Order (and OIRA guidance interpreting it) directs agencies to disregard any obligation otherwise imposed by the Executive Order that would conflict with any federal statute. *See supra* at 22-23 (citing E.O. 13990 §§ 5(b)(ii), 8; OIRA Guidance, at 2).

In short, whatever the merits of Plaintiffs' statutory theories, this Court need not engage in *ultra vires* review to "police" the "purity" of hypothetical agency actions "long before the administrative process is over." *Sanderson Farms*, 651 F. App'x at 298. Instead, pursuant to clear Fifth Circuit precedent, the Court should dismiss Plaintiffs' *ultra vires* claim for lack of subject-matter jurisdiction.

## II.    PLAINTIFFS' CLAIMS ARE MERITLESS.

For all of the reasons above, each of Plaintiffs' claims should be dismissed on threshold grounds. But if the Court goes on to address the substance of Plaintiffs' claims, they are meritless.[30]

---

[29] Additional support for this conclusion comes from *Trump v. Sierra Club*, 140 S. Ct. 1 (2019). There, plaintiffs argued that the "[t]he existence of an APA cause of action, or lack thereof, [did] not affect the availability of *ultra vires* review" of their claim that the Acting Secretary of Defense exceeded his statutory authority by approving a transfer of defense funds for the purpose of building border barriers. Respondent's Stay Opp'n at 31, *Sierra Club*, 140 S. Ct. (2019) (No. 19A60). Nevertheless, the Supreme Court entered a stay, noting that "[a]mong the reasons" for doing so was "that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance" with the statute. *Sierra Club*, 140 S. Ct. at 1.

[30] Because review of the *substance* of the Interim Estimates would ordinarily be on the basis of an administrative record, Defendants' motion to dismiss Plaintiffs' substantive APA arbitrary-and-capricious claim (Count II) is limited to the matters of jurisdiction and justiciability set forth above (which would be dispositive of the entire case). Defendants of course believe that the rationality of

A.    Plaintiffs' statutory claims are meritless.

In Count III, Plaintiffs assert that the Interim Estimates are "contrary to law," specifically, contrary to five environmental and natural resource statutes: the EPCA (discussed *supra* at 6), the Clean Air Act, NEPA, the Mineral Leasing Act (MLA), and the Outer Continental Shelf Lands Act (OCSLA).  Compl. ¶¶ 146-152.  But the Court need not delve into Plaintiffs' conclusory allegations and their (often-unexplained) connections to these various statutes because, even if some statute explicitly prohibited agencies from using the Interim Estimates—and Plaintiffs have not identified any such provision of law—the claim still fails.

1.    The government of course does not dispute that Article I of the Constitution grants Congress the legislative power and that, pursuant to this authority, Congress may require, permit, or forbid federal agencies to prepare (or rely on) cost-benefit analyses when issuing rules.  In doing so, Congress may also specify the factors to be considered in such cost-benefit analyses.  And it would be unlawful for the President to require agencies to ignore lawful statutory boundaries set by Congress.

But the President has not done so; one need only read the Executive Order to confirm that the key premise of Plaintiffs' statutory claim is mistaken.  Whatever requirements E.O. 13990 imposes, or how broadly they might otherwise be read, the text of the Executive Order renders those requirements inoperative whenever they conflict with existing law: "Nothing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency."  E.O. 13990 § 8(a)(i).  Moreover, the Executive Order provides that it "shall be implemented in a manner consistent with applicable law," *id.* § 8(b), and the operative section at issue in this case also makes clear that the Working Group's actions (including creation of the Interim Estimates) may only be implemented "as appropriate and consistent with applicable law."  *Id.* § 5(b)(ii).  Recent OIRA guidance puts the matter beyond any doubt, confirming that, where applicable, "statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas

_____

the Interim Estimates is clear (particularly in light of the expertise applied to create them, and the deferential standard of review), but reserve that argument for summary judgment should it prove to be necessary.  For the reasons below, however, all of Plaintiffs' other claims (*i.e.*, Counts I, III, and IV) can be dismissed now, for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6)— even if the Court rejects all of Defendants' threshold arguments of jurisdiction and justiciability.

emissions."  OIRA Guidance, at 2.  Thus, the President has not exercised, nor has he conferred, "any power to prevent an agency from carrying out its legal duty."  *Meyer*, 981 F.2d at 1290.  Instead, like earlier executive orders, E.O. 13990 "recognizes that agencies face various statutory obligations, and it does not—and could not—purport to override those obligations."  *California v. Trump*, 2020 WL 1643858, at *3.  Neither E.O. 13990 nor the Interim Estimates requires agencies to act contrary to law, and the complaint does not plausibly allege that any agency has done so or will do so.  Thus, Count III can be dismissed without any assessment of the specific statutory provisions Plaintiffs cite.

**2.**  Even if the Court were to consider Plaintiffs' specific statutory-interpretation arguments, Plaintiffs have not identified any statutory provision that actually prohibits agency reliance on the Interim Estimates.  In some instances, Plaintiffs cherry-pick legislative statements of purpose that suggest (unsurprisingly) that Congress generally legislates with the interests of the United States in mind.  *See* Compl. ¶¶ 115, 149 (citing 42 U.S.C. § 7401(b)(1) (Clean Air Act); *id.* ¶ 116 (citing 42 U.S.C. § 4331(b)(2) (NEPA); *id.* ¶ 118.  But those statements are "a rather thin reed upon which to base" a complete prohibition on any agency consideration of global economic and environmental effects that is "neither expressed nor . . . fairly implied in the operative sections," *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994)—particularly where other, more specific statutory provisions could, depending on the facts presented in a proper case, be in strong tension with Plaintiffs' reading.  *See, e.g.*, 42 U.S.C. § 7479(3) (permitting authorities may "tak[e] into account energy, environmental, and economic impacts and other costs" when determining the maximum degree of pollution reduction achievable at a major emitting facility).  In fact, at times, Plaintiffs' statutory arguments are directly contrary to appellate precedent interpreting the statute at issue.  *Compare* Compl. ¶ 114 (citing 42 U.S.C. § 6295(o)(2)(B)(i)(VI)  (EPCA)); *with Zero Zone*, 832 F.3d at 677 (stating that there is "no doubt that Congress intended that DOE have the authority under the EPCA to consider the reduction in [the social cost of carbon]" under 42 U.S.C. § 6295(o)(2)(B)(i)(VI)).

In any event, this Court need not resolve any of these statutory-interpretation questions: if Plaintiffs are right that any or all of these statutes prohibit agencies from using the Interim Estimates, then the Court can presume that agencies will not do so. *Cf. U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10

(2001) ("[A] presumption of regularity attaches to the actions of Government agencies . . . ."). And if one day, an agency *does* violate some federal statute—notwithstanding the language in the Executive Order and the OIRA Guidance to the contrary—Plaintiffs can challenge that specific agency action at that time. But as of today, none of Plaintiffs' allegations establish that the Interim Estimates have been or will be applied in a manner contrary to law. As the D.C. Circuit held in analogous circumstances, "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction" against an Executive Order. *Allbaugh*, 295 F.3d at 33.

      **B.**    **Plaintiffs' ultra vires claims are duplicative and meritless.**

For reasons largely explained above, *see supra* at Section I.C.3., Plaintiffs' Count IV *ultra vires* claim is duplicative of their Count III claim that Defendants' actions are "contrary to law" under the APA. Having failed to allege that any defendant has acted contrary to law, *see supra* at Section II.A., Plaintiffs have necessarily also failed to assert the kind of "plain violation of an unambiguous and mandatory provision" required to sustain an *ultra vires* claim on the merits. *Lundeen*, 291 F.3d at 312. And even if some agency one day exceeds its statutory authority (including by reliance on the Interim Estimates or Section 5 of E.O. 13990), the APA (or another statute) will provide a meaningful and adequate opportunity for judicial review. *See Exxon Chems.*, 298 F.3d at 469. Thus, for largely the same reasons that the Court lacks jurisdiction over Plaintiffs' *ultra vires* claim, it also fails on its merits.

      **C.**    **Plaintiffs' notice-and-comment claims are meritless.**

Plaintiffs also argue that the Working Group violated the APA by failing to subject the Interim Estimates to formal notice-and-comment (Count I). That claim also fails—both because there was no notice-and-comment obligation here, and because, even if there were, any error was harmless.

      **1.** At the outset, for all the reasons stated above, *see supra* at Section II.B., the Working Group is not an "agency" within the meaning of the APA, and so the notice-and-comment requirements of 5 U.S.C. § 553 are simply inapplicable. But, even setting that (and all of Defendants' other threshold arguments) to the side, Plaintiffs' notice-and-comment claim still fails on the merits.

      Plaintiffs predicate their notice-and-comment claim on a belief that the Interim Estimates are a substantive rule, but the hallmark of a substantive rule is that it "affect[s] individual rights and

obligations and [is] binding on the courts." *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000); *see also Williams v. Van Buren*, 117 F. App'x 985, 987 (5th Cir. 2004) ("The APA requires 'notice and comment' rulemaking procedures to be followed whenever rules which affect the rights and obligations of those being regulated are created."). But the Interim Estimates have no binding effect on individuals or regulated entities (or anyone outside of the Executive Branch).

Accordingly, if the Working Group were subject to the APA at all, the Interim Estimates would at most be considered "general statements of policy," 5 U.S.C. § 553(b)(A), which do not establish binding legal norms, but merely memorialize how an agency intends to exercise its discretion in the future. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596, 601-02 (5th Cir. 1995). That is all the Interim Estimates do: they "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted) (quoted in *Texas v. United States*, 809 F.3d 134, 171 n.123 (5th Cir. 2015)).[31] And as OIRA guidance makes clear, when an agency takes "final action in reliance on a benefit-cost analysis that includes estimates of the social cost of greenhouse gas emissions, the agency must respond to any significant comments on those estimates and ensure its analysis (including any use of the 2021 interim estimates) is justified as not arbitrary or capricious." OIRA Guidance at 2; *cf. Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.) ("When the agency applies a general statement of policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." (citation & alterations omitted)).[32]

---

[31] Despite some broad dicta, *Texas v. United States* did not (and could not) depart from the Supreme Court's definition of a general statement of policy. In *Texas*, the Fifth Circuit relied on factual findings that the agency's description of the immigration policy in question was "merely pretext," to conclude that the challenged policy *itself* directly affected regulated parties—by "conferring lawful presence on 500,000 illegal aliens residing in Texas," and thus "forc[ing] the state to choose between spending millions of dollars to subsidize driver's license and amending its statutes." *Texas*, 809 F.3d at 172-176. Plaintiffs have not alleged anything similar here.

[32] For similar reasons, Plaintiffs' suggestion that the Interim Estimates improperly (*i.e.*, without notice-and-comment) repealed certain aspects of Circular A-4 is incorrect. *See* Compl. ¶ 99. Circular A-4, by its own terms, offers only "*guidance* to Federal agencies." OMB, Circular A-4 at 1 (emphasis added). Any required compliance with its recommendations comes in the course of the regulatory review process established by E.O. 12866—a process that, like Circular A-4, has no binding effect

**2.** Even assuming that the Interim Estimates were required to go through notice-and-comment before publication in February 2021, Plaintiffs' claim still fails under the APA's harmless-error rule, because they cannot show prejudice—primarily, because all of the objections they now advance were long ago considered and rejected. The APA explicitly instructs courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. This "harmless error rule requires the party asserting error to demonstrate prejudice from the error." *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013). Plaintiffs cannot meet that burden.

For one, Plaintiffs have had "notice of the issues" before the Working Group for over a decade, and they have "had the ability to comment on" the Working Group's methodology in numerous proceedings. *Id.* at 245. The Working Group's estimates and methodology have been subjected to more than a decade of peer review, public comment, and iterative improvement. *See, e.g.*, EPA & NHTSA, *Proposed Rulemaking To Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 74 Fed. Reg. 49454, 49612 (Sept. 28, 2009). Following those public-comment periods, and after the Working Group had adopted official SC-CO$_2$ estimates, those estimates and methodologies were again repeatedly subject to further notice-and-comment as part of many individual agency rulemakings—resulting in judicial opinions endorsing the Working Group's process and upholding agency use of their social-cost estimates. *See, e.g.*, *Zero Zone*, 832 F.3d at 654. And, as Plaintiffs point out, the Interim Estimates currently in effect "pick up right where the . . . [2016] SC-GHG estimates left off," Compl. ¶ 56, and are identical (save indexing for inflation) to those estimates, which were subjected to specific and repeated forms of public comment from 2013-2016. *See, e.g.*, *Response to Comments*, at 4; EPA & NHTSA, *Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles*, 81 Fed. Reg. 73478 (Oct. 25, 2016).

---

outside the Executive Branch. *See* E.O. 12866 § 10; *supra* at 5. Thus, notice-and-comment procedures were not necessary to adopt Circular A-4, nor are they required for OMB to change it. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). In any event, measuring global damages and using lower discount rates, at least in this context, is not at all inconsistent with Circular A-4's generic recommendations. *See* OMB, Circular A-4, at 3 (there is no "formula" for cost-benefit analysis and "different emphases in the analysis" may be appropriate based on circumstances); *see also id.* at 36 (agencies may consider lower discount rates when a rule may have important intergenerational effects).

In addition, Plaintiffs' substantive critiques of the Interim Estimates have already been considered and rejected.  *Cf. United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("[W]hen a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced."). Over the past decade, the methodological critiques that Plaintiffs raise—many of them foundational in nature, going to the very enterprise of estimating future, social costs of emissions— have been aired and addressed by the Working Group (and multiple agencies) more than once. *See, e.g.*, *Response to Comments*, at 25 (addressing comments about the averaging of SC-CO$_2$ estimates); *id.* at 20-25 (selection of discount rates); *id.* at 30-32 (consideration of domestic and global costs); EPA, *Fuel Efficiency Standards*, 81 Fed. Reg. at 73876-79. And if that were not enough, before agencies rely on the latest iteration of the Interim Estimates to promulgate final rules, Plaintiffs will have yet more opportunities to comment. Accordingly, Plaintiffs cannot show any prejudice. *Cf. City of Arlington*, 668 F.3d at 246 ("The FCC considered and addressed all of the substantive issues the cities now raise. Any deficiencies in the procedures . . . do not justify vacating and remanding the order.").[33]

**D.      Any remaining claims against the Defendants other than the President or the Working Group should be dismissed for failure to state a claim.**

Even if all other grounds for dismissal were rejected, the Court should still dismiss all claims against all Defendants other than the President and the Working Group under Rule 12(b)(6)—for the simple reason that Plaintiffs allege no wrongdoing specific to those Defendants. *See also supra* at 39.

## CONCLUSION

For these reasons, all of Plaintiffs' claims should be dismissed.

---

[33] Plaintiffs are demonstrably wrong to suggest that the Working Group and federal agencies "failed to sufficiently alert the public" to earlier uses of the social cost estimates (specifically the 2010 Estimates) or somehow "buried" the methodology used to calculate them. Compl. ¶ 71. In fact, the public was informed of and invited to comment on these methodologies in multiple proceedings. *See, e.g.*, Dep't of Energy, *Energy Conservation Program: Energy Conservation Standards for Battery Chargers and External Power Supplies*, 77 Fed. Reg. 18478, 18561-63 (Mar. 27, 2012) (describing SC-CO$_2$ estimates and methodology, noting that "the interagency group will continue to explore the issues raised by this analysis and *consider public comments* as part of the ongoing interagency process" (emphasis added)); EPA, *Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*, 76 Fed. Reg. 52738, 52793 (Aug. 23, 2011) ("[T]he EPA seeks public comments . . . regarding social cost of methane estimates . . . .").

Dated: June 28, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER C. VAN HOOK
Acting United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

/s/   *Stephen M. Pezzi*
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Email: cody.t.knapp@usdoj.gov

*Attorneys for Defendants*