**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, <br> By and through its Attorney General, <br> JEFF LANDRY, et al., <br><br> PLAINTIFFS, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity <br> as President of the United States; et al., <br><br> DEFENDANTS. | CIV. NO. 2:21-CV-1074-JDC-KK |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... v

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 2

    I.    THE ADMINISTRATIVE PROCEDURE ACT AND CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES. ....................................................... 2

    II.   THE CREATION AND DEVELOPMENT OF THE SOCIAL COST OF GREENHOUSE GASES ESTIMATES. ....................................................................... 5

        A.    SCC & SC-GHG in the Obama Administration. ............................... 5

        B.    SCC & SC-GHG in the Trump Administration. ............................... 10

    III.  PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 13990 REQUIRING AGENCIES TO EMPLOY SC-GHG ESTIMATES CREATED BY AN INTERAGENCY WORKING GROUP. ............................................................................. 11

        A.    Executive Order 13990. ................................................................ 11

        B.    The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates. ....................................... 11

STANDARD OF REVIEW ................................................................................... 13

ARGUMENT ..................................................................................................... 14

    I.    PLAINTIFF STATES HAVE ARTICLE III STANDING. ................................. 14

        A.    Plaintiff States Have Standing Under the Traditional Analysis. ........ 14

            1.    Direct Injury to Sovereign Interests ...................................... 14

            2.    Direct Fiscal Harm ............................................................. 18

            3.    Direct Procedural Harm ....................................................... 22

            4.    Parens Patriae ..................................................................... 24

        B.    Defendants' Attacks on the Immediacy of the Harm and Traceability Do Not Undermine Plaintiff States' Standing. .............. 25

        C.    Defendants' Attacks on Redressability Are Not Persuasive. ............ 32

        D.    Special Solicitude Puts Plaintiff States' Standing Beyond Doubt. ........... 34

II.    Plaintiff States' Claims are Ripe for Review. .......................................35

III.   Plaintiff States Have APA and Ultra Vires Causes of Actions. ..................39

   A.    The SC-GHG Estimates Are Final Agency Action Under the APA. ....................39

   B.    The IWG is an Agency Under the APA. ....................................41

   C.    Section 5 of Executive Order 13990 is Ultra Vires. ...............................43

IV.    Plaintiff States Adequately Allege Their Statutory Claims. ....................44

   A.    The SC-GHG Estimates and Executive Order Contravene Several Statutes. .........44

   B.    The SC-GHG Estimates and Executive Order Are Major Actions Taken Without Clear Statutory Authorization. ........................................47

   C.    The SC-GHG Estimates Are Legislative Rules and Did Not Comply With the APA's Notice and Comment Procedures. ...................................47

CONCLUSION ............................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ...............................................................................................25

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
801 F. Supp. 2d 383 (D. Md. 2011) ................................................................ 43, 44

*ARCO Alaska, Inc. v. F.E.R.C.,*
89 F.3d 878 (D.C. Cir. 1996) ......................................................................... 18, 19

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ..............................................................................................25

*Arkla Expl. Co. v. Tex. Oil & Gas Corp.,*
734 F.2d 347 (8th Cir. 1984) .................................................................................46

*Associated Builders & Contractors of Se. Tex. v. Rung,*
2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ................................................. 43, 44

*Aziz v. Trump,*
231 F. Supp. 3d 23 (E.D. Va. 2017) .....................................................................25

*Bennett v. Spear,*
520 U.S. 154 (1997) ..............................................................................................26

*Bhd. of Locomotive Engineers & Trainmen v. FRRA,*
972 F.3d 83 (D.C. Cir. 2020) ................................................................................41

*BNSF Ry. Co. v. EEOC,*
385 F. Supp. 3d 512 (N.D. Tex. 2018) ............................................................ 41, 43

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021) .......................................................................... 22, 24

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) .................................................................................31

*California v. Texas,*
141 S. Ct. 2104 (2021) ..........................................................................................18

*Cf. Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ............................................................................. 16, 26, 30

*Chamber of Commerce v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ..............................................................................34

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ......................................................................... 28, 44

*City of Dallas, Tex. v. Hall,*
  2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ....................................................... 44

*City of Davis v. Coleman,*
  521 F.2d 661 (9th Cir. 1975) ................................................................................ 16

*Clean Water Action v. United States Envtl. Prot. Agency,*
  936 F.3d 308 (5th Cir. 2019) ................................................................................ 48

*Corrosion Proof Fittings v. E.P.A.,*
  947 F.2d 1201 (5th Cir. 1991) .............................................................................. 45

*CREW v. Office of Admin.,*
  566 F.3d 219 (D.C. Cir. 2009) .............................................................................. 42

*Ctr. For Biological Diversity v. NHTSA,*
  538 F.3d 1172 (9th Cir. 2008) .......................................................................... 5, 47

*Davis v. U.S. E.P.A.,*
  348 F.3d 772 (9th Cir. 2003) ................................................................................ 17

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) .............................................................................................. 46

*Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries,*
  512 U.S. 267 (1994) ................................................................................................ 2

*E.P.A. v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) .............................................................................................. 15

*EarthReports, Inc. v. Fed. Energy Regulatory Comm'n,*
  828 F.3d 949 (D.C. Cir. 2016) .............................................................................. 10

*El Paso Cty., Texas v. Trump,*
  982 F.3d 332 (5th Cir. 2020) .......................................................................... 19, 20

*FEC v. Akins,*
  524 U.S. 11 (1998) ................................................................................................ 33

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................................ 33, 41

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ................................................................................................ 2

*Gov't of Manitoba v. Bernhardt,*
   923 F.3d 173 (D.C. Cir. 2019) ................................................................. 25

*Hias, Inc. v. Trump,*
   985 F.3d 309 (4th Cir. 2021) ........................................................ 28, 36, 44

*Jindal v. U.S. Dep't of Educ.,*
   2015 WL 854132 (M.D. La. Feb. 26, 2015) ............................... 17, 27, 35

*League of Conservation Voters v. Trump,*
   303 F. Supp. 3d 985 (D. Alaska 2018) .................................................. 44

*Little v. KPMG LLP,*
   575 F.3d 533 (5th Cir. 2009) ................................................................. 13

*Louisiana v. Biden,*
   2021 WL 244601 (W.D. La. June 15, 2021) ................................... passim

*Louisiana v. DOE,*
   507 F. Supp. 1365 (W.D. La. 1981) ............................................ 19, 39, 40

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................... 13

*Luv N' Care, Ltd. v. Jackel Int'l Ltd.,*
   2020 WL 6881672 (W.D. La. Nov. 23, 2020) ........................................ 13

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ............................................................. 42

*Mountain States Legal Found. v. Bush,*
   306 F.3d 1132 (D.C. Cir. 2002) ....................................................... 43, 44

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003) ......................................................................... 37, 38

*Nat'l Treasury Emps. Union v. Nixon,*
   492 F.2d 587 (D.C. Cir. 1974) ............................................................... 33

*New Jersey v. EPA,*
   989 F.3d 1038 (D.C. Cir. 2021) ............................................................. 16

*New Mexico ex rel. Richardson v. BLM,*
   565 F.3d 683 (10th Cir. 2009) ............................................................... 21

*New Mexico v. Dep't of Interior,*
   854 F.3d 1207 (10th Cir. 2017) ............................................................. 17

*New Mexico v. HHS,*
    1987 WL 109007 (10th Cir. Jan. 7, 1987) ................................................16

*NRDC v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) ................................................................40

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .............................................................................38

*Orangeburg, S.C. v. FERC,*
    862 F.3d 1071 (D.C. Cir. 2017) ............................................................21

*Pac. Legal Found. v. Council on Envtl. Quality,*
    636 F.2d 1259 (D.C. Cir. 1980) ............................................................42

*Pub. Citizen, Inc. v. Trump,*
    361 F. Supp. 3d 60 (D.D.C. 2019) ................................................... 21, 30

*Qureshi v. Holder,*
    663 F.3d 778 (5th Cir. 2011) ................................................................41

*Rosebud Sioux Tribe v. Trump,*
    428 F. Supp. 3d 282 (D. Mont. 2019) ...................................................44

*Rushforth v. Council of Econ. Advisers,*
    762 F.2d 1038 (D.C. Cir. 1985) ............................................................42

*Sackett v. E.P.A.,*
    566 U.S. 120 (2012) .............................................................................39

*Sec'y of the Interior v. California,*
    464 U.S. 312 (1984) .............................................................................18

*Sierra Club v. U.S. Fish & Wildlife Serv.,*
    245 F.3d 434 (5th Cir. 2001) ................................................................48

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971) ...................................................... 41, 42

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .........................................................................23

*State of Fla. v. Weinberger,*
    492 F.2d 488 (5th Cir. 1974) ..................................................... 16, 38, 39

*State of Louisiana Through Dep't of Com. & Indus. v. Weinberger,*
    404 F. Supp. 894 (E.D. La. 1975) .........................................................17

*State v. Bureau of Land Mgmt.,*
   286 F. Supp. 3d 1054 (N.D. Cal. 2018) ....................................................................4

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ...................................................................................... 23, 30

*Texas v. Equal Emp. Opportunity Comm'n,*
   933 F.3d 433 (5th Cir. 2019) .............................................................................passim

*Texas v. United States,*
   787 F.3d 733 (5th Cir. 2015) ...............................................................................15

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ...........................................................................passim

*Texas v. United States,*
   2021 WL 2096669 (S.D. Tex. Feb. 23, 2021) ................................................passim

*U.S. Army Corps of Engineers v. Hawkes Co.,*
   136 S. Ct. 1807 (2016) .........................................................................................39

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ..............................................................................48

*United States v. Riccardi,*
   989 F.3d 476 (6th Cir. 2021) ..............................................................................47

*W. Virginia v. EPA,*
   362 F.3d 861 (D.C. Cir. 2004) ............................................................................16

*W. Watersheds Project v. Bureau of Land Mgmt.,*
   629 F. Supp. 2d 951 (D. Ariz. 2009) ..................................................................44

*Watt v. Energy Action Educ. Found.,*
   454 U.S. 151 (1981) ............................................................................................18

*Wild Virginia v. CEQ,*
   2021 WL 2521561 (W.D. Va. June 21, 2021) .....................................................38

*Wyoming v. United States Dep't of the Interior,*
   2020 WL 7641067 (D. Wyo. Oct. 8, 2020) .................................................... 4, 46

**Statutes**
5 U.S.C. §706 ...............................................................................................................2

5 U.S.C. §551(4) .......................................................................................................47

23 U.S.C. §327 ..........................................................................................................16

30 U.S.C. §187 ...................................................................................................46

42 U.S.C. §17352(a)(3) .......................................................................................45

42 U.S.C. §4331(b)(2) .........................................................................................45

42 U.S.C. §4332(D) .............................................................................................16

42 U.S.C. §6295(o)(2)(B)(i) .................................................................................45

42 U.S.C. §7410 ..................................................................................................15

42 U.S.C. §7411 ..................................................................................................16

42 U.S.C. §7415(a) ..............................................................................................45

49 U.S.C. §32902(f) .............................................................................................45

**Other Authorities**

24 C.F.R. §§58.1, 58.4 .........................................................................................16

40 C.F.R. §1501.7(b) ...........................................................................................16

46 Fed. Reg. 13193 (Feb. 17, 1981) ...................................................................32

58 Fed. Reg. 51735 (Sept. 30, 1993) ..................................................................31

86 Fed. Reg. 23054 (Apr. 30, 2021) ...................................................................27

86 Fed. Reg. 24699 (May 7, 2021) ..............................................................13, 40

86 Fed. Reg. 27150 (May 19, 2021) .........................................................20, 27, 30

86 Fed. Reg. 35280 (July 2, 2021) ................................................................27, 29

Alaska LNG Project LLC, DOE/FE Order No. 3643-B, FE Docket 14-96-LNG, Order on
    Rehearing (Apr. 15, 2021) ...........................................................................29

Cass Sunstein, *Biden Climate Regulation Is About to Get Tougher*, BLOOMBERG OPINION
    (Jan. 26, 2021), https://bloom.bg/3r6QQ7c ...................................................32

*Comments of Jeff Landry, Notice of Availability and Request for Comment on "Technical Support Document:
    Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under Executive Order 13990";*
    Fed. Reg. Doc. 2021-09679; OMB Doc. 2021-0006 (June 21, 2021) ...................23

Dep't of the Interior, Sec'y of the Interior Order No. 3399 (Apr. 16, 2021),
https://on.doi.gov/3e4F5c9 ................................................................. 15, 16, 17, 19

DHS, "DHS Begins to Process Individuals in MPP Into the United States to Complete their
Immigration Proceedings" (Apr. 13, 2021), https://bit.ly/3b5IVjL ................................13

EPA, *Proposed Rule - Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading
Program under the AIM Act* (Apr. 30, 2021), https://bit.ly/3uoJoFe...................................13

Executive Order 12291 ...........................................................................................31

Executive Order 13783 ...........................................................................................10

Executive Order 13990 ......................................................................................passim

*Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371 (2015)............................. 5, 8, 28

Frank Ackerman & Elizabeth A. Stanton, *The Social Cost of Carbon: A Report for the Economics for
Equity and Environment Network* 2 (Apr. 1, 2010), https://bit.ly/3mZJWOQ....................32

James Broughel, Comment: The Interagency Working Group on the Social Cost of Greenhouse
Gases should be transparent about the value judgments behind its estimates and acknowledge
their cost, George Mason Univ. Mercatus Center, at 2 (June 11, 2021) ............................20

Kate C. Shouse, Cong. Research Serv., *EPA's Proposal to Repeal the Clean Power Plan: Benefits and
Costs*, at 9 (Feb. 28, 2018), https://bit.ly/3v1pjZ ................................................31

Kevin D. Dayaratna and David W. Kreutzer, *Loaded DICE: An EPA Model Not Ready for the Big
Game*, Heritage Foundation Backgrounder No. 2860, at 3 (Nov. 21, 2013),
https://bit.ly/32VSkpk ......................................................................................7

Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global
Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017) ..............20

Circular A-4, available at
https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.........passim

## INTRODUCTION

In public, President Biden has extolled the Social Cost of Greenhouse Gases as a regulatory measure designed to transform the American economy. Plaintiff States took him at his word and challenge those estimates here. Yet his lawyers now say that the SC-GHG Estimates "will rarely be out-come determinative." Doc. 31-1 at 2. The Executive Order's text belies their assertion. It says agencies "shall" use the SC-GHG Estimates in rulemakings that have already harmed, and will continue to directly harm, the States and their citizens. Doc. 31-2 at 5. In fact, these Estimates are perhaps the most significant regulatory action in American history—yet Defendants cannot cite *one statute* authorizing them. Indeed, to avoid public and judicial accountability, the Administration has resorted to creating a new agency out of whole cloth, avoiding notice and comment procedures, and reviving a discredited methodology to justify unprecedented burdens on State sovereignty and individual liberty. This is the very definition of an APA violation and ultra vires action.

Apparently recognizing the lawlessness of their actions, Defendants hardly defend the SC-GHG Estimates on the merits. Instead, they distort jurisdictional doctrines to stir chaos. None of their efforts, however, obscures the simple fact that the SC-GHG Estimates are final agency action that have directly injured the States and their citizens. Defendants are correct that "Article III has no convenience exception." Doc. 31-1 at 17. But it is the President, not Plaintiff States, who has circumvented the Constitution for the sake of convenience, side-stepping the carefully wrought constitutional lawmaking process by attempting to make new law via executive fiat. Plaintiff States have adequately alleged that the SC-GHG Estimates and Executive Order 13990 are unlawful and have directly harmed or will imminently harm numerous State interests in a way this Court can redress. Because this case should proceed to the merits, the Defendants' motion should be denied.

**BACKGROUND**

I.   **THE ADMINISTRATIVE PROCEDURE ACT AND CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES.**

One of the foremost checks on the "growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life," is the Administrative Procedure Act (APA). *See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). The APA mandates that agencies act only in accordance with express legal authority, in a transparent manner, with opportunity for robust public input, in a nonarbitrary fashion, and with robust judicial review. *See* 5 U.S.C. §706. Courts vigorously police the APA's requirements to ensure that the vast administrative state stays within the bounds set by the Constitution and Congress. *E.g.*, *Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries*, 512 U.S. 267, 281 (1994) (holding that Department of Labor rule violated the APA).

Another check on the growth of the Administrative State is the decades-old bipartisan consensus around cost/benefit analyses. Presidents Nixon, Ford, Carter, Reagan, and Clinton required agencies to perform vigorous cost/benefit analyses before regulating. Doc. 1 at 16, ¶48. Embodying this consensus, President Clinton issued Executive Order 12866, which instructs agencies "[i]n deciding whether and how to regulate" to "assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." Doc. 31-3 at 2.

To implement EO 12866 and ensure agencies use a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions," President George W. Bush's Office of Management and Budget issued Circular A-4 in 2003. Doc. 1 at 17, ¶50; *see* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf (Circular A-4). Part compilation of decades of best regulatory practices—and part aggregation of public comments, expert peer review, and interagency considerations—Circular A-4 has become the cornerstone of regulatory analysis in the Executive Branch. It gives "highly detailed guidance to the agencies on the

key elements of a 'good regulatory analysis' under Executive Order 12,866, including a clear baseline for comparative purposes, specifically stated assumptions, an assessment of the sensitivity of the analytical results to changes in those assumptions, and attention to ancillary impacts." Doc. 1 at 17, ¶50. Circular A-4 was issued after an extensive and transparent process of peer and interagency review and public notice and comment. Doc. 1 at 17, ¶51; *see* Circular A-4, at 1 ("In developing this Circular, OMB first developed a draft that was subject to public comment, interagency review, and peer review.").

As relevant here, Circular A-4 contains two cornerstone instructions: first, agencies must use a 3 and 7 percent discount rate; second, agencies must consider domestic—rather than global—costs and benefits. Doc. 1 at 17, ¶52.

First, the discount rates of 3 and 7 percent. Discount rates matter a great deal in regulatory analysis because "[b]enefits and costs do not always take place in the same time period. When they do not, it is incorrect simply to add all of the expected net benefits or costs without taking account of when the[y] actually occur." Circular A-4 at 31. "If benefits or costs are delayed or otherwise separated in time from each other, the difference in timing should be reflected in" an agency's "analysis." *Id.* "Benefits or costs that occur sooner are generally more valuable" because people "plac[e] a higher value on current consumption than on future consumption." *Id.* at 32. "To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing. The further in the future the benefits and costs are expected to occur, the more they should be discounted." *Id.* "When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits." *Id.*[1]

---

[1] "Regulatory Impact Analyses typically simplify comparison of costs and benefits by valuing the streams of future costs and benefits as 'present values.' One debate involves how, in calculating present values, to reflect society's valuation of future benefits compared with values today. Economists use 'discount rates' for these calculations. Higher discount rates give less present value

Reflecting these economic realities, Circular A-4 instructs agencies to apply discount rates of both 3 percent and 7 percent when conducting regulatory cost/benefit analysis. OMB did not randomly select these discount rates. Rather, the Executive Branch had used a 7 percent rate for more than a decade before Circular A-4. That rate itself was the product of "extensive internal review and public comment." Circular A-4, at 33. The 7 percent discount rate was picked because it "reflects the returns to real estate and small business capital as well as corporate capital." *Id.* It thus "approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* But Circular A-4 also recognizes, based on material accumulated in OMB's extensive internal and public review, that a lower discount rate may be appropriate in certain circumstances. So Circular A-4 instructs agencies also to "provide estimates of net benefits using both 3 percent and 7 percent." *Id.* at 34.

Second, the focus on analyzing domestic effects. Circular A-4 unambiguously requires as much: "Your analysis should focus on benefits and costs that accrue *to citizens and residents of the United States*. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." *Id.* at 15 (emphasis added). And courts have recognized this unmistakable direction to focus on domestic, rather than global, effects. *E.g.*, *Wyoming v. United States Dep't of the Interior*, 2020 WL 7641067, at *21 (D. Wyo. Oct. 8, 2020) (noting that Circular A-4 mandates a national focus); *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018) ("While Plaintiffs argue that the same Circular directs BLM to encompass 'all the important benefits and costs likely to result from the rule,' including 'any important ancillary benefits,' it does not specifically mandate that agencies consider global impacts."). Reflecting this clear directive,

---

than lower discount rates to benefits or costs that accrue in the future. For climate change, this debate has especially strong implications, because many of the benefits of GHG mitigation would occur generations after the year of emission control." Doc. 1 at 20, ¶58 n.14.

"the typical agency practice is, in fact, to leave foreign impacts out of cost-benefit analyses entirely."

Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015).

## II.   THE CREATION AND DEVELOPMENT OF THE SOCIAL COST OF GREENHOUSE GASES ESTIMATES.

Carbon dioxide, methane, and nitrous oxide are ubiquitous byproducts of everyday American life. They are produced by virtually every imaginable American activity from energy production to agriculture to waste disposal. Carbon dioxide, for example, "enters the atmosphere through burning fossil fuels (coal, natural gas, and oil), solid waste, trees and other biological materials, and also as a result of certain chemical reactions (e.g., manufacture of cement)." Doc. 1 at 4, ¶3. It is also emitted by the natural processes of human beings and other respiratory organisms. Methane emissions, too, are also ever-present parts of the economy since they are "emitted during the production and transport of coal, natural gas, and oil [and] also result from livestock and other agricultural practices, land use and by the decay of organic waste in municipal solid waste landfills." Doc. 1 at 4, ¶4. And "[n]itrous oxide is emitted during agricultural, land use, industrial activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater." Doc. 1 at 5, ¶5. Greenhouse gas emissions are thus an inherent part of human life and society—encompassing "everything airborne, from Frisbees to flatulence." *Massachusetts v. E.P.A.*, 549 U.S. 497, 558 n.2 (2007) (Scalia, J., dissenting).

### A.   SCC & SC-GHG in the Obama Administration.

No statute requires agencies to consider a "social cost" of greenhouse gases as part of their regulatory cost-benefit analyses. But in 2008, the Ninth Circuit held that NHTSA must account for the economic effects of a reduction of carbon dioxide emissions when analyzing the impacts of fuel economy standards. *Ctr. For Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008). The next year, President Obama convened an Interagency Working Group (IWG) to estimate the "social cost of carbon" (SCC). Doc. 1 at 19, ¶56. The plan was to develop estimates, and then require agencies to incorporate those SCC estimates into their regulatory cost-benefit analysis. *See id.* The Obama IWG

issued several iterations of the SCC estimates throughout the Administration. *Id.* And in 2016, the IWG released estimates for the Social Cost of Methane (SCM) and Social Cost of Nitrous Oxide (SCN). *Id.* Those estimates, which form the basis of the Biden SC-GHG Estimates, were not the product of reasoned decisionmaking and broke from the longstanding requirements of the APA and Circular A-4. *Id.*

The IWG's first round of "interim" SCC estimates "did *not* undertake *any* original analysis. Instead, it combined SCC estimates from the existing literature to use as interim values." Doc. 1 at 19, ¶57. Not until the Spring of 2010 did the IWG issue a "technical support document" in which it presented final SCC estimates and described its methodology. Doc. 1 at 20, ¶58. IWG purported to use Circular A-4 as its starting point but expressly rejected two of Circular A-4's fundamental tenets of good regulatory practice. First, IWG focused on global rather than domestic effects. *Id.* Second, IWG rejected Circular A-4's discount rates—3 and 7 percent—and instead mandated discount rates of 2.5, 3, and 5 percent. *Id.* The IWG also ignored the APA by failing to hold a dedicated public comment period for the SCC estimates. *Id.* at 20, ¶59.

In 2013, the IWG issued revised SCC estimates in another technical support document. Doc. 1 at 20, ¶60. Although the IWG stuck with its underlying methodologies, it applied new versions of underlying models that resulted in a nearly twofold increase of the SCC estimate over the 2010 SCC estimates. *Id.* at 20-21, ¶60. But the IWG again failed to solicit public comment. *Id.* at 21. This massive increase, however, attracted enough public attention that OMB initiated the first public review and comment period for the IWG's SCC estimates. *Id.* at 21, ¶61. OMB received over 100 unique comments that "covered a wide range of topics including the technical details of the modeling, the aggregation and presentation of the results, and the process by which the SCC estimates were derived." *Id.* But OMB rejected and ignored these comments by calling them "out of scope" of the call for comments. Doc. 1 at 21-22, ¶62 ("OMB clarified that it was not requesting comments on the three

peer-reviewed IAMs themselves."). Instead, the Obama Administration decided to continue relying upon the 2013 estimates "until revisions based on the many thoughtful public comments we have received and the independent advice of the Academies" could be incorporated. *Id.* Those revisions never came; neither OMB nor IWG ever addressed the "thoughtful" and "technical" public comments, and thus never revised the SCC values in response to them. *See id.*

Finally, in 2016, the Obama IWG issued a minor revision to the SCC estimates that again held off on making substantive revisions pending receipt of a report from the National Academies of Sciences, Engineering, and Medicine. Doc. 1 at 22, ¶63. The IWG also issued a final addendum; that did not change the SCC estimates, but instead established estimates for the SCM and SCN using the same methods and models as those underlying the SCC estimates. *Id.* at 23, ¶64.

Given this haphazard set of events, it's clear that the Obama Administration's IWG's process was not a model of reasoned decisionmaking.

*First*, the time horizons upon which the SCC estimate was based were arbitrary. For example, even the Natural Resource Council of NAS admitted that the SCC estimates "suffer from uncertainty, speculation, and lack of information about (1) future emissions of GHGs; (2) the effects of past and future emissions on the climate system, (3) the impact of changes in climate on the physical and biological environment, and (4) the translation of these environmental impacts into economic damages." Doc. 1 at 23, ¶66. Others criticized the inherently speculative and arbitrary nature of the models—known as "Integrated Assessment Models" (IAM)—underlying the SCC estimates. The IAMs upon which SCC was and is based are particularly unreliable because they are based on a *three-hundred-year* time horizon, meaning they purport to predict political, technological, economic, social, geopolitical developments three centuries into the future. *See* Doc. 1 at 29, ¶87; *see also* Kevin D. Dayaratna and David W. Kreutzer, *Loaded DICE: An EPA Model Not Ready for the Big Game*, Heritage Foundation Backgrounder No. 2860, at 3 (Nov. 21, 2013), https://bit.ly/32VSkpk ("[I]t is highly

suspect for the government to claim the capacity to base policy decisions on statistical forecasts extending nearly 300 years into the future.").

*Second*, the IWG's process failed key good government transparency standards. For example, the IWG failed to disclose the personnel involved. It also failed to disclose whether outside consultants participated. Such failures violate longstanding OMB regulatory integrity guidelines. Doc. 1 at 23, ¶67.

*Third*, the SCC estimates rested on flawed and arbitrary damage functions: "These damage functions translate variables, such as projected sea level rise, to estimated economic damages. By their nature, we know very little about the correct functional form of damage functions. According to a well-known economist, '[the model] developers ... can do little more than make up functional forms and corresponding parameter values. And that is pretty much what they have done.'" Doc. 1 at 23-24, ¶68. Even Obama Administration agencies themselves noted that the SCC was not ready for primetime, but continued to implement it anyway. *Id.*

*Fourth*, even though the relevant statutes direct agencies to consider domestic—not global— costs and benefits, the 2013 SCC estimates were based upon global harms. Doc. 1 at 24, ¶69 ("It must also be noted that between 77 and 93 percent of the benefits from reductions in CO2 emissions resulting from this regulation will be captured by foreigners, not by Americans .... While global benefits are useful general information, they should be excluded from the calculation of net benefits from the rule because these are not benefits to American taxpayers, whom the DOE is tasked to serve ...."). This was a radical break from the past. *See* Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015) ("[T]he decision to count global impacts—and to count them in the way they are counted—occurs against an institutional backdrop that constitutes a bold diversion from existing regulatory policy. In other domestic regulatory contexts, the United States does not count foreign impacts. The typical agency practice is, in fact, to leave foreign impacts out of cost-benefit analyses entirely."). But the IWG tried to play off its shift as condoned by Circular A-4 despite the

previously uniform weight of authority recognizing that the Circular mandates a domestic focus. Even worse, the IWG and agencies failed to contemplate their statutory authority to consider global effects. *See id.* at 375 ("[A]gencies implementing these statutes have inexplicably failed to systematically examine their own statutory authority to apply a globally scoped SCC. As a result, recent rules based on the globally scoped SCC are vulnerable to challenge as exceeding agencies' statutory authority, and as arbitrary and capricious.").

*Fifth*, the IWG never gave the public a full and fair opportunity to comment on the SCC estimates and the underlying models. Instead, the Obama Administration followed an opaque piecemeal approach in which different parts of the SCC estimates appeared to be up for comment in different regulatory proceedings at different times over the course of the Administration. *See, e.g.*, Doc. 1 at 25, ¶72. The only time the Administration accepted public comment on the SCC estimates specifically, it rejected and ignored comments on the underlying models and delayed substantive revisions based on public comment until the NAS finalized its recommendations. Such substantive revisions were never made. And the SCM and SCN were subject to public scrutiny only in a single DOE rulemaking. *See* Doc. 1 at 25-26, ¶73.

*Sixth*, the sheer substantive uncertainty of the SCC estimate enterprise was hugely problematic. *See, e.g.*, Doc. 1 at 26, ¶74 ("One potential challenge of relying on SC-CO2 estimates to set a carbon fee are methodological concerns. ... No estimates of impacts are comprehensive at this time, and many of the risks are difficult to estimate and value. ... In addition, the element of time in climate change impacts particularly complicates the valuation. ... Economists do not agree on the appropriate discount rate(s) to use for a multi-generational, largely non-market issue such as human-induced climate change."). This uncertainty makes it particularly egregious to depart from Circular A-4's time-tested 7 percent discount rate in favor of a discount-rate spectrum never before employed.

Though most executive agencies were compelled to use the IWG's SCC estimates, those that were not so bound, such as the Federal Energy Regulatory Commission, refused to employ them due to their unsoundness. FERC specifically found that "it would not be appropriate or informative to use" IWG's SC-GHG estimates "for three reasons: the lack of consensus on the appropriate discount rate leads to 'significant variation in output[,]' the tool 'does not measure the actual incremental impacts of a project on the environment[,]' and 'there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes.'" Doc. 1 at 26, ¶75. The D.C. Circuit upheld FERC's "finding [that] the tool [is] inadequately accurate." *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016).

**B.**     **SCC & SC-GHG in the Trump Administration.**

It was against that backdrop—SC-GHG estimates that the Obama Administration itself conceded were inaccurate and needed future updates, and that were rejected by other agencies—that the Trump Administration considered how to address the "social cost" of greenhouse gases. In light of the significant flaws in the IWG's SCC, SCM, and SCN estimates, President Trump issued Executive Order 13783, which disbanded the IWG and rescinded its technical support documents. Doc. 1 at 26-27, ¶76. EO 13783 also directed agencies to return to Circular A-4's methodologies to guide their analysis of the value of changes in greenhouse gas emissions. Agencies thus returned to Circular A-4's longstanding 3 and 7 percent discount rates and focused on domestic costs and benefits. Doc. 1 at 27, ¶77. For example, the EPA promulgated SCC values based upon Circular A-4's methodologies. *Id.* at 27, ¶78. EPA found the SCC to be $7 per metric ton at a 3 percent discount rate and $1 per metric ton at a 7 percent discount rate. *Id.* EPA also determined the SCM to be $184 per metric ton at a 3 percent discount rate and $57 per metric ton at a 7 percent discount rate. *Id.* NHTSA employed Circular A-4's methodology to determine that the SCN was $2,820 per metric ton. *Id.* CEQ

also issued a final rule clarifying that NEPA does not allow agencies to consider effects that are "remote in time, geographically remote, or the result of a lengthy causal chain."  Doc. 1 at 33, ¶100.

## III.   PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 13990 REQUIRING AGENCIES TO EMPLOY SC-GHG ESTIMATES CREATED BY AN INTERAGENCY WORKING GROUP.

### A.   Executive Order 13990.

On January 20, 2021, President Biden issued Executive Order 13990. Doc. 1 at 27, ¶79. Section 5 of the EO directs federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." Doc. 1 at 27-28, ¶80. To accomplish this, EO 13990 resurrects the Obama-era IWG. The key provision regarding SC-GHG is §5(b)(ii)(A), which provides that "the Working Group shall … publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies *shall* use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." Doc. 1 at 28, ¶81 (emphasis added). By its plain terms, this provision strips all federal agencies of discretion about whether to use the SC-GHG Estimates. But it cites no statutory authority for that directive.

### B.   The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates.

On February 26, 2021, the IWG released the SC-GHG Estimates that Section 5 of EO 13990 commands agencies to employ. *See* Doc. 1 at 28, ¶83 ("SC-GHG Estimates"). The Biden SC-GHG Estimates are identical to those issued by the Obama Administration in the 2016 Technical Support Document and addendum, adjusted for inflation. *Id.* at 28, ¶84. It is therefore unsurprising that the Biden SC-GHG Estimates' two most radical breaks from past practice are the same as the Obama IWG's: (1) the rejection of the longstanding 7 percent discount rate, and (2) the focus on global rather than domestic effects (and failure to analyze—at all—any statutory authority to consider global effects). Still, when compared to the immediately preceding values used by the Trump Administration,

11

the departure is striking. Comparing 2020 values using a 3 percent discount rate, they raise the social cost of carbon from $7 (2018 dollars) per metric ton to $51 per metric ton (2020 dollars); the social cost of methane from $184 per metric ton (2018 dollars) to $1,500 per metric ton (2020 dollars); and the social cost of nitrous oxide from $2,800 per metric ton (2018 dollars) to $18,000 per metric ton (2020 dollars). Doc. 1 at 28-29, ¶84. Making matters worse, the IWG failed to solicit or receive any public input or peer review despite EO 13990's directive to "solicit public comment; engage with the public and stakeholders; [and] seek the advice of ethics experts." Doc. 1 at 29, ¶85. Even the IWG itself recognizes the inherent uncertainty surrounding the SC-GHG Estimates and acknowledges that it is engaged in an inherently legislative function. *See* Doc. 1 at 29, ¶86.

Overall, the Biden SC-GHG Estimates usurp agencies' statutorily vested authority by dictating a specific number for each greenhouse gas. The SC-GHG Estimates for carbon, methane, and nitrous oxide also increase over time—to $85, $3100, and $33,000 respectively in 2050. The Working Group, however, immediately admits that these numbers are not the correct values, though in its view they "underestimate" the cost. *Id.* Those numbers will result in massively increased social cost estimates, which will be used to justify, or even mandate, an unprecedented expansion of the federal government's regulatory power. EO 13990's command that agencies "shall" use these values in their regulatory activity confirms that significant regulatory infringements upon the States and their citizens will occur imminently. The costs to the national economy caused by the Biden SC-GHG Estimates will be in the hundreds of billions or trillions of dollars. Those costs pose existential threats to Plaintiff States and their citizens.

The Biden SC-GHG Estimates are already being employed by Executive agencies. For example, the EPA has relied upon them in disapproving state implementation plans under the NAAQS good-neighbor provisions and to justify the imposition of more stringent federal implementation plans on several Plaintiff States. *See* Doc. 1 at 45-46, ¶124. Similarly, EPA has explicitly

relied upon the SC-GHG Estimates in formulating a "Social Cost of Hydrofluorocarbons" to justify an attempted expansion of regulatory power. *See* EPA, *Proposed Rule - Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program under the AIM Act* (Apr. 30, 2021), https://bit.ly/3uoJoFe.[2] In contrast, the Administration has failed to employ the SC-GHG Estimates to analyze costs and benefits of some of its favored policies—such as immigration actions—with an obvious impact on greenhouse gas emissions. *See, e.g.*, DHS, "DHS Begins to Process Individuals in MPP Into the United States to Complete their Immigration Proceedings" (Apr. 13, 2021), https://bit.ly/3b5IVjL.

## STANDARD OF REVIEW

"In evaluating a motion to dismiss under Rule 12(b)(6), the Court must 'accept all well-pleaded facts in the complaint as true and view the facts in the light most favorable to the plaintiff.'" *Luv N' Care, Ltd. v. Jackel Int'l Ltd.*, 2020 WL 6881672, at *3 (W.D. La. Nov. 23, 2020). Accordingly, "courts 'are not authorized or required to determine whether the plaintiff's plausible inference ... is equally or more plausible than other competing inferences....'" *Id.* This plausibility standard is met "when the complaint pleads 'enough fact to raise a reasonable expectation that discovery will reveal evidence' in support of the alleged claims.'" *Id.* Regarding jurisdiction specifically, "[a]t the pleading stage, allegations of injury are liberally construed." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). And "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

---

[2] Since Plaintiffs filed this suit, the Office of Information and Regulatory Affairs issued a request for comments regarding the SC-GHG Estimates. *See* 86 Fed. Reg. 24699 (May 7, 2021). The Request notes that the target date for publishing the next set of SC-GHG Estimates is January 2022.

## ARGUMENT

### I. PLAINTIFF STATES HAVE ARTICLE III STANDING.

To establish standing, Plaintiff States "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015). "'When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* And "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Id.* Additionally, States "are not normal litigants for the purposes of invoking federal jurisdiction," and may be entitled to "special solicitude" in the standing inquiry. *Id.* at 152.

Defendants attack Plaintiff States' standing only by obscuring the clear line of causation between Plaintiff States' concrete injuries in fact and the Executive Order and SC-GHG Estimates. Although Plaintiff States have established standing under the traditional mode of analysis, the special solicitude to which they are entitled puts their standing beyond doubt.

### A. Plaintiff States Have Standing Under the Traditional Analysis.

#### 1. *Direct Injury to Sovereign Interests*

Defendants erroneously contend (at 15) that Plaintiff States "do not allege that they have already suffered any 'concrete, particularized,' or 'actual' injury." Plaintiff States allege that the SC-GHG Estimates impose new obligations on them to use the Estimates when they participate in cooperative federalism programs. Doc. 1 at 45-46, ¶¶123-125. This type of increased regulatory burden, and the obligation or pressure on sovereign States to change their regulatory practices, is a direct injury, long held to be judicially cognizable. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *see also Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("Those intrusions are

analogous to pressure to change state law."); *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015) ("Texas's interest in not being pressured to change its law is more directly related to its sovereignty than was Massachusetts's interest in preventing the erosion of its shoreline."); *Texas v. United States*, 2021 WL 2096669, at *20 (S.D. Tex. Feb. 23, 2021) (standing appropriate where federal policies "assert 'direct, substantial pressure' on a State's 'lawmaking authority'").

The SC-GHG Estimates also impose additional duties on Plaintiff States when they carry out cooperative federalism programs. The SC-GHG Estimates compel Plaintiff States to employ an illegal methodology as a condition of approving significant funding and State environmental implementation plans. For example, States must comply with federal standards in programs such as the National Ambient Air Quality Standards (NAAQS), 42 U.S.C. §7410. Under that regime, "the burden [is on] States to propose plans adequate for compliance with the NAAQS." *E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014). Because these NAAQS are now required to be set based on the IWG's SC-GHG Estimates, States must employ the Estimates or risk having their state implementation plans (SIP) disapproved. And if a SIP is disapproved by EPA, EPA must impose a federal implementation plan (FIP)—which must be based upon the SC-GHG Estimates—upon the State. *See* Doc. 1 at 45-46, ¶¶123-125.

This harm is far from speculative—EPA has already published a final rule utilizing the SC-GHG Estimates and imposing more stringent NAAQS good neighbor Federal Implementation Plans (FIPs) on several Plaintiff States including Louisiana, Kentucky, and Texas. *See* Doc. 1 at 45-46, ¶124. And despite Defendants' assertion (at 29) that the SC-GHG Estimates do not have "any consequences for NEPA," the Secretary of the Interior issued Secretarial Order 3399 to direct her agency to use the SC-GHG in NEPA analyses.[3] Dep't of the Interior, Sec'y of the Interior Order No. 3399, at 1, 4 (Apr.

---

[3] These are just a few examples of the States' obligation to employ the SC-GHG Estimates. Such cooperative federalism programs abound. Just to name a few others, there is point-source power

16, 2021), https://on.doi.gov/3e4F5c9. Defendants' assertion (at 29) that "any consequences for NEPA or cooperative federalism programs are entirely speculative" cannot be reconciled with these on-the-ground realities. *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts "are 'not required to exhibit a naiveté from which ordinary citizens are free'").

Plaintiff States are entitled to relief for the imminent and irreparable harm caused by alterations to such cooperative federalism programs. *See State of Fla. v. Weinberger*, 492 F.2d 488, 494 (5th Cir. 1974) ("It seems clear that ... the State of Florida has standing, arising from its clear interest both in the manner in which the Medicaid program is administered vis-a-vis its citizens and in being spared the reconstitution of its statutory program, to litigate the merits of this case."); *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) ("EPA's actions injure states when those actions necessitate changes to state laws and make 'the states' task of devising an adequate SIP' 'more difficult and onerous.'"); *W. Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004) ("The NOx SIP Call directs each state to revise its SIP in accordance with EPA's NOx emissions budget for the state. The lower the emissions budget, the more difficult and onerous is the states' task of devising an adequate SIP. ... This injury is sufficient to confer standing."); *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975) (municipality has standing and was within zone of interests to challenge federal agency procedure under NEPA because "statute expressly contemplates that state and local governments are to play an important role in the effectuation of national environmental policy"); *New Mexico v. HHS*, 1987 WL 109007, at *2 (10th Cir. Jan. 7, 1987) ("This congressional intention to involve the states in the preparation and promulgation of standards supports the conclusion that New Mexico has standing to challenge HUD standards. To conclude otherwise would frustrate the congressional policy to encourage the cooperation of the states

---

plant implementation and enforcement, 42 U.S.C. §7411; Housing and Urban Development assistance environmental review, 24 C.F.R. §§58.1, 58.4; Federal Highway Administration highway project environmental review, 23 U.S.C. §327; and other NEPA reviews that States undertake as "joint lead agencies" with the federal government, *see, e.g.*, 42 U.S.C. §4332(D); 40 C.F.R. §1501.7(b).

in the development and enforcement of HUD standards."); *State of Louisiana Through Dep't of Com. & Indus. v. Weinberger*, 404 F. Supp. 894, 896 (E.D. La. 1975). This is a direct, unspeculative injury that readily clears Article III's imminence and traceability requirements.

Defendants' only response to this harm is to declare (at 29) that the Executive Order "does not bind *state* agencies." But as described, the SC-GHG Estimates have *already* been used in EPA's disapproval of several Plaintiff States' good neighbor FIPs. Doc. 1 at 45-46, ¶124. And the Secretary of the Interior has issued an order relying on the Executive Order that directs her agency to employ SC-GHG in evaluating NEPA. Sec'y of the Interior Order No. 3399. Defendants have thus already demonstrated that States either must change their regulatory practices to conform to the SC-GHGs or be held out of compliance with federal standards. Such forced choices to change State policy gives rise to standing. *See, e.g., Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007) ("Texas's only alternative to participating in this allegedly invalid process is to forfeit its sole opportunity to comment upon Kickapoo gaming regulations, a forced choice that is itself sufficient to support standing."); *Jindal v. U.S. Dep't of Educ.*, 2015 WL 854132, at *5 (M.D. La. Feb. 26, 2015) ("Governor Jindal alleges that the DOE programs, as implemented, coerced State cooperation which had the effect of diminishing or impairing the State's sovereign right to control education of its citizenry. The presumed true allegations of the Complaint allege a causal connection between the DOE programs and an alleged encroachment on State sovereignty sufficient to satisfy jurisdictional standing."); *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1218 (10th Cir. 2017) (standing elements met because agency action "imposed a forced choice on" the State); *Davis v. U.S. E.P.A.*, 348 F.3d 772, 778 (9th Cir. 2003) (finding standing because "[i]f California fails to comply with its implementation plan requirements, it could be subject to various federal enforcement remedies. In addition, the State could lose millions of dollars in highway funds, and could be required to offset emissions from new or expanded industrial facilities").

Because the SC-GHG Estimates impose direct obligations on the Plaintiff States, and create significant pressure to change the Plaintiff States' regulatory practices and laws, they impose a directly traceable injury in fact upon the States. The SC-GHG Estimates are thus the cause of direct, concrete, and particularized harm to Plaintiff States.[4]

### 2.   *Direct Fiscal Harm*

The SC-GHG Estimates will impose significant financial harm upon Plaintiff States. Harm to State revenue and fiscal health is a quintessential injury in fact. *E.g.*, *Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015); *accord ARCO Alaska, Inc. v. F.E.R.C.*, 89 F.3d 878, 881-82 (D.C. Cir. 1996). Plaintiff States allege numerous financial harms that they will suffer because of the SC-GHG Estimates.

For instance, the Estimates will cause Plaintiff States to lose revenue from less public land and OCS tracts being offered for sale. Doc. 1 at 47, ¶127; *see Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160-61 (1981) ("California thus has a direct financial stake in federal OCS leasing off the California coast. In alleging that the bidding systems currently used by the Secretary of the Interior are incapable of producing a fair market return, California clearly asserts the kind of 'distinct and palpable injury,' that is required for standing."). The Bureau of Land Management and Bureau of Ocean Energy Management must conduct robust environmental analyses before conducting onshore and offshore oil and gas lease sales. *See generally Sec'y of the Interior v. California*, 464 U.S. 312, 339 (1984). The same applies to BLM and BOEM's permitting discovery and drilling on leased land. *Id.*  By imposing a higher SC-GHG upon BLM and BOEM, the Estimates make it inevitable that less land will be offered for sale. Indeed, the Secretary of the Interior has already instructed BLM and BOEM to employ SC-

---

[4] *California v. Texas* does not alter this conclusion because, unlike there, Plaintiff States have shown how their injuries are "directly traceable to any actual or possible unlawful Government conduct." 141 S. Ct. 2104, 2117 (2021). Also, *California* involved a significantly higher standard because that case was decided on summary judgment. *See id.* ("'[A]t the summary judgment stage, such a party can no longer rest on ... mere allegations, but must set forth ... specific facts' that adequately support their contention.").

GHG in conducting environmental analysis. Sec'y of the Interior Order No. 3399; *cf. Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 806 (9th Cir. 2015) ("The agency actions need not be the sole source of injury, and a 'causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.'"). Contra Defendants' repeated assertions, these are not independent third parties choosing to employ SC-GHG. They are executive officers explicitly complying with a mandatory Presidential command. This is more than enough to satisfy Plaintiff States' burden of showing "some fairly direct link between the status as a collector and recipient of revenues, and the legislative or administrative action being challenged." *Louisiana v. DOE*, 507 F. Supp. 1365, 1373 (W.D. La. 1981), *aff'd sub nom.* 690 F.2d 180 ("[T]he [Supreme] Court recognized the principle that lost tax revenues could confer standing where there existed 'some fairly direct link between the state's status as a collector and recipient of revenues, and the legislative or administrative action being challenged.'").

The SC-GHG Estimates also will justify unprecedentedly stringent regulation of the energy sector from which the States derive significant tax revenue. Doc. 1 at 48, ¶¶122, 129-30. Such reduction in tax revenue is a direct injury giving rise to standing. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015); *ARCO Alaska, Inc. v. FERC*, 89 F.3d 878, 881-82 (D.C. Cir. 1996) (finding standing because "cutting short its production will adversely affect Alaska's oil tax revenue"). Given the robust energy industries in Louisiana, Wyoming, and Kentucky, those Plaintiff States' tax revenues will be particularly hard hit by increased regulatory stringency. *See* Doc. 1 at 11-12, 47-49, ¶¶19, 128-130, 133. And, contra Defendants (at 28), Plaintiff States explicitly allege "a loss of specific tax revenues" of the type the Supreme Court has found creates standing. *Compare* Doc. 1 at 48, ¶129 ("The Biden SC-GHG Estimates will threaten the economic well-being of Plaintiff Commonwealth of Kentucky by directly reducing Kentucky's coal severance tax revenues."), *with El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) ("The act's passage caused Wyoming to lose hundreds of

19

thousands of dollars of severance tax revenue. The Supreme Court held that Wyoming had standing to sue because the Oklahoma law caused Wyoming 'a direct injury in the form of a loss of specific tax revenues.'"). Beyond that, unlike the plaintiff in *El Paso County*, Plaintiff States here have identified specific statutorily vested royalty revenues that will be impeded by the SC-GHG Estimates. *See* Doc. 1 at 7, 11-12, 47, ¶¶10, 19, 127. One need only look at the costs imposed by the last administration under regulatory programs such as the Clean Power Plan (justified by the SCC) to see the direct link between this specific tax and royalty revenue and the SC-GHG Estimates.[5] *See* Doc. 1 at 27, ¶78.

Contrary to Defendants' repeated assertions, these damages are not speculative. They are directly traceable to the IWG's SC-GHG Estimates. For instance, the EPA has already employed IWG's work to create a Social Cost of Hydrofluorocarbons that it employs to justify a massive increase in regulation in a recent proposed rule. *See* 86 Fed. Reg. 27150, 27157 (May 19, 2021). And in the Obama Administration, the SCC estimates were used in rulemakings across the board to justify unprecedented regulatory costs. *See* James Broughel, Comment: The Interagency Working Group on the Social Cost of Greenhouse Gases should be transparent about the value judgments behind its estimates and acknowledge their cost, George Mason Univ. Mercatus Center, at 2 (June 11, 2021) ("The total cost of these 83 regulatory actions [using social costs] is estimated to be between $447 billion and $561 billion (in 2020 dollars."); *see also* Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017) (as of mid-2016, the SC-GHG was employed in "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have used the SCC or SCM in their analyses"). This type of automatic use of the SC-GHG to justify massive regulatory costs rebuts Defendants' talismanic use of the word "speculative." *Cf. Texas v. United States*,

---

[5] Indeed, the Trump Administration's use of Circular A-4 in calculating the costs and benefits of the Clean Power Plan's repeal resulted in a significantly less burdensome rule. Doc. 1 at 27, ¶78.

2021 WL 2096669, at *16 (S.D. Tex. Feb. 23, 2021) ("In *Dep't. of Commerce*, the Supreme Court found a traceable link between government action and noncitizens' future unlawful behavior where evidence established a likelihood that noncitizens have 'historically' behaved in a certain manner. In light of this evidence, the Supreme Court concluded that traceability was not 'mere speculation,' but rather, the product of a 'predictable effect of the Government action on the decisions of third parties.'").

The SC-GHG Estimates will also impose a significant drain on Plaintiff States' budgets by driving up energy prices. *See* Doc. 1 at 50-51, ¶136. Plaintiff States are significant purchasers of energy and increased energy prices will cause substantial harm to the public fisc. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power)."). The SC-GHG Estimates will significantly drive up these costs while simultaneously decreasing State revenue, imperiling Plaintiff States' ability to carry out their sovereign duties to their citizens. This is yet another independently sufficient ground supporting standing. *Texas v. United States*, 2021 WL 2096669, at *11 (S.D. Tex. Feb. 23, 2021) ("The Supreme Court and the Fifth Circuit have recognized injuries to a local or state government's financial interests based on the actions of the federal government."); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 697 (10th Cir. 2009) ("financial burden through the costs of lost resources" sufficient); *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019) (denying motion to dismiss challenge to executive order because purchaser "[s]tanding depends on the probability of harm, not its temporal proximity").

If the threat to Massachusetts's coastline a century in the future can justify standing, so does Plaintiff States' detailed allegations regarding financial loss in a much shorter timeframe. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497; *Texas*, 809 F.3d at 159-60 ("For Massachusetts's injury to have occurred, individuals would have had to drive less fuel-efficient cars as a result of the EPA's decision, and that would have had to contribute meaningfully to a rise in sea levels, causing the erosion of the

state's shoreline."). And there is far less uncertainty here than in *Massachusetts. See id.* ("There was some uncertainty about whether the EPA's inaction was a substantial cause of the state's harm, considering the many other emissions sources involved."). "But the Court held that Massachusetts had satisfied the causation requirement because the possibility that the effect of the EPA's decision was minor did not negate standing, and the evidence showed that the effect was significant in any event." *Id.* So too here. Plaintiff States have adequately alleged several independent financial injuries directly traceable to the Executive Order and SC-GHG Estimates. *Id.* ("This case raises even less doubt about causation, so the result is the same.").

### 3.    *Direct Procedural Harm*

Plaintiff States adequately allege procedural harm arising from Defendants' failure to employ notice-and-comment procedures in promulgating the SC-GHG Estimates. Doc. 1 at 50, ¶135.[6] Plaintiff States have a cognizable injury because they have "been deprived of 'a procedural right to protect [their] concrete interests.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019). And "a violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Id.*; *see also Brackeen v. Haaland*, 994 F.3d 249, 296 (5th Cir. 2021) (en banc). Plaintiff States explicitly allege that Defendants violated the APA's procedures and deprived them of their procedural rights. Doc. 1 at 50, ¶135.

This procedural violation harms Plaintiff States' concrete interest in commenting on the SC-GHG Estimates *before* the Federal Government uses them to directly regulate the States' economies and prescribe standards that States must employ when conducting environmental analysis in compliance with federal standards. As discussed extensively, Plaintiff States have a concrete interest

---

[6] For purposes of standing, the procedural violation must be assumed. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) ("We assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim that the Guidance was promulgated in violation of the APA.").

in the SC-GHG Estimates due to, among other thing, the role they play in cooperative federalism programs. Demonstrating that they would participate in a comment period for the 2021 Estimates if they had been given the chance, Plaintiff States have sought to participate at every turn in the promulgation of SC-GHG standards or their application. *See, e.g.*, *Comments of Jeff Landry, Notice of Availability and Request for Comment on "Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates Under Executive Order 13990"*; Fed. Reg. Doc. 2021-09679; OMB Doc. 2021-0006 (June 21, 2021). Absent judicial relief, however, they will never be able to do so for the 2021 Estimates under review. Defendants' claim (at 30) that Plaintiff States' have suffered a "bare procedural violation" cannot withstand these concrete interests. Accordingly, Plaintiff States have adequately alleged a procedural injury in fact by alleging "a risk of real harm" to their concrete interests from the SC-GHG Estimates. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).[7]

Because Plaintiffs have established a procedural injury, the traceability and redressability requirements are relaxed. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A] 'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'"). Enjoining the SC-GHG Estimates would require Defendants to reconsider the issue with the benefit of Plaintiff States' input. That is "all a plaintiff must show when asserting a procedural right." *Texas*, 809 F.3d at 161; *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right,

---

[7] *Summers v. Earth Island Institute* is not to the contrary. Far from asserting "a procedural right *in vacuo*," 555 U.S. at 496, Plaintiff States have shown several concrete harms from their inability to comment upon the SC-GHG Estimates. For instance, this inability prevented them from raising significant reliance interests that would be harmed—as Plaintiff States have raised when actually given the opportunity to comment. In any case, *Summers* involved a forgone comment period for a matter that had already been settled through an agreement involving the plaintiffs there, making it truly a bare assertion of a procedural right that could not result in future agency reconsideration.

that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").

In sum, Plaintiff States have a procedural right to comment on the SC-GHG Estimates under the APA. Deprivation of that procedural right causes Plaintiff States concrete harm. And a ruling vacating the Estimates would create "some possibility" that the Executive would reconsider the issue through the proper procedures. Plaintiff States thus have adequately alleged a procedural injury.

### 4.    *Parens Patriae*

Defendants do not attempt to rebut Plaintiffs States' extensive allegations of economic harm to their citizens. Instead, they assert (at 26-27) that States categorically do not have *parens patriae* standing to sue the federal government. But "Defendants' rebuttal to the Sates *parens patriae* argument is not as simple as they would suggest." *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015). Instead, courts in this Circuit have rebuffed Defendants' precise assertion here: "Defendants' succinct argument, however, ignores an established line of cases that have held that states may rely on the doctrine of parens patriae to maintain suits against the federal government." *Id.* (collecting cases). There is an "important distinction" between a State "bringing suit to *protect* their citizens *from* the operation of a federal statute" and "bringing suit to *enforce* the rights guaranteed by a federal statute." *Id.*; *see also Massachusetts*, 549 U.S. at 520 ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do).").[8] Because Plaintiff States seek redress for an Executive violation of federal law, they may proceed as *parens patriae* against the federal government. *Id.* (*parens patriae* standing not precluded because "the States are suing to …

---

[8] This distinction accords with *Brackeen*, which involved an Equal Protection Clause challenge seeking to protect citizens from the operation of a federal law, the Indian Child Welfare Act. *Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021) (en banc).

prevent the implementation of a policy that undermines those laws" "passed by Congress"); *accord Aziz v. Trump*, 231 F. Supp. 3d 23, 31-32 (E.D. Va. 2017) ("[A] state is not be barred by the *Mellon* doctrine from a parens patriae challenge to executive action when the state has grounds to argue that the executive action is contrary to federal statutory or constitutional law."); *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015).[9]

Accordingly, because Plaintiff States have alleged, without rebuttal, numerous quasi-sovereign interests in the economic well-being of their citizens, they may proceed as *parens patriae*. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general").

## B. Defendants' Attacks on the Immediacy of the Harm and Traceability Do Not Undermine Plaintiff States' Standing.

Defendants' argument against traceability amounts to incanting the word "speculative" time and again. But there is nothing speculative about the link between Plaintiff States' injuries and the SC-GHG Estimates. *For the harm to Plaintiff States' sovereign interests*: the SC-GHG Estimates create a new GHG cost measure that Plaintiff States must use when running cooperative federalism programs or risk serious consequences. *For the harm to Plaintiff States' revenue*: the SC-GHG Estimates significantly increase the cost numbers, agencies must use those Estimates, and agencies have already done so to justify regulatory increases that reduce specifically identified State tax revenue, Doc. 1 at 7, 9-12, 48, ¶¶10, 14, 19, 129, and royalty payments, Doc. 1 at 7, 11-12, ¶¶10, 19. *For the harm to Plaintiff States' procedural rights*: because the SC-GHG Estimates are final legislative rules (as must be assumed for

---

[9] Defendant's citation to the D.C. Circuit's holding in *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) is not convincing because the "persuasive force of that opinion is diminished by the majority opinion in *Massachusetts v. EPA*" and *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). *See Aziz*, 231 F. Supp. 3d at 32 n.10.

standing purposes), Plaintiff States have a specific right to submit comments, and the deprivation of this right prevented Plaintiff States from raising important reliance interests and other flaws that specifically affect the States. *For the harm to Plaintiff States' citizens*: the SC-GHG Estimates create a new GHG cost measure that agencies must use in their regulatory actions that has already resulted in greater regulatory burdens and harm to Plaintiff States' citizens' economic well-being. This court should reject Defendants' attempts to create chaos out of these clear lines of causation and to impose a higher pleading burden on Plaintiff States than the law requires.

At their core, Defendants' arguments against imminence and traceability reflect a fundamental misunderstanding of those doctrines and of Plaintiffs' pleading standards. Defendants demand (at 15-23) that Plaintiff States show inevitable harms flowing directly from the Executive Order or SC-GHG Estimates. According to Defendants, any uncertainty or necessary action on the part of other Executive officers irredeemably breaks the causal chain. But that is not how standing works. Rather, the causation required for standing purposes can be established with "no more than de facto causality." *Louisiana v. Biden*, 2021 WL 2446010, at *10 (W.D. La. June 15, 2021) (quoting *Dep't of Commerce v. New York*, 139 S. Ct. at 2566). And Plaintiff States "need not demonstrate that the defendant's actions are 'the very last step in the chain of causation.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 169-70 (1997)). Defendants' assertion that Plaintiff States' claims must await the last step of the causal chain—i.e., individual agency rulemakings applying the SC-GHG Estimates—ignores basic principles of standing.

Defendants also try to create confusion about whether agencies will implement the SC-GHG Estimates and what effect the Estimates will have on regulatory decisionmaking. It takes no wild speculation, however, to see that agencies will implement the mandatory commands of an Executive Order. Courts often rely upon the predictable actions of even third parties in finding a fairly traceable link between government action and harm. *See, e.g.*, *Texas v. United States*, 2021 WL 2096669, at *16. It takes far less speculation to determine that agencies will apply the indisputably higher SC-GHG

Estimates to justify greater regulatory costs. Defendants' entire position is premised upon Executive officers defying the mandatory command of an executive order. And applying the same historical propensity that courts apply to even third parties makes clear that (a) executive agencies will apply the SC-GHG Estimates and (b) such application will increase regulatory costs. Indeed, *they already have* applied the Estimates and IWG's methodology to finalize, delay, and propose actions having the effect of imposing increased regulatory costs. *See* 86 Fed. Reg. 23054, 23061 (Apr. 30, 2021) (good neighbor NAAQS final rule); 86 Fed. Reg. 35280, 35,281 (July 2, 2021) (relying on E.O. 13990 to delay Alaskan natural gas project for consideration of global costs); 86 Fed. Reg. 27150 (May 19, 2021) (employing IWG methodology to propose social cost of hydrofluorocarbons). It is clear that agencies read the word "shall" in the Executive Order to mean "shall." It is also clear that, as in the Obama Administration, the application of unprecedented social cost of carbon estimates—rather than the lower numbers produced by using Circular A-4's methodology—results in unprecedented levels of regulatory burden and pressure on the States to employ the SC-GHG Estimates in cooperative federalism programs. Defendants' reliance (at 16) on cases regarding "independent decisionmakers" is thus misplaced given the Executive Order's mandatory language. Even absent such language, past and current executive practice demonstrates that the Executive Branch will employ the SC-GHG Estimates in a way that injures Plaintiffs.

Defendants also ignore basic principles of pleading in the standing context. The requirement that Plaintiff States' "injuries be 'fairly traceable'" does not mean they must "show to a scientific certainty that defendant's [conduct] caused the precise harm suffered." *Jindal v. U.S. Dep't of Educ.*, 2015 WL 854132, at *5 (M.D. La. Feb. 26, 2015). Stated differently, "the [standing-causation] standard is not equivalent to a requirement of tort causation"; to the contrary, "the plaintiffs' 'burden ... of alleging that their injury is "fairly traceable" to' the challenged act 'is relatively modest.'" *Id.*

The remainder of Defendants' flyspecking compels no contrary conclusion.

27

*First*, Defendants (at 19-20) insist that the Executive Order is an effective nullity because it contains a boilerplate disclaimer that its provisions apply only when "consistent with applicable law." Such boilerplate savings clauses do not save mandatory commands in executive orders from judicial review. *See Louisiana*, 2021 WL 2446010, at \*19 ("[T]he Court notes the wording in the Executive Order, which states, 'To the extent consistent with applicable law,' but also notes the wording 'shall pause.' This does not leave the agency free to exercise discretion unless they disobey a Presidential Executive Order."); *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) ("[W]e reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order."); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) ("Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.' The Executive Order's savings clause does not and cannot override its meaning.").[10] And past practice demonstrates that agencies will implement the Estimates without regard to statutory authority. *See* Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015) ("Perhaps emboldened by [the IWG's] general dismissal of statutory constraints, agencies using the globally scoped SCC have appeared to ignore the question of statutory authority entirely.").

Even if the boilerplate disclaimer trumped the specific mandatory command, agencies still are not free to depart from the SC-GHG Estimates based on *substantive disagreements* with their methodology. Defendants ignore that States have both substantive and legal concerns with SC-GHGs, such as their reliance on out-of-date and inherently flawed IAMs. It will be useless for States to submit

---

[10] OIRA's made-for-litigation guidance does not alter this result as it merely parrots the boilerplate contained in the Executive Order. It also does not trump a mandatory command in a Presidential Executive Order.

comments urging agencies not to use the IAMs because of their methodological flaws—they are commanded to do so by the Executive Order. Thus, even applying the standard "consistent with law" disclaimer, Plaintiff States have still suffered a procedural injury.

*Second*, Defendants assert several times that Plaintiffs have not alleged certainly impending or actual injury and insist (at 15) that this case is "solely about 'a threatened future injury.'" But Plaintiff States *do* allege an injury that has already occurred: the divestment of their right to comment on the SC-GHG Estimates. For the reasons discussed, this is a concrete procedural injury that has actually occurred, is traceable to the IWG's decision not to invite public input, and is redressable by a judicial order vacating the SC-GHG Estimates. Defendants also erroneously state (at 22) that "Plaintiffs have not identified a single state law or federal regulation [that] has been promulgated, preempted, or altered, in any way, by the Executive Order."[11] But Plaintiff States adequately alleged another actual injury that has already occurred due to the SC-GHG Estimates: EPA's reliance on the SC-GHG Estimates to impose "more stringent NAAQS good-neighbor Federal Implementation Plans (FIPs) upon several states, including Louisiana, Kentucky, and Texas, under the Clean Air Act." Doc. 1 at 45-46, ¶124. Plaintiff States have also alleged that discrete actions are certainly impending because of the Executive Order and SC-GHG Estimates. *See* Doc. 1 at 47, ¶127 ("[R]evenues will shrink because

---

[11] The Administration's actions continue to confirm the injuries alleged in the Complaint. On April 15, 2021, relying upon Executive Order 13990, DOE issued a Rehearing Order to reconsider a liquified natural gas project environmental assessment that had justified approving the project. *See* Alaska LNG Project LLC, DOE/FE Order No. 3643-B, FE Docket 14-96-LNG, Order on Rehearing (Apr. 15, 2021). On July 2, 2021, DOE issued a notice of intent to prepare a supplemental EIS regarding the project, again relying upon EO 13990 and stating its intent to "examine the global nature of GHG emissions associated with exports of LNG." Notice of Intent To Prepare a Supplemental Environmental Impact Statement for the Alaska LNG Project, 86 Fed. Reg. 35280, 35,281 (July 2, 2021).

the Biden SC-GHG Estimates will limit the scope of public lands and waters that BLM and BOEM

make available for exploration and development.").[12]

*Third*, Defendants assert (at 17) that Plaintiff States are not harmed because the SC-GHG

Estimates and Executive Order "'govern[] only agency conduct.'" Not so. Unlike *Summers*, which

involved procedural regulations, the SC-GHG Estimates set a mandatory number that agencies must

use in determining the appropriate level to regulate Plaintiff States and their citizens. They also

mandate how Plaintiff States must conduct cooperative federalism programs or risk being held out of

compliance with them, as has already happened to several Plaintiff States. Doc. 1 at 45-46, ¶124. The

SC-GHG Estimates are no more internal rules of agency conduct than DACA, *Texas*, 809 F.3d 134,

EEOC guidance, *Texas*, 933 F.3d 433, a directive to stop deportations, *Texas*, 2021 WL 2096669, a

Secretarial memo reinstituting a citizenship question, *New York*, 139 S. Ct. 2551, or an oil and gas

leasing moratorium, *Louisiana v. Biden*, 2021 WL 2446010, at *10 (W.D. La. June 15, 2021). Like those

actions, the SC-GHG Estimates are directives to executive officers on how to regulate private parties

and States—not internal procedural instructions like those at issue in *Summers*.

*Fourth*, Defendants demand (at 17) that Plaintiff States "show that, in the absence of the

Executive Order and the Interim Estimates, the agency would have come to a different regulatory

result."[13] But it is black letter law that such a showing is not necessary to allege a procedural injury. *See*

---

[12] What's more, on May 19, 2021, EPA issued a proposed rule using IWG's methodology to create a social cost of hydrofluorocarbons to justify a costly new regulatory approach to those substances. *See* 86 Fed. Reg. 27150 (May 19, 2021).

[13] The only case Defendants cite for this proposition is *Public Citizen v. Trump*. But that case actually supports Plaintiff States. Defendants cite the *summary judgment* holding. But at the *pleading* stage, the court denied the federal defendants' *motion to dismiss* and specifically rejected strikingly similar arguments. *See Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019) (federal defendants' "argument...turns the concept of undue speculation on its head. To be sure, it is always possible that a regulation might be enjoined or that members of the public might ask the agency to rescind a mandate. The question for present purposes, however, is simply whether Plaintiffs have plausibly alleged or otherwise shown that they have standing, and they have met that burden.").

*Massachusetts*, 549 U.S. at 518; *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019); *see also California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) ("The plaintiff need not prove that the substantive result would have been different had he received proper procedure; all that is necessary is to show that proper procedure could have done so.").

In any event, Plaintiff States' allegations easily show that regulatory outcomes would be different in the absence of the Executive Order and SC-GHG Estimates. It is not, as Defendants assert (at 17-20), impossible to determine the effect of the Executive Order and SC-GHG Estimates. No speculation is necessary—all one needs to do is look to the "predictable effect" of the SC-GHG Estimates as revealed by past practice. *Texas v. United States*, 2021 WL 2096669, at *16. In the Obama Administration, the SCC Estimates were used in nearly one hundred regulatory actions to justify unprecedented regulatory costs. *See* Doc. 1 at 39-40, 49, ¶¶110, 131. The repeal of the Clean Power Plan tells the whole story. President Obama's EPA relied upon the SCC Estimates to justify the enormous costs of the CPP. Doc. 1 at 27, ¶78. President Trump's EPA relied upon Circular A-4's methodology to determine that the costs did not justify the benefits. *See* Kate C. Shouse, Cong. Research Serv., *EPA's Proposal to Repeal the Clean Power Plan: Benefits and Costs*, at 9 (Feb. 28, 2018), https://bit.ly/3v1pjZ (detailing differences caused by applying Circular A-4 instead of the SCC Estimates). And the Biden Administration has already used the SC-GHG Estimates to justify increased regulatory costs and disapproval of State NAAQS plans. Doc. 1 at 45, ¶124.

*Fifth*, Defendants minimize (at 19-21) the importance of cost-benefit analysis to regulatory decisionmaking to argue that the SC-GHG Estimates will have minimal effect on agency actions. But Executive Order 12,866 explicitly directs that Each agency "shall assess both the costs and the benefits of the intended regulation and ... propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." 58 Fed. Reg. 51735 (Sept. 30, 1993). Indeed, this requirement has been in force since at least 1981. *See* Exec. Ord. 12291, 46 Fed. Reg.

13193 (Feb. 17, 1981) ("Regulatory action shall not be undertaken unless the potential benefits to society for the regulation outweigh the potential costs to society."). In addition, Defendants' attempt to minimize (at 20) the SC-GHG Estimates' importance to cost-benefit analysis actually illustrates precisely why the Estimates are so important: "one can simply adjust a single numerical variable on the front end, and every regulation that emerges at the back end will necessarily be altered in some material and predictable way." That is exactly what has happened—the use of the SC-GHG Estimates has produced consistently higher regulatory burdens than the use of Circular A-4 and has proven to be outcome determinative on whether costs outweigh benefits. That is why it has been called "most important number you've never heard of." Frank Ackerman & Elizabeth A. Stanton, *The Social Cost of Carbon: A Report for the Economics for Equity and Environment Network* 2 (Apr. 1, 2010), https://bit.ly/3mZJWOQ.[14]

Ultimately, Defendants ask the court to accept that (1) executive officers refuse to implement mandatory executive orders, (2) increasing cost calculations by several orders of magnitude will have no effect on regulatory decisionmaking, and (3) States are not harmed by being precluded from raising important interests in public comment periods. It does not take recourse to special solicitude, *see infra*, or the relaxed standards of the pleading stage, *see supra*, to see why those arguments fail.

## C.      Defendants' Attacks on Redressability Are Not Persuasive.

Defendants' arguments against redressability share the same flawed premises as their other attacks. As an initial matter, Defendants do not even try to argue that Plaintiff States' procedural injury is not redressable. As discussed, vacatur and an injunction would redress Plaintiff States' injury. Nor

---

[14] Professor Sunstein, who helped formulate the SCC as an OIRA Administrator, also emphasizes the importance of this "single numerical variable" to regulatory outcomes: "Because federal agencies often base their decisions on cost-benefit analysis, a high social cost of carbon means aggressive regulation of greenhouse gas emissions and a low one will produce modest regulation." Cass Sunstein, *Biden Climate Regulation Is About to Get Tougher*, BLOOMBERG OPINION (Jan. 26, 2021), https://bloom.bg/3r6QQ7c.

have they shown that a different substantive outcome would result after the Executive's reconsideration. *See, e.g.*, *FEC v. Akins*, 524 U.S. 11, 25 (1998) ("[R]espondents' 'injury in fact' is 'fairly traceable' to the FEC's decision not to issue its complaint, even though the FEC might reach the same result exercising its discretionary powers lawfully. For similar reasons, the courts in this case can 'redress' respondents' 'injury in fact.'").

Defendants argue (at 23-24) that an order enjoining the SC-GHG would not remedy Plaintiff States' injuries because the Executive Branch might just continue using the same SC-GHG Estimates anyway. Arguing that a bound party would not faithfully comply with a court order is a questionable strategic start. And it is not true that vacatur of the SC-GHG Estimates would result in a vacuum. Rather, Circular A-4, which continues to govern agencies' non-climate cost-benefit analysis, would once more cover climate-related cost-benefit analysis. Beyond that, Defendants' assertion (at 24-25) that the SC-GHG Estimates would continue to be used because they embody the "best available science" cannot be reconciled with the IWG's acknowledgement that the SC-GHG Estimates do "not reflect the tremendous increase in the scientific and economic understanding of climate-related damages that has occurred in the past decade." 2021 TSD at 22. With the SC-GHG Estimates enjoined, agencies would again be bound by Circular A-4, which continues to embody best regulatory practices and remedies the arbitrary and lawless flaws inherent in the Estimates.

Finally, Plaintiff States of course agree that an injunction does not lie against the President. But there is no bar to declaratory relief against the President. *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality op.) ("[I]t is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination."); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) ("This case presents a most appropriate instance for the use of a declaratory decree" against the

President). And Defendants do not, and cannot, dispute the judiciary's authority to enjoin executive officers from implementing an unlawful executive order. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.'"); *Texas v. United States*, 809 F.3d 134, 161 (5th Cir. 2015) ("Enjoining DAPA based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right. And enjoining DAPA based on the substantive APA claim would prevent Texas's injury altogether.").

### D.   Special Solicitude Puts Plaintiff States' Standing Beyond Doubt.

Though Plaintiff States establish standing under the traditional analysis, the "special solicitude" courts must show to State litigants puts Plaintiff States' standing beyond question. *Cf. Texas v. United States*, 2021 WL 2096669, at *20 (S.D. Tex. Feb. 23, 2021) ("Even if Texas could not carry its burden under the regular standing inquiry, the Court is persuaded that the State is entitled to special solicitude and thus can easily satisfy the standing elements."). Because "the states [] 'are not normal litigants for the purposes of invoking federal jurisdiction,'" they are entitled to "special solicitude" in the standing analysis if certain factors are present. *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015). The Fifth Circuit's holding in *Texas v. United States* is on point and controlling. First, as in *Texas*, "'[t]he parties' dispute turns on the proper construction of a congressional statute,' the APA, which authorizes challenges to 'final agency action for which there is no other adequate remedy in a court.'" *Id.* Second, as in *Texas*, the SC-GHG Estimates "affect[] the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their" practices and laws to remain in compliance with federal standards. *Id.* at 153; *see also id.* ("[S]tates may have standing based on ... federal assertions of authority to regulate matters they believe they control."). Accordingly, Plaintiff States are entitled to special solicitude in the standing inquiry. *Id.*; *see also Texas v. United States*, 2021 WL 2096669, at *20 (S.D. Tex.

Feb. 23, 2021) ("Although the record demonstrates no express intention of any party to convince Texas to change its detention or education budgets, the pressure exerted on Texas to reconfigure its budget in those areas is just as 'direct' and 'substantial' as the pressure on the State in *Texas v. United States*.").

Given their "special solicitude," Plaintiff States' "standing to sue [is] unassailable." *Texas v. United States*, 2021 WL 2096669, at *10. After a State has established special solicitude, courts routinely find traceability and redressability for injuries comparable to those extensively alleged in Plaintiff States' Complaint. *See Texas v. United States*, 809 F.3d at 159-60; *Louisiana v. Biden*, 2021 WL 2446010, at *10; *Texas v. United States*, 2021 WL 2096669, at *20; *Jindal v. U.S. Dep't of Educ.*, 2015 WL 854132, at *7. Accordingly, "any infirmity" in Plaintiff States' standing "is easily remedied." *Texas v. United States*, 2021 WL 2096669, at *20. "If Massachusetts, armed with special solicitude, can establish causation between the EPA's decision to not regulate greenhouse gas emissions from new motor vehicles and its interest in protecting its physical territory," *id.*, so too can Plaintiff States "establish causation" between the SC-GHG Estimates and harm to their sovereign interests, budgets, procedural rights, and citizens' economic well-being. *See also Texas*, 809 F.3d at 159 ("[T]he government theorizes that Texas's injury is not fairly traceable to DAPA because it is merely an incidental and attenuated consequence of the program. But *Massachusetts v. EPA* establishes that the causal connection is adequate. Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here.").

## II. PLAINTIFF STATES' CLAIMS ARE RIPE FOR REVIEW.

Defendants base their ripeness attacks on a misrepresentations of Plaintiff States' claims and misunderstandings of the law of justiciability. "To determine if a case is ripe for adjudication, a court must evaluate (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of

withholding court consideration." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007). Plaintiff States meet these requirements.

First, "[a] challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Id.* at 498-99. Plaintiff States' claims present pure questions of law about whether the SC-GHG Estimates comply with the APA and applicable organic statutes, and whether Section 208 of the Executive Order exceeds the President's authority. As discussed below, Plaintiff States challenge final agency action. And further factual development (except for the targeted discovery Plaintiff States intend to pursue) is not necessary because the SC-GHG Estimates are already in force and binding.

Defendants' only response is to downplay the effect of the Executive Order. But as discussed extensively, the boilerplate disclaimer that Defendants rely on does not cure the defect in the mandatory command of the order. And even if the savings clause trumped the mandatory command, the Executive Order still binds agencies to disregard substantive objections to the SC-GHG and their underlying methodology. To read the Order any other way would be to render it inoperative and its mandatory command surplusage. *Hias, Inc.*, 985 F.3d at 325 ("The President cannot immunize his Order from scrutiny under such conditions."). Thus, under even Defendants' reading of the Executive Order, Plaintiff States will not be able to bring their full arguments to bear in future agency proceedings. Accordingly, Defendants' alternative (at 33) of an "APA lawsuit" challenging a future decision is not an adequate alternative remedy.[15] And Defendants continue (at 34-35) to

---

[15] The Administration's recent good neighbor rule demonstrates why challenges to mechanical applications of the SC-GHG Estimates are insufficient. EPA there assumed that it must use the SC-GHG Estimates in accordance with the Executive Order and Plaintiff States did not have a chance to challenge this foregone conclusion. The agencies have already shown that they will treat the SC-GHG Estimates as binding, as they did in the Obama Administration. Only a direct challenge to the Estimates themselves, rather than their mechanical application, can remedy Plaintiff States' injuries.

mischaracterize Plaintiff States' Complaint by portraying their claims as based on contingent future events. There is nothing contingent or speculative about the effect of a direct command from the President to agencies to employ a specific number in rulemaking and other regulatory activities. And there is nothing speculative about Plaintiff States' exclusion from any comment process. *See Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) ("Texas claims present injury from submission to an invalid agency process, regardless whether the Secretary ultimately allows gaming on Kickapoo land. With this distinction in mind, Texas's claims are fit for adjudication.").

Second, Plaintiff States will suffer hardship absent an immediate challenge to the SC-GHG Estimates. "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] ... to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas*, 497 F.3d at 499. For the reasons discussed at length, Plaintiff States have suffered numerous legal and practical harms from the SC-GHG Estimates. Contra Defendants (at 31), "the timing and type of injury" to Plaintiff States has been extensively alleged in the Complaint and consists of actual injury already suffered, ongoing harm, and certainly impending harms. *See supra* Sec. I.A. And the Supreme Court has long recognized that a substantive rule "which as a practical matter requires the plaintiff to adjust his conduct immediately" is subject to challenge. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Plaintiff States have alleged exactly this in the context of cooperative federalism programs. *See, e.g.*, Doc. 1 at 45, ¶123.

The forced choice Plaintiff States face between employing the illegal and illogical SC-GHG Estimates in cooperative federalism programs or risking penalties for noncompliance is precisely the type of harm that satisfies the ripeness inquiry. *See, e.g.*, *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) ("If Texas cannot challenge the Procedures in this lawsuit, the State is forced to choose one of two undesirable options: participate in an allegedly invalid process that eliminates a procedural

safeguard promised by Congress, or eschew the process with the hope of invalidating it in the future, which risks the approval of gaming procedures in which the state had no input."); *State of Fla. v. Weinberger*, 492 F.2d 488, 492 (5th Cir. 1974) ("As for that hardship, the state is presently faced with the dilemma whether to bow to the Secretary's volte-face and amend its laws and procedures, with all the likely financial outlay and certain legislative and administrative effort which that process entails, or to risk the at least temporary loss of funding which a conformity hearing by the Secretary could well produce.").

*Ohio Forestry Association* and *National Park Hospitality Association* provide useful contrasts to Plaintiff States' ripe claims. Unlike the binding and currently-in-force SC-GHG Estimates, *Ohio Forestry Association* involved a nonbinding forest plan subject to "future actions to revise ... or modify the expected methods of implementation." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 736 (1998). The Court specifically found that the plan did not "inflict significant practical harm" upon the plaintiff and did not "force it to modify its behavior in order to avoid future adverse consequences," *id.* at 734— in other words, precisely what Plaintiff States have alleged here. Similarly, *National Park Hospitality Association* involved "nothing more than a 'general statemen[t] of policy' designed to inform the public of" the agency's views. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003). The Court specifically found that plaintiffs suffered "no practical harm" because of the policy statement, *id.* at 810—again exactly the opposite of Plaintiff States' detailed allegations of legal and practical harm.[16]

Finally, Defendants' discussion (at 35-37) of FERC's approach to SC-GHG only proves Plaintiff States' point. FERC opened a robust comment period on the SC-GHG Estimates and their underlying models only because it is an independent agency with the discretion not to employ them.

---

[16] Defendants' reliance (at 34-35) on *Wild Virginia v. CEQ* is also unavailing because that case involved a challenge to a directive from one agency to other agencies to draft specific NEPA procedures—a far cry from a directive from the President to employ a specific numerical value in substantive rulemaking. 2021 WL 2521561 (W.D. Va. June 21, 2021).

By contrast, executive agencies bound by Executive Order 13990 have already began perfunctorily adopting the SC-GHG Estimates. This is just a replay of events during the Obama Administration—executive agencies like EPA and DOE employing SC-GHG without second guessing the IWG, and independent agencies like FERC reviewing the IWG's work, finding it wanting, and refusing to employ the Estimates.

In sum, "[t]he lines are drawn, the positions taken, and the matter is ripe for judicial review." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974); *see Louisiana v. DOE*, 507 F. Supp. 1365, 1373–74 (W.D. La. 1981) ("[O]nly prompt resolution of the overriding legal question to interpret the regulation which defines property as a right to produce from a lease or a fee interest can alleviate any injury that Louisiana has experienced as a result of DOE's action. The Court feels that the resolution of this legal question will foster rather than impede the final resolution of this matter.").

## III.   PLAINTIFF STATES HAVE APA AND ULTRA VIRES CAUSES OF ACTIONS.

### A.   The SC-GHG Estimates Are Final Agency Action Under the APA.

The SC-GHG Estimates are legislative rules. *See infra* Sec. IV.C. Accordingly, it automatically follows that they are final agency action subject to APA review. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (a legislative rule is "by definition, a final agency action"). In any event, the SC-GHG Estimates also easily meet the APA test for final agency action. The SC-GHG Estimates are final agency action if (1) they "mark the consummation of the agency's decision-making process" and (2) are an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Louisiana v. Biden*, 2021 WL 2446010, at *12 (W.D. La. June 15, 2021) (citing *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). This test must be applied "pragmatic[ally]" and "flexibly," keeping in mind the APA's basic presumption of judicial review. *Sackett v. E.P.A.*, 566 U.S. 120, 130 (2012) ("The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all.").

The Estimates mark the consummation of the IWG's decisionmaking process—they are in force right now and agencies are using them in regulatory proceedings. They are the IWG's last word until at least 2022. 86 Fed. Reg. 24699. Defendants' frequent invocation of the word "interim" does nothing to help them. *Louisiana v. DOE*, 507 F. Supp. 1365, 1371 (W.D. La. 1981) ("'The label an agency attaches to its action is not dispositive.'"). Because there are no further steps in the process, the SC-GHG Estimates are not subject to further revision, and agencies are obligated by the Executive Order to use them, they satisfy the first prong of the finality test. *See Louisiana*, 2021 WL 2446010, at *12 ("As long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test.") (citing *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020)). This is not merely the beginning of the process—the SC-GHG Estimates definitively set the binding values indefinitely.

Turning to the second prong, "[w]here agency action withdraws an entity's previously held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 442 (5th Cir. 2019). The SC-GHG Estimates do exactly that here—they bind the entire Executive Branch to a particular numerical measure of the social cost of greenhouse gases. Recognizing their conundrum, Defendants resort to out-of-circuit precedent. But the Fifth Circuit is unequivocal that when an action "denies the decisionmaker discretion in the area of its coverage[,] then the statement is binding, and creates rights or obligations." *Texas*, 809 F.3d at 171. In any event, the SC-GHG Estimates do affect Plaintiff States' rights and obligations and have serious legal consequences: they impose binding obligations in cooperative federalism programs—use the SC-GHG Estimates or have your State Implementation Plan denied— and they set out a new standard for determining whether to regulate. The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Plaintiff States have

thus established that the SC-GHG Estimates are an executive action "by which rights or obligations have been determined, or from which legal consequences will flow." *Louisiana v. Biden*, 2021 WL 2446010, at *12 (W.D. La. June 15, 2021).

Ultimately, reflecting the final-agency-action standard's "flexible and pragmatic" nature, *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011), courts have found far less formal and consequential agency actions to satisfy the APA's finality requirement. *See, e.g., See Bhd. of Locomotive Engineers & Trainmen v. FRRA*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases holding that "[a]gency action generally need not be committed to writing to be final and judicially reviewable"). To hold otherwise would be to "shelter" the Executive "from judicial enforcement of congressional mandates." *BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 522 (N.D. Tex. 2018). Accordingly, the SC-GHG is final agency action reviewable under the APA. *Louisiana v. Biden*, 2021 WL 2446010, at *13 (W.D. La. June 15, 2021) ("[A] 'final agency action' does not have to be permanent. Additionally, there is a strong presumption of judicial review. Establishing unreviewability is a heavy burden.").[17]

**B.     The IWG is an Agency Under the APA.**

Finally, the IWG is an "agency" for purposes of the APA because it has been granted authority by EO 13990 to act "with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). It is simply not true (at 41) that "the Working Group lacks any substantial authority that is independent from the President himself." The IWG is far from the President's mere lackey; EO 13990 vests it with significant independent authority to create SC-GHG Estimates that bind executive agencies. *See* EO 13990 §5(b)(ii)(A). No further action

---

[17] Contrary to Defendants' suggestion (at 39), the defendants other than the President and IWG are proper parties to this case because Plaintiff States seek an order enjoining them from carrying out the SC-GHG Estimates and have alleged that the statutes they administer prohibit them from employing the Estimates. *Cf. Louisiana v. Biden*, 2021 WL 2446010, at *10 (enjoining several agency officials who were named defendants from complying with illegal executive order and moratorium).

from the President is needed. This power to "issue guidelines to federal agencies for the preparation of" regulatory review is a hallmark of an APA agency. *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C .Cir. 1980). Beyond that, the IWG is tasked with ongoing and independent research and investigative functions, another hallmark of agency status. EO 13990, §5(b)(ii)(C)-(E), (b)(iii); *Soucie*, 60 F.3d at 854 ("By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency."); *see Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985) ("initiation and support of research, awarding scholarships, fostering the interchange of information and evaluating the status of the sciences in correlating the research" are hallmarks of an agency).

Defendants' contention (at 41) that the IWG exists "solely to assist the President" thus misstates the facts. Unlike the Task Force at issue in *Myer*, the IWG can take significant unilateral actions, including promulgating final rules that bind executive branch agencies. *Compare Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993), *with CREW v. Office of Admin.*, 566 F.3d 219, 233 (D.C. Cir. 2009) (observing the Task Force "lacked substantial authority independent of the President 'to direct executive branch officials'"). Indeed, the entire *Myer* holding was based upon the Task Force's lack of "substantial independence" from the President—the court specifically found that it was reliant directly upon the President for all of its functions. And unlike the IWG, the Task Force did not have the independent authority to bind executive agencies, but instead "found it necessary to advise the President to put such instructions in another Executive Order." *Meyer*, 981 F.2d at 1294.

Concluding that an entity with independent authority to promulgate perhaps the most important rule in the history of the Executive Branch is not an agency subject to judicial review thus defies common sense. *See Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985) (noting irrelevance of lack of grant of statutory authority to agency status and that "it was the functional role of the agency on which *Soucie* turned"). Finally, to the extent that it is relevant at all,

IWG's lack of a statutory grant of authority to this agency makes judicial review more essential, not less. *Cf. BNSF Ry. Co.*, 385 F. Supp. 3d at 523 ("[W]hen an agency 'engage[s] in shenanigans by exceeding its statutory bounds, judicial review remains available consistent with the Administrative Procedure Act, which directs courts to set aside agency action not in accordance with law or in excess of statutory jurisdiction, authority, or limitations.'").

### C.    Section 5 of Executive Order 13990 is Ultra Vires.

Contrary to Defendants' contention (at 42-44) that Plaintiff States are attempting to circumvent APA review, Plaintiff States adequately allege an ultra vires cause of action of the type that courts have long recognized. Ultra vires review is available to review "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see Associated Builders & Contractors of Se. Tex. v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Commerce*, 74 F.3d at 1332). So if ultra vires review is an extraordinary remedy, it is a commensurate response when the Executive takes extraordinary acts beyond legal authority, and courts have never shrunk from their duty to reign in lawless action. It is not Plaintiff States who seek an end-run round the APA—it is the President, who has created an agency out of whole cloth to promulgate a legislative rule of massive importance without statutory authority.

The President's directive to impose a uniform social cost of greenhouse gases across the government—especially the EO's explicit command to "tak[e] global damages into account"—is not

authorized by any statute and is in direct conflict with several statutes. Such ultra vires presidential action is subject to judicial review—particularly when it concerns matters of major national importance. *See Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'"); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 995 (D. Alaska 2018); *Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406; *Associated Builders & Contractors of Se. Texas*, 2016 WL 8188655, at *5; *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 960 (D. Ariz. 2009); *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *15 (N.D. Tex. Oct. 29, 2007). The EO's boilerplate "consistent with law" language does not save its mandatorily-worded unlawful commands from judicial review. EO 13990 §5(b)(ii)(A); *Louisiana*, 2021 WL 2446010, at *19; *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018).

Plaintiff States thus have adequately alleged an ultra vires cause of action to challenge Section 5 of EO 13990.[18]

## IV.   PLAINTIFF STATES ADEQUATELY ALLEGE THEIR STATUTORY CLAIMS.

### A.   The SC-GHG Estimates and Executive Order Contravene Several Statutes.

Plaintiff States adequately allege that the SC-GHG Estimates and Section 208 of the Executive Order expressly contravene several statutes. Though Plaintiff States offer specific textual provisions that cannot be reconciled with these actions, Defendants' offer only the conclusory statement (at 46)

---

[18] As explained in Plaintiff States' discussion of ripeness, the circumstances and history surrounding SC-GHG Estimates demonstrate that challenges in specific rulemakings will be inadequate.

that "plaintiffs have not identified any statutory provision that actually prohibits agency reliance on the Interim Estimates." But Plaintiff States identified several specific statutory commands that cannot be reconciled with the Executive Order.[19]

*First*, EPCA allows DOE to create energy efficiency standards with an eye toward only domestic costs, 42 U.S.C. §6295(o)(2)(B)(i), in contravention of the Executive Order's directive to "tak[e] global damages into account." Doc. 1 at 41, ¶114; *id.* at 52, ¶148. EPCA's structure also reveals the statute's domestic focus—CAFE standards must be promulgated considering "the need of *the United States* to conserve energy." 49 U.S.C. §32902(f) (emphasis added). Nowhere is the Secretary authorized to eschew such domestic considerations in favor of the global effects mandated by the SC-GHG Estimates.

*Second,* Congress specified in the Clean Air Act that regulations must protect and enhance the quality of *the Nation's* air resources to promote the public health and welfare and the productive capacity of its population." *Id.* §7401(b)(1) (emphasis added). Additionally, and like EPCA, when Congress intended the agency to consider global effects, it granted specific and limited authority to do so. *See* 42 U.S.C. §17352(a)(3); 42 U.S.C. §7415(a). The Executive Order's across the board directive to consider global effects cannot be reconciled with these careful statutory regimes. Doc. 1 at 41, ¶115; *id.* at 52, ¶149; *see Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1209 (5th Cir. 1991) (international considerations cannot be implied when statue "provides a laundry list of factors to consider when promulgating a rule under section 6, including 'the effect [of the rule] on the national economy'" and "[i]nternational concerns are conspicuously absent from the statute").

*Third*, the Biden SC-GHG Estimates contravene NEPA, which directs agencies to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42

---

[19] For the reasons detailed at length, Defendants' primary contention on this point (at 45-46)—that the Executive Order's boilerplate saves its legality—is meritless.

U.S.C. §4331(b)(2) (emphasis added). What's more, the Supreme Court has held that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" akin to the "'familiar doctrine of proximate cause from tort law.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Simply put, consideration of effects across the globe and three hundred years into the future cannot be squared with NEPA's proximate cause standard. *See* Doc. 1 at 41, ¶116; *id.* at 52, ¶150.

*Fourth*, the Biden SC-GHG Estimates contravene the MLA, which directs the Secretary of the Interior to "'promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise,'" "'obtain for the public reasonable financial returns on assets belonging to the public,'" *Wyoming*, 2020 WL 7641067, at *8, and "provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing," *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984). The Biden SC-GHG Estimates will lead to fewer lease-sales and permit approvals, undermining the MLA's statutory framework. And the SC-GHG Estimates require BLM to contravene the MLA by relying upon global costs rather than national costs. Doc. 1 at 42, ¶117; *id.* at 53, ¶151; *see Wyoming*, 2020 WL 7641067, at *20 ("[T]he Court questions whether the 'social cost of methane' – particularly on a global scale – is a factor Congress intended BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority. It seems an unreasonable stretch to interpret BLM's authority under the MLA to require lease provisions 'for the safeguarding of the public welfare' (30 U.S.C. §187) as congressional intent that the BLM consider this ancillary air quality benefit.").

*Fifth*, the Biden SC-GHG Estimates contravene OCSLA by compelling a global effects analysis. Doc. 1 at 42, ¶118; *id.* at 53, ¶152. The text of OCSLA concerns only "the local environmental impact of leasing activities in the OCS and does not authorize—much less require—Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on

either the world at large, or the derivative impact of global fossil fuel consumption on OCS areas." *Ctr. For Biological Diversity*, <u>563 F.3d at 485</u>. Accordingly, "Interior simply lacks the discretion to consider any global effects that oil and gas consumption may bring about." *Id.*

Accordingly, Plaintiff states have adequately alleged that the SC-GHG Estimates and Executive Order contravene several discrete laws.

**B.      The SC-GHG Estimates and Executive Order Are Major Actions Taken Without Clear Statutory Authorization.**

Defendants have no answer for Plaintiff States' allegation that the Executive Order and SC-GHG Estimates are ultra vires because they represent a major action taken without clear congressional authorization. <u>Doc. 1 at 43-44</u>, ¶¶119-120 (collecting cases). As Plaintiff States explain in the Complaint: "If Congress wishes to authorize the President to implement sweeping new costs for greenhouse gas effects—and test the limits of its power under the nondelegation doctrine and the Federal Government's power under the Commerce Clause and Tenth Amendment—it must do so clearly." *Id.* at 44, ¶120.

**C.      The SC-GHG Estimates Are Legislative Rules and Did Not Comply With the APA's Notice and Comment Procedures.**

Defendants do not seriously contest that the SC-GHG Estimates "prescri[be] ... valuations, costs or accounting, or practices bearing on any of the foregoing." <u>5 U.S.C. §551(4)</u>. That makes them legislative rules. And no exception to notice-and-comment rulemaking applies here. Indeed, rules that set numerical values are universally held to be legislative rules that require notice and comment. *See United States v. Riccardi*, <u>989 F.3d 476, 487</u> (6th Cir. 2021) ("Precedent . . . recognizes that a specific numeric amount . . . generally will not qualify as a mere 'interpretation' of general nonnumeric language.") (collecting cases). Indeed, IWG itself acknowledges that it engaged in a quintessentially

47

legislative function by balancing societal, economic, and moral concerns in promulgating the Estimates.[20]

Finally, Defendants cannot invoke the harmless error rule to shield one of the most important regulatory actions in history from public comment. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) ("Agency mistakes constitute harmless error only where they 'clearly had no bearing on the procedure used or the substance of decision reached.' This Court has affirmed that '[a]bsence of such prejudice must be clear for harmless error to be applicable."). The Executive's error was not harmless—the 2021 Estimates have never been subject to public comment, and never will be absent an order from this Court. Plaintiff States thus had no opportunity to raise four years of developments, new studies since the last comment period (to the extent a prior comment period existed), and the specific findings of agencies between 2017–2021 rejecting the IWG's methodology. Plaintiff States also extensively allege that the previous iteration of the SCC Estimates never had adequate independent comment period—neither the 2010–2017 Estimates nor their 2021 successors have complied with the APA's notice and comment period. *E.g.*, Doc. No. 1 at 20-22, ¶¶59-63; *id.* at 24-25, ¶¶70-73; *id.* at 29, ¶85; *id.* at 32-34, ¶¶96-100; *id.* at 51, ¶¶137-141. Accordingly, Defendants cannot meet their heavy burden of showing harmless error. *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("An overreaching harmless error doctrine would allow the agency to inappropriately 'avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.'").

---

[20] The SC-GHG Estimates also effectively repeal key provisions of two regulatory actions—Circular A-4 and CEQ's recent NEPA final rule, *see supra*—that  went through notice and comment. *Clean Water Action v. United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (an agency must "follow the same process to revise a rule as it used to promulgate it").

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: July 19, 2021                    Respectfully submitted,

TYLER R. GREEN*                         _/s/ Elizabeth B. Murrill_
DANIEL SHAPIRO*
CONSOVOY MCCARTHY PLLC                  JEFF LANDRY
222 S. Main Street, 5th Floor           Attorney General
Salt Lake City, UT 84101               ELIZABETH B. MURRILL (LSBN 20685)
(703) 243-9423                           Solicitor General
                                       JOSEPH S. ST. JOHN (LSBN 36682)
                                         Deputy Solicitor General
                                       BENJAMIN WALLACE (LSBN 39516)
                                         Assistant Solicitor General
                                       LOUISIANA DEPARTMENT OF JUSTICE
                                       1885 N. Third Street
                                       Baton Rouge, LA 70804
                                       Tel: (225) 326-6766
                                       murrille@ag.louisiana.gov
                                       stjohnj@ag.louisiana.gov
                                       wallaceb@ag.louisiana.gov

                                       *Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
   Attorney General of Alabama
Edmund G. LaCour Jr.*
   Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

ASHLEY MOODY
   Attorney General of Florida
Rachel Siegel*
   Deputy Solicitor General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
Tel: (850) 414-3300
Fax: (850) 410-2672
rachel.siegel@myfloridalegal.com
*Counsel for the State of Florida*

CHRISTOPHER M. CARR
   Attorney General of Georgia
Andrew A. Pinson*
   Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

DANIEL CAMERON
   Attorney General of Kentucky
S. Chad Meredith**
   Solicitor General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330
Chad.Meredith@ky.gov
*Counsel for the State of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
Justin L. Matheny*
  Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
Justin.Matheny@ago.ms.gov
*Counsel for the State of Mississippi*

Katie Hruska*
  Deputy General Counsel to South Dakota
  Governor Kriski Noem
500 East Capitol Avenue
Pierre, South Dakota 57501-5070
Katie.Hruska@state.sd.us
*Counsel for the State of South Dakota*

KEN PAXTON
  Attorney General of Texas
Eric Hudson*
  Special Counsel
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Eric.Hudson@aog.texas.gov
*Counsel for the State of Texas*

PATRICK MORRISEY
  West Virginia Attorney General
Lindsay S. See*
  Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

BRIDGET HILL
  Attorney General of Wyoming
James Kaste*
  Deputy Attorney General

51

Travis Jordan*
  Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov
*Counsel for the State of Wyoming*

*\*Admitted Pro Hac Vice*
*\*\* Motion for Pro Hac Vice admission forthcoming*