**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; et al., <br><br> Defendants. | Civ. No. 2:21-cv-1074-JDC-KK |

**Memorandum in Support of Motion for Preliminary Injunction**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................iv

INTRODUCTION ..........................................................................................................................1

BACKGROUND .............................................................................................................................1

   I.   THE ADMINISTRATIVE PROCEDURE ACT AND CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES. ....................................................................................1

   II.   THE CREATION AND DEVELOPMENT OF ESTIMATES FOR THE SOCIAL COST OF GREENHOUSE GASES. ..........................................................................................4

      A.   SCC & SC-GHG in the Obama Administration. ...........................................5

      B.   SCC & SC-GHG in the Trump Administration. ..........................................11

   III.   PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 13990 REQUIRING AGENCIES TO EMPLOY SC-GHG ESTIMATES CREATED BY AN INTERAGENCY WORKING GROUP. ................................................................................................................12

      A.   Executive Order 13990. ................................................................................12

      B.   The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates. ..........................................................13

ARGUMENT .................................................................................................................................15

   I.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ....15

      A.   The President and the IWG Lack Authority to Promulgate and Enforce the SC-GHG Estimates. ...................................................................................15

      B.   The SC-GHG Estimates Were Promulgated Without Complying With the APA's Notice and Comment Requirements. ...............................................17

      C.   The SC-GHG Estimates Are Arbitrary and Capricious Under the APA. ...............19

      D.   The SC-GHG Estimates Are Contrary to Law. ...........................................31

         1.   The SC-GHG Estimates Contravene EPCA ..........................................31

         2.   The SC-GHG Estimates Contravene the CAA ......................................33

         3.   The SC-GHG Estimates Contravene NEPA ..........................................33

         4.   The SC-GHG Estimates Contravene the MLA ......................................34

5.    The SC-GHG Estimates Contravene OCSLA .......................................................35

E.    No Barriers to Justiciability Prevent Review of the SC-GHG Estimates................36

1.    The SC-GHG Estimates Are Final Agency Action Under the APA...................36

2.    The SC-GHG Estimates and Executive Order 13990 Are Ultra Vires..............38

II.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN
INJUNCTION................................................................................................................40

III.    AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC
INTEREST. .................................................................................................................47

CONCLUSION .................................................................................................................48

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ................................................................................................ 43, 47

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
   801 F. Supp. 2d 383 (D. Md. 2011) ...................................................................... 39

*Arkla Expl. Co. v. Tex. Oil & Gas Corp.,*
   734 F.2d 347 (8th Cir. 1984) ................................................................................ 35

*Associated Builders & Contractors of Se. Texas v. Rung,*
   2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ...................................................... 39

*BNSF Ry. Co. v. EEOC,*
   385 F. Supp. 3d 512 (N.D. Tex. 2018) ................................................................ 37

*Boelens v. Redman Homes, Inc.,*
   748 F.2d 1058 (5th Cir. 1984) .............................................................................. 17

*Catholic Health Initiatives v. Sebelius,*
   617 F.3d 490 (D.C. Cir. 2010) ............................................................................. 18

*Cf. California v. Bernhardt,*
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ................................................................ 20

*Cf. Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010) .............................................................................................. 32

*Chamber of Commerce of the U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ............................................................................. 39

*City of Dallas, Tex. v. Hall,*
   2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ..................................................... 40

*City of Davis v. Coleman,*
   521 F.2d 661 (9th Cir. 1975) ................................................................................ 45

*City & Cty. of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ..................................................................... 31, 39, 40

*Clean Water Action v. United States Envtl. Prot. Agency,*
   936 F.3d 308 (5th Cir. 2019) ................................................................................ 19

*Commc'ns Comm'n v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) .......................................................................................... 31

*Corrosion Proof Fittings v. E.P.A.*,
   947 F.2d 1201 (5th Cir. 1991) ...................................................................................33

*Ctr. For Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008) ....................................................................................5

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ..................................................................................36

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ....................................................................................48

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .............................................................................................22

*Dep't of Energy v. State of Louisiana*,
   690 F.2d 180 (Temp. Emer. Ct. App. 1982) ......................................................39, 46

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ........................................................................................21, 22

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ............................................................................................12, 34

*E.P.A. v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014) .................................................................................................44

*EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*,
   828 F.3d 949 (D.C. Cir. 2016) ............................................................................11, 27

*Ensco Offshore Co. v. Salazar*,
   781 F. Supp. 2d 332 (E.D. La. 2011) .......................................................................36

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................22, 24

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .................................................................................................16

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ...................................................................................................1

*Hawkes Co. v. U.S. Army Corps of Engineers*,
   782 F.3d 994 (8th Cir. 2015) ....................................................................................37

*Hias, Inc. v. Trump*,
   No. 20-1160, 2021 WL 69994 (4th Cir. Jan. 8, 2021) ..............................................31

*Hias, Inc. v. Trump*,
  985 F.3d 309, 325 (4th Cir. 2021) ...........................................................40

*Hoctor v. U.S. Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996) ....................................................................18

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir. 1986) ................................................................40

*League of Conservation Voters v. Trump*,
  303 F. Supp. 3d 985 (D. Alaska 2018)......................................................39

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)......................................................................48

*Louisiana v. Biden*,
  2021 WL 2446010 (W.D. La. June 15, 2021) ...................................37, 40, 47

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007) ..............................................................5, 40, 41, 43

*MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*,
  512 U.S. 218 (1994) ...............................................................................16

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*
  463 U.S. 29 (1983) .................................................................................29

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ...............................................................39

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ...............................................................................29

*New Jersey v. Env't Prot. Agency*,
  989 F.3d 1038 (D.C. Cir. 2021) ...............................................................45

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ...................................................................38

*Opulent Life Church v. City of Holly Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) ...................................................................15

*Orangeburg, S.C. v. FERC*,
  862 F.3d 1071 (D.C. Cir. 2017) ...............................................................46

*Pac. Legal Found. v. Council on Envtl. Quality*,
  636 F.2d 1259 (D.C.Cir.1980) .................................................................38

*Paul v. United States*,
  140 S. Ct. 342 (2019) ..........................................................................................16

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ..............................................................................................19

*Pros. & Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) ................................................................................17

*Rosebud Sioux Tribe v. Trump*,
  428 F. Supp. 3d 282 (D. Mont. 2019) ................................................................39

*Sackett v. E.P.A.*,
  566 U.S. 120 (2012) ............................................................................................37

*Settling Devotional Claimants v. Copyright Royalty Bd.*,
  797 F.3d 1106 (D.C. Cir. 2015) ..........................................................................27

*Smiley v. Citibank (South Dakota), N.A.*,
  517 U.S. 735 (1996) ............................................................................................21

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ............................................................................................17

*Soucie v. David*,
  448 F.2d 1067 (D.C. Cir 1971) ..........................................................................38

*State of Fla. v. Weinberger*,
  492 F.2d 488 (5th Cir. 1974) ..............................................................................45

*State of La. v. Dep't of Energy*,
  507 F. Supp. 1365 (W.D. La. 1981) ........................................................37, 38, 46

*State of Louisiana Through Dep't of Com. & Indus. v. Weinberger*,
  404 F. Supp. 894 (E.D. La. 1975) ......................................................................45

*State of N.M. v. U.S. Dep't of Hous. & Urb. Dev.*,
  1987 WL 109007 (10th Cir. Jan. 7, 1987) ..........................................................45

*State v. Bureau of Land Mgmt.*,
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) ................................................................4

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................47

*Texas v. Equal Emp. Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ........................................................................36, 38

*Texas v. United States,*
  2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ............................................ 17, 19, 22, 41, 48

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .................................................... 18, 38, 41, 43, 46

*U.S. Army Corps of Engineers v. Hawkes Co.,*
  136 S. Ct. 1807 (2016) ............................................................................ 37

*United States v. Bass,*
  404 U.S. 336 (1971) ............................................................................... 17

*United States v. Riccardi,*
  989 F.3d 476 (6th Cir. 2021) ................................................................... 18

*Util. Air Regul. Grp. v. E.P.A.,*
  573 U.S. 302 (2014) ......................................................................... 15, 16

*W. Virginia v. E.P.A.,*
  362 F.3d 861 (D.C. Cir. 2004) ................................................................ 45

*W. Watersheds Project v. Bureau of Land Mgmt.,*
  629 F. Supp. 2d 951 (D. Ariz. 2009) ....................................................... 40

*Warshauer v. Solis,*
  577 F.3d 1330 (11th Cir. 2009) ............................................................... 18

*Washington Env't Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013) ................................................................ 23

*Whitman v. Am. Trucking Associations,*
  531 U.S. 457 (2001) .............................................................................. 16

*WildEarth Guardians v. Bernhardt,*
  2020 WL 6799068 (D.N.M. Nov. 19, 2020) ............................................. 22

*Wyoming v. United States Dep't of the Interior,*
  2020 WL 7641067 (D. Wyo. Oct. 8, 2020) ............................................ 4, 35

**Statutes**
5 U.S.C. §551(4) ..................................................................................... 18

5 U.S.C. §553 ......................................................................................... 17

5 U.S.C. §706(2)(A) ........................................................................... 19, 31

5 U.S.C. §706(2)(C) ................................................................................ 31

5 U.S.C. §706(2)(D) ................................................................................................................. 19

23 U.S.C. §327 ......................................................................................................................... 45

30 U.S.C. §187 ......................................................................................................................... 35

42 U.S.C. §17352(a)(3) ............................................................................................................ 32

42 U.S.C. §4331(b)(2) ....................................................................................................... 29, 34

42 U.S.C. §4332(D) .................................................................................................................. 45

42 U.S.C. §4332(F) ................................................................................................................... 34

42 U.S.C. §6295(o)(2)(B)(i) ..................................................................................................... 32

42 U.S.C. §6295(o)(2)(B)(i)(VI) .............................................................................................. 28

42 U.S.C. §7401(a)(1)-(4) ........................................................................................................ 33

42 U.S.C. §7401(b)(1) ....................................................................................................... 29, 33

42 U.S.C. §7410 ....................................................................................................................... 44

42 U.S.C. §7411 ....................................................................................................................... 44

42 U.S.C. §7411(b)(1)(A) ........................................................................................................ 33

42 U.S.C. §7415(a) ................................................................................................................... 33

42 U.S.C. §7521(a)(1) .............................................................................................................. 33

43 U.S.C. §§1332, 1337, 1340, 1344, 1345, 1351 .................................................................. 35

43 U.S.C. §1332(3) .................................................................................................................. 36

49 U.S.C. §32902(f) ................................................................................................................. 32

**Other Authorities**

24 C.F.R. §§58.1, 58.4 ............................................................................................................. 44

24 C.F.R. §58.1 ........................................................................................................................ 21

40 C.F.R. §1501.7(b) ............................................................................................................... 45

64 Fed. Reg. 43255 (Aug. 4, 1999) ......................................................................................... 29

68 Fed. Reg. 58366 (Oct. 9, 2003) ...........................................................................................2

78 Fed. Reg. 70586 (Nov. 26, 2013) .........................................................................................6

79 Fed. Reg. 32050 (June 3, 2014) ............................................................................................7

79 Fed. Reg. 4359 (Jan. 27, 2014) .............................................................................................6

81 Fed. Reg. 74504 (Oct. 26, 2016) .........................................................................................44

82 Fed. Reg. 5650 (Jan. 18, 2017) ...........................................................................................10

85 Fed. Reg. 43304 (July 16, 2020) .............................................................................12, 19, 27

86 Fed. Reg. 23054 (Apr. 30, 2021) ...................................................................................15, 44

86 Fed. Reg. 24699 (May 7, 2021) ...........................................................................................15

86 Fed. Reg. 27150 (May 19, 2021) .........................................................................................15

Administrative Procedure Act.............................................................................................passim

Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371 (2015) .................passim

BLM, Record of Decision, WY-060-EA13-147 (Nov. 30, 2017) ..........................................22

CEQ, *Update to the Regulations Implementing the Procedural Provisions of the
     National Environmental Policy Act*, 85 Fed. Reg. 43304, 43375 (July 16, 2020)..............................12, 27

Chamber of Commerce, IQA Pet., Doc. No. 0079-A2 ..............................................................8

Circular A-4...........................................................................................................................passim

Cong. Research Serv., *Attaching a Price to Greenhouse Gas Emissions with a Carbon Tax or Emissions
     Fee: Considerations and Potential Impacts 6-8* (Mar. 22, 2019) ......................................................10

Cong. Research Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* 5-7
     (Dec. 9, 2014).................................................................................................................................2

Cong. Research Serv., *R44657, Federal Citations to the Social Cost of Greenhouse Gases*
     (Mar. 21, 2017)..............................................................................................................................10

Cong. Research Serv., *Social Costs of Carbon/Greenhouse Gases: Issues for Congress, IF 10625*
     (Sept. 24, 2017) ..............................................................................................................................3

Dep't of Interior, Secretarial Order No. 3399 (Apr. 16, 2021) ................................................30

DOE, *Energy Conservation Program: Energy Conservation Standards for Commercial Refrigeration*

*Equipment,* 78 Fed. Reg. 55890, 55947 (Sept. 11, 2013) ...................................................8

*Dominion Cove Point LNG, LP*, 151 F.E.R.C. ¶61,095 (2015) ...................................11

EPA, *Overview of Greenhouse Gases* .........................................................................5

EPA, *Regulatory Impact Analysis for the Proposed Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program* (Aug. 2018) ...................................................22

EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan* (June 2019), https://bit.ly/3tuYkR3.................................................................................................21

EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal* (Oct. 2017).....................21

Executive Order 12866 ..................................................................................................2

Executive Order 13132 ................................................................................................29

Executive Order 13783 .......................................................................................... 11, 12

Executive Order 13990 .........................................................................................passim

GAO, GAO-20-254, *Social Cost of Carbon:  Identifying a Federal Entity to Address the National Academies' Recommendations Could Strengthen Regulatory Analysis* (June 2020) .........................................12

Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb. 26, 2021) ..........................................................13

IWG 2010 Technical Support Document (Feb. 2010).....................................................6

IWG, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (July 2015).....................................................................6

Kate C. Shouse, Cong. Research Serv., EPA's Proposal to Repeal the Clean Power Plan: Benefits and Costs (Feb. 28, 2018)..............................................................................12

Kevin D. Dayaratna & David W. Kreutzer, *Loaded DICE: An EPA Model Not Ready for the Big Game*, Heritage Foundation Backgrounder No. 2860 (Nov. 21, 2013) ......................... 8, 9

Mercatus Center Comments (Nov. 2013), Doc. No. 072-A1 ...........................................9

Nina A. Mendelson & Jonathan B. Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J.L. & Pub. Pol'y 447 (2014)......................................................................... 1, 2

OMB, *Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations,* 68 Fed. Reg. 5492 (Feb. 3, 2003) ...............................................................................2

OMB, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. 8452 (Feb. 22, 2002) ................................8

OMB, Response to Comments, Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (July 2015) ....................................................................................................10

Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017) .............29

Pub. L. No. 94–163, 89 Stat. 871 (1975) .............................................................................................31

*Qualifying Facility Rates & Requirements Implementation Issues Under the Pub. Util. Regul. Pol'y Act of 1978*, 173 FERC ¶ 61158 (2020)....................................................................................................................28

R.S. Pindyck, *Climate Change Policy: What do the Models Tell Us?*, NBER Working Paper Series, WP 192441 (July 2013)....................................................................................................................................8

State of Missouri, et al., *Comment on the Use of the Social Cost of Carbon (c6, c7)*, FERC NOI, Docket Number PL 18-1-000 C (Apr. 26, 2021) ..........................................................................................26

Stephen A. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363 (1986) ...........16

Susan E. Dudley *et al.*, *The Office of Management and Budget's Draft 2010 Report to Congress on the Benefits and Costs of Federal Regulations*, GW Regulatory Studies Center ..........................................................11

U.S. Energy Info. Admin., "Alabama: State Profile and Energy Estimates" (updated July 16, 2020) ....................................................................................................................42

U.S. Energy Info. Admin., "Florida: State Profile and Energy Estimates" (updated Nov. 19, 2020) ....................................................................................................................42

U.S. Energy Info. Admin., "Georgia: State Profile and Energy Estimates" (updated Nov. 19, 2020) ....................................................................................................................42

U.S. Energy Info. Admin., "Louisiana: State Profile and Energy Estimates" (updated Apr. 15, 2021) ....................................................................................................................41

U.S. Energy Info. Admin., "Mississippi: State Profile and Energy Estimates" (updated July 16, 2020) ....................................................................................................................42

U.S. Energy Info. Admin., "South Dakota: State Profile and Energy Estimates" (updated Apr. 16, 2020) ....................................................................................................................42

U.S. Energy Info. Admin., "Texas: State Profile and Energy Estimates" (updated Apr. 15, 2021) ....................................................................................................................42

U.S. Energy Info. Admin., "West Virginia: State Profile and Energy Estimates"
(updated Oct. 15, 2020)...................................................................................................43

U.S. Energy Info. Admin., "Wyoming: State Profile and Energy Estimates"
(updated Mar. 18, 2021)...................................................................................................43

U.S. Energy Information Administration, "Coal FAQ" ..........................................................41

## INTRODUCTION

The Biden Administration's Social Cost of Greenhouse Gases Estimates may be the most significant regulatory encroachment upon individual liberty and State sovereignty in American history. Yet the Administration has not cited one source of statutory authority for these measures. It has not because it cannot: All relevant statutes prohibit the approach mandated by the SC-GHG Estimates. Magnifying that problem, the Administration has assiduously avoided complying with any of the Administrative Procedure Act's constraints and ignored decades of Executive Branch best regulatory practices. At bottom, then, the Administration seeks to fundamentally reorganize the American economy—but to do so without authorization from Congress, scientific support, or accountability to the American people. This is precisely the type of maneuver that the Constitution and Administrative Procedure Act prohibits.

## BACKGROUND

### I.   THE ADMINISTRATIVE PROCEDURE ACT AND CIRCULAR A-4'S LONGSTANDING RULEMAKING PROCEDURES.

One of the foremost checks on the "growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life," *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010), is the Administrative Procedure Act. The APA does so by mandating that agencies take action only pursuant to express legal authority, in a transparent manner, with opportunity for robust public input, in a nonarbitrary manner, and with robust judicial review. Courts have vigorously policed the APA's requirements to ensure the vast administrative state stays within the bounds set by the Constitution and Congress.

Another check on the growth of the Administrative State is the now-decades-old bipartisan consensus on cost/benefit analysis. Presidents Nixon, Ford, Carter, Reagan, and Clinton required agencies to perform vigorous cost/benefit analysis before regulating. *See* Nina A. Mendelson & Jonathan B. Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J.L. & Pub. Pol'y 447, 454-57

1

(2014). Embodying this consensus, President Clinton issued Executive Order 12866, which instructs agencies "[i]n deciding whether and how to regulate" to "assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating." St. John Decl. Ex. 1.

To implement EO 12866 and ensure agencies use a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions," President George W. Bush's Office of Management and Budget issued Circular A-4 in 2003. Circular A-4, at 1 (St. John Decl. Ex. 5). Part compilation of decades of best regulatory practices and part aggregation of public comments, expert peer review, and interagency considerations, Circular A-4 has become the cornerstone of regulatory analysis in the Executive Branch. Smith Decl. ¶¶18-19. It gives "highly detailed guidance to the agencies on the key elements of a 'good regulatory analysis' under Executive Order 12866, including a clear baseline for comparative purposes, specifically stated assumptions, an assessment of the sensitivity of the analytical results to changes in those assumptions, and attention to ancillary impacts." Mendelson & Wiener, *supra*, at 457-58. Circular A-4 was issued after an extensive and transparent peer and interagency review and public notice and comment process. *See* Circular A-4, at 1 (St. John Decl. Ex. 5) ("In developing this Circular, OMB first developed a draft that was subject to public comment, interagency review, and peer review."); 68 Fed. Reg. 58366 (Oct. 9, 2003); OMB, *Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations*, 68 Fed. Reg. 5492 (Feb. 3, 2003) (St. John Decl. Ex. 3) ("OMB seeks public comment on *all aspects* of this Draft Report.") (emphasis added), *id.* at 5513 ("Before issuing the Circular, this draft will go through a process of peer review, public comment and interagency review."); *see also* Cong. Research Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* 5-7 (Dec. 9, 2014) (St. John Decl. Ex. 40).

As relevant here, Circular A-4 contains two cornerstone instructions: first, agencies are to use a 3 and 7 percent discount rate; second, agencies are to consider domestic—rather than global—costs and benefits.

2

First, the discount rates of 3 and 7 percent. Discount rates matter a great deal in regulatory analysis because "[b]enefits and costs do not always take place in the same time period. When they do not, it is incorrect simply to add all of the expected net benefits or costs without taking account of when the[y] actually occur." Circular A-4, at 31. "If benefits or costs are delayed or otherwise separated in time from each other, the difference in timing should be reflected in" an agency's "analysis." Id. "Benefits or costs that occur sooner are generally more valuable" because people "plac[e] a higher value on current consumption than on future consumption." *Id.* at 32. "To reflect this preference, a discount factor should be used to adjust the estimated benefits and costs for differences in timing. The further in the future the benefits and costs are expected to occur, the more they should be discounted." *Id.* "When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits." *Id.*[1]

Reflecting these economic realities, Circular A-4 instructs agencies to apply discount rates of both 3 percent and 7 percent when conducting regulatory cost/benefit analysis. OMB did not randomly select these discount rates. Rather, the Executive Branch had used a 7 percent rate for more than a decade before Circular A-4 that itself was the product of "extensive internal review and public comment." Circular A-4, at 33. The Executive Branch had long used a 7 percent discount rate because it "reflects the returns to real estate and small business capital as well as corporate capital." *Id.* A 7 percent discount rate thus "approximates the opportunity cost of capital, and it is the appropriate

---

[1] "Regulatory Impact Analyses typically simplify comparison of costs and benefits by valuing the streams of future costs and benefits as 'present values.' One debate involves how, in calculating present values, to reflect society's valuation of future benefits compared with values today. Economists use 'discount rates' for these calculations. Higher discount rates give less present value than lower discount rates to benefits or costs that accrue in the future. For climate change, this debate has especially strong implications, because many of the benefits of GHG mitigation would occur generations after the year of emission control." Cong. Research Serv., Social Costs of Carbon/Greenhouse Gases: Issues for Congress, IF 10625, at 2 (Sept. 24, 2017) (St. John Decl. Ex. 41).

3

discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* But Circular A-4 also recognizes, based on material accumulated in OMB's extensive internal and public review, that a lower discount rate may be appropriate in certain circumstances. So Circular A-4 instructs agencies also to "provide estimates of net benefits using both 3 percent and 7 percent." *Id.* at 34.

Second, the domestic focus of analysis. Circular A-4 unambiguously instructs agencies to make domestic effects the basis of their analysis: "Your analysis should focus on benefits and costs that accrue *to citizens and residents of the United States.* Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." *Id.* at 15 (emphasis added). And courts have recognized this unmistakable direction to focus on domestic, rather than global, effects. *See Wyoming v. United States Dep't of the Interior*, 2020 WL 7641067, at *21 (D. Wyo. Oct. 8, 2020) (noting that Circular A-4 mandates a national focus); *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018) ("While Plaintiffs argue that the same Circular directs BLM to encompass 'all the important benefits and costs likely to result from the rule,' including 'any important ancillary benefits,' it does not specifically mandate that agencies consider global impacts."). Reflecting this clear directive, "the typical agency practice is, in fact, to leave foreign impacts out of cost-benefit analyses entirely." Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015); Smith Decl. ¶18 ("Circular A-4 still requires that analysis results be presented for both the 3% and 7% discount rates, and for domestic benefits alone.").

## II.    THE CREATION AND DEVELOPMENT OF ESTIMATES FOR THE SOCIAL COST OF GREENHOUSE GASES.

Carbon dioxide, methane, and nitrous oxide are ubiquitous by-products of everyday American life. They are produced by virtually every imaginable American activity from energy production to agriculture to waste disposal. Carbon dioxide, for example, "enters the atmosphere through burning

4

fossil fuels (coal, natural gas, and oil), solid waste, trees and other biological materials, and also as a result of certain chemical reactions (e.g., manufacture of cement)." EPA, *Overview of Greenhouse Gases* (St. John Decl. Ex. 42). It is also emitted by the natural processes of human beings and other respiratory organisms. Methane emissions are also ever-present parts of the economy as they are "emitted during the production and transport of coal, natural gas, and oil [and] also result from livestock and other agricultural practices, land use and by the decay of organic waste in municipal solid waste landfills." *Id.* And "[n]itrous oxide is emitted during agricultural, land use, industrial activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater"—75 percent of such emissions are caused by fertilizing crops. *Id.* Greenhouse gas emissions are thus an inherent part of human life and society—encompassing "everything airborne, from Frisbees to flatulence." *Massachusetts v. E.P.A.*, 549 U.S. 497, 558 n.2 (2007) (Scalia, J., dissenting).

### A.    SCC & SC-GHG in the Obama Administration.

No statute requires agencies to consider a "social cost" of carbon as part of their regulatory cost/benefit analysis in rulemakings. But in 2008, the Ninth Circuit held that NHTSA must account for the economic effects of a reduction of carbon dioxide emissions when analyzing the impacts of fuel economy standards. *See Ctr. For Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008). The Obama Administration did not let this holding go to waste—it provided an opening to remake the American economy in the absence of congressional action. Because the Biden Administration's actions challenged here effectively resurrect the Obama Administration's efforts, Plaintiffs discuss those efforts in some detail before describing the Biden Administration's unlawful acts.

In 2009, President Obama convened an Interagency Working Group (IWG) to establish estimates of the "social cost of carbon" that all agencies must use in their regulatory cost/benefit analysis. The Obama IWG issued several iterations of the SCC estimates over the course of the Administration. And in 2016, the IWG released estimates for the Social Cost of Methane (SCM) and

Social Cost of Nitrous Oxide (SCN). These estimates, which form the basis of the Biden SC-GHG Estimates, were not the product of reasoned decisionmaking and broke from the longstanding requirements of the APA and Circular A-4.

The IWG's first round of "interim" SCC estimates "did *not* undertake *any* original analysis. Instead, it combined SCC estimates from the existing literature to use as interim values." IWG 2010 Technical Support Document at 4 (Feb. 2010) (St. John Decl. Ex. 6) (describing 2009 IWG process) (emphasis added). Not until the Spring of 2010 did the IWG issue a "technical support document" in which it presented final SCC estimates and described its methodology. IWG purported to use Circular A-4 as its starting point but expressly rejected two of Circular A-4's fundamental tenets of good regulatory practice. First, IWG focused on global rather than domestic effects. *Id.* Second, IWG rejected Circular A-4's discount rates—3 and 7 percent—and instead mandated discount rates of 2.5, 3, and 5 percent. The IWG also ignored the APA by failing to hold a dedicated public comment period for the SCC estimates.

In 2013, the IWG issued a revision of the SCC estimates in another technical support document. St. John Decl. Ex. 9. Although the IWG stuck with its underlying methodologies, it applied new versions of underlying models that resulted in a nearly twofold increase of the SCC estimate over the 2010 SCC estimates. Yet again, the IWG failed to solicit public comment. This massive increase, however, attracted enough public attention that OMB initiated the first public review and comment period for the IWG's SCC estimates. *See* 78 Fed. Reg. 70586 (Nov. 26, 2013) (St. John Decl. Ex. 11); 79 Fed. Reg. 4359 (Jan. 27, 2014) (St. John Decl. Ex. 12). OMB received over 100 unique comments that "covered a wide range of topics including the technical details of the modeling, the aggregation and presentation of the results, and the process by which the SCC estimates were derived." IWG, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* at 4-5 (July 2015) (St. John Decl. Ex. 15). But OMB rejected and ignored these comments by calling them

6

"out of scope" of the call for comments. *Id.* at 3 ("OMB clarified that it was not requesting comments on the three peer-reviewed IAMs themselves."). Moreover, the Obama Administration decided to continue relying upon the 2013 estimates "until revisions based on the many thoughtful public comments we have received and the independent advice of the Academies can be incorporated into the estimates[.]" *Id.* at 41. Such revisions never came. Neither OMB nor IWG ever did address the "thoughtful" and "technical" public comments, and thus never revised the SCC values in response to them.

Finally, in 2016, the IWG issued a minor revision to the SCC estimates in which it again held off on making substantive revisions to wait on a report of the National Academies of Sciences, Engineering, and Medicine. The IWG also issued a final addendum, which did not change the SCC estimates, but instead established estimates for the SCM and SCN using the same methods and models as those underlying the SCC estimates.

As can be seen, the Obama IWG's process was not a model of reasoned decisionmaking.

*First*, many have noted the sheer arbitrariness of the time horizons upon which the SCC estimate was based. For example, even the Natural Resource Council of NAS had to admit that the SCC estimates "suffer from uncertainty, speculation, and lack of information about (1) future emissions of GHGs; (2) the effects of past and future emissions on the climate system, (3) the impact of changes in climate on the physical and biological environment, and (4) the translation of these environmental impacts into economic damages." 79 Fed. Reg. 32050, 32094 (June 3, 2014) (St. John Decl. Ex. 13). Others noted the inherently speculative and arbitrary nature of the models—known as "Integrated Assessment Models" (IAM)—underlying the SCC estimates. The IAMs upon which SCC was and is based are particularly unreliable because they are based on a *three hundred year* time horizon, meaning they purport to predict political, technological, economic, social, geopolitical developments three centuries into the future. *See* Kevin D. Dayaratna & David W. Kreutzer, *Loaded DICE: An EPA*

*Model Not Ready for the Big Game*, Heritage Foundation Backgrounder No. 2860, at 3 (Nov. 21, 2013), (St. John Decl. Ex. 43) ("[I]t is highly suspect for the government to claim the capacity to base policy decisions on statistical forecasts extending nearly 300 years into the future.").

*Second*, the IWG's process failed key good government transparency standards. For example, the IWG failed to disclose the personnel involved. It also failed to disclose of outside consultants participated. Such failures violate longstanding OMB regulatory integrity guidelines. *See* OMB, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication*, 67 Fed. Reg. 8452 (Feb. 22, 2002) (St. John Decl. Ex. 2).

*Third*, several commentors noted the SCC estimates rested on flawed and arbitrary damage functions: "These damage functions translate variables, such as projected sea level rise, to estimated economic damages. By their nature, we know very little about the correct functional form of damage functions. According to a well-known economist, '[the model] developers … can do little more than make up functional forms and corresponding parameter values. And that is pretty much what they have done.'" Chamber of Commerce, IQA Pet., Doc. No. 0079-A2, at 12 (quoting R.S. Pindyck, *Climate Change Policy: What do the Models Tell Us?*, NBER Working Paper Series, WP 19244, at 11 (July 2013)) (St. John Decl. Ex. 8). Even Obama Administration agencies themselves noted that the SCC was not ready for prime time, but continued to implement it anyway. DOE, *Energy Conservation Program: Energy Conservation Standards for Commercial Refrigeration Equipment*, 78 Fed. Reg. 55890, 55947 (Sept. 11, 2013) ("The 2009 National Research Council report mentioned above points out that there is tension between the goal of producing quantified estimates of the economic damages from an incremental ton of carbon and the limits of existing efforts to model these effects. There are a number of concerns and problems that should be addressed by the research community, including research programs housed in many of the Federal agencies participating in the interagency process to estimate the SCC. The interagency group intends to periodically review and reconsider those estimates to reflect

8

increasing knowledge of the science and economics of climate impacts, as well as improvements in modeling."); *see also* Loaded DICE, *supra*, at 9 ("In particular, the loss functions of the DICE model and the FUND model are arbitrarily chosen, and we have yet to see sufficient justification for these functions themselves.").

*Fourth*, many pointed out that even though the relevant statutes direct agencies to consider domestic—not global—costs and benefits, the 2013 SCC estimates were based upon global harms. Mercatus Center Comments (Nov. 2013), Doc. No. 072-A1, at 2 (St. John Decl. Ex. 10) ("It must also be noted that between 77 and 93 percent of the benefits from reductions in CO2 emissions resulting from this regulation will be captured by foreigners, not by Americans .... While global benefits are useful general information, they should be excluded from the calculation of net benefits from the rule because these are not benefits to American taxpayers, whom the DOE is tasked to serve ...."). Indeed, even sympathetic scholars recognized that this was a radical break from the past. *See* Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 373 (2015) ("[T]he decision to count global impacts--and to count them in the way they are counted—occurs against an institutional backdrop that constitutes a bold diversion from existing regulatory policy. In other domestic regulatory contexts, the United States does not count foreign impacts. The typical agency practice is, in fact, to leave foreign impacts out of cost-benefit analyses entirely."). But the IWG attempted to play off its shift as condoned by Circular A-4 despite the previously uniform weight of authority recognizing that the Circular mandates a domestic focus. And even worse, the IWG and agencies utterly failed to consider their statutory authority to consider global effects. *See id.* at 375 ("[A]gencies implementing these statutes have inexplicably failed to systematically examine their own statutory authority to apply a globally scoped SCC. As a result, recent rules based on the globally scoped SCC are vulnerable to challenge as exceeding agencies' statutory authority, and as arbitrary and capricious."). As discussed below, a rule of this magnitude requires clear statutory authorization.

*Fifth*, the IWG never gave the public a full and fair opportunity to comment on the SCC estimates and the underlying models in particular. Instead the Obama Administration followed an opaque piecemeal approach in which different parts of the SCC estimates appeared to be up for comment in different regulatory proceedings at different times over the course of the Administration. *See, e.g.*, OMB, Response to Comments, Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 3 (July 2015) ("OMB further clarified that it was not requesting comments on the three peer reviewed [integrated assessment models, or] IAMs themselves."). As discussed above, the one time the Administration accepted public comment on the SCC estimates specifically, it rejected and ignored comments on the underlying models and gave the public the runaround by delaying substantive revisions based on public comment until the NAS finalized recommendations. Such substantive revisions were never made. *Id.* at 5. And the SCM and SCN were never put out for public comment individually and subject to public scrutiny only in a single DOE rulemaking. *See* Cong. Research Serv., R44657, Federal Citations to the Social Cost of Greenhouse Gases at 13 (Mar. 21, 2017) (St. John Decl. Ex. 44); 82 Fed. Reg. 5650 (Jan. 18, 2017).

*Sixth*, many noted the sheer substantive uncertainty of the SCC estimate enterprise. See, e.g., Cong. Research Serv., Attaching a Price to Greenhouse Gas Emissions with a Carbon Tax or Emissions Fee: Considerations and Potential Impacts 6-8 (Mar. 22, 2019) (St. John Decl. Ex. 23) ("One potential challenge of relying on SC-CO2 estimates to set a carbon fee are methodological concerns. ... No estimates of impacts are comprehensive at this time, and many of the risks are difficult to estimate and value. ... In addition, the element of time in climate change impacts particularly complicates the valuation. ... Economists do not agree on the appropriate discount rate(s) to use for a multi-generational, largely non-market issue such as human-induced climate change."). This uncertainty makes it particularly egregious to ditch Circular A-4's time-tested 7 percent discount rate in favor of a discount rate spectrum never before employed. *See* Susan E. Dudley *et al.*, *The Office of*

*Management and Budget's Draft 2010 Report to Congress on the Benefits and Costs of Federal Regulations*, at 12, GW Regulatory Studies Center (St. John Decl. Ex. 45) ("The 7 percent rate remains an appropriate estimate of the average before-tax rate of return to provide capital in the U.S. economy.").

Though most executive agencies were compelled to use the IWG's SCC estimates, those that were not so bound, such as the Federal Energy Regulatory Commission, refused to employ them due to their manifest flaws. FERC specifically found that "it would not be appropriate or informative to use" IWG's SC-GHG estimates "for three reasons: the lack of consensus on the appropriate discount rate leads to 'significant variation in output[,]' the tool 'does not measure the actual incremental impacts of a project on the environment[,]' and 'there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes.'" *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n,* 828 F.3d 949, 956 (D.C. Cir. 2016) (quoting *Dominion Cove Point LNG, LP,* 151 F.E.R.C. ¶61,095 (2015)). And the D.C. Circuit upheld FERC's "finding [that] the tool [is] inadequately accurate." *Id.*

### B.      SCC & SC-GHG in the Trump Administration.

It was against that backdrop—SC-GHG estimates that the Administration itself conceded were inaccurate and needed future updates and that were rejected by other agencies—that the Trump Administration considered how to address the "social cost" of greenhouse gases. In light of the significant flaws in the IWG's SCC, SCM, and SCN estimates, President Trump issued Executive Order 13783, which disbanded the IWG and rescinded its technical support documents. EO 13783 also directed agencies to return to Circular A-4's methodologies to guide their analysis of the value of changes in greenhouse gas emissions.

Agencies complied with EO 13783 and returned to Circular A-4's longstanding 3 and 7 percent discount rates and focus on domestic costs and benefits. For example, the EPA promulgated SCC values based upon Circular A-4's methodologies. Kate C. Shouse, Cong. Research Serv., EPA's

Proposal to Repeal the Clean Power Plan: Benefits and Costs, at 9 (Feb. 28, 2018) (St. John Decl. Ex. 46). Doing so, EPA found the SCC to be $7 per metric ton at a 3 percent discount rate and $1 per metric ton at a 7 percent discount rate. GAO, GAO-20-254, *Social Cost of Carbon:  Identifying a Federal Entity to Address the National Academies' Recommendations Could Strengthen Regulatory Analysis*, at 57-58 (June 2020) (St. John Decl. Ex. 24). EPA also determined the SCM to be $184 per metric ton at a 3 percent discount rate and $57 per metric ton at a 7 percent discount rate. *Id.* NHTSA employed Circular A-4's methodology to determine that the SCN was $2,820 per metric ton. *Id.* at 58 n.3. CEQ also issued a final rule clarifying that NEPA does not allow agencies to consider effects that are "remote in time, geographically remote, or the result of a lengthy causal chain." CEQ, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43304, 43375 (July 16, 2020) (St. John Decl. Ex. 25). Instead, agencies must only consider effects that are "reasonably foreseeable" and bear a "reasonably close causal relationship" to the proposed action, "analogous to proximate cause in tort law." *Id.* (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

III.  **PRESIDENT BIDEN ISSUES EXECUTIVE ORDER 13990 REQUIRING AGENCIES TO EMPLOY SC-GHG ESTIMATES CREATED BY AN INTERAGENCY WORKING GROUP.**

   A.    **Executive Order 13990.**

   On January 20, 2021, President Biden issued Executive Order 13990. 86 Fed. Reg. 7037 (St. John Decl. Ex. 26). Section 5 of this Order directs federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. at 7040. To accomplish this, EO 13990 resurrects the Obama-era IWG. The key provision regarding SC-GHG is §5(b)(ii)(A), which provides that "the Working Group shall … publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies *shall* use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." *Id.* (emphasis added). This provision thus

12

strips all federal agencies of discretion when it comes to SC-GHG Estimates and cites no statutory authority for the directive.

**B.    The Biden IWG Issues SC-GHG Estimates Effectively Identical to the Obama IWG's Discredited Estimates.**

On February 26, 2021, the IWG released the SC-GHG Estimates that Section 5 of EO 13990 commands agencies to employ. *See* Interagency Working Group on Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates Under Executive Order 13990 (Feb. 26, 2021) (St. John Decl. Ex. 27) ("Biden SC-GHG Estimates"). The Biden SC-GHG Estimates are identical to those issued by the Obama Administration in the 2016 Technical Support Document and addendum, adjusted for inflation. But they represent a radical departure from the Trump Administration's values—comparing 2020 values using a 3 percent discount rate, they raise the social cost of carbon from $7 (2018 dollars) per metric ton to $51 per metric ton (2020 dollars); the social cost of methane from $184 per metric ton (2018 dollars) to $1,500 per metric ton (2020 dollars); and the social cost of nitrous oxide from $2,800 per metric ton (2018 dollars) to $18,000 per metric ton (2020 dollars). And the IWG did not solicit or receive comments or any public input or peer review despite EO 13990's directive to "solicit public comment; engage with the public and stakeholders; [and] seek the advice of ethics experts."

The IWG itself recognizes the inherent uncertainty surrounding the SC-GHG Estimate and acknowledges that it is engaged in an inherently legislative function. *See id.* at 2 (noting it was balancing "affected interests" such as "net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services"); *id.* at 15, 30 (acknowledging it has attempted to predict the effects of "political destabilization and global migration," along with developments in technology, industrial policy, and geopolitics"). The Biden SC-GHG Estimates' two most radical

breaks from past practice are the same as the Obama IWG's: (1) the rejection of the longstanding 7 percent discount rate, and (2) the focus on global rather than domestic effects (and failure to provide any analysis whatsoever of statutory authority to consider global effects).

Continuing the Obama IWG's rejection of Circular A-4, the Biden SC-GHG Estimates also usurp agencies' statutorily vested authority by dictating a specific number for each greenhouse gas. The SC-GHG Estimates declare the SCC to be $51 per metric ton, the SCM to be $1,500 per metric ton, and the SCN to be $18,000 per metric ton, id. at 4-6—a six- to eight-fold increase over the Trump Administration's SC-GHG Values of $7 per metric ton, $184 per metric ton, and $2,800 per metric ton, respectively. The Biden SC-GHG Estimates for carbon, methane, and nitrous oxide also increase over time—to $85, $3100, and $33,000 respectively in 2050. The Working Group, however, immediately admits that these numbers are not the correct values, though in its view they "underestimate" the cost. *Id.* at 4. These numbers will result in massively increased social cost estimates, which will be used to justify, or even to mandate, an unprecedented expansion of the federal government's regulatory power. EO 13990's command that agencies "shall" use these values in their regulatory activity confirms that significant regulatory infringements upon the States and their citizens will occur imminently. The costs to the national economy caused by the Biden SC-GHG Estimates will be in the hundreds of billions or trillions of dollars. As discussed in depth below, those costs pose existential threats to Plaintiff States and their citizens.

The Biden SC-GHG Estimates are already being employed by Executive agencies. For example, the EPA has relied upon them in disapproving state implementation plans under the NAAQS good neighbor provisions and to justify the imposition of federal implementation plans on several Plaintiff States. 86 Fed. Reg. 23054, 23061 (Apr. 30, 2021) (St. John Decl. Ex. 29). Similarly,

EPA has explicitly relied upon the SC-GHG Estimates in formulating a "Social Cost of Hydrofluorocarbons" to justify a new regulatory power-grab. *See* 86 Fed. Reg. 27150 (May 19, 2021).[2]

## ARGUMENT

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in the Plaintiff States' favor.

## I.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   The President and the IWG Lack Authority to Promulgate and Enforce the SC-GHG Estimates.

The Supreme Court "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). The SC-GHG is the quintessential example of a situation where Congress must go first. It may well be the most consequential regulatory action ever taken by the Federal Government. Considering global effects, dropping the 7 percent discount rate, and increasing the time frame of relevant effects to three centuries are decisions of major national magnitude. Indeed, as all sides recognize, the methodology behind any SC-GHG Estimates will fundamentally transform regulatory analysis and the national economy. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Yet neither the President nor the IWG can point to statutory authority authorizing SC-GHG Estimates or the consideration of

---

[2] During the pendency of this suit, the Office of Information and Regulatory Affairs issued a request for comments regarding the SC-GHG Estimates. *See* 86 Fed. Reg. 24699 (May 7, 2021). The Request notes that the target date for publishing the next set of SC-GHG Estimates is January 2022.

global effects in domestic regulatory policymaking. To the contrary, as discussed below, whenever statutes speak of considering effects in the regulatory context, they specify domestic effects. The SC-GHG will fundamentally transform the Administrative State and the American economy. But Congress has never authorized its use. And Congress has consistently refused to enact a national climate policy authorizing the Executive to intrude on nearly every aspect of American life.

"In order for an executive or independent agency to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) (citing *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218 (1994); Stephen A. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986)). On topics touching SC-GHG analysis, Congress has expressly legislated with an eye toward only domestic effects and has legislated against the backdrop of OMB's longstanding standard 3 percent and 7 percent discount rates and NEPA's proximate cause standard. The Executive cannot "bring about an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.*, 573 U.S. at 324; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (rejecting Executive claim to "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization). But that is precisely what President Biden has done through fiat.

The SC-GHG Estimates require federal agencies to engage in expansive rulemakings based on speculative predictions about the future impact of climate change on primarily foreign countries

16

hundreds of years into the future. This will impose hundreds of billions or trillions of dollars in regulatory costs on the U.S. economy in future years and decades and fundamentally transform American life. If Congress wishes to authorize the President to implement sweeping new costs for greenhouse gas effects—and test the limits of the Executive's power under the nondelegation doctrine and the Federal Government's power under the Commerce Clause and Tenth Amendment—it must do so clearly. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) ("Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."); *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984) ("Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance."). Accordingly, this Court should enjoin the SC-GHG Estimates as beyond the Executive Branch's authority to promulgate and implement, leaving the ball where it belongs—in Congress's court.

> **B.** **The SC-GHG Estimates Were Promulgated Without Complying With the APA's Notice and Comment Requirements.**

Agency legislative rules must go through the APA's notice-and-comment procedures. 5 U.S.C. §553; *see also Texas v. United States*, 2021 WL 723856, at *43 (S.D. Tex. Feb. 23, 2021). That includes rules that alter "rights and obligations" or do not leave agency decisionmakers free to exercise discretion. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *Texas v. United States*, 809 F.3d at 171 ("'If a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.'"). In deciding whether a

rule is legislative, courts must be "mindful but suspicious of the agency's own characterization" of the rule. *Id.*

The SC-GHG Estimates are an incontestably legislative rule because it "prescri[bes] … valuations, costs or accounting, or practices bearing on any of the foregoing." 5 U.S.C. §551(4). And no exception to notice and comment rulemaking applies here. Indeed, rules that sets numerical values are universally held to be legislative rules that require notice and comment. *See United States v. Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021) ("Precedent . . . recognizes that a specific numeric amount . . . generally will not qualify as a mere 'interpretation' of general nonnumeric language.") (collecting cases). This is because "an agency performs a legislative function when it makes 'reasonable but arbitrary (not in the 'arbitrary or capricious' sense) rules that are consistent with the statute or regulation under which the rules are promulgated but not derived from it, because they represent an arbitrary choice among methods of implementation." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010). That is precisely what the IWG did here. It acknowledges over and over again in the SC-GHG Estimates that it is engaged in a legislative function rather than in mere interpretation or procedure making. Accordingly, the SC-GHG Estimates were required to go through the APA's notice and comment procedures. *See Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) ("Judge Friendly wrote that when an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking."); *see also Warshauer v. Solis*, 577 F.3d 1330, 1340 (11th Cir. 2009); *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996) ("When agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking, a procedure that is analogous to the procedure employed by legislatures in making statutes.").

Additionally, the SC-GHG Estimates must be enjoined because they effectively repeal key provisions of two regulatory actions that went through notice and comment. *Clean Water Action v.*

*United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (an agency must "follow the same process to revise a rule as it used to promulgate it") (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015). First, as discussed above, the SC-GHG Estimates revise two key provisions of Circular A-4: its 7 percent discount rate and focus on domestic effects. Because Circular A-4 was subjected to an intensive public comment process and peer review, so too must any effort to repeal its key provisions. Second, the SC-GHG Estimates revise CEQ's recent NEPA final rule's causation standard. CEQ's rule, published after notice and comment, requires agencies to exclude effects that "are remote in time, geographically remote, or the product of a lengthy causal chain," 85 Fed. Reg. 43304, 43375 (July 16, 2020), but the SC-GHG Estimates require agencies to consider precisely such remote effects. To be sure, the Administration was entitled to amend these rules. But it was required to "use the same procedures" in amending as it "used to issue the rule in the first instance. *Clean Water Action*, 936 F.3d at 313-14 (quoting *Perez*, 575 U.S. at 101). Because the IWG failed to do so, the Biden SC-GHG Estimates were promulgated "without observance of procedure required by law," 5 U.S.C. §706(2)(D), and must be enjoined.

### C.      The SC-GHG Estimates Are Arbitrary and Capricious Under the APA.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas v. United States*, 2021 WL 723856, at *39. "This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.*

Simply put, the Biden SC-GHG Estimates are arbitrary and capricious for the same reasons the Obama SCC, SCM, and SCN were arbitrary and capricious. They are based on a fundamentally flawed methodology that does not take into account statutory considerations, ignores decades of best

regulatory practices, and sub silentio departs from regulatory documents that remain in force. *Cf. California v. Bernhardt*, <u>472 F. Supp. 3d 573, 600-01</u> (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration. The APA requires reasoning, deliberation, and process. These requirements exist, in part, because markets and industries rely on stable regulations."). Specifically, the SC-GHG Estimates must be enjoined as arbitrary and capricious for at least eight reasons, each in itself independently sufficient to require eventual vacatur.

*First*, the Estimates fail to consider all important aspects of the problem by failing to consider the positive externalities of energy production. The Working Group arbitrarily focused only upon energy production's negative aspects without consider the benefits affordable energy has on economic development, social welfare, economic and energy independence, and international peace. Instead, it continued to rely upon flawed integrated assessment models (IAMs) that arbitrarily refuse to consider potential benefits from a warming climate. The DICE Model, which accounts for 1/3 of the input of SC-GHG, focuses exclusively upon increased mortality from warming-related diseases but ignores decreased mortality from wintertime mortality. *See* Susan E. Dudley et al., *supra* at 12; *see also Arden Rowell, Foreign Impacts and Climate Change*, 39 Harv. Envtl. L. Rev. 371, 383 (2015) ("[L]acking any principled mechanism for distinguishing between the models, the IWG decided to simply average them. This had the effect of weighting each model as one third of the SCC."). Both the IWG and the underlying models systematically refuse to consider the economic and health benefits, indicating a determination to bend science to a particular policy outcome.

*Second*, IWG failed to even consider whether "there was 'legitimate reliance' on the" prior administration's method of focusing on domestic effects and using higher discount rates. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, <u>140 S. Ct. 1891, 1913</u> (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, <u>517 U.S. 735, 742</u> (1996)). The Biden SCC Estimates will affect a number of

cooperative federalism programs, and Plaintiff States have taken actions in reliance upon the previous Administration's SCC findings. *See, e.g.*, 24 C.F.R. §58.1 et seq. (State recipients of HUD assistance must assume responsibility for environmental review). But the IWG never once addresses these significant interests that will be undone by the radically higher Biden SC-GHG Estimates. It missed— or altogether ignored—this important part of the problem. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 ("When an agency changes course … it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.'"). Indeed, Plaintiff States were never even given the opportunity to make IWG aware of such reliance interests because there was no comment period. *See e.g.*, Dismukes Decl. ¶¶18-26 (detailing State specific issues that were not considered in the IWG's process).

*Third*, the SC-GHG Estimates ignore the specific factual findings made by the previous Administration justifying its reliance on Circular A-4 in regulatory proceedings. For example, the IWG also completely ignored the extensive discussion and findings regarding discount rates and uncertainty in Chapter 7 of the EPA's RIA supporting the repeal of the Clean Power Plan. *See EPA, Regulatory Impact Analysis for the Review of the Clean Power Plan*, at 7-2-7-8 (June 2019), https://bit.ly/3tuYkR3; EPA, *Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal*, at 42-46 (Oct. 2017) (St. John Decl. Ex. 19) ; *see also* EPA, *Regulatory Impact Analysis for the Proposed Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program* (Aug. 2018) (Chapter 7, "APPENDIX – UNCERTAINTY ASSOCIATED WITH ESTIMATING THE SOCIAL COST OF CARBON") (St. John Decl. Ex. 23). Similarly, the IWG ignores BLM's specific finding that the Obama IWG's SCC "is not appropriate" because "it is intended to model effects on the welfare of future generations on a global scale by additional carbon emissions occurring in the present," "[m]onetizing only certain effects on social welfare can lead to an unbalanced assessment," and "[r]eporting the SCC in isolation

would be misleading." BLM, Record of Decision, WY-060-EA13-147 (Nov. 30, 2017) (St. John Decl. Ex. 20); *see also WildEarth Guardians v. Bernhardt*, 2020 WL 6799068, at \*11 (D.N.M. Nov. 19, 2020) (affirming BLM's refusal to use SCC).

The IWG's failure to address or even acknowledge these fact findings by itself renders the Estimates arbitrary and capricious. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency required to "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (agency's "prior judgment" or factual finding  cannot be ignored "without any consideration whatsoever" of the prior finding or alternative).

*Fourth*, there is a "significant mismatch" between the conclusions of the SC-GHG Estimates and the administrative record. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). The IWG itself recognized that its SC-GHG Estimate is based on antiquated models, needs updating to reflect changed circumstance, and based largely on guesswork. But instead of addressing these serious shortcomings, the Working Group rushed out the SC-GHG Estimates in a hurried process with no outside input. The only discernable reason for this rush is obvious: to comply with EO 13990's demand that the IWG come up with the most important number in American regulatory policy *in a month. Cf. Texas*, 2021 WL 723856, at \*41 (noting that a similar time frame "did not leave much time for reflection and analysis"). Given that such an undertaking could not be achieved in thirty days, the real reason for the SC-GHG Estimates' massive increase in the SCC, SCN, and SCM values were to comply with the President's stated desire to impose more stringent regulation. Although political reasons can be a legitimate basis for agency action, *Dep't of Commerce*, 139 S. Ct. at 2573, agencies cannot avoid accountability by refusing to frankly acknowledge the influence of such reasons on their decisionmaking, *id.* at 2575 ("[W]e cannot ignore the disconnect between the decision made and the

explanation given [and] are 'not required to exhibit a naiveté from which ordinary citizens are free.'") (cleaned up). "Altogether, the evidence"—that the Obama Administration Estimates are, at a minimum, insufficient and out of date—"tells a story that does not match the explanation the [Working Group] gave for [its] decision." *Id.* Because IWG's SC-GHG Estimates dress up a political decision in the cloak of science, they are arbitrary and capricious.

*Fifth*, the IWG fails to justify the SC-GHG's use of a global rather than domestic scope in calculating costs. As discussed above, this focus on global costs represents a break with decades of Executive Branch practice and the directives of Circular A-4. *See* Smith Decl. ¶¶65-75. Rowell, *supra* at 389 (observing that "agencies have used [the domestic scope] in their cost-benefit analyses for decades"). Focusing on global effects is particularly unreasoned in the context of greenhouse gas emissions. As one court has noted, "Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime. Current research on how greenhouse gases influence global climate change has focused on the cumulative environmental effects from aggregate regional or global sources. But there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1143-44 (9th Cir. 2013). Buttressing this uncertainty, "there are numerous independent sources of GHG emissions, both within and outside the United States, which together contribute to the greenhouse effect." *Id.* Thus, calculating the global effect of any discrete regulated activity is inherently arbitrary. *Id.* (noting that "the effect of collective emissions from the Oil Refineries on global climate change is 'scientifically indiscernible'").

And IWG does not actually acknowledge that it broke with Circular A-4's clear and reasoned directive to "focus on benefits and costs that accrue to citizens and residents of the United States." Circular A-4, at 15. Instead, the Biden IWG, like its predecessor, attempts to argue that its global focus

is somehow consistent with Circular A-4's domestic effects framework. *See* Rowell, *supra*, at 397 ("The [Obama IWG] report makes no explicit reference to the fact that its chosen methodology is also a departure from past practices in non-climate-change contexts."), *id.* at n.138 ("The IWG's choice of a standardized global SCC thus deviates from [Circular A-4's] guidance in two important ways: in focusing on foreign impacts, and in encouraging agencies to value, calculate, and make decisions based upon a global SCC that does not require any separate identification, much less consideration, of domestic impacts."). By misrepresenting Circular A-4's clear guidance, the IWG failed to "display awareness that it *is* changing position." *Fox Television Stations*, 556 U.S. at 515; *see also* Rowell, *supra* at 397 n.138 (noting that the Obama IWG's reading of Circular A-4 "leaves out two aspects that are likely to strike even a casual reader reviewing the provision"). Accordingly, IWG's failure to fully and frankly grapple with Circular A-4's domestic analysis provision renders the SC-GHG Estimates arbitrary and capricious. *See Fox Television Stations*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1913 ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'").

*Sixth*, the SC-GHG arbitrarily departs from decades of prior Executive Branch cost/benefit practice regarding discount rates. As embodied in Circular A-4, Executive Branch agencies have long utilized standard discount rates of 3 percent and 7 percent. *See, e.g.*, Smith Decl. ¶11; Rowell, *supra* at 385 n.88 ("Agencies typically discount at 3% and 7%, the rates set forth in OMB Circular A-4, which provides well-established executive guidance to agencies performing cost-benefit analysis."). The IWG fundamentally alters this longstanding practice without a reasoned justification. Circular A-4 explains that the 7 percent discount rate is essential to reasoned cost/benefit analysis because "it is a broad measure that reflects the returns to real estate and small business capital as well as corporate capital"

24

and "approximates the opportunity cost of capital." Circular A-4, at 33. Therefore, the 7 percent discount rate "is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector." *Id.* The IWG does not assert that the fundamentals of economics have changed in a manner justifying abandoning the longstanding 7 percent discount rate. Instead, to reach a higher SC-GHG valuation, it simply ignores the effects that regulations have on "the use of capital in the private sector." But this capital measure, as long recognized by Circular A-4, and Executive Branch agencies, is an indispensable variable when calculating regulatory costs. Smith Decl. ¶80. By directing agencies to ignore it, the SC-GHG Estimates direct agencies to systematically ignore an important aspect of any regulatory cost/benefit analysis. Indeed, by ignoring the private sector, these lower discount rates will endanger rather than help future generations by "crowding out private investments with a higher rate of return." *See* Dudley, supra, at 15 ("Future generations may well question why government policy limited them to receiving only a 3 percent rate of return, when investments with much higher rates of return were available and would have done far more to improve their welfare.").

*Seventh*, the SC-GHG Estimates continue to be based on the same three flawed models that produced the Obama SCC, SCM, and SCN. Both the models themselves and the process IWG uses to produce social cost values from them are inherently flawed. The models are flawed because, as discussed above, they systematically undervalue or entirely ignore positive externalities from energy production. Additionally, the models employ unprecedentedly long and unpredictable timeframes. The SC-GHG models estimate climate impacts *out to the year 2300*, "a significantly longer time scale than is generally included in such analyses, *which do not typically extend further than fifty years*." Rowell, *supra* at 386. This time horizon is inherently arbitrary and cannot serve as a reasoned basis for regulatory prediction given the impossibility of forecasting that far into the future. Smith Decl. ¶60 ("[O]ur ability to project how society will value different types of commodities and services starts to dim after about

25

80 years into the future, and it becomes a deep uncertainty after more than 120 years. 'Deep uncertainty' refers to phenomena that are cannot be informed by any empirical evidence currently available. Estimates of such phenomena are thus inherently speculative, and this uncertainty should be respected when attempting to make decisions that use such estimates.") As experts have explained:

> While I conclude that 120 years is at the limit of ability to project societal vulnerabilities and changes, it should also be noted that a significant fraction of the damage estimates in the lower discount rate changes actually occur up to 280 years in the future. That would require considering how well someone living in 1740 could have projected the societal values and vulnerabilities of 2020. How accurate would economic projections made in 1740 regarding today's markets, levels of economic output, technologies, and lifestyle preferences have been? Would such projections have anticipated the present overriding importance of electricity to 2020's society, given that Benjamin Franklin's famous kite experiment only occurred in 1752? Would market seers of 1740 have overemphasized the importance of protecting against a future threat to the supply of horses, given that horses and other animals provided the sole source of locomotion on land other than walking? The socioeconomic projections of the IWG are inherently unreliable because modelers are forced to rely on experience of recent history and present knowledge to predict economic results as much as 280 years in the future.

Smith Decl. ¶64; *see also* State of Missouri, et al., *Comment on the Use of the Social Cost of Carbon (c6, c7),* FERC NOI, Docket Number PL 18-1-000 C, at 8-9 (Apr. 26, 2021) (citing the work of Kevin Dayaratna).

And the IWG added another layer of arbitrariness in its method of using these arbitrary models to come to the SC-GHG Estimates. Each model produces different SC-GHG values. Instead of accounting for the relative flaws and strengths of each model, the Biden IWG (like the Obama IWG) simply averages the SC-GHG values produced by these models to reach the definitive SC-GHG Estimates that agencies must follow. *See* Rowell, *supra* at 383 ("[G]iven that the different IAMs predicted different monetized impacts, how should the IWG calculate a single, standardized SCC? One option, of course, would have been to create multiple SCCs representing the predicted outcomes of each model. ... Instead, lacking any principled mechanism for distinguishing between the models, the IWG decided to simply average them. This had the effect of weighting each model as one third of

the SCC."). In other words, the SC-GHG Estimates are just a simple average of three flawed models—nothing more. *See id.* at 383 n.75 (noting that "[t]his approach has not been met with universal approval" in the expert community). It is hard to imagine a more arbitrary process. *See Settling Devotional Claimants v. Copyright Royalty Bd.*, 797 F.3d 1106, 1109 (D.C. Cir. 2015) (an "arbitrary splitting of the baby" is not reasoned decisionmaking). Just as FERC examined the flaws in the models and found in 2015 that "it would not be appropriate or informative to use" the Obama IWG's SC-GHG estimate, *EarthReports, Inc.*, 828 F.3d at 956, the Biden IWG's estimates are equally (or more) flawed. Accordingly, IWG's use of inherently flawed models in an inherently flawed manner renders the SC-GHG Estimates arbitrary and capricious. *Id.* at 1121(agencies must rely upon "some relevant and creditable methodological evidence").

      *Eighth*, the SC-GHG Estimates do not even acknowledge the existence of the Council on Environmental Quality's recent final rule regarding the appropriate calculation of uncertainty under NEPA. Last summer, CEQ finalized revisions to its binding NEPA regulations to "simplify the definition of effects by striking the specific references to direct, indirect, and cumulative effects and providing clarity on the bounds of effects consistent with the Supreme Court's holding in Public Citizen." CEQ, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43375 (July 16, 2020). As agencies have observed, CEQ's NEPA regulation "explains that agencies should not consider effects that are 'remote in time, geographically remote, or the result of a lengthy causal chain.'" *Qualifying Facility Rates & Requirements Implementation Issues Under the Pub. Util. Regul. Pol'y Act of 1978*, 173 FERC ¶ 61158 n.790 (2020) (quoting *id.*). Instead, "[u]nder this standard, the mere fact that an effect might not occur 'but for' the project is not sufficient to trigger a NEPA analysis; rather, there must be a 'reasonably close causal relationship' between the proposed action and the effect, 'analogous to proximate cause in tort law.'" *Id.* This proximate cause standard is fundamentally at odds with the expansive approach to causation

embedded in the SC-GHG Estimates, which are much closer to the but-for standard that CEQ explicitly considered and rejected. The IWG does not even acknowledge the existence of CEQ's standard—or that it is compelling agencies to use a fundamentally different causation standard when calculating environmental effects for cost/benefit purposes than the standard they must use when calculating the same effects under NEPA. *Cf.* Rowell, *supra* at 400 (noting the Obama IWG's approach "creates tension with agency practice in other cost-benefit arenas"). This constitutes another important aspect of the problem ignored in the SC-GHG Estimates.

*Ninth*, by considering global rather than domestic effects, the IWG has relied upon statutorily impermissible factors and has not even considered the statutorily mandated factors under which agencies operate. Below, Plaintiff States extensively discuss how the SC-GHG Estimates are unambiguously barred by several environmental statutes. But even if not explicitly barred by such statutes, the Estimates are still arbitrary and capricious for failing to even discuss the relevant statutory factors and their unmistakably domestic focus. *Cf.* Rowell, *supra* at 408 (noting that the Obama "IWG's treatment of statutory authority can be summarized in a single breezy sentence"). For example, the Environmental Policy and Conservation Act (EPCA) explicitly directs the Secretary to focus on "the need for *national* energy and water conservation" in the setting of consumer products energy efficiency standards. 42 U.S.C. §6295(o)(2)(B)(i)(VI). Similarly, the Clean Air Act instructs agencies "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the *productive capacity* of *its population.*" 42 U.S.C. §7401(b)(1) (emphasis added); *see also* 42 U.S.C. §4331(b)(2) (NEPA directive to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings") (emphasis added).[3] Because the IWG relies "on factors which

---

[3] This neglect of statutory factors is particularly pernicious because given the mandatory nature of the SC-GHG Estimates and EO 13990, agencies are seemingly left without discretion to rethink the fundamentals of the IWG's work. Indeed, the experience of the Obama Administration demonstrates that agencies refused to consider whether the IWG's values conflicted with statutory

Congress had not intended it to consider," the Biden SC-GHG Estimates are arbitrary and capricious. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983).

*Tenth*, the IWG ignores the significant federalism costs caused by the SC-GHG Estimate. As confirmed by Executive Order 13132, federalism concerns are an important aspect of regulatory analysis. *See* EO 13132, 64 Fed. Reg. 43255, 43256 (Aug. 4, 1999) ("The national government should be deferential to the States when taking action that affects the policymaking discretion of the States and should act only with the greatest caution where State or local governments have identified uncertainties regarding the constitutional or statutory authority of the national government."). Despite this clear directive, the IWG nowhere considers that the higher SC-GHG Estimates will encroach on the States' traditional police power. As of mid-2016, the SC-GHG was employed in "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have used the SCC or SCM in their analyses." Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S COLUM. J. OF ENVT'L LAW 203, 219-20 & appx. A (2017). These regulatory actions encroach into nearly every facet of life regulated, if at all, by the States; examples include federal regulatory action on vending machines, dishwashers, dehumidifiers, microwave ovens, residential water heaters, residential refrigerators and freezers, fluorescent lamps, residential clothes dryers, room air conditioners, residential furnaces, residential air conditioners, and battery chargers. *See* Smith Decl. ¶¶85-92. And these regulatory intrusions into State authority would not be justifiable without the unlawful SC-GHG Estimates. *See,*

---

factors: "If agencies may only apply a globally scoped SCC when the relevant statute permits them to consider a globally scoped measure of impacts, we might expect that the IWG and agencies would be highly sensitive to the specifics of each statute under which the SCC is applied. But this has not been the case. ... Perhaps emboldened by [the IWG's] general dismissal of statutory constraints, agencies using the globally scoped SCC have appeared to ignore the question of statutory authority entirely." Rowell, *supra* at 408.

*e.g.*, Rowell, *supra* at 409 ("As we have seen in the calculation of the global SCC, where foreign impacts account for as much as 93% of the total impact, the selection of the scope for an analysis can be the determining factor in the quantity of benefits assessed, and in whether a particular rule appears to be cost-benefit justified.").

Nor does the IWG consider the costs to federal-state relations of imposing significant obligations on the States in cooperative federalism programs. As discussed in depth throughout this Memorandum, States have a robust role to play in conducting NEPA and other environmental analyses. But the SC-GHG Estimates fail to take into account the muddied and conflicting standards and implementation costs imposed upon the States by its fundamental shift in methodology.

Further straining federal-state relations, IWG neglected to consider the effects the SC-GHG Estimates will have upon State revenue. The Biden SC-GHG Estimates will result in significantly fewer tracts of land being made available for lease sales. *See, e.g.*, Dep't of Interior, Secretarial Order No. 3399 (Apr. 16, 2021) (noting intent to employ SC-GHG). And they will greatly increase the difficulty of obtaining development permits under OCSLA and the MLA due to the distortions caused in the environmental impact statements required for public lands and water development. *See infra.* States rely heavily upon the revenue from these lease sales and development royalties to fund environmental restoration projects. This constitutes yet another important aspect of the problem that IWG failed to recognize. States will also be required to shoulder increased regulatory costs, increased costs of projects due to the delays in NEPA studies, and increased shared costs imposed under the Stafford Act and HUD programs by the Corps of Engineers for projects related to disaster preparedness, response, and recovery.

In sum, the SC-GHG Estimates are neither "reasonable" nor "reasonably explained." *Fed. Comm'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Accordingly, they must be enjoined as arbitrary and capricious.

### D.      The SC-GHG Estimates Are Contrary to Law.

Agency action is unlawful if it is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A) & (C). The SC-GHG Estimates contravene several statutes by directing agencies to consider factors that Congress did not authorize.[4]

### 1.      *The SC-GHG Estimates Contravene EPCA*

The text and structure of the Energy Policy and Conservation Act unambiguously preclude the consideration of global effects. EPCA was enacted in response to the 1973 energy crisis and includes several provisions designed to make America energy independent. EPCA states that it is designed to "increase domestic energy supplies and availability; to restrain energy demand; to prepare for energy emergencies; and for other purposes." Pub. L. No. 94–163, 89 Stat. 871 (1975). To this end, among other things, EPCA creates two major programs—the Energy Conservation Program for Consumer Products and the Corporate Average Fuel Economy standards—both of which preclude any consideration of foreign effects.

The consumer products conservation program authorizes the Secretary of Energy to set efficiency standards by conducting a cost/benefit analysis. Its only reference to whether a national or global scope is permissible leaves no room for doubt: "In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to

---

[4] The Executive Order's standard "to the extent applicable by law" disclaimer does not cure this problem. All executive orders contain such boilerplate. And that does not immunize them from judicial review. *See, e.g., Hias, Inc. v. Trump*, No. 20-1160, 2021 WL 69994 (4th Cir. Jan. 8, 2021) ("[W]e reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order."); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) ("Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.' The Executive Order's savings clause does not and cannot override its meaning."). Indeed, as discussed *supra* note 4, agencies have demonstrated in the past that they consider themselves bound by the IWG's estimates regardless of statutory authority.

the greatest extent practicable, considering-- ... (VI) the need for *national* energy and water conservation." 42 U.S.C. §6295(o)(2)(B)(i) (emphasis added). By directing the Secretary to consider global effects, the SC-GHG Estimates thus directly contravenes EPCA's domestic focus for consumer goods energy efficiency standards. Similarly, EPCA directs the Secretary of Transportation in setting CAFE standards to consider "the need of *the United States* to conserve energy." 49 U.S.C. §32902(f) emphasis added). Nowhere is the Secretary authorized to eschew such domestic considerations in favor of the global effects mandated by the SC-GHG Estimates.

These textual provisions' domestic focus is confirmed by EPCA's structure. When Congress wished for agencies to consider international effects, it did so explicitly. For example, in the Energy Independence and Security Act of 2007's amendment to EPCA, Congress created an International Clean Energy Foundation entirely separate from the CAFE and energy efficiency programs to study international implications of greenhouse gases. *See* 42 U.S.C. §17352(a)(3). By creating such a separate authority Congress demonstrates that it knows how to clearly instruct agencies to consider international effects. *Cf. Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Congress's explicit instruction to the ICEF to consider international effects throws EPCA's still-operational provisions pertaining to the CAFE and efficiency standards program into sharp relief. They both retain their focus on domestic effects and thereby preclude the Secretaries of Transportation and Energy from considering international effects in their implementation of these programs. *See Corrosion Proof Fittings v. E.P.A.*, 947 F.2d 1201, 1209 (5th Cir. 1991) (international considerations cannot be implied when statue "provides a laundry list of factors to consider when promulgating a rule under section 6, including 'the effect [of the rule] on the national economy'" and "[i]nternational concerns are conspicuously absent from the statute").

### 2.    *The SC-GHG Estimates Contravene the CAA*

The Biden SC-GHG Estimates also directly conflict with the text and structure of the Clean Air Act. In adopting the CAA, Congress made several specific findings, all of which are explicitly domestic. *See* 42 U.S.C. §7401(a)(1)-(4) (referring to "the Nation's population," the "responsibility of States and local governments," and "cooperative Federal, State, regional, and local programs to prevent and control air pollution"). Congress also made clear that CAA programs are designed to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the productive capacity of its population." *Id.* §7401(b)(1) (empahsis added). To implement this design, the CAA authorizes the Administrator of EPA to set air pollution standards for new motor vehicles and stationary sources, "which may reasonably be anticipated to endanger public health or welfare." *Id.* §§ 7411(b)(1)(A), 7521(a)(1). Nowhere is the Administrator authorized to consider global effects in setting these vitally important standards.

Like EPCA, the structure of the CAA confirms that agencies may not consider global effects. When Congress addresses global effects through the CAA, it does so through a specific process in Section 115. There the Administrator is instructed to instate a formal State SIP plan process when he "has reason to believe that any air pollutant or pollutants emitted in the United States cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare in a foreign country." 42 U.S.C. §7415(a). When the Executive wishes to consider foreign effects of air pollution, it can only through this specific process—not through the other provisions of CAA, which are explicitly focused on domestic effects. Accordingly, the SC-GHG Estimates explicitly conflict with the text and structure of the Clean Air Act.

### 3.    *The SC-GHG Estimates Contravene NEPA*

The Biden SC-GHG Estimates contravene NEPA, which directs agencies to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C.

§4331(b)(2) (emphasis added). As discussed above, CEQ's regulations implementing NEPA preclude both the SC-GHG Estimates' consideration of global effects and approach to causation. And the Court has held that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" akin to the "'familiar doctrine of proximate cause from tort law.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Simply put, consideration of effects across the globe and three hundred years into the future cannot be squared with NEPA's proximate-cause standard. *See* 85 Fed. Reg. at 43344 (codifying "a key holding of *Public Citizen* relating to the definition of effects to make clear that effects do not include effects that the agency has no authority to prevent or that would happen even without the agency action, because they would not have a sufficiently close causal connection to the proposed action. For example, this would include effects that would constitute an intervening and superseding cause under familiar principles of tort law.").

NEPA's structure also confirms that agencies may consider only national costs. When Congress authorizes agencies to consider international benefits and costs, it does so expressly as it did in NEPA's provision about international agreements. That authorizes the Executive Branch to "lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." 42 U.S.C. §4332(F). Accordingly, like EPCA and the CAA, NEPA only allows agencies to consider global effects in limited and carefully circumscribed areas.

### 4.    *The SC-GHG Estimates Contravene the MLA*

The Biden SC-GHG Estimates contravene the MLA, which directs the Secretary of the Interior to "'promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise,'" "'obtain for the public reasonable financial returns on assets belonging to the public,'" *Wyoming*, 2020 WL 7641067, at *8, and "provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive

bidding adequate compensation to the government for leasing in producing areas," *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984). The Biden SC-GHG Estimates will inevitably lead to fewer lease-sale and permit approvals due to the flawed Environmental Impact Statements that the Secretary must prepare, under Executive Order 13990, in reliance upon the IWG's work. The Biden SC-GHG Estimates thus contravene the Secretary's duty to ensure the expeditious development of public land. And the SC-GHG Estimates require BLM to contravene the MLA by relying upon global costs rather than national costs. *See Wyoming*, 2020 WL 7641067, at *20 ("[T]he Court questions whether the 'social cost of methane' – particularly on a global scale – is a factor Congress intended BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority. It seems an unreasonable stretch to interpret BLM's authority under the MLA to require lease provisions 'for the safeguarding of the public welfare' (30 U.S.C. §187) as congressional intent that the BLM consider this ancillary air quality benefit."). The SC-GHG Estimates thus also independently violate the MLA.

### 5.    *The SC-GHG Estimates Contravene OCSLA*

Finally, the Biden SC-GHG Estimates contravene OCSLA by disrupting its carefully crafted statutory leasing program, which promotes the development of resources on the Outer Continental Shelf. 43 U.S.C. §§1332, 1337, 1340, 1344, 1345, 1351. By inevitably restricting the number of land sales that will made available, and making it harder to obtain drilling permits, the Biden SC-GHG Estimates contravene the Secretary of the Interior's duty to make the Outer Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 339 (E.D. La. 2011) (noting "OCSLA's overriding policy of expeditious development"); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 485 (D.C. Cir. 2009) ("Congress has already decided that the OCS should be used to meet the nation's need for energy. Indeed, OCSLA instructs Interior to ensure that oil and

gas are extracted from the OCS in an expeditious manner that minimizes the local environmental damage to the OCS.").

The Biden SC-GHG Estimates also contravene OCSLA by compelling a global effects analysis. OCSLA's text concerns only "the local environmental impact of leasing activities in the OCS and does not authorize—much less require—Interior to consider the environmental impact of post-exploration activities such as consuming fossil fuels on either the world at large, or the derivative impact of global fossil fuel consumption on OCS areas." *Ctr. For Biological Diversity*, 563 F.3d at 485. Accordingly, "Interior simply lacks the discretion to consider any global effects that oil and gas consumption may bring about." *Id.* By directing the Department to consider global effects, the SC-GHG Estimates directly conflict with OCSLA's directive to assess only "the relative impacts of production and extraction of oil and gas on the localized areas in and around where the drilling and extraction occurred." *Id.*

> ### E.     No Barriers to Justiciability Prevent Review of the SC-GHG Estimates.[5]
> #### 1.     The SC-GHG Estimates Are Final Agency Action Under the APA.[6]

Because the SC-GHG Estimates are legislative rules, *supra* Sec. I.B, it necessarily follows that they are final agency action subject to APA review, *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (a legislative rule is "by definition, a final agency action"). In any event, the SC-GHG Estimates also easily meet the APA test for final agency action. The SC-GHG Estimates are final agency action if (1) they "mark the consummation of the agency's decision-making process" and (2) is one "by which rights or obligations have been determined, or from which legal consequences

---

[5] Standing is discussed in conjunction with irreparable harm *infra* Sec. II.
[6] Plaintiff States lack any adequate alternative remedy to challenge this final agency action because alternatives to judicial review of the Estimates themselves impose "prohibitive costs, risk, and delay" upon Plaintiff States. *Hawkes Co. v. U.S. Army Corps of Engineers*, 782 F.3d 994, 1001 (8th Cir. 2015).

will flow." *Louisiana v. Biden*, 2021 WL 2446010, at \*12 (W.D. La. June 15, 2021) (citing *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). This test must be applied "pragmatic[ally]" and "flexibly" keeping in mind the APA's basic presumption of judicial review. *Sackett v. E.P.A.*, 566 U.S. 120, 130 (2012) ("The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all."); *BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 522 (N.D. Tex. 2018) ("Buoying this pragmatic framework is an increasing hesitance by the Supreme Court and lower courts alike to shelter agencies from judicial enforcement of congressional mandates.").

The Estimates mark the consummation of the IWG's decisionmaking process—they are in force right now and agencies are using them in regulatory proceedings. They are the IWG's last word until at least 2022. IWG's frequent invocation of the work "interim" does nothing to help them. *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1371 (W.D. La. 1981) ("'The label an agency attaches to its action is not dispositive.'"). Because there are no further steps in the process, the SC-GHG Estimates for 2021 are not subject to further revisions and agencies are obligated by the Executive Order to use them, they satisfy the first prong of the finality test. *See Louisiana*, 2021 WL 2446010, at \*12 ("As long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature— the rule satisfies the first prong of the finality test.") (citing *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020)).

Turning to the second prong, "[w]here agency action withdraws an entity's previously held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 442 (5th Cir. 2019). This is exactly what the SC-GHG Estimates do here—they bind the entire Executive Branch to a particular numerical measure of the social cost of greenhouse gases. Because the SC-GHG Estimates "denies the decisionmaker

discretion in the area of its coverage[,] then the statement is binding, and creates rights or obligations." *Texas*, 809 F.3d at 171.

Finally, the IWG is an "agency" for purposes of the APA because it has been granted authority, by EO 13990, to act "with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir 1971). The IWG is not the President's mere lackey; EO 13990 vests the IWG with significant independent authority to create SC-GHG Estimates that will be binding on executive agencies. No further action from the President is needed. This power to "issue guidelines to federal agencies for the preparation of" regulatory review is a hallmark of an APA agency. *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C.Cir.1980). And the IWG is tasked with an ongoing and independent investigative function, another hallmark of agency status. EO 13990, §5(b)(ii)(C)–(E), (b)(iii); *Soucie*, 60 F.3d at 854 ("By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency.").

Accordingly, the SC-GHG is final agency action reviewable under the APA.[7]

### 2.    *The SC-GHG Estimates and Executive Order 13990 Are Ultra Vires.*

Plaintiff States also have a cause of action to obtain review of the President's illegal Executive Order. Ultra vires review is available to review "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136

---

[7] Since the SC-GHG Estimates constitutes final agency action, they are ripe for review. *See, e.g., Melissa Indus. Dev. Corp. v. N. Collin Water Supply Corp.*, 256 F. Supp. 2d 557, 567 (E.D. Tex. 2003). Additionally, this case is ripe because "the questions presented are 'purely legal,'" and "further factual development" is unnecessary. *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007); *see also State of Louisiana v. Dep't of Energy*, 507 F. Supp. 1365, 1372 (W.D. La. 1981), *aff'd sub nom. Dep't of Energy v. Louisiana*, 690 F.2d 180 (Temp. Emer. Ct. App. 1982) ("Herein, the lines are drawn, the positions are taken and the matter is ripe for judicial review.").

38

(D.C. Cir. 2002)); *see also Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

As explained above, §I.A, the President's directive to impose a uniform social cost of greenhouse gases across the government—especially the EO's explicit command to "tak[e] global damages into account"—is not authorized by any statute and is in direct conflict with several statutes. Such ultra vires presidential action is subject to judicial review—particularly when it concerns matters of major national importance. *See Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'"); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 995 (D. Alaska 2018); *Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 406; *Associated Builders & Contractors of Se. Texas*, 2016 WL 8188655, at *5; *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 960 (D. Ariz. 2009); *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *15 (N.D. Tex. Oct. 29, 2007). And the EO's boilerplate "consistent with law" language does not save its mandatorily worded unlawful commands from judicial review. EO 13990 §5(b)(ii)(A); *Louisiana*, 2021 WL 2446010, at *19 ("[T]he Court notes the wording in the Executive Order, which states, 'To the extent consistent with applicable law,' but also notes the wording 'shall pause.' This does not leave the agency free to exercise discretion unless they disobey a Presidential Executive Order."); *see also Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) ("[W]e reject the government's

attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order."); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (savings clauses" must be "read in their context, and they cannot be given effect when the Court, by rescuing the [legality] of a measure, would override clear and specific language" in an executive order).

Plaintiff States thus have an ultra vires cause of action to challenge Section 5 of EO 13990.

***

To sum up: because Plaintiff States have demonstrated multiple independently sufficient grounds to vacate the SC-GHG Estimate, they have shown a strong likelihood of success on the merits.

## II.  PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, Plaintiff States "need only show it 'cannot be undone through monetary remedies'" and that they are "'*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Texas v. United States*, 2021 WL 723856, at \*48. Plaintiff States easily clear this threshold. The SC-GHG Estimates will cause irreparable harm to Plaintiff States' sovereign, proprietary, and parens patriae interests.

Plaintiff States have standing to challenge the SC-GHG Estimates and are entitled to an injunction because the Estimates irreparably harm Plaintiff States' sovereign, proprietary, and *parens patriae* interests. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518-520 (2007); *see also Texas v. United States*, 809 F.3d 134, 151-55 (5th Cir. 2015); *Texas*, 2021 WL 723856, at \*10-21. Though Plaintiff States have standing under the traditional analysis, they also receive "special solicitude" on this issue. *Massachusetts v. E.P.A.*, 549 U.S. at 518-20. Plaintiff States will suffer several irreparable harms as a direct result of the SC-GHG Estimates.

40

*First*, Plaintiff States are substantial producers of energy and rely upon tax revenue from energy production to perform their sovereign duties. Regulatory standards affecting air quality, energy efficiency, power plant regulation will necessarily increase in stringency due to the increased SC-GHG Estimates. *See* Smith Decl. ¶¶85-92; Dismukes Decl. ¶23 ("The use of unsupported SC-GHG estimates in NEPA and other regulatory analysis will result in the approval of new regulations that will impose significant costs on Louisiana's economy and businesses that are not justified by an accurate assessment of their costs and benefits."). And this increased stringency will directly harm the economies and revenues of Plaintiff States.

Louisiana's energy, chemical manufacturing, and agricultural industries are leading employers of the State's citizens. The SC-GHG Estimates will directly harm these industries by increasing their regulatory burdens and driving up the price of the electricity they need to stay in business and continue to employ Louisianians and contribute to tax revenues. Dismukes Decl. ¶¶22-26. The SC-GHG Estimates will be particularly harmful to Louisiana because it is the nation's number two producer of oil and a top five national natural gas producer. *See* U.S. Energy Info. Admin., "Louisiana: State Profile and Energy Estimates" (updated Apr. 15, 2021) (St. John Decl. Ex. 30). Moreover, Louisiana derives significant royalties from leasing sales under OCSLA, which will be significantly reduced as a direct result of the SC-GHG Estimates.

The SC-GHG Estimates will also hit Kentucky's economy particularly hard. For decades, Kentucky has been one of the top coal-producing states, and it remains among the top five. *See* U.S. Energy Information Administration, "Coal FAQ" (St. John Decl. Ex. 32). Kentucky has a special interest in keeping energy costs low; higher energy costs discourage future growth in Kentucky's manufacturing industry, resulting in considerable economic losses and fewer job opportunities for employing Kentuckians. As demonstrated by the havoc the Obama Administration's SCC-justified Clean Power Plan threated to wreck on Kentucky's coal industry, the SC-GHG Estimates will directly

harm Kentucky's economic welfare by making a new CPP justifiable under cost/benefit analysis principles. Coal production is a key part of Kentucky's economy.

The SC-GHG Estimates will endanger the economic welfare of all Plaintiff States and their citizens. The SC-GHG Estimates will harm Alabama's ability to exploit its sizeable energy resources and harm its robust industrial sector, which has contributed to the State ranking among the top 15 states for energy consumption. *See* U.S. Energy Info. Admin., "Alabama: State Profile and Energy Estimates" (updated July 16, 2020) (St. John Decl. Ex. 31). The SC-GHG Estimates will harm Florida by driving up the transportation costs and energy prices upon which its thriving tourism industry relies. *See* U.S. Energy Info. Admin., "Florida: State Profile and Energy Estimates" (updated Nov. 19, 2020) (St. John Decl. Ex. 33). The SC-GHG Estimates will directly harm Georgia's thriving and energy intensive industrial sector by increasing stationary source regulatory stringency. *See* U.S. Energy Info. Admin., "Georgia: State Profile and Energy Estimates" (updated Nov. 19, 2020) (St. John Decl. Ex. 34). The SC-GHG Estimates will directly harm Mississippi's significant energy infostructure including its petroleum refinery, natural gas processing plant and LNG terminal. *See* U.S. Energy Info. Admin., "Mississippi: State Profile and Energy Estimates" (updated July 16, 2020) (St. John Decl. Ex. 35). The SC-GHG Estimates will directly harm both South Dakota's industrial and agricultural capacities. *See* U.S. Energy Info. Admin., "South Dakota: State Profile and Energy Estimates" (updated Apr. 16, 2020) (St. John Decl. Ex. 36). The SC-GHG Estimates will directly, imminently, and substantially harm Texas, the nation's leading energy producer. Every imaginable energy resource can be found in Texas, from its gulf coast to western oil fields and every imaginable facet of Texas's economy will be subject to the SC-GHG Estimates. *See* U.S. Energy Info. Admin., "Texas: State Profile and Energy Estimates" (updated Apr. 15, 2021) (St. John Decl. Ex. 37). The SC-GHG Estimates will harm West Virginia's economy as it is the fifth-largest energy producer in the nation. A repeat of the Obama Administration's CPP that is would be inevitable under the Biden SC-GHG Estimates will be

potentially fatal to West Virginia's thriving coal industry. *See* U.S. Energy Info. Admin., "West Virginia: State Profile and Energy Estimates" (updated Oct. 15, 2020) (St. John Decl. Ex. 38). Finally, the SC-GHG Estimates will imminently harm Wyoming, which is the largest net energy supplier in the nation and a major producer of coal, natural gas, and oil—all of which will be targeted as a result of the Estimates. *See* U.S. Energy Info. Admin., "Wyoming: State Profile and Energy Estimates" (updated Mar. 18, 2021) (St. John Decl. Ex. 39).

These harms to Plaintiff States and their citizens economic well-being more than suffice to establish standing and the possibility of irreparable harm. *See Massachusetts v. E.P.A.*, 549 U.S. at 518-526 (once a concrete harm established, magnitude of harm irrelevant); *Texas v. United States*, 809 F.3d at 151-55; *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general"); *Texas v. United States*, 2021 WL 3025857, at *14 (S.D. Tex. July 16, 2021) (parens patriae standing appropriate against the federal government). And they are imminent and directly traceable to the Executive Order and SC-GHG Estimates. History demonstrates the direct line from the IWG's work to changes in regulatory activity. Obama Administration executive agencies reflexively employed the SCC without considering statutory authority or other important aspects of the problem. *See* Rowell, *supra* at 408 ("Perhaps emboldened by [the IWG's] general dismissal of statutory constraints, agencies using the globally scoped SCC have appeared to ignore the question of statutory authority entirely."). The chain of causation is clear and confirmed by history: agencies will apply EO 13990's unambiguous command to apply the IWG's unlawful SC-GHG Estimates in a manner that will harm Plaintiff States' legally cognizable interests.

*Second*, SC-GHG will impose additional duties upon Plaintiff States when they implement cooperative federalism programs. SC-GHG will compel Plaintiff States to employ an illegal methodology as a condition of approving significant funding and State environmental implementation

plans. For example, States must comply with federal standards in programs such as the National Ambient Air Quality Standards (NAAQS), 42 U.S.C. §7410. Under that regime, "the burden [is on] States to propose plans adequate for compliance with the NAAQS." *E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014). Because these NAAQS are now required to be set based on the IWG's SC-GHG Estimates, States must employ the Estimates or their state implementation plans (SIP) will be disapproved. And if a SIP is disapproved by EPA, EPA must impose a federal implementation plan (FIP)—which must be based upon the SC-GHG Estimates—upon the State. This harm is far from speculative—EPA has already published a final rule relying on the Biden SC-GHG Estimates to impose NAAQS good neighbor FIPs on several Plaintiff States including Louisiana and Kentucky. *See* 86 Fed. Reg. 23054, 23061 (Apr. 30, 2021). And the Obama Administration relied upon the SCC to do the same to Texas. *See* 81 Fed. Reg. 74504 (Oct. 26, 2016).

This is just one example of the States' obligation to employ the SC-GHG Estimates. Such cooperative federalism programs abound. Just to name a few examples, there is point-source power plant implementation and enforcement, 42 U.S.C. §7411; Housing and Urban Development assistance environmental review, 24 C.F.R. §§58.1, 58.4; Federal Highway Administration highway project environmental review, 23 U.S.C. §327; and other NEPA reviews States undertake as "joint lead agencies" with the federal government, *see, e.g.*, 42 U.S.C. §4332(D); 40 C.F.R. §1501.7(b).

Time and again, courts have confirmed that States are entitled to relief arising from the imminent and irreparable harm caused by alterations to such cooperative federalism programs. *See State of Fla. v. Weinberger*, 492 F.2d 488, 494 (5th Cir. 1974) ("It seems clear that, considerations of ripeness and sovereign immunity aside, the State of Florida has standing, arising from its clear interest both in the manner in which the Medicaid program is administered vis-a-vis its citizens and in being spared the reconstitution of its statutory program, to litigate the merits of this case."); *see also New Jersey v. Env't Prot. Agency*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) ("EPA's actions injure states when those

actions necessitate changes to state laws and make 'the states' task of devising an adequate SIP' 'more difficult and onerous.'"); *W. Virginia v. E.P.A.*, 362 F.3d 861, 868 (D.C. Cir. 2004) ("The NOx SIP Call directs each state to revise its SIP in accordance with EPA's NOx emissions budget for the state. The lower the emissions budget, the more difficult and onerous is the states' task of devising an adequate SIP. ... This injury is sufficient to confer standing."); *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975) (municipality has standing and was within zone of interests to challenge federal agency procedure under NEPA because "statute expressly contemplates that state and local governments are to play an important role in the effectuation of national environmental policy"); *State of N.M. v. U.S. Dep't of Hous. & Urb. Dev.*, 1987 WL 109007, at *2 (10th Cir. Jan. 7, 1987) ("This congressional intention to involve the states in the preparation and promulgation of standards supports the conclusion that New Mexico has standing to challenge HUD standards. To conclude otherwise would frustrate the congressional policy to encourage the cooperation of the states in the development and enforcement of HUD standards."); *State of Louisiana Through Dep't of Com. & Indus. v. Weinberger*, 404 F. Supp. 894, 896 (E.D. La. 1975). This is a direct, unspeculative injury that easily clears Article III's imminence and traceability requirement.

*Third*, the SC-GHG Estimates will harm Plaintiff States' ability to purchase affordable energy to carry out their sovereign functions. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power)."). Plaintiff State Louisiana spends significant sums on energy every year. The SC-GHG Estimates will significantly drive up these costs while simultaneously significantly decreasing State revenue, imperiling Plaintiff States' ability to carry out their sovereign duties to their citizens. *See* Dismukes Decl. ¶¶17-26; *cf. Texas*, 809 F.3d at 155 ("At least one state—

Texas—has satisfied the first standing requirement by demonstrating that it would incur significant costs.")[8]

*Fourth*, the Biden SC-GHG Estimates will significantly impact Plaintiff States' revenue. For example, the Biden SC-GHG Estimates will limit the scope of public lands and waters BLM and BOEM make available for exploration and development thereby reducing the significant revenue Plaintiff States' derive under OCSLA and the MLA. Dismukes Decl. ¶¶21-22. And Plaintiff State Kentucky will lose significant tax revenues from its severance tax on coal. Such impacts on revenue are sufficient to establish standing and entitle Plaintiff States to a preliminary injunction to avoid this significant and imminent harm. *See Dep't of Energy v. State of Louisiana*, 690 F.2d 180, 187 (Temp. Emer. Ct. App. 1982); *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1373 (W.D. La. 1981), *aff'd sub nom.* 690 F.2d 180 ("[T]he [Supreme] Court recognized the principle that lost tax revenues could confer standing where there existed 'some fairly direct link between the state's status as a collector and recipient of revenues, and the legislative or administrative action being challenged.'").

*Fifth*, the Biden SC-GHG Estimates threaten the coastline of Plaintiff State of Louisiana by directly reducing the funds necessary to maintain the state's coastal lands. *See Massachusetts*, 549 U.S. at 519 & n.17 (State's "independent interest 'in all the earth and air within its domain'" and "well-founded desire to preserve its sovereign territory" supports standing).[9]

*Sixth*, the Biden SC-GHG Estimates' failure to employ notice and comment divested Plaintiff States of their procedural rights under the APA and various other federal statutes to be consulted and

_____

[8] An injunction would redress Plaintiff States injuries by returning the status quo of Circular A-4, which direct agencies to utilize reasonable discount rates and consider only domestic effects in accordance with the law.

[9] The deprivation of those funds directly harms Louisiana's territory. Louisiana is losing swaths of coastal land—nearly two thousand square miles and counting—due to follow-on effects from environmental catastrophes. *See Louisiana*, 2021 WL 2446010, at *21 (noting irreparable harm from "damage for reduced funding to the Coastal Master Plan, which would reduce proceeds that are used in Louisiana's coastal recovery and restoration program").

offer views regarding administrative actions impacting concrete State interests. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A] 'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'").

*Seventh*, as discussed above, Plaintiff States have *parens patriae* standing to vindicate the economic injuries the SC-GHG estimates will impose on their citizens. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general"). Louisiana businesses in particular will be harmed by the SC-GHG Estimates in competing for federal procurement contracts. *See* Dismukes Decl. ¶26 ("When competing for federal sales and contracts, Louisiana businesses will be at a disadvantage compared to businesses in states where a larger share of electricity comes from renewable generation. In 2018, Louisiana was the 49th ranked state by share of energy from renewables as renewables accounted for 3.5 percent of Louisiana energy consumption.").

## III.   AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC INTEREST.

Finally, the public interest and balance of equities weigh in favor of granting a preliminary injunction. Simply put, Defendants "have no legitimate interest in the implementation of [the] unlawful" SC-GHG Estimates. *Texas*, 2021 WL 723856, at *49. Instead, "the public is served when the law is followed." *Id.* at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). The public has an overriding interest in ensuring that vast regulatory programs are implemented lawfully, in compliance with the constitutional separation of powers and APA. And while

Plaintiff States would be irreparably harmed by the implementation of SC-GHG, the only harm to the Defendants from an injunction would be to wait for an actual grant of authority from Congress. Accordingly, the public interest and balance of harms weigh heavily in Plaintiff States' favor.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for a Preliminary Injunction.

Respectfully submitted,

Dated: July 27, 2021

**JEFF LANDRY**
  **ATTORNEY GENERAL OF LOUISIANA**

TYLER R. GREEN
DANIEL SHAPIRO
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

 */s/   Elizabeth B. Murrill*

ELIZABETH B. MURRILL
  Solicitor General
JOSEPH S. ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.*
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

ASHLEY MOODY
  Attorney General of Florida
Rachel Siegel*
  Deputy Solicitor General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
Tel: (850) 414-3300
Fax: (850) 410-2672
rachel.siegel@myfloridalegal.com
*Counsel for the State of Florida*

49

CHRISTOPHER M. CARR
  Attorney General of Georgia
Andrew A. Pinson*
  Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

DANIEL CAMERON
  Attorney General of Kentucky
Marc Manley**
  Assistant Attorney General
Victor Maddox**
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330
Marc.Manley@ky.gov
Victor.Maddox@ky.gov
*Counsel for the State of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
Justin L. Matheny*
  Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

Katie Hruska*
  Special Assistant Attorney General and
  Deputy General Counsel to South Dakota
  Governor Kristi Noem
Mark Miller**
  General Counsel to South Dakota Governor
  Kristi Noem
500 East Capitol Avenue
Pierre, South Dakota 57501-5070
Mark.Miller@state.sd.us
*Counsel for the State of South Dakota*

50

KEN PAXTON
  Attorney General of Texas
Brent Webster
  First Assistant Attorney General
Judd E. Stone II*
  Solicitor General
Patrick Sweeten*
  Deputy Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 463-4139
Fax: (512) 474-2697
Patrick.Sweeten@oag.texas.gov
Judd.Stone@oag.texas.gov
*Counsel for the State of Texas*


PATRICK MORRISEY
  West Virginia Attorney General
Lindsay S. See*
  Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*


BRIDGET HILL
  Attorney General of Wyoming
James Kaste*
  Deputy Attorney General
Travis Jordan*
  Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov


*Admitted Pro Hac Vice*
**Motion for Pro Hac Vice admission forthcoming*