# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

THE STATE OF LOUISIANA, *et al.*,

        Plaintiffs,

      v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

        Defendants.

Case No. 2:21-cv-01074-JDC-KK

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER C. VAN HOOK
Acting United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION....................................................................................................................1

ARGUMENT.........................................................................................................................2

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION.................................2

      A.    Plaintiffs lack Article III standing. ...............................................................2

            1.    Plaintiffs have not alleged a concrete, particularized, and actual or imminent injury-in-fact..........................................................................3

            2.    Any injury would be traceable to future, hypothetical agency actions, not to the Executive Order or the Interim Estimates. ...........................8

            3.    Plaintiffs' alleged injuries are not redressable by a victory in this lawsuit. ................................................................................................9

            4.    Plaintiffs' remaining, miscellaneous bases for standing are meritless. .............11

      B.    Plaintiffs' claims are not ripe. ...................................................................15

      C.    Plaintiffs lack a cause of action. ...............................................................19

            1.    Plaintiffs do not challenge any final agency action. .................................19

            2.    Even if the Interim Estimates are a "final" action, the Working Group is not an "agency" subject to APA litigation.................................19

            3.    Plaintiffs cannot obtain *ultra vires* review as an alternative to proceeding under the APA. .........................................................................20

II.    PLAINTIFFS' CLAIMS ARE MERITLESS..............................................................22

      A.    Plaintiffs' statutory claims are meritless. ..................................................22

      B.    Plaintiffs' *ultra vires* claims are duplicative and meritless. .....................24

      C.    Plaintiffs' notice-and-comment claims are meritless...............................24

      D.    Any remaining claims against the Defendants other than the President or the Working Group should be dismissed for failure to state a claim........................25

CONCLUSION.....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ..................................................................................................................12

*Allen v. Wright,*
    468 U.S. 737 (1984) ..................................................................................................................15

*Am. Airlines, Inc. v. Herman,*
    176 F.3d 283 (5th Cir. 1999) ..............................................................................................21, 22

*Am. Fed'n of Gov't Emps. v. United States,*
    No. CIV.A. SA00CA1508, 2001 WL 262897 (W.D. Tex. Mar. 7, 2001) ..................................9

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.,*
    801 F. Supp. 2d 383 (D. Md. 2011) ........................................................................................22

*Arias v. DynCorp,*
    752 F.3d 1011 (D.C. Cir. 2014) ..............................................................................................14

*Associated Builders & Contractors of Se. Tex. v. Rung,*
    No. 16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ................................................22

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ....................................................................................................3

*Barbero v. Reg'l Recovery Servs., Inc.,*
    No. 17-cv-03379, 2018 WL 3150681 (W.D. Mo. June 27, 2018) ............................................25

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..............................................................................................................4, 19

*Biden v. Texas,*
    No. 21A21, 2021 WL 3702101 (U.S. Aug. 20, 2021) ............................................................13

*Bldg. & Const. Trades Dep't v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ......................................................................................22, 23, 24

*Brackeen v. Haaland,*
    994 F.3d 249 (5th Cir. 2021) ..............................................................................................12, 13

*California v. Texas,*
    141 S. Ct. 2104 (2021) ....................................................................................................2, 3, 8, 13

*California v. Trump,*
    No. 19-cv-960, 2020 WL 1643858 (D.D.C. Apr. 2, 2020) ......................................................23

*Choice Inc. of Tex. v. Greenstein,*
  691 F.3d 710 (5th Cir. 2012) .................................................................................................15

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ..........................................................................................22, 23

*City of Hearne v. Johnson,*
  929 F.3d 298 (5th Cir. 2019) .................................................................................................12

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................................................2, 3, 7

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. 2020) .........................................................................................24

*Ctr. for Biological Diversity v. NHTSA,*
  538 F.3d 1172 (9th Cir. 2008) ...........................................................................................9, 11

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ...........................................................................................................8

*El Paso Cnty. v. Trump,*
  982 F.3d 332 (5th Cir. 2020) ............................................................................................13, 14

*FEC v. Akins,*
  524 U.S. 11 (1998) ...............................................................................................................11

*Fed. Forest Res. Coal. v. Vilsack,*
  100 F. Supp. 3d 21 (D.D.C. 2015) ...........................................................................................4

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) .............................................................................................................22

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) ..........................................................................................12, 13

*Helicopter Ass'n Int'l, Inc. v. FAA,*
  722 F.3d 430 (D.C. Cir. 2013) .................................................................................................5

*Hias, Inc. v. Trump,*
  985 F.3d 309 (4th Cir. 2021) .......................................................................................22, 23, 24

*Hoctor v. USDA,*
  82 F.3d 165 (7th Cir. 1996) ..................................................................................................25

*Iowa ex rel. Miller v. Block,*
  771 F.2d 347 (8th Cir. 1985) .................................................................................................14

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
  613 F.3d 1112 (D.C. Cir. 2010)................................................................25

*Lance v. Coffman,*
  549 U.S. 437 (2007) ......................................................................................14

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ......................................................................................24

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...........................................................................2, 10, 12

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ........................................................................................1

*Luminant Generation Co. v. EPA,*
  757 F.3d 439 (5th Cir. 2014)........................................................................19

*Lundeen v. Mineta,*
  291 F.3d 300 (5th Cir. 2002).....................................................................21, 24

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council,*
  811 F.3d 542 (2d Cir. 2016) .........................................................................20

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ......................................................................................13

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) .................................................................................12, 13

*Meyer v. Bush,*
  981 F.2d 1288 (D.C. Cir. 1993).....................................................................20

*Midwest Ozone Grp. v. EPA,*
  No. 21-1146 (D.C. Cir.)...................................................................................6

*Morgan v. Huntington Ingalls, Inc.,*
  879 F.3d 602 (5th Cir. 2018)........................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)........................................................................................16

*Nat'l Park Hosp. Ass'n v. of Dep't of Interior*
  538 U.S. 803 (2003) .................................................................................16, 17

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010).....................................................................11

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009)....................................................................................21

*CREW v. Off. of Admin.,*
    566 F.3d 219 (D.C. Cir. 2009)..............................................................................19, 20

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ..............................................................................7, 16, 17, 22

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976)....................................................................................14

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)......................................................................................................25

*Renal Physicians Ass'n v. HHS,*
    489 F.3d 1267 (D.C. Cir. 2007)..................................................................................11

*Sackett v. EPA,*
    566 U.S. 120 (2012)....................................................................................................19

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality,*
    968 F.3d 419 (5th Cir. 2020).......................................................................................12

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000).......................................................................................19

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018)..................................................................................19

*South Carolina v. Katzenbach*
    383 U.S. 301 (1966)....................................................................................................13

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016)................................................................................................12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)........................................................................................................3

*Summers v. Earth Island Inst.*
    555 U.S. 488 (2009) .............................................................................................*passim*

*Texas v. Biden,*
    No. 21-10806, 2021 WL 3674780 (5th Cir. Aug. 19, 2021) ......................................13

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ........................................................................12

*Texas v. United States,*
   523 U.S. 296 (1998) .............................................................................................................18

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ..........................................................................................13, 24

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) .............................................................................................................21

*Town of Chester v. Laroe Ests., Inc.,*
   137 S. Ct. 1645 (2017).............................................................................................................6

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021)...........................................................................................................11

*Trump v. New York,*
   141 S. Ct. 530 (2020) ..............................................................................................................1

*U.S. Postal Serv. v. Gregory,*
   534 U.S. 1 (2001) ..................................................................................................................15

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ................................................................................................................5

*Watt v. Energy Action Educ. Found.,*
   454 U.S. 151 (1981) ..............................................................................................................14

*Wild Va. v. Council on Env't Quality,*
   --- F. Supp. 3d ---, 2021 WL 2521561 (W.D. Va. June 21, 2021)........................................18

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992) ..............................................................................................................14

*Zero Zone, Inc. v. Dep't of Energy,*
   832 F.3d 654 (7th Cir. 2016) .......................................................................................10, 11, 22

**Statutes**

5 U.S.C. § 553(b)(A) ..................................................................................................................24

5 U.S.C. § 701(b)(1) .................................................................................................................2, 19

5 U.S.C. § 706.............................................................................................................................25

5 U.S.C. § 706(2)(A) ..................................................................................................................16

42 U.S.C. § 4321 ........................................................................................................................18

42 U.S.C. § 7410(a)(2)(D)(i)(I)....................................................................................................5

42 U.S.C. § 7607(b)(1) ...........................................................................................................4, 6

Consolidated Appropriations Act,
    Pub. L. No. 116-260, 134 Stat. 1182 (2021) ................................................................4

**Regulations**

40 C.F.R. § 1502.22 (2020) ........................................................................................18

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act,*
    86 Fed. Reg. 27150 (May 19, 2021) ............................................................................4

*Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS,*
    86 Fed. Reg. 23054 (April 30, 2021) ..........................................................................5, 6

*Notice of Intent To Prepare a Supplemental Environmental Impact Statement for the Alaska LNG Project,*
    86 Fed. Reg. at 35280 (Jul. 2, 2021) ..........................................................................6

**Executive Orders**

Exec. Order No. 12866, *Regulatory Planning and Review,*
    58 Fed. Reg. 51735 ....................................................................................5, 9, 24

Exec. Order No, 13783, *Promoting Energy Independence and Economic Growth,*
    82 Fed. Reg. 16093 (Mar. 28, 2017)............................................................................20

Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis,*
    86 Fed. Reg. 7037 (Jan. 20, 2021)............................................................................*passim*

**Other Authorities**

EPA, *Revised Cross-State Air Pollution Rule Update – Response to Comment* (Apr. 29, 2021),
    https://perma.cc/RGW8-G2DT.............................................................................5, 6

Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021),
    https://perma.cc/78K2-FJMC.............................................................................18

OMB, Circular A-4 (Sept. 17, 2003),
    https://perma.cc/7BZH-KLQG .............................................................................9, 10

Louisiana Comment (Jun. 21, 2021)
    https://perma.cc/32BJ-4GHL.............................................................................25

Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O. 13990* ("Feb. 2021 TSD")........................................................10, 18

**INTRODUCTION**

At least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). "The President, to be sure, has made clear his desire" that agencies use the Interim Estimates in rulemaking, *id.*—though only when doing so is already authorized by law. But until an agency takes some specific action, relying on the Interim Estimates, which affects regulated parties, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time." *Id.* (quotation omitted). And in the absence of a concrete application of the Executive Order, in a particular, final agency action that harms Plaintiffs, the Court cannot reach the merits. "The case-by-case approach that this requires is understandably frustrating to" Plaintiffs, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990), who would prefer to invalidate Section 5 of the Executive Order and the Interim Estimates in their entirety and all at once. But that case-by-case approach "is the traditional, and remains the normal, mode of operation of the courts." *Id.*

Plaintiffs' claims would fare no better on the merits. Their entire case is premised on the idea that Executive Order 13990 and the Interim Estimates "usurp agencies' statutorily vested authority." Pls.' Opp'n to Defs.' Mot. to Dismiss, ECF No. 48, at 12 ("Pls.' Opp'n"). But the text of the Executive Order prohibits exactly that result, providing (more than once) that it does not "impair or otherwise affect the authority granted by law to an executive department or agency." *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, E.O. 13990 § 8(a)(i), 86 Fed. Reg. 7037 (Jan. 20, 2021); *see id.* §§ 5(b)(ii), 8(b). And recent OIRA Guidance puts the matter beyond any doubt, confirming that any applicable "statutory requirements must dictate whether and how the agency monetizes changes in greenhouse gas emissions." OIRA Guidance, ECF No 31-5, at 2 (June 3, 2021). Those two quotations, standing alone, are a near-complete response to most of Plaintiffs' brief.

Rather than welcome confirmation that they overestimated the reach of the Executive Order, Plaintiffs maintain that it is "perhaps the most significant regulatory action in American history." Pls.' Opp'n 1. But Plaintiffs cannot explain why the Court should interpret these intra-Executive Branch obligations more broadly than the Executive Branch does. So, as one example, although Plaintiffs

claim to need judicial intervention to avoid "new obligations on them to use the Estimates when they participate in cooperative federalism programs," Pls.' Opp'n 14, in fact, the Executive Order creates no such obligations.  Even if Article III of the U.S. Constitution allowed this Court to issue an advisory opinion about the legality of federal mandates that do not exist, Plaintiffs have no need for one.

Finally, as for their notice-and-comment claim, Plaintiffs admit that "[t]he Biden SC-GHG Estimates are identical to those issued" five years ago, "adjusted for inflation," Pls.' Opp'n 11—estimates that were subjected to extensive public comment, peer review, and iterative improvement over nearly a decade.  Nor can Plaintiffs dispute that, "before agencies rely on the latest iteration of the Interim Estimates to promulgate final rules, Plaintiffs will have yet more opportunities to comment," Defs.' Mot. to Dismiss, ECF No. 31, at 50 ("MTD")—including opportunities they have already taken advantage of.  That is more than enough to reject their notice-and-comment claim, even if (counterfactually) Plaintiffs were correct that the Working Group is an "agency" within the meaning of 5 U.S.C. § 701(b)(1), or that the Interim Estimates qualify as a legislative rule under the APA.

All of Plaintiffs' claims should be dismissed.

## ARGUMENT

## I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION.

### A.     Plaintiffs lack Article III standing.

Plaintiffs have not carried their burden to establish "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  All of Plaintiffs' alleged injuries are (1) speculative; (2) caused by future hypothetical agency regulations (rather than the Executive Order or the Interim Estimates themselves); and (3) not likely to be redressed by the court order they seek. Plaintiffs try to water down the standard, criticizing Defendants for "demand[ing] (at 15-23) that Plaintiff States show inevitable harms flowing directly from the Executive Order or SC-GHG Estimates." Pls' Opp'n 26. But Plaintiffs' quarrel is with the Supreme Court, not Defendants. *Compare id.*, *with Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (quotation omitted); *California v. Texas*, 141 S. Ct. 2104, 2119 (2021)

(no standing because "[t]he Government's conduct in question is . . . not 'fairly traceable' to enforcement of the 'allegedly unlawful' provision of which the plaintiffs complain").

### 1.   Plaintiffs have not alleged a concrete, particularized, and actual or imminent injury-in-fact

**a.**  Plaintiffs' theory of injury assumes that they will be harmed by future agency regulations issued in reliance on the Executive Order and the Interim Estimates. But Plaintiffs cannot base their standing on a "speculative chain of possibilities." *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017). To mitigate that problem, Plaintiffs speculate about "on-the-ground realities," and suggest that Defendants have "exhibit[ed] a naiveté," Pls.' Opp'n 16, in arguing that Plaintiffs' future injuries are not "*certainly* impending," *Clapper*, 568 U.S. at 409. But Article III demands more than such rhetoric.

For one, the Supreme Court has been "reluctant to endorse standing theories," such as those here, "that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 413. That is what Plaintiffs ask of this Court. Which agency might harm Plaintiffs? When? By what means? Under what authority? Relying in what way (if at all) on the Interim Estimates? Plaintiffs never say, because they do not (and cannot) know. Instead, Plaintiffs seem to assume that it is enough to predict that, at some point, some agency will inevitably issue some rule that relies in some way on the Interim Estimates. *See, e.g.*, Pls.' Opp'n 27 (predicting generally that "the Executive Branch will employ the SC-GHG Estimates in a way that injures Plaintiffs"). But "allegations of future injury" must "be particular and concrete." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998).

If the bar were as low as Plaintiffs suggest, then the plaintiffs in *Summers v. Earth Island Institute* would have had standing. After all, there was little doubt in *Summers* that, at some point in the future, at least once, the Forest Service would make use of the challenged "regulations that exempt[ed] small . . . timber-salvage projects from the notice, comment, and appeal process used by the [agency] for more significant" actions. 555 U.S. 488, 490 (2009). Nonetheless, the Court granted certiorari to "determine whether respondents ha[d] standing to challenge the regulations in the absence of a live dispute over a concrete application of those regulations." *Id.* Its answer was no: "the plaintiffs lacked standing because they had failed 'to allege that any *particular* timber sale or other project claimed to be

unlawfully subject to the regulations will impede a specific and concrete' interest of the plaintiffs in the national forests." *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 43 (D.D.C. 2015) (quoting *Summers*, 555 U.S. at 495) (emphasis altered).  Plaintiffs have (at least) the same problem—"in the absence of a live dispute over a concrete application" of the Interim Estimates in a *particular* agency action that causes them harm, *Summers*, 555 U.S. at 490, Plaintiffs cannot show standing.

**b.**  Plaintiffs try to identify a few actual (rather than hypothetical) examples of agency actions to support their standing theory.  But those isolated examples—which would at most be relevant to Plaintiffs' standing to challenge *those specific agency actions*—turn out to be only tenuously connected (if at all) to the Executive Order and the Interim Estimates that are challenged in this case.

First, Plaintiffs assert that "EPA has explicitly relied upon the SC-GHG Estimates in formulating a 'Social Cost of Hydrofluorocarbons' to justify an attempted expansion of regulatory power." Pls.' Opp'n 13 (citing *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27150 (May 19, 2021)). That description of this proposed rule is materially inaccurate.  EPA did not "rel[y] upon" *any* of the Interim Estimates in that proposal, Pls.' Opp'n 13, and the proposed rule offers no suggestion that E.O. 13990 in any way mandated, justified, or even motivated EPA's proposal.  To the contrary, the proposed rule discusses actions that would implement an explicit *congressional* command in the American Innovation and Manufacturing Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182, which "directs EPA to address HFCs by providing new authorities" to "phase down the production and consumption of listed HFCs," and to do so on a "schedule prescribed by Congress."  86 Fed. Reg. at 27153, 27159. And in any event, Plaintiffs do not even assert that this proposed rule has caused them any concrete, actual, or imminent harm—or even that it *will* harm them, if finalized in the same form.[1]

Second, Plaintiffs repeatedly reference so-called "cooperative-federalism" programs, and in particular contend that the EPA's National Ambient Air Quality Standards (NAAQS) "are now

---

[1] Also, Plaintiffs cannot sue over a *proposed* rule, *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), and any lawsuit challenging the final rule would have to be filed directly in the D.C. Circuit, *see* 42 U.S.C. § 7607(b)(1).  And if Plaintiffs had concerns with this proposal, they could have commented.

required to be set based on" the Interim Estimates.  Pls.' Opp'n 15.  Again, that is simply incorrect; Plaintiffs offer no citation to support that assertion, and none exists.  Nor have Plaintiffs identified any NAAQS-setting process in which the Interim Estimates were actually relied upon.  In fact, there are no NAAQS for greenhouse gases, *see Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014) (listing the "six pollutants" for which "EPA has issued NAAQS"), and Plaintiffs offer no explanation of how the Interim Estimates would be used in setting or revising NAAQS for non-greenhouse-gas pollutants.

With respect to NAAQS implementation, Plaintiffs contend that "the EPA has relied upon" the Interim Estimates "in disapproving state implementation plans under the NAAQS good-neighbor provisions and to justify the imposition of more stringent federal implementation plans on several Plaintiff States."  Pls.' Opp'n 12.  Once again, Plaintiffs are simply incorrect to assert that EPA "relied upon" the Interim Estimates in any such action.  They cite to just one action for support, *see Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS*, 86 Fed. Reg. 23054 (April 30, 2021) ("Revised CSAPR Update"), and the record belies their assertions.  In the Revised CSAPR Update, EPA established new nitrogen oxide emission budgets for power plants in twelve states under the "good neighbor" provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I).  But the basis for this action had nothing to do with the Interim Estimates.  *See* 86 Fed. Reg. at 23086-87 (explaining the multi-factor approach EPA used to address regional ozone).  To be sure, to comply with the longstanding, unchallenged, and undisputedly non-enforceable[2] intra-Executive Branch requirements imposed by E.O. 12866, EPA conducted a cost-benefit analysis, and used the Interim Estimates as part of that analysis.  *See id.* at 23150-55.  But as for the actual *justification* for its action, EPA could not have been clearer: "[i]nformation from the [Working Group] used to estimate climate benefits is not

---

[2] Defendants previously explained that "[o]ften, agencies prepare a cost-benefit analysis solely as part of the Regulatory Impact Analysis required by E.O. 12866—not because it is required by statute, and not because that cost-benefit analysis will be relied upon as justification for the agency rule."  MTD 19.  Plaintiffs do not dispute that in that scenario—in which "the Interim Estimates will have made no substantive difference to the outcome," *id.*—the agency's cost benefit analysis would generally not be subject to judicial review.  Nor could they.  *See, e.g., Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013).

relied upon as part of the record basis for this rulemaking." EPA, *Revised Cross-State Air Pollution Rule Update – Response to Comment* (Apr. 29, 2021) at 546, https://perma.cc/RGW8-G2DT.[3]

Nonetheless, Plaintiffs assert that EPA used "the SC-GHG Estimates to impose more stringent NAAQS good-neighbor Federal Implementation Plans (FIPs) upon several . . . states, including Louisiana, Kentucky, and Texas[.]" Pls.' Opp'n 29 (quotation omitted). Again, Plaintiffs cite no action on State Implementation Plan (SIP) submissions that in any way relied on the Interim Estimates as a basis for disapproval. And the FIPs that Plaintiffs *do* cite (for Louisiana and Kentucky) were based on the same air-quality and emissions-control analysis applied to other states—which likewise did not rely on the Interim Estimates. *See, e.g.*, 86 Fed. Reg. at 23085-86. As for Texas, EPA did not even *issue* any new or revised plan in the Revised CSAPR Update—instead, EPA included Texas on a list of states for which a prior rule already "satisf[ied] their good neighbor obligations." *Id.* at 23057. Plaintiffs have thus not identified a single example of EPA relying on the Interim Estimates as a basis for disapproving state plans (or promulgating federal plans) under the Clean Air Act.[4]

For those reasons, Plaintiffs cannot base their standing on "harm caused by alterations to . . . cooperative federalism programs," Pls.' Opp'n 16, and their inaccurate factual narrative would not support standing to challenge even these specific agency actions. But, regardless, these examples certainly do not provide standing in *this* lawsuit, which raises only a facial challenge to the Executive Order and the Interim Estimates—after all, "standing is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017). To be sure, one day, some agency *might* actually take

---

[3] The Revised CSAPR Update is now the subject of a petition for judicial review in the D.C. Circuit. *See Midwest Ozone Grp. v. EPA*, No. 21-1146 (D.C. Cir.). But none of these plaintiffs has challenged that action through the process required by 42 U.S.C. § 7607(b)(1).

[4] Plaintiffs also cite a recent "Notice of Intent to Prepare a Supplemental Environmental Impact Statement" (SEIS) for a natural gas project in Alaska, apparently as an example of the Department of Energy (DOE) having "applied the Estimates and IWG's methodology" to "delay" regulatory action that Plaintiffs favor. Pls.' Opp'n 27, 29 n.11 (citing 86 Fed. Reg. at 35280). Yet the notice, which simply announces the start of a process that will include an opportunity for public comment on a draft SEIS before a final SEIS is issued, does not reference the Interim Estimates or Section 5 of E.O. 13990. Accordingly, DOE has not yet "applied" the Interim Estimates, may never do so, and any challenge to that process is not even close to ripe. What's more, Plaintiffs clearly lack standing to challenge natural gas regulation in Alaska—Alaska is not a plaintiff here.

some action that harms Plaintiffs concretely, in reliance on the Interim Estimates, in which the Interim Estimates actually made a difference.  At that time, Plaintiffs may challenge that agency action, including by arguing that the Interim Estimates are unlawful.  *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998).  But that possibility—actual or hypothetical—cannot support standing here.

 **c.**  Defendants already explained at length why Plaintiffs' theory of standing rests on high-level misunderstandings about the federal regulatory process—in particular, the realities that (1) cost-benefit analyses are often prepared solely to comply with other longstanding executive orders not challenged here, and are not relied upon to justify an agency's action, *see* MTD 19; *supra* at 5 n.2; (2) even if some statute requires (or permits) an agency to prepare and rely upon a cost-benefit analysis, that analysis will then typically be subject both to notice-and-comment and to judicial review, *see* MTD 19-20 (citing OIRA Guidance at 2); (3) cost-benefit analysis will only rarely be outcome-determinative to a given rule, *see* MTD 19-20; and (4) the social costs of greenhouse gases will only rarely be outcome-determinative to an agency's cost-benefit analysis, *id.* at 20.  Plaintiffs do not dispute any of those premises, responding only with the conclusory statement that they disagree.  *See* Pls.' Opp'n 32. Plaintiffs' failure to engage is telling.  This is another basis to dismiss for lack of standing, given the speculation that is required to assume that (1) some agency will propose some (currently unidentified) future regulation; (2) which relies on a cost-benefit analysis; (3) which in turn relies on the Interim Estimates; (4) for which the costs would have outweighed the benefits using Plaintiffs' preferred approach to estimating the social costs of greenhouse gases; (5) the agency will reject all comments advocating for Plaintiffs' approach; and (6) that particular rule (as finalized) will injure Plaintiffs.[5]

*     *     *

 In sum, Plaintiffs are surely correct to predict "that agencies will implement the mandatory commands of an Executive Order."  Pls.' Opp'n 26.  But that is not enough to show a "certainly impending" future injury, *Clapper*, 568 U.S. at 409 (emphasis omitted), from a "concrete application"

---

[5] Plaintiffs also assert that "it is black letter law that such a showing is not necessary to allege a procedural injury," Pls.' Opp'n 30—an implicit (and appropriate) concession that it *is* required for Plaintiffs' various alleged *non*-procedural injuries.  *Accord Ohio Forestry*, 523 U.S. at 734.  In any event, Plaintiffs' procedural-injury allegations fail for other reasons, as discussed further *infra* at 11-12.

of the Executive Order and the Interim Estimates, *Summers*, 555 U.S. at 494, in a "particular" agency action, *id.* at 495.  Accordingly, Plaintiffs cannot show an Article III injury in fact.

> **2.    Any injury would be traceable to future, hypothetical agency actions, not to the Executive Order or the Interim Estimates.**

All of Plaintiffs' alleged injuries will be caused, if at all, by future, hypothetical agency actions. *See* MTD 21-23.  Plaintiffs' latest brief (like their complaint, *see id.* at 23) is full of references to harms that Plaintiffs assume they will suffer from *future agency regulations*—rather than actual or imminent harms caused by the Executive Order or the Interim Estimates.  For example, Plaintiffs assert "that significant regulatory infringements upon the States and their citizens will occur imminently," at the cost of "hundreds of billions or trillions of dollars," and that those future regulations "pose existential threats to Plaintiff States and their citizens."  Pls.' Opp'n 12.  Even putting aside the speculation and hyperbole, that is a claim about harm from future agency actions—not the Executive Order.

Traceability is lacking where, as here, there is a mismatch between (1) the specific government action challenged as unlawful and (2) the precise source of Plaintiffs' alleged injury.  Indeed, eight of these Plaintiffs were on the wrong side of this issue before the Supreme Court just a few months ago. In *California v. Texas*, the Supreme Court reversed the Fifth Circuit to dismiss a challenge to the Affordable Care Act for lack of standing because the specific statutory provision that the plaintiff states challenged—the individual mandate to buy health insurance—was not the provision that caused their injuries.  *See* 141 S. Ct. at 2119.[6]  Here, the disconnect is far wider: although it is Section 5 of the Executive Order and the Interim Estimates that Plaintiffs argue is unlawful, their alleged injuries (if any) would stem from future agency actions by one or more of dozens of different agencies.

---

[6] On both injury and causation, Plaintiffs rely heavily on *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), but the unusual circumstances of that case—about efforts to add a citizenship question to the census—have little relevance here.  There, the Supreme Court concluded that "the District Court did not clearly err in crediting *the Census Bureau's* [*own*] *theory* that the discrepancy [in response rates was] likely attributable at least in part to noncitizens' reluctance to answer a citizenship question."  *Id.* at 2566 (emphasis added).  Defendants have made no analogous concession here.  *See also California v. Texas*, 141 S. Ct. at 2119 (distinguishing *Department of Commerce* on similar grounds).

### 3.   Plaintiffs' alleged injuries are not redressable by a victory in this lawsuit.

**a.**   Plaintiffs hardly dispute the core premises of Defendants' redressability argument, including that "an order declaring the Interim Estimates to be non-binding would be sufficient to resolve all of Plaintiffs' legal objections." MTD 23-24. Plaintiffs also seem to accept that "[e]ven without any binding directive, agencies often may (and sometimes must) consider social costs of greenhouse gases." *Id.* at 24; *see, e.g., Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1201 (9th Cir. 2008). Nevertheless, in Plaintiffs' view, vacating the Interim Estimates would stave off their alleged injuries, because "[w]ith the SC-GHG Estimates enjoined, agencies would again be bound by Circular A-4," a (non-binding) guidance document from the Office of Management and Budget (OMB). Pls.' Opp'n 33. But Plaintiffs materially misread OMB Circular A-4, which is not at all inconsistent with the Interim Estimates to begin with—even ignoring that it represents only non-binding, non-enforceable, internal Executive Branch guidance. *Cf. Am. Fed'n of Gov't Emps. v. United States*, 2001 WL 262897, at *7 (W.D. Tex. Mar. 7, 2001) ("OMB Circular A-76 cannot create enforceable rights in third parties"); *see supra* at 5 n.2 (explaining why the intra-Executive Branch obligations of E.O. 12866, which Circular A-4 implements, are generally unenforceable); *see also* OMB Circular A-4 (Sept. 17, 2003), https://perma.cc/7BZH-KLQG.

Plaintiffs emphasize that OMB Circular A-4 (at 33-34) recommends, "[a]s a default position," the use of 3% and 7% discount rates, while the Interim Estimates use lower (though still partially overlapping) rates of 2.5%, 3%, and 5%. But Circular A-4 itself goes on to identify circumstances in which that default recommendation might not be appropriate. As particularly relevant here: "Special ethical considerations arise when comparing benefits and costs across generations," and "it may not be appropriate for society to" take the same approach to discounting "when deciding between the well-being of current and future generations." *Id.* at 35. That is because "[f]uture citizens who are affected by such choices cannot take part in making them, and today's society must act with some consideration of their interest." *Id.* In such circumstances, Circular A-4 notes that experts have estimated a more appropriate discount rate for policies with significant intergenerational effects to "range[] from 1 to 3 percent," *id.* at 36—thus endorsing discount rates even *lower* than the 2.5%, 3%,

and 5% rates selected by the Working Group.  Of course, as non-binding guidance, Circular A-4 ultimately leaves these matters to agency discretion—but it also explicitly suggests that an agency "consider a further sensitivity analysis using a lower but positive discount rate," if a "rule will have important intergenerational benefits or costs." *Id.*

So the upshot is this: even if Plaintiffs were to obtain relief against the Interim Estimates, agencies would retain ample discretion to account for the social costs of greenhouse gases as they see fit—and even to use the same (or lower) discount rates.  And because those costs have been estimated in ranges that may *exceed* those in the Interim Estimates, Plaintiffs could even face *higher* social-cost estimates in the absence of the uniform approach contemplated by E.O. 13990.  *See* Working Group, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under E.O. 13990* ("Feb. 2021 TSD"), ECF No. 31-4, at 4 (noting that the Interim Estimates "likely underestimate societal damages from GHG emissions").  Accordingly, because it is "merely 'speculative,'" *Lujan*, 504 U.S. at 561, that prevailing in this lawsuit will actually prevent or redress some cognizable injury, Plaintiffs lack standing for that independent reason.[7]

Finally, Plaintiffs misunderstand Defendants' redressability argument in disparaging it as a suggestion that "a bound party would not faithfully comply with a court order." Pls.' Opp'n 33.  It should go without saying that Defendants will comply with any order issued by this Court.  The point is that Plaintiffs have not requested—nor could they possibly be entitled to—any order that would prohibit the Executive Branch from assigning significant weight to the social costs of greenhouse gases, independent of the Executive Order challenged here.  *See, e.g., Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677 (7th Cir. 2016) ("Congress intended that [the Department of Energy] have

---

[7] Plaintiffs also contend that the Interim Estimates are inconsistent with Circular A-4 because they consider global (not just domestic) costs.  *See* Pls.' Opp'n 3.  But Circular A-4 does not limit agencies' discretion to analyze a regulation's global effects; indeed, it expressly provides that agencies should separately report such effects.  *See* OMB Circular A-4 at 5.  And because even domestic greenhouse-gas emissions have global effects (and vice versa), it is fully consistent with Circular A-4 for agencies to consider global effects.  *Cf. Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 678-79 (7th Cir. 2016) (carbon emissions are "a global externality" so "global effects are an appropriate consideration when looking at a national policy").

the authority . . . to consider the reduction in [the social cost of carbon dioxide].”); *Ctr. for Biological Diversity*, 538 F.3d at 1201 (holding that it was arbitrary and capricious for NHTSA “not to monetize or quantify the value of carbon emissions reduction”). Instead, the most Plaintiffs could hope for from a victory here would be a departure from the *standardized* approach contemplated by E.O. 13990. But how would these costs be estimated, as part of the rule-by-rule, agency-by-agency patchwork that would remain? Things could be better, worse, or the same for Plaintiffs. And the possibility that a “victory” in this lawsuit would have no real-world benefit to Plaintiffs is a bar to standing. *See Renal Physicians Ass’n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) (no redressability if “the undoing of the governmental action will not undo the harm” where the “status quo is held in place by other forces”). [8]

**b.** As for Plaintiffs’ claims against the President, there is no longer much (if any) disagreement: Plaintiffs “agree that an injunction does not lie against the President.” Pls.’ Opp’n 33. And although Plaintiffs seem to think that they may nevertheless seek redress against the President through a declaration, *but see Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010); MTD 26 n.10, the Court need not decide that here. All agree that Plaintiffs can obtain an order against the President’s subordinates (assuming, counterfactually, that the Court otherwise had jurisdiction and that Plaintiffs’ claims had merit). Accordingly, Plaintiffs’ claims against the President are not redressable (and are also unnecessary), and the President should be dismissed as a Defendant.

### 4.    Plaintiffs’ remaining, miscellaneous bases for standing are meritless.

**a.** Plaintiffs double down on the idea that they have standing solely because they “allege procedural harm.” Pls.’ Opp’n 22. Plaintiffs seem to believe that because they allege that Defendants violated the law (here, the APA’s notice-and-comment requirements), they have standing, with no

---

[8] Plaintiffs overread *FEC v. Akins*, 524 U.S. 11 (1998), *see* Pls.’ Opp’n 33, which arose in the unique context of informational standing. The Supreme Court recently clarified that *Akins* applies only when a plaintiff challenges the “denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information.” *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) (citing *Akins*, 524 U.S. at 11). In any event, there was no Article III standing in *TransUnion* because “the plaintiffs ha[d] identified no downstream consequences from failing to receive the required information.” *Id.* (quotation omitted). Similarly here, in the absence of any likely (rather than speculative) real-world consequences from a ruling in their favor, Plaintiffs lack standing.

further analysis required. To the contrary, plaintiffs "cannot satisfy the demands of Article III by alleging a bare procedural violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016); *see Summers*, 555 U.S. at 496-97 (same); *City of Hearne v. Johnson*, 929 F.3d 298, 301-02 (5th Cir. 2019) (same); *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606-07 (5th Cir. 2018) (same).

Of course, Plaintiffs *otherwise* facing some concrete injury may bring both procedural and substantive claims—but Plaintiffs err to suggest that procedural harm alone can independently provide standing. As the Fifth Circuit put it recently, a plaintiff "can have standing to enforce procedural rights only if 'the procedures in question are designed to protect some threatened concrete interest' that is 'the ultimate basis of his standing.'" *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020) (quoting *Lujan*, 504 U.S. at 573 n.8)). Plaintiffs try to distinguish *Summers*—just one of the cases cited by Defendants for this principle—as arising under different facts, *see* Pls.' Opp'n 23 n.7, but it is the relevant *legal* principle that is fatal to the argument. And Plaintiffs do not even try to distinguish any of the other authority from the Supreme Court or the Fifth Circuit, all of which is equally binding here.

**b.** "[A]s a general matter, a 'State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982)); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (op. of Dennis, J.). That well-settled principle—the so-called *Mellon* bar—is significant here, because many of Plaintiffs' standing-related allegations are not about direct injury to the Plaintiff States, but rather focus on potential harms to in-state businesses, state residents, or state economies, *see, e.g.*, Compl. ¶¶ 10-19, 121, 130—none of which are cognizable without a *parens patriae* hook. *See* MTD 26-27.

Plaintiffs contend that they are "bringing suit to *enforce* the rights guaranteed by a federal statute" instead of "bringing suit to *protect* their citizens *from* the operation of a federal statute," and that that somehow makes all the difference. Pls.' Opp'n 24 (quoting *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015)). At times, they even suggest that there is a heretofore-unknown exception for all constitutional claims. *See* Pls.' Opp'n 25. But none of those arguments can be

12

squared with the Supreme Court's language in *South Carolina v. Katzenbach* that was quoted in *Brackeen*, in which six Fifth Circuit judges—with no disagreement from any of their colleagues—explained that states could not bring constitutional claims "as the parent of its citizens . . . against the Federal Government," because the United States is "the ultimate parens patriae of every American citizen." 383 U.S. 301, 324 (1966) (quoted in 994 F.3d at 292 n.13 (op. of Dennis, J.)).[9]

Similarly unavailing is the idea that "States are 'entitled to special solicitude'" in a way that materially alters the analysis. Pls.' Opp'n 34-35 (quoting *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) (in turn quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007))). Although the precise meaning of "special solicitude" is elusive, it makes little sense to think it could override the *Mellon* bar—a rule that applies specifically to states. And in the most recent Supreme Court decision about state standing, *California v. Texas*, 141 S. Ct. 2104 (2021), the Court had little trouble reversing the Fifth Circuit to conclude that states lacked standing—without citing *Massachusetts v. EPA*, or even acknowledging (let alone relying on) the "special solicitude" on which Plaintiffs so heavily depend.[10]

**c.** Plaintiffs continue to argue that the Interim Estimates "will justify unprecedentedly stringent regulation of the energy sector from which the States derive significant tax revenue." Pls.' Opp'n 19. This illustrates the fundamental problems with Plaintiffs' standing theories in general: the Executive Order and the Interim Estimates do not "regulat[e] . . . the energy sector" at all, and if an agency one day *does* impose some new burden, Plaintiffs can challenge such application then. In any event, Plaintiffs have no answer to the Fifth Circuit's explicit and recent rejection of this precise theory: the "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020), *cert. denied* No. 20-298, 2021 WL

---

[9] Plaintiffs also rely on a footnote from *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (cited in Pls.' Opp'n 24, 25 n.9), but as the D.C. Circuit put it, "the Supreme Court had no need to carve out an exception" to the usual rules on *parens patriae* standing in "*Massachusetts v. EPA* because Massachusetts did not sue in its *parens patriae* capacity." *Gov't of Manitoba*, 923 F.3d at 182.

[10] Last week, in the context of an emergency stay application, in refusing to stay a preliminary injunction pending appeal, a Fifth Circuit motions panel concluded that two states were entitled to "special solicitude." *Texas v. Biden*, No. 21-10806, 2021 WL 3674780, at *5-6 (5th Cir. Aug. 19, 2021). The United States then requested (and received) a temporary stay from Justice Alito, who referred the matter to the full Court. *Biden v. Texas*, No. 21A21, 2021 WL 3702101 (U.S. Aug. 20, 2021).

2742797 (U.S. July 2, 2021); *see also Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) (same); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (same). "'[V]irtually all federal policies' will have 'unavoidable economic repercussions,'" *El Paso Cnty.*, 982 F.3d at 339 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)), but that is not enough for standing.

Plaintiffs use buzzwords like "*specific* tax revenues" and "*direct* financial stake" to try and fit within precedents like *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), and *Watt v. Energy Action Education Foundation*, 454 U.S. 151 (1981). Pls.' Opp'n 18-19 (emphases added). But there is nothing "direct" or "specific" about the hypothesized loss of revenue here, where Plaintiffs assert vaguely, for example, that "[g]iven the robust energy industries in Louisiana, Wyoming, and Kentucky, those Plaintiff States' tax revenues will be particularly hard hit by increased regulatory stringency." *Id.* at 19. Even setting aside the speculation required, that theory is hardly "direct" or "specific"—and less so than the "cancellation of the $20 million project at Fort Bliss" that failed to suffice in *El Paso County*.[11]

**d.** Defendants previously addressed Plaintiffs' allegations that "virtually everything that States and their citizens encounter every day" will get more expensive. Compl. ¶ 6. In particular, Plaintiffs now predict that "increased energy prices will cause substantial harm to the public fisc." Pls.' Opp'n 21. Plaintiffs cite nothing to justify their confidence that they can successfully predict future swings in energy prices—let alone pin some predicted future increase on the Executive Order. But even ignoring the speculativeness, traceability, and redressability issues, this theory would apply to every energy consumer on earth. So "unless and until the Executive Order is applied in a future agency action that directly affects these Plaintiffs in some *particularized* way, Plaintiffs' interest in the Executive Order's legality is the same as anyone else's: an 'undifferentiated, generalized grievance about the conduct of government.'" MTD 27-28 (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)).

---

[11] Plaintiffs likewise speculate that they will lose revenue "from less public land and OCS tracts being offered for sale," but that speculation is based on their unexplained assumption that the Interim Estimates "appl[y] to BLM and BOEM's permitting discovery and drilling on leased land." Pls.' Opp'n 18. In fact, as explained in greater detail *infra* at 15, 17-18 (and MTD 28-29, 34), the Executive Order explicitly contemplates further deliberations before the Interim Estimates are applied in any context other than cost-benefit analysis in agency rulemaking. *See* E.O. 13990 §§ 5(b)(ii)(A), (C).

**e.**  Plaintiffs cite cases for the proposition that an "increased regulatory burden" or "the obligation or pressure on sovereign States to change their regulatory practices" suffice for standing. *Id.* at 14-18, 25, 27, 30, 37, 40.  But all of these arguments rely on the incorrect assumption that the Interim Estimates currently "impose additional duties on Plaintiff States when they carry out cooperative federalism programs." Pls.' Opp'n 15.  In fact, Plaintiffs do not face any "forced choice" between "employing" the Interim Estimates and "risking penalties for compliance," Pls.' Opp'n 37—which is presumably why they include no citation for their contrary interpretation.[12]  And as discussed at length above, Plaintiffs' primary example of this alleged phenomenon—in the NAAQS context—is baseless.  *See supra* at 4-6.  Similarly, Plaintiffs' assertions that they must now "employ an illegal methodology" are completely unsupported.  Pls.' Opp'n 15.  In any event, Plaintiffs might disagree with the Interim Estimates, or even consider them unlawful, but they "have no standing to complain simply that the[] Government is violating the law." *Allen v. Wright*, 468 U.S. 737, 755 (1984).

**B.**  <u>Plaintiffs' claims are not ripe.</u>

**1.**  On the ripeness question of "the hardship to the parties of withholding" review, *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quotation omitted), Plaintiffs barely engage with Defendants' primary argument: because Plaintiffs can sue later—*i.e.*, when faced with a concrete *application* of the Executive Order, in a specific agency action that causes them harm—they cannot sue now.  Plaintiffs do suggest that they need to litigate now because future comments opposing the Interim Estimates will be "disregard[ed]," such that "Plaintiff States will not be able to bring their full arguments to bear in future agency proceedings." Pls.' Opp'n 36.  But "a presumption of regularity attaches to the actions of Government agencies," *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), and so Plaintiffs cannot assume that agencies will flout the APA.  Moreover, OIRA guidance about E.O. 13990 conclusively refutes their pessimism: whenever "required by principles of administrative

---

[12] Plaintiffs do offer conclusory cites to statutory schemes they claim are "examples of the States' obligation to employ the SC-GHG Estimates," including environmental reviews under the National Environmental Policy Act (NEPA), and other similar programs.  Pls.' Opp'n 15 n.3.  As Defendants have explained, MTD 28-29 (citing E.O. 13990 §§ 1, 5(b)(ii)), Plaintiffs are simply incorrect to assume that E.O. 13990 or the Interim Estimates create any obligations to use the Interim Estimates when conducting an analysis under NEPA. *See also infra* at 17-18.

law, the agency must make its benefit-cost analysis (including any use of the 2021 interim estimates and methodological choices made with respect to the 2021 interim estimates, as well the agency's rationale for those choices) available for public notice and comment." OIRA Guidance at 2. And if an agency decides to "take final action in reliance on a benefit-cost analysis that includes estimates of the social cost of greenhouse gas emissions, the agency must respond to any significant comments on those estimates and ensure its analysis (including any use of the 2021 interim estimates) is justified as not arbitrary or capricious." *Id.* No comments will be "disregard[ed]." Pls.' Opp'n 36.[13]

To be sure, in addressing comments, an agency might disagree with Plaintiffs on the *substance* of how to account for the costs of emissions—with or without the Executive Order. But that is no answer to Defendants' ripeness argument. If an agency rejects Plaintiffs' comments and takes some action that they consider to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," they can challenge it. *See* 5 U.S.C. § 706(2)(A). And if a court agrees, the action will be set aside. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Neither the Executive Order nor the Interim Estimates alters those basic APA principles.

**2.** Plaintiffs argue that the Supreme Court's decisions in "*Ohio Forestry Association* and *National Park Hospitality Association* provide useful contrasts to Plaintiff States' ripe claims." Pls.' Opp'n 38; *see also* MTD 31-32 (citing both cases). In fact, those cases are independently fatal to Plaintiffs' position. In *Ohio Forestry*, the Forest Service had created a land-management plan for a specific forest, but several steps remained before any actual injury would result: "before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental

---

[13] Plaintiffs also overlook the possibility that the APA *itself* might require deviation from the Interim Estimates (*i.e.*, to avoid a finding that agency action is arbitrary and capricious). To be sure, that is unlikely to happen in the short term, because the current view of the Executive Branch is that the Interim Estimates generally reflect the best available science. *See* OIRA Guidance at 2 (explaining why "the 2021 interim estimates . . . will *often* provide the best available method for monetizing the value of increases or decreases in greenhouse gas emissions") (emphasis added). But the APA itself is one of the "applicable statutes," *id.*, which could require agencies to deviate from the Interim Estimates in a given rulemaking. *See* E.O. 13990 §§ 5(b)(ii), 8(b).

review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."

523 U.S. at 734.  As the Supreme Court explained:

> The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain.  Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, *i.e.*, if the Plan plays a causal role with respect to the future, then-imminent, harm from logging.  Hence we do not find a strong reason why the Sierra Club must bring its challenge now in order to get relief.

*Id.*  Simply replace "Plan" with "Executive Order," and "logging" with "agency reliance on the Interim Estimates," and the consequences for this case are obvious.

Justice Thomas's opinion for the Court in *National Park Hospitality Association* is just as clear. There, the National Park Service issued a regulation about concession contracts in national parks. 538 U.S. 803, 806 (2003).  Immediately, "concessioners doing business in the national parks" "brought a facial challenge to the regulation"—in advance of any "concrete dispute about a *particular* concession contract."  *Id.* at 804, 807, 812 (emphasis added). The Court dismissed on ripeness grounds, holding that litigation must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Id.* at 808.  So too here.

**3.**  Plaintiffs continue to assert—without any citation—that they now face an "obligation to employ" the Interim Estimates during "NEPA reviews."  Pls.' Opp'n 15-16 n.3.  Plaintiffs are mistaken.  To be clear: at present, neither the Executive Order nor the Interim Estimates triggers *any* legally binding NEPA-related obligations for federal agencies—let alone for states.  *See* MTD 28, 33. "The Executive Order applies to 'all executive departments and agencies' of the *federal* government, E.O. 13990 § 1"—it does not apply to states.  MTD 28-29, 34-35.  And even as to the federal government, "no decisions have yet been made as to whether (and to what extent) the Executive Order applies *at all* outside the context of agency regulations," making any NEPA consequences entirely speculative.  *Id.* at 29 (citing E.O. 13990 § 5(b)(ii) (the President requesting "recommendations" by September)).  In addition, "NEPA . . . does not require *any* agency to conduct a formal cost-benefit analysis when preparing an analysis of environmental impacts, . . . and federal

agencies frequently do not do so." MTD 29 (citing 42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1502.22 (2020)). That resolves the matter because, "at present, Section 5 of the Executive Order only governs when an agency monetizes the cost of greenhouse-gas emissions in a cost-benefit analysis." *Id.* (citing E.O. 13990 §§ 5(a), (b)(ii)(A); Feb. 2021 TSD at 9). And despite making various standing, ripeness, and merits arguments based on NEPA, tellingly, Plaintiffs do not respond to any of these arguments.[14]

Even if there *were* some binding NEPA-related obligation hidden in the Executive Order or the Interim Estimates, that would be no help to Plaintiffs here. At most, any such obligation would be relevant to a "future lawsuit challenging the use of the Interim Estimates in a specific agency action that triggers NEPA-related requirements"—rather than to *this* lawsuit which challenges only the Executive Order and the Interim Estimates on their face and in their entirety. MTD 29. That is why a court recently dismissed a challenge to new Executive-Branch-wide NEPA regulations, in favor of future litigation in the context of specific agency actions. *See Wild Va. v. Council on Env't Quality*, --- F. Supp. 3d ---, 2021 WL 2521561, at *8 (W.D. Va. June 21, 2021).[15] In sum, Plaintiffs' unsupported assumptions about NEPA cannot solve their ripeness problem—if anything, they exacerbate it, confirming that this suit "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

---

[14] Defendants also cited recent guidance from the Department of the Interior, which states "that the Working Group's social-cost estimates 'can be a useful measure' in some NEPA-related contexts," but does not yet "*mandat[e]* their use by the agency in any context other than rulemaking." MTD 34 n.18 (quoting Dep't of the Interior, Sec'y of the Interior Order No. 3399 (April 16, 2021), *available at* https://perma.cc/78K2-EJMC). That order also explicitly notes that additional guidance is forthcoming on this subject, further undermining Plaintiffs' assumption that there is some fixed and current legal obligation. *See id.* Plaintiffs misinterpret this order as the Secretary of the Interior "direct[ing] her agency to use the SC-GHG in NEPA analysis." Pls.' Opp'n 15, 17, 18-19. But they cannot square their reading with the text of the order, nor the fact that E.O. 13990 itself explicitly contemplates future deliberations on this very subject. *See* E.O. 13990 § 5(b)(ii).

[15] Plaintiffs' attempt to distinguish *Wild Virginia* makes little sense. The fact that that case involved an Executive-Branch-wide "directive from one agency to other agencies" whereas this case involves an Executive-Branch-wide "directive from the President" to agencies is immaterial, Pls.' Opp'n 38 n.16, and Plaintiffs offer no explanation of their contrary view.

C.  **Plaintiffs lack a cause of action.**

    1.    **Plaintiffs do not challenge any final agency action.**

As Defendants have explained, *see* MTD 37-39, Plaintiffs lack an APA cause of action because they do not challenge any "final agency action," *i.e.,* an action that "(1) 'mark[s] the consummation of the agency's decisionmaking process,' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

On the first *Bennett* prong, Plaintiffs' true grievance is not with the Working Group, but with the *future* consummation of *other* actors' decisionmaking processes, in which the Interim Estimates will play just a partial role, if any at all. *See* Pls.' Opp'n 15-16, 40. But when those decisions are final and cause Plaintiffs harm, they can sue. On the second, Plaintiffs argue that the Interim Estimates "bind the entire Executive Branch to a particular numerical measure," and thus "alter the legal regime." Pls.' Opp'n 40. But *Bennett*'s second prong is evaluated "from the regulated parties' perspective," not "from the agency's perspective." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018); *see also Sackett v. EPA*, 566 U.S. 120, 126 (2012) (final agency action where plaintiffs "the Sacketts" faced a new "legal obligation"); *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (agency action not "final" because it "does not itself determine Luminant's rights or obligations"). No matter what E.O. 13990 requires of agencies, it does not impose "direct and appreciable legal consequences" on anyone outside of the Executive Branch. *Bennett*, 520 U.S. at 178.[16]

    2.    **Even if the Interim Estimates are a "final" action, the Working Group is not an "agency" subject to APA litigation.**

To state an APA claim, Plaintiffs must also show that the Working Group is an "agency" within the meaning of 5 U.S.C. § 701(b)(1). *See* MTD 39-42. On this issue, the key question is whether

---

[16] Having failed to allege wrongdoing by any Defendants other than the President and the Working Group, *see* MTD 39, Plaintiffs claim they may still "seek an order enjoining [those Defendants] from carrying out the SC-GHG Estimates" because "the statutes they administer prohibit them from employing the Estimates." Pls.' Opp'n 41 n.17. Whatever its merits, that argument does not even purport to identify any "agency action" by those Defendants, final or otherwise. So, at a minimum, all other Defendants should be dismissed for lack of any final agency action.

the Working Group "wield[s] substantial authority independently of the President." *CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (citation omitted).   It does not.

To establish the Working Group's supposed independence, Plaintiffs assert that it can "bind executive branch agencies." Pls.' Opp'n 42.  They have it backwards: to the extent agencies are bound to use the Interim Estimates, that obligation flows *from the President*, not the Working Group.  *See* E.O. 13990 § 5(b)(ii)(A).   And while Plaintiffs also suggest that the Working Group "can take significant unilateral actions," Pls.' Opp'n 42, any such actions are taken at the direction of the President.  *See* E.O. 13990 § 5(b)(ii), (iii).   All of this explains why, as with the Task Force at issue in *Meyer v. Bush*, "it is rather hard to imagine that . . . any . . . head of a department or agency who reports directly to the President, would acquiesce in" the Working Group's Interim Estimates if they were "thought not to represent directly and precisely the President's opinion."  981 F.2d 1288, 1295 (D.C. Cir. 1993).

At bottom, the Working Group is similarly situated to many other important governmental bodies used by the President to amplify his capacity to oversee the Executive Branch and advance his priorities.  *Compare Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 562 (2d Cir. 2016) ("[E]xecutive orders providing for the NSC to formulate or give policy direction for security programs affecting multiple agencies, or to approve or review such programs' directives or actions, do not reach beyond the NSC's advisory coordinating function."), *with* Pls.' Opp'n 42 (characterizing "this power to issue guidelines to federal agencies" and the possession of "research and investigative functions" as a "hallmark of agency status").   Regardless of the importance of its work, the Working Group is ultimately a mere extension of the President, who may unilaterally revoke its authority (in whole or in part) at any time. *See Promoting Energy Independence and Economic Growth*, E.O. 13783, 82 Fed. Reg. 16093 (Mar. 28, 2017) (disbanding Working Group); E.O. 13990 (reestablishing it).  For this reason, the Working Group, like the President, is not an "agency" subject to APA litigation.

### 3.  Plaintiffs cannot obtain *ultra vires* review as an alternative to proceeding under the APA.

Plaintiffs also seek to avail themselves of a (duplicative) non-statutory *ultra vires* cause of action. As detailed in Defendants' motion to dismiss, *see* MTD 42-44, such claims are subject to an

extraordinarily high bar in the Fifth Circuit: They are only available when (1) "there is a 'plain' violation of an unambiguous and mandatory provision of [a] statute," *and* (2) no statutory cause of action, including that provided in the APA, will ever provide the plaintiff with a "meaningful and adequate opportunity for judicial review of the validity" of the challenged action. *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999); *accord Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (*ultra vires* claims are "essentially a Hail Mary pass" that "rarely succeeds"). Yet Plaintiffs do not even grapple with, much less satisfy, the Fifth Circuit standard. Instead, they vaguely suggest that Section 5 of E.O. 13990 "concerns matters of major national importance." Pls.' Opp'n 43-44. Perhaps. But that is not a basis for *ultra vires* review.

For one thing, Plaintiffs have not alleged that any agency has directly contravened a clear statutory prohibition. Notwithstanding Plaintiffs' assertions that Section 5 of E.O. 13990 "is not authorized by any statute" and conflicts with "several statutes," *id.*, as a general matter, none of the authorities that Plaintiffs invoke prohibit the federal government (or any agency) from estimating the impacts (whether present or future, global or domestic) of greenhouse gas emissions. Moreover, even if some statute were to require agencies to ignore such information in specific regulatory circumstances, *e.g.*, when approving oil and gas leases, *see* Pls.' Opp'n 46-47, the Executive Order would require compliance with that statutory prohibition rather than the Interim Estimates. *See* E.O. 13990 §§ 5(b)(ii), 8; *see also* OIRA Guidance, at 2. And even if (hypothetically) an agency were to err— either by misinterpreting its statutory authority or by mistaking the legal effect of E.O. 13990—that would present only the type of ordinary "question of statutory interpretation that can be meaningfully reviewed under" the APA in a challenge to that specific agency action. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 216 (1994). Thus, Plaintiffs' allegations do not establish the kind of "plain violation of an unambiguous and mandatory provision of [a] statute" that "is of a summa or magna quality" sufficient to invoke *ultra vires* review. *Lundeen v. Mineta*, 291 F.3d 300, 312 (5th Cir. 2002).

Plaintiffs' attempt to invoke an *ultra vires* cause of action faces yet another, equally fatal, problem: the eventual availability of APA review. If an agency relies upon the Executive Order or the Interim Estimates to justify some action that concretely harms Plaintiffs, the APA will provide an

opportunity for "meaningful and adequate" review. *Am. Airlines*, 176 F.3d at 293; *see also Ohio Forestry*, 523 U.S. at 734.[17]  Moreover, though Plaintiffs' assert that "circumstances and history . . . demonstrate that challenges in specific rulemakings will be inadequate," Pls.' Opp'n 44 n.18, that conclusion is belied by past examples of precisely such lawsuits. *See, e.g.*, *Zero Zone*, 832 F.3d at 678.

## II.   PLAINTIFFS' CLAIMS ARE MERITLESS.

### A.   Plaintiffs' statutory claims are meritless.

In their motion, Defendants argued that the APA contrary-to-law claims in Count III fail for the simple reason that the actions that Plaintiffs challenge here—the President's issuance of Section 5 of E.O. 13990 and the Working Group's development of the Interim Estimates—are not prohibited by any of the statutes that Plaintiffs reference.  *See* MTD 46-47.  Plaintiffs respond only with repackaged versions of the allegations of their complaint.  *Compare* Pls.' Opp'n 45-47, *with* Compl. ¶¶ 114-118.  But again, Plaintiffs' arguments rest on cherry-picked legislative statements of purpose, divine legislative prohibitions that are neither expressed nor fairly implied by operative text, and, at times, directly contradict appellate precedent interpreting the statute at issue.  *See* MTD 46-47.

Ultimately, it is unnecessary to parse each statutory provision independently, because Count III fails for a more fundamental reason:  Neither E.O. 13990 nor the Interim Estimates purport to override any legislative limits on the development or use of estimates of the social cost of greenhouse gases.  *See id.* at 45-46.  Through Section 5 of E.O. 13990, the President has appropriately exercised supervisory authority over his own subordinates.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (the President has "general administrative control of those executing the laws"); *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (the President's subordinates "are duty-bound to give effect" to his directions "to the extent allowed by the law").  Recognizing the possibility that a generally applicable directive like Section 5 of E.O. 13990—with

---

[17] Plaintiffs' authorities are not to the contrary.  Several did not even involve *ultra vires* claims. *See Hias, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018); *Associated Builders & Contractors of Se. Tex. v. Rung*, No. 16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016).  Others involved narrow agency actions that bear no resemblance to the broad exercise of presidential supervisory authority challenged here.  *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 388-92 (D. Md. 2011).

numerous possible applications across varied statutory contexts—might conflict with at least some pre-existing, more-granular legal obligations, the President made clear in the text of the Executive Order that any relevant Legislative command must take priority: "Nothing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency." E.O. 13990 § 8(a)(i); *see also id.* §§ 5(b)(ii), 8(b). This is common language, used in many Executive Orders, precisely to avoid any potential conflict with the Legislative Branch or federal law. *See, e.g., Allbaugh*, 295 F.3d at 33. Thus, E.O. 13990, like other executive orders, "recognizes that agencies face various statutory obligations, and it does not—and could not—purport to override those obligations." *California v. Trump*, No. 19-cv-960, 2020 WL 1643858, at *3 (D.D.C. Apr. 2, 2020). The result is clear: "if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33. Thus, the Working Group cannot prevent an agency from carrying out its legal duty, *see* E.O. 13990 § 5(b)(ii), and no agency may presume that it can, *id.* §§ 8(a), (b). *See also* OIRA Guidance at 2. Given these clear, substantive limits on the scope of the Executive Order, the Court may dismiss Count III without assessing the various statutes that Plaintiffs cursorily invoke.

Plaintiffs do not dispute Defendants' interpretation of the Executive Order's unambiguous text—they simply ask the Court to ignore it, repeatedly disparaging these provisions as "boilerplate." Pls.' Opp'n 28, 28 n.10, 36, 44. But there is a reason why certain terms recur—in Executive Orders, much like in contracts, such terms play an important role in ensuring compliance with the law. And the cases that Plaintiffs rely on stand primarily for the uncontroversial proposition that when an agency acts in reliance on an executive order, the legality of that executive order may be reviewed in a challenge to that specific agency action—exactly what Defendants have argued. Thus, in *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), the Ninth Circuit found that the inclusion of an instruction to act "consistent with law" did not preclude judicial review of an executive order's legality where that order's substantive directives required agency action that was unlawful. *Id.* at 1239-40. *Hias, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), was similar: there, an executive order

imposed specific conditions on refugee resettlement that were found to be incompatible with specific text from the Refugee Act, rendering the order's savings clause "purely theoretical." *Id.* at 325.

Plaintiffs' challenge is different. There are indisputably *many* circumstances, including the regulatory-review process under E.O. 12866, in which compliance with the Executive Order would be lawful. Moreover, there are clear and familiar standards for discerning when an agency must deviate from the Interim Estimates: most notably, the same organic statutes that govern virtually *all* agency actions, with which agencies will be most familiar. *See also* OIRA Guidance at 2 (reinforcing agencies' obligations to comply with the APA and other applicable statutes when considering whether or not to employ the Interim Estimates). Thus, in this case, where Plaintiffs challenge only the generic terms of the Executive Order itself, the Court "cannot ignore [the] repeated and unambiguous qualifiers imposing lawfulness . . . constraints" on the Executive Order's implementation. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) (citing *Allbaugh*, 295 F.3d at 33).

**B.     Plaintiffs' ultra vires claims are duplicative and meritless.**

Having failed to allege that any defendant has acted contrary to law, *see supra* at 22-24, Plaintiffs have also necessarily failed to assert the kind of "plain violation of an unambiguous and mandatory provision" required to sustain their Count IV *ultra vires* claim on the merits. *Lundeen*, 291 F.3d at 312.

**C.     Plaintiffs' notice-and-comment claims are meritless.**

Plaintiffs' notice-and-comment claim (Count I) is also subject to dismissal, both because the APA does not govern the Working Group's development of the Interim Estimates, *see supra* at 19-20, and because, even if the APA did apply, Plaintiffs still would not be entitled to relief based on the failure to conduct notice and comment prior to the publication of the Interim Estimates in February.

The Interim Estimates "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted) (quoted in *Texas v. United States*, 809 F.3d at 171 n.123). Thus, they are best characterized as "general statements of policy," 5 U.S.C. § 553(b)(A), which are exempt from notice-and-comment by the text of the APA. Plaintiffs counter only that, in essence, because the Interim Estimates are numerical and are sensitive to specific inputs and judgments, they must be legislative rules subject to notice and

comment.  *See* Pls.' Opp'n 47-48.  But this argument sweeps too broadly:  An agency need not engage in notice-and-comment any time that it deals in numbers.  *See, e.g.,* Hoctor v. USDA, 82 F.3d 165, 171 (7th Cir. 1996) (emphasizing that an agency's use of numbers is less likely to require notice-and-comment procedures when the agency deals in scientific and technical areas).[18]

Moreover, even if notice and comment were required, the failure to do so in early 2021 would not warrant the relief that Plaintiffs seek.  Plaintiffs have had ample opportunity to comment on the Working Group's estimates and methodology; current changes reflect only inflation adjustments; and Plaintiffs will have more such opportunities in the future.[19]  So Plaintiffs cannot meet their burden to show prejudice.[20]  *See supra* at 15-16 (concerning future opportunities to comment); 5 U.S.C. § 706.

### D.   Any remaining claims against the Defendants other than the President or the Working Group should be dismissed for failure to state a claim.

As Defendants argued in their motion to dismiss, *see* MTD 50, all Defendants other than the President or the Working Group should be dismissed for the simple reason that Plaintiffs have alleged no wrongdoing specific to them.  "Where a plaintiff fails to make allegations directed at a defendant, the plaintiff has not presented a plausible cause of action against the defendant."  *Barbero v. Reg'l Recovery Servs., Inc.,* No. 17-cv-03379, 2018 WL 3150681, at *2 (W.D. Mo. June 27, 2018).  That alone warrants dismissal of all Defendants other than the President and the Working Group.

### CONCLUSION

For these reasons, all of Plaintiffs' claims should be dismissed.

---

[18] Nor, contrary to Plaintiffs' contentions, Pls.' Opp'n 48 n.20, is the APA a one-way ratchet; though the Interim Estimates, like OMB Circular A-4, have previously been through notice-and-comment, the previous use of such procedures does not transform a general statement of policy into a legislative rule.  *See* Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 101 (2015).  And, regardless, as explained above, it is simply untrue that the Interim Estimates "effectively repeal," Pls.' Opp'n 48 n.20, any part of OMB Circular A-4, or prior NEPA regulations.  *See supra* at 9-10, 17-18.

[19] Plaintiffs assert that "the 2021 Estimates have never been subject to public comment, and never will be absent an order from this Court." Pls.' Opp'n 48.  As they know, that is incorrect: a public comment period concluded on June 21, 2021, in which the Attorney General of Louisiana signed and submitted a lengthy comment.  *See* Louisiana Comment, https://perma.cc/32BJ-4GHL.

[20] Plaintiffs incorrectly state that Defendants bear a "heavy burden" of showing harmless error. Pls.' Opp'n 48.  In fact, "[t]he burden to demonstrate prejudicial error is on the party challenging agency action."  *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1121 (D.C. Cir. 2010).

Dated: August 23, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER C. VAN HOOK
Acting United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

/s/  *Stephen M. Pezzi*
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Email: cody.t.knapp@usdoj.gov

*Attorneys for Defendants*