# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

|  |  |
|---|---|
| THE STATE OF LOUISIANA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 2:21-cv-01074-JDC-KK |

## DEFENDANTS' SUPPLEMENTAL BRIEF

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRANDON BONAPARTE BROWN
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

ARGUMENT........................................................................................................3

   I.    Agency Use of the Interim Estimates...................................................3

   II.   The President's Authority to Issue Executive Order 13990 .........................16

   III.  The Current Status of the Interim Estimates..................................................23

CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) ........................................................................... 19, 20

*Am. Radio Ass'n v. Mobile S.S. Ass'n,*
    483 F.2d 1 (5th Cir. 1973) .............................................................................. 3

*Biden v. Missouri,*
    ---S.Ct.---- 2022 WL 120950 (Jan. 13, 2022) ............................................. 20

*Bldg. & Const. Trades Dep't v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) .................................................................. 17, 18

*California v. Texas,*
    141 S. Ct. 2104 (2021) .................................................................................... 1

*California v. Trump,* --- F. Supp. 3d ----, 2020 WL 1643858, at *8 (D.D.C. Apr. 2,
2020)................................................................................................................. 7

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398, 409 (2013) ............................................................................... 3

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) ...................................................................... 21

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ...................................................................................... 20

*Fed. Forest Res. Coal. v. Vilsack,*
    100 F. Supp. 3d 21 (D.D.C. 2015) ................................................................ 14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ...................................................................................... 17

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    920 F.3d 1 (D.C. Cir. 2019) *cert. denied*, 140 S. Ct. 789 (2020)................... 22

*Helicopter Ass'n Int'l, Inc. v. FAA,*
    722 F.3d 430 (D.C. Cir. 2013).......................................................................... 6

*Landis v. N. Am. Co.,*
    299 U.S. 248 (1936) ...................................................................................... 25

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................3, 11

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
   *512 U.S.* 218 (1994) ........................................................................................20

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ...............................................................19, 21

*Michigan v. EPA,*
   576 U.S. 743 (2015) ........................................................................................22

*Missouri v. Biden,*
--- F. Supp. 3d ----, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021*)*
 *appeal filed,* 2021 WL 3885590 (8th Cir. 2021) ................................................*passim*

*National Park Hospitality Association v. U.S. Department of the Interior,*
   538 U.S. 803 (2003) ...................................................................................14, 15

*Nat'l Fed. Of Indep. Business v. OSHA,*
   ---S. Ct.----, 2022 WL 120952 (Jan. 13, 2022) .................................19, 20, 22

*Ohio Forestry Association v. Sierra Club,*
   523 U.S. 726 (1998) ....................................................................................14,15

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183  2020) ........................................................................17, 22

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ......................................................................18

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ..........................................................................................13

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ................................................................................3, 13,14

*Tex. All. for Retired Ams. v. Hughs,*
   976 F.3d 564 (5th Cir. 2020)............................................................................3

*Tex. Democratic Party v. Abbott,*
   978 F.3d 168 (5th Cir. 2020)........................................................................3, 4

*Utility Air Regul. Grp. v.EPA,*
   573 U.S. 302 (2014) .....................................................................................5, 20

*Wild Va. v. Council on Env't Quality,*
  --- F. Supp. 3d ---, 2021 WL 2521561 (W.D. Va. June 21, 2021) ............................ 13

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................................. 3

*Zero Zone, Inc. v. U.S.Dep't of Energy,*
  832 F.3d 654 (7th Cir. 2016) ............................................................................ 21

**<u>Statutes</u>**

42 U.S.C. § 4321 ................................................................................................ 12

42 U.S.C. § 7410 ................................................................................................. 6

42 U.S.C. § 7675 ............................................................................................ 4, 5

American Innovation and Manufacturing Act of 2020,
  Pub. L. No. 116-260 134 Stat. 1182 ................................................................ 4

<u>Regulations</u>

40 C.F.R. § 1502.22 ............................................................................................ 12

E.O. 12291, *Federal Regulation*, 46 Fed. Reg. 13,193 (Feb. 17, 1981) ................ 17, 21

E.O. 12866, *Regulatory Planning and Review,*
  *58 Fed. Reg. 51735 (Sept. 30, 1993)* .......................................................... *6, 17*

E.O. 13422, *Further Amendment to Executive Order 12866 on
Regulatory Planning and Review*, 72 Fed. Reg. 2,763 (Jan. 18, 2007) ................ 17, 21

E.O. 13563, *Improving Regulation and Regulatory Review*,
76 Fed. Reg. 3,821 (Jan. 18, 2011) .................................................................. 17, 21

E.O. 13771, *Reducing Regulation and Controlling Regulatory Costs*,
 82 Fed. Reg. 9,229 (Jan. 30, 2017) ................................................................. 17, 21

E.O. 13783, *Promoting Energy Independence and Economic Growth*,
82 Fed. Reg. 16,093 (Mar. 28, 2017) ............................................................... 17, 21

E.O 13990, *Protecting Public Health and the Environment and
  Restoring Science To Tackle the Climate Crisis,*
  86 Fed. Reg. 7037 (Jan. 20, 2021) .......................................................*passim*

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150 (May 19, 2021) .......................................................................... 4, 9

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021) .................................................................... 5

*Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS*, 86 Fed. Reg. 23,054 (Apr. 30, 2021) ....................................................... 6 ,7

*Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards,* 86 Fed. Reg. 43,726 (Aug. 10, 2021) ...................................................... 9

Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74434 (Dec. 30, 2021) .................................................... 9

## Other Authorities

EPA, *Revised Cross-State Air Pollution Rule Update – Response to Comment* (Apr. 29, 2021)
https://perma.cc/RGW8-G2DT .................................................................. 6

OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs)*, (June 3, 2021),
https://perma.cc/V495-HK8L ...................................................... 18

11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed.) .................................................................... 8

Comment at 17, Attorney General of Missouri (Sept. 28, 2021), Docket No. EPA-HQ-OAR-2021-0208-0116, https://perma.cc/9M94-HE8J 9

EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Regulatory Impact Analysis* (Dec. 2021), https://perma.cc/9LWV-JEF9..9

EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Response to Comments* (Dec. 2021), https://perma.cc/RX8S-FFPJ ......... 9

## Constitution

U.S. Const. Art. II, § 1. .................................................................... 19

# INTRODUCTION

Exactly one year ago yesterday, the President of the United States issued Executive Order 13990.   *See* ECF No. 31-2, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021).   Plaintiffs filed suit several months later, attacking the Executive Order based on an asserted concern that it would help to usher in future regulatory actions that, in turn, may "fundamentally transform[] the way States conduct business and Americans live."  Compl. ¶ 6, ECF No. 1.

But the case-or-controversy requirement of Article III of the United States Constitution requires far more than hyperbolic speculation about potential downstream agency actions that might harm Plaintiffs in the future—actions that can themselves be subject to judicial review at the appropriate time.  Instead, Plaintiffs must demonstrate an actual or imminent "personal injury fairly traceable to" the challenged action immediately at hand "and likely to be redressed by the requested relief," *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citation omitted)— to say nothing of the even higher burden to obtain the extraordinary remedy of a preliminary injunction.  But, certainly by now, a year and a day into the "fundamental[] transform[ation]" that Plaintiffs predicted, if Plaintiffs were right about the legal effect and scope of this Executive Order, there should be abundant evidence of the injury that Plaintiffs feared.

There is not.  Plaintiffs have failed to identify any actual or imminent harm they have suffered as a result of the Executive Order, which (contrary to Plaintiffs'

assumptions) serves only a limited purpose within the broader federal regulatory landscape. That is why this Court is correct to be "concern[ed] regarding the Plaintiff States allegation of a concrete injury." Order, ECF No. 82.

The Court ordered supplemental briefing on three issues: (1) "evidence of agency use of the interim estimates as well as specific evidence of the interim estimates actually being utilized"; (2) "the President's authority to issue Executive Order 13990 including the Major Questions Doctrine"; and (3) "the current status of the final estimates ordered by President Biden to be issued in January 2022 and the proposed date the final estimates will be finalized." Order, ECF No. 82.

In response, Defendants respectfully submit that (1) Plaintiffs' alleged examples—some actual, some hypothetical—of agencies making reference to the Interim Estimates cannot support standing to challenge the facial validity of the Executive Order; (2) the President had ample constitutional authority to issue the Executive Order (a question that does not implicate the Major Questions Doctrine); and (3) the forthcoming publication of Final Estimates means that this dispute about the Interim Estimates may soon be overtaken by events.

Accordingly, just as in *Missouri v. Biden*, --- F. Supp. 3d ----, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021), *appeal filed*, No. 21-3013 (8th Cir.)—a parallel case brought by another group of states challenging the same Executive Order, asserting the same speculative theories of injury—Defendants' motion to dismiss should be granted, and Plaintiffs' motion for a preliminary injunction should be denied.

## ARGUMENT

### I.    Agency Use of the Interim Estimates

**a.**  In previous briefs, Defendants have explained that Plaintiffs have not alleged (much less shown) any "certainly impending" future injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted), from a "concrete application" of the Executive Order and the Interim Estimates in a "particular" agency action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-95 (2009).

Even if Plaintiffs had alleged a basis for standing sufficient to survive dismissal, however, that would not meet the far higher bar for justifying the "extraordinary remedy" of a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "In the preliminary-injunction context, plaintiffs must make a 'clear showing' of standing" to obtain relief. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021); *see Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 567 n.1 (5th Cir. 2020) (contrasting the ordinary showing of standing required "to overcome a motion to dismiss" with the "'clear showing' of standing required to maintain a preliminary injunction").  Plaintiffs cannot merely allege Article III injury; it is their burden to affirmatively *show* it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  And Plaintiffs must also show that such an injury is *irreparable*—that is, that they need immediate relief *now*, lest they be unable to ever obtain meaningful judicial relief in the future. *See, e.g.*, *Am. Radio Ass'n v. Mobile S.S. Ass'n*, 483 F.2d 1, 5 (5th Cir. 1973).

**b.** Plaintiffs have not carried their burden—neither to survive a motion to dismiss, nor to obtain a preliminary injunction. As the Court's order for Plaintiffs to identify "specific evidence of the interim estimates actually being utilized" suggests, Order, ECF No. 82, their prior briefing offered very little in the way of "specific evidence" of injury—and certainly not a "clear showing." *Abbott*, 978 F.3d at 178.[1]

**1.** First, Plaintiffs asserted that "EPA has explicitly relied upon the SC-GHG Estimates in formulating a 'Social Cost of Hydrofluorocarbons,'" in connection with a proposed rule about reducing their production. Pls.' MTD Opp'n, ECF No. 48, at 12-13 (citing *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150 (May 19, 2021)). In fact, EPA did not "rel[y] upon" the Interim Estimates in that proposal, *id.*, and the proposed rule offered no suggestion that E.O. 13990 in any way mandated, justified, or motivated it. To the contrary, the proposed rule explained that it would implement an explicit *congressional* command in the American Innovation and Manufacturing Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182 (codified at 42 U.S.C. § 7675), which "directs EPA to address HFCs by providing new authorities" to "phase down the production and consumption of listed HFCs" on a "schedule prescribed by Congress." 86 Fed. Reg. at 27,153, 27,159.

---

[1] Because Plaintiffs alone bear the burden of invoking this Court's jurisdiction, *Clapper*, 568 U.S. at 411-12, and because the parties are filing their supplemental briefs concurrently, this brief is necessarily limited to addressing the evidence that Plaintiffs put before the Court in their prior briefs. If Plaintiffs identify any new evidence for the first time in their supplemental brief, however, Defendants reserve the right to seek leave to file a short response, if appropriate.

Even if that Rule *had* used the Interim Estimates, and even if Plaintiffs could demonstrate some concrete harm as a result (which they have not done with respect to either the proposed rule or the final rule, *see* 86 Fed. Reg. 55,116 (Oct. 5, 2021)), the appropriate process would have been to comment on the proposed rule and, if dissatisfied with the agency's response, to challenge the final rule directly, in the time and place provided by Congress. That would not be this Court, however—Congress requires such challenges to be filed directly in the D.C. Circuit, "within sixty days" of publication. *See* 42 U.S.C. §§ 7607(b)(1), 7675(k)(1)(C). That time has now expired. Plaintiffs did not challenge the rule.

**2.** Second, Plaintiffs have repeatedly referenced so-called "cooperative-federalism" programs, and in particular assert (without citation) that the EPA's National Ambient Air Quality Standards (NAAQS) "are now required to be set based on the IWG's SC-GHG Estimates"—which means, Plaintiffs say, that "States must employ the Estimates or their state implementation plans (SIP) will be disapproved." Pls.' MTD Opp'n at 15; *see also* Pls.' PI Br. at 44, ECF No. 63. Even if that were correct, at most, it could support standing to challenge the denial of a particular state plan, or perhaps even EPA's setting of NAAQS generally. But it is *not* correct—there are no NAAQS for greenhouse gases, *see Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014) (listing the "six pollutants" for which "EPA has issued NAAQS").

Plaintiffs have also argued that "EPA has already published a final rule relying on the Biden SC-GHG Estimates to impose NAAQS good neighbor [plans] on several Plaintiff States including Louisiana and Kentucky." Pls.' PI Br. 44 (citing *Revised*

*Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS*, 86 Fed. Reg. 23,054 (Apr. 30, 2021) ("Revised CSAPR Update"). That assertion is belied by the record. EPA established new nitrogen oxide emission budgets for power plants in twelve states under the "good neighbor" provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I). But the basis for that action had nothing to do with the Interim Estimates. *See* 86 Fed. Reg. at 23,086-87 (explaining EPA's multi-factor approach).

To be sure, accompanying the Revised CSAPR Update, EPA also conducted a cost-benefit analysis in order to comply with the longstanding, unchallenged, and undisputedly non-enforceable[2] intra-Executive Branch requirements imposed by a separate Executive Order dating back to the 1990s (E.O. 12866), and it used the Interim Estimates as one input in that analysis. *See* 86 Fed. Reg. at 23,150-55. But as for the actual justification for its action, EPA could not have been clearer: "[i]nformation from the [Working Group] used to estimate climate benefits is not relied upon as part of the record basis for this rulemaking." EPA, *Revised Cross-State Air Pollution Rule Update – Response to Comment* (Apr. 29, 2021) at 546, https://perma.cc/RGW8-G2DT.

---

[2] Defendants have explained in prior briefs that "[o]ften, agencies prepare a cost-benefit analysis solely as part of the Regulatory Impact Analysis required by E.O. 12866—*not* because it is required by statute, and not because that cost-benefit analysis will be relied upon as justification for the agency rule." Defs.' Mot. to Dismiss ("MTD"), ECF No. 31, at 19; *see also* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (Defs.' PI Opp'n"), ECF No. 68, at 20 n.6. Plaintiffs have never disputed that in that scenario—in which "the Interim Estimates will have made no substantive difference to the outcome," *id.*—the agency's cost-benefit analysis would generally not be subject to judicial review. Nor could they. *See, e.g.*, *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013).

Plaintiffs likewise have cited no SIP submission that relied upon the Interim Estimates, let alone one that EPA has disapproved (or even proposed to disapprove) based on a State's failure to do so.  And the Federal Implementation Plans that Plaintiffs have cited (for Louisiana and Kentucky) were based on the same air-quality and emissions-control analysis applied to other states—none of which relied on the Interim Estimates.  *See, e.g.*, 86 Fed. Reg. at 23,085-86.  As for Texas, EPA did not even *issue* any new or revised plan in the Revised CSAPR Update—instead, EPA included Texas on a list of states for which a prior rule already "satisf[ied] their good neighbor obligations."  *Id.* at 23,057.

In sum, Plaintiffs have not identified any example of the Interim Estimates providing a basis for EPA's disapproval of state plans (or the promulgation of federal plans) under the Clean Air Act.  Plaintiffs cannot base their standing (let alone irreparable harm) on passing references to the Interim Estimates that were irrelevant to the substance of the agency's decision.  Such arguments would not even support standing to challenge those specific agency actions—let alone standing for this lawsuit, which broadly challenges the Executive Order and the Interim Estimates on their face and in their entirety.  *See, e.g.*, *California v. Trump*, --- F. Supp. 3d ----, 2020 WL 1643858, at *8 (D.D.C. Apr. 2, 2020) (no standing to challenge Executive Order because "Plaintiffs cannot show that any material delay in action or any agency action was caused by the Executive Order").

Ironically, both the Revised CSAPR Update and the hydrofluorocarbons rule that Plaintiffs complain of in their briefs (but do not actually challenge in their

complaint) are currently the subject of separate litigation.  *See Midwest Ozone Grp. v. EPA*, No. 21-1146 (D.C. Cir.); *Heating, Air-Conditioning & Refrigeration Dists., Int'l v. EPA*, No. 21-1251 (D.C. Cir.) (and consolidated cases).  But none of these plaintiffs challenged those actions through the process made available by the Clean Air Act, 42 U.S.C. § 7607(b)(1),  which, among other things, channels such lawsuits directly to the courts of appeals.  So Plaintiffs' allegations concerning Clean Air Act rules cannot support standing here—and certainly not irreparable harm, given the availability of other remedies.  *See* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed.) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of . . . other relief.").

3.    Finally, Plaintiffs also cite a recent "Notice of Intent to Prepare a Supplemental Environmental Impact Statement" (SEIS) for a natural gas project in Alaska as a purported example of the Department of Energy (DOE) having "applied the Estimates and IWG's methodology" to "delay" regulatory action that Plaintiffs favor.  Pls.' MTD Opp'n at 27, 29 n.11 (citing 86 Fed. Reg. at 35,280).  Yet the notice does not reference the Interim Estimates or Section 5 of E.O. 13990.  Indeed, it simply announces the start of a process that will include an opportunity for public comment on a draft SEIS before a final SEIS is issued.  Accordingly, the Department of Energy has not yet "applied" the Interim Estimates as part of that process, may never do so, and any challenge to that process is plainly unripe.  In any event, *these* Plaintiffs also

straightforwardly lack standing to challenge natural gas regulation in Alaska. Alaska is not a plaintiff here.

**4.** To further illustrate why Plaintiffs' one-size-fits-all challenge to Executive Order 13990 is inappropriate, consider one additional example. Last summer, EPA published a notice of proposed rulemaking regarding emissions standards for passenger cars and light trucks. *See* 86 Fed. Reg. 43726 (Aug. 10, 2021). The agency received 187,860 comments, including one from a group of states, which advocated for the policies of "the previous administration," and against reliance on the Interim Estimates.[3] On December 30, 2021, EPA published the final rule, *see* 86 Fed. Reg. 74434 (Dec. 30, 2021), along with a Regulatory Impact Analysis (which included cost-benefit analyses),[4] and a lengthy "Response to Comments" document.[5]

EPA explained that it "is not required to conduct formal cost benefit analysis to determine the appropriate standard under Section 202" of the Clean Air Act, and that "analysis of monetized GHG benefits was not material" to its decision. Response to Comments at 14-105. Nevertheless, because "EO 12866 requires EPA to perform a cost-benefit analysis" for internal Executive Branch purposes, it did so. *Id.*; *accord* 86 Fed. Reg. at 74498.

---

[3] *See* Comment at 17, Attorney General of Missouri (Sept. 28, 2021), Docket No. EPA-HQ-OAR-2021-0208-0116, https://perma.cc/9M94-HE8J.

[4] EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Regulatory Impact Analysis* (Dec. 2021), https://perma.cc/9LWV-JEF9.

[5] EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Response to Comments* (Dec. 2021), https://perma.cc/RX8S-FFPJ.

In performing that analysis, EPA explained its independent determination that the Interim Estimates "are the best currently available SC-GHG estimates." Response to Comments at 14-105.   Nevertheless, EPA agreed to "also assess[] an estimate of benefits from climate impacts within U.S borders based on SC-GHG estimates used in regulatory analysis under revoked E.O. 13783," *id.*—that is, using the methodology from the previous administration, which these Plaintiffs seek to restore.  But that methodological alternative made no difference to the bottom-line result: "regardless of the method used in quantifying the benefits of GHG reductions for purposes of this rulemaking, EPA would still adopt the standards of this final rule pursuant to its statutory obligation to set standards for pollutants that contribute to air pollution that endangers public health and welfare."  *Id.*   In other words, "the decisions reached and standards put in place do not depend on the 2021 SC-GHG interim estimates."  *Id.*

This example (and those above) show two things: (1) agencies, as contemplated by guidance on E.O. 13990 from the Office of Information and Regulatory Affairs (OIRA), ECF No. 31-5, are independently considering and responding to comments about the Interim Estimates to facilitate judicial review on a case-by-case basis, consistent with the Administrative Procedure Act; and (2) often, the Interim Estimates will have no impact on the agency's ultimate policy decision. *See, e.g.*, MTD at 19-21 (Plaintiffs lack standing because "it is unknowable in advance whether any harm caused by future (hypothetical) regulations would have any causal connection to the Executive Order or the Interim Estimates").   In any event, to the extent

10

Plaintiffs (or others) have suffered some concrete injury from this rule, they can challenge it in the normal course. Plaintiffs' lawsuit is thus not only inconsistent with Article III, it is unnecessary to protect against their alleged harms.

**c.** For confirmation of the lack of concrete evidence (or even allegations) demonstrating actual harm from application of the Interim Estimates, the Court need look no further than Plaintiffs' counsel's own statements. At argument, when the Court pressed Plaintiffs' counsel to identify a single example of actual injury to the State of Louisiana caused by use of the Interim Estimates, Plaintiffs' counsel from the Louisiana Solicitor General's office was unable to provide one:

> THE COURT: Do you know of an instance where this has been used? . . . Do you have a specific example here in Louisiana where maybe some -- where this has already happened, where it's kind of impacted the State or impacted a project in the State that economically has damaged the State in some way?
>
> MR. ST. JOHN: I don't have visibility into Louisiana. . . .

Dec. 7, 2021 Hr'g Tr., ECF No. 86, at 52:15-24. Unable to identify actual examples, Plaintiffs then offered various *hypothetical* injuries. But under well-settled Supreme Court precedent, a hypothetical is never enough for Article III standing (let alone a preliminary injunction)—it is Plaintiffs' burden to show an injury that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560.

In any event, even on their own terms, Plaintiffs' hypotheticals miss the mark. For example, as part of a colloquy about the possibility of "a new I-10 bridge over the river," Hr'g Tr. at 27:16-17, Plaintiffs' counsel told the Court that "[y]ou'll have a NEPA analysis," *id.* at 20-21, and that as part of that analysis, "[w]hether the project

11

goes forward will depend on the cost benefit analysis," *id.* at 28:9-10.   But even if that hypothetical were accurate, it would be for reasons that have nothing to do with Executive Order 13990.   Importantly, NEPA does not require agencies to conduct a formal cost-benefit analysis when preparing an analysis of environmental impacts, and federal agencies frequently do not do so.   *See, e.g.*, 42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1502.22 (2020).   That resolves the matter, because Section 5 of the Executive Order only speaks directly to how agencies "determine the social benefits of reducing greenhouse gas emissions *when conducting cost-benefit analyses*[.]" E.O. 13990 § 5(a) (emphasis added); *see also id.* § (b)(ii)(A); Feb. 2021 TSD, ECF No. 31-4, at 9.

More generally, neither the Executive Order nor the Interim Estimates triggers *any* legally binding obligations under NEPA for federal agencies—let alone for states.   The Executive Order applies to "all executive departments and agencies" of the federal government, E.O. 13990 § 1—it does not apply to state governments at all.   And even as to the federal government, no final decisions have yet been made as to whether (and to what extent) the Interim Estimates apply *at all* outside the context of issuing agency regulations, making any NEPA-related consequences entirely speculative.   *See* E.O. 13990 § 5(b)(ii)(C) (the President requesting "recommendations" on this subject); *see also infra* at 24-25 (discussing the current status of those recommendations).

In any event, even if there were some binding NEPA-related obligation hidden here, that would be no help to Plaintiffs.   At most, that might be relevant to a future, narrower lawsuit challenging the use of the Interim Estimates in a specific agency

action that triggers NEPA-related requirements—rather than to this lawsuit, which challenges only the Executive Order and the Interim Estimates, on their face and in their entirety.  That is why a court last summer dismissed a challenge to new Executive Branch-wide NEPA regulations for lack of standing and ripeness, in favor of future litigation in the context of specific agency actions.  *See Wild Va. v. Council on Env't Quality*, --- F. Supp. 3d ---, 2021 WL 2521561, at *8 (W.D. Va. June 21, 2021). And it is why virtually identical allegations concerning NEPA were insufficient to establish standing and ripeness in *Missouri v. Biden*, 2021 WL 3885590, at *8, *13— the case directly paralleling this one in which the district court, after thorough consideration, dismissed another group of States' challenge to the Executive Order and Interim Estimates for lack of a sufficient Article III controversy.

**d.**  Most of Plaintiffs' arguments in this case have rested on the assumption that it is enough to predict that, at some point, some federal agency will inevitably issue some rule that relies in some way on the Interim Estimates.  *See, e.g.*, Pls.' MTD Opp'n at 27 (predicting generally that "the Executive Branch will employ the SC-GHG Estimates in a way that injures Plaintiffs").  Again, that approach is at odds with binding precedent: "allegations of future injury" must "be particular and concrete."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998).

In any event, to the extent Plaintiffs continue to rely on this prediction-based theory of standing, it is foreclosed by (among other cases) *Summers v. Earth Island Institute*, 555 U.S. 488, 490 (2009).  There was little doubt in *Summers* that, at some point in the future, at least once, the Forest Service would make use of the challenged

13

"regulations that exempt[ed] small . . . timber-salvage projects from the notice, comment, and appeal process used by the [agency] for more significant" actions. Nonetheless, the Supreme Court granted certiorari to "determine whether respondents ha[d] standing to challenge the regulations in the absence of a live dispute over a concrete application of those regulations." *Id.*

The answer was no: "the plaintiffs lacked standing because they had failed 'to allege that any *particular* timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete' interest of the plaintiffs in the national forests." *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 43 (D.D.C. 2015) (quoting *Summers*, 555 U.S. at 495) (emphasis altered). Plaintiffs have (at least) the same problem here—"in the absence of a live dispute over a concrete application" of the Interim Estimates in a *particular* agency action that causes them harm, *Summers*, 555 U.S. at 490, Plaintiffs cannot show standing.

Two more Supreme Court decisions that address a similar problem through the lens of ripeness—*Ohio Forestry Association v. Sierra Club*, 523 U.S. 726 (1998), and *National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803 (2003)—are also independently fatal to Plaintiffs' reliance on the mere expectation that future agency actions will be taken in connection with the Executive Order.

In *Ohio Forestry*, the Forest Service had created a land-management plan for a specific forest, but several steps remained before any actual injury would result: "before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the

14

public an opportunity to be heard, and (if challenged) justify the proposal in court."

523 U.S. at 734.  That meant that the claims before the Court were premature:

> The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain.  Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, *i.e.*, if the Plan plays a causal role with respect to the future, then-imminent, harm from logging.  Hence we do not find a strong reason why the Sierra Club must bring its challenge now in order to get relief.

*Id.*  The parallels to this case are clear—Plaintiffs can (and therefore, must) challenge any future agency action that harms them, if any, when that harm is actually imminent.  That "later challenge might also include a challenge to the lawfulness of the" Executive Order itself, "if (but only if)" the Executive Order "then matters"—that is, if it "plays a causal role with respect to the future, then-imminent, harm."  *Id.*

Justice Thomas's opinion for the Court in *National Park Hospitality Association* is just as clear.  There, the National Park Service issued a regulation about concession contracts in national parks. 538 U.S. 803, 806 (2003).  Immediately, "concessioners doing business in the national parks" "brought a facial challenge to the regulation"—in advance of any "concrete dispute about a *particular* concession contract."  *Id.* at 804, 807, 812 (emphasis added).  The Court dismissed on ripeness grounds, holding that litigation must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Id.* at 808.  So too here.

\*       \*       \*

In sum, as another district court recently explained in addressing nearly identical arguments, "[t]here is simply no way to predict how the Interim Estimates will affect an agency's analysis, if at all, without resorting to sheer speculation." *Missouri*, 2021 WL 3885590 at \*9. And "[t]he Court cannot meaningfully engage with Plaintiffs' arguments *en masse*, divorced from the context of particular agencies operating under specific statutory delegations of authority." *Id.* at \*13 (citation omitted). Thus, just as in *Missouri*, this Court should dismiss this entire case for lack of jurisdiction, and then deny Plaintiffs' motion for a preliminary injunction as moot.

## II.   The President's Authority to Issue Executive Order 13990

The Court also ordered further briefing on "the President's authority to issue Executive Order 13990" and, more specifically, on the relevance of the "Major Questions Doctrine" to the President's authority.   In response, Defendants respectfully submit that (1) the President issued the Executive Order pursuant to ample constitutional authority, and (2) the major questions doctrine is not implicated in this case because (among other reasons) the doctrine does not apply to exercises of constitutional—as opposed to statutory—authority.

**1.** The President's authority to issue Section 5 of E.O. 13990 is rooted in the Constitution, which, irrespective of any statutory delegation by Congress, confers on the President the power and the duty to supervise and control his subordinates. *See, e.g.*, Defs.' MTD 45-46; Defs.' MTD Reply 22-24; Defs.' PI Opp'n 44-45.   Article II provides that the "executive Power shall be vested in a President of the United States

of America." U.S. Const. Art. II, § 1. That "entire 'executive Power' belongs to the President alone." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).

With the "executive Power" comes "the general administrative control of those executing the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (citation omitted). Controlling subordinates as they implement the laws and make policy decisions is an "active obligation," intended by the Framers to ensure the political accountability of the Executive Branch. *Id.* at 496 (cleaned up). Thus, the "faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates," irrespective of the authority that may be delegated to the Executive Branch from Congress. *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002).

Executive Order 13990 is a routine exercise of this traditional presidential control over subordinates, consistent with prior Executive Orders dating back many decades. As part of supervising their subordinates' actions, all recent presidents have required agencies to prepare cost-benefit analyses of certain proposals as a way of enhancing the rationality and transparency of agency decisions.[6] Through E.O.

---

[6] *See, e.g.*, E.O. 12291, *Federal Regulation*, 46 Fed. Reg. 13,193 (Feb. 17, 1981); E.O. 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Sept. 30, 1993); E.O. 13422, *Further Amendment to Executive Order 12866 on Regulatory Planning and Review*, 72 Fed. Reg. 2,763 (Jan. 18, 2007); E.O. 13563, *Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3,821 (Jan. 18, 2011); E.O. 13771, *Reducing Regulation and Controlling Regulatory Costs*, 82 Fed. Reg. 9,229 (Jan. 30, 2017); E.O. No. 13783, *Promoting Energy Independence and Economic Growth*, 82 Fed. Reg. 16,093 (Mar. 28, 2017); E.O. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7,037 (Jan. 20, 2021).

13990, this President determined that "[a]n accurate social cost [estimate] is essential . . . when conducting cost-benefit analyses of regulatory and other actions." E.O. 13990 § 5(a). To that end, he directed the Working Group to develop a uniform approach and instructed agencies, where appropriate, to employ the Interim Estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions." *Id.* § 5(b)(2)(A). As a result, where Congress has authorized a federal agency to act in ways that may affect greenhouse-gas emissions, they may, when appropriate, use the Interim Estimates to assess the consequences of proposed actions.

To be sure, because Congress may have foreclosed his preferred approach in particular statutory contexts, the President was also careful to note that any contrary Legislative directive must always take precedence: "Nothing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." *Id.* § 8(a)(i); *see also id.* §§ 5(b)(ii), 8(b) ("This order shall be implemented in a manner consistent with applicable law"); ECF No. 31-5, OIRA, *Social Cost of Greenhouse Gas Emissions: Frequently Asked Questions (FAQs),* (June 3, 2021), https://perma.cc/V495-HK8L. Thus, the issuance of E.O. 13990 falls squarely within the President's authority—and duty—to "supervise and guide" agencies "in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Allbaugh*, 295 F.3d at 32 (quoting *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981)).

**2.**  Because Article II supplies all the authority needed to issue E.O. 13990, the major questions doctrine has no bearing on the President's authority to issue E.O. 13990.   That doctrine embodies a principle of statutory construction: that Courts might expect Congress to "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*) (cleaned up).  Thus, in a challenge to agency action that qualifies as an exercise of such power, one relevant question may be whether the statute invoked by the agency "plainly authorizes" its action.  *Nat'l Fed. of Indep. Bus. v. OSHA*, --- S. Ct. ---, 2022 WL 120952, at *3 (Jan. 13, 2022) ("*NFIB*"). This question may arise because "[a]dministrative agencies are creatures of statute," and "possess only the authority that Congress has provided."  *Id.*

But the President of the United States is *not* a creature of statute.  *See* U.S. Const. Art. II, § 1.  Moreover, E.O. 13990 does not require agencies to issue any particular regulations (or exercise their authority to do anything), but instead "merely prescribes standards and procedures governing the conduct of federal agencies . . . when monetizing the value of changes in greenhouse gas emissions" in cost-benefit analyses that the agency is otherwise planning to undertake consistent with longstanding Executive Branch practice.  *Missouri*, 2021 WL 3885590 at *8. That is an exercise of Article II authority to manage internal Executive Branch procedures; no specific authorization from Congress is required.  *Cf. Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any

private rights—is not, for instance, subject to judicial review." (citation omitted)). And the major questions doctrine has no application in assessing the scope of this constitutional—as opposed to statutory—authority.[7]

That is not to say that the major questions doctrine has no applications at all. When an agency has claimed "unheralded" and "extravagant statutory power" to make "decisions of vast 'economic and political significance,'" the Supreme Court has sometimes concluded that ambiguous statutory text was insufficient to confer that power. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).  But here, no particular agency decision or claim of statutory power is before the Court.  Accordingly, the major questions doctrine has no application in this case.

**3.**  Even if the major questions doctrine could somehow be relevant to the President's *constitutional* authority, the key grounds for invoking the doctrine—*e.g.*, a dramatic exercise, pursuant to an ambiguous authorizing text, of previously unimagined authority—are absent here.  There is nothing novel or dramatic about presidential supervision of agency assessments of the costs and benefits of agency

---

[7] Every case in which the Supreme Court has applied the major questions doctrine involved an agency's allegedly novel application of existing authority under a particular statutory scheme.  *See, e.g.*, *NFIB*, 2022 WL 120952, at *3 (OSHA's authority under the Occupational Safety and Health Act); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2487 (the CDC's authority under the Public Health Service Act); *Util. Air Regul. Grp.*, 573 U.S. at 307 (EPA's authority under the Clean Air Act); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (FDA's authority under the Food, Drug, and Cosmetic Act); *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218 (1994) (the FCC's authority under the Communications Act of 1934).  Those cases also concerned direct regulation of private conduct, and bear no resemblance to Plaintiffs' indiscriminate, government-wide challenge to the President's long-acknowledged authority to supervise federal regulatory analysis.

actions.  *See Meyer*, 981 F.2d at 1297 (recognizing the President's "duty to oversee the regulatory policies produced by the departments and agencies").  Indeed, every modern President has exercised this authority, through executive orders, to require federal agencies to monetize and assess the expected social and economic consequences of proposed regulations—and to guide how they do so.[8]  And even at a more granular level of analysis, it is well-established that agencies may estimate the social cost of greenhouse-gas emissions—even on a global, intergenerational scale.  *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1200 (9th Cir. 2008) (requiring estimation of the social cost of greenhouse-gas emissions); *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 679 (7th Cir. 2016) (approving use of global, intergenerational social-cost estimates).

E.O. 13990's call for a specific, uniform approach to estimating the social cost of greenhouse-gas emissions reflects the "scale and scope" of the problem addressed, but does not undermine the President's underlying authority to address it.  *Biden v. Missouri*, --- S. Ct. ---, 2022 WL 120950, at *3 (Jan. 13, 2022); *see also id.* at *5 (noting that "unprecedented circumstances provide no grounds for limiting the exercise of authorities" that have "long been recognized").  Neither E.O. 13990, nor the approach to cost estimation that it adopts, invoke or apply statutory authority in a novel context on a dramatic scale.  *See Missouri*, 2021 WL 3885590, at *9 ("It is implausible to suggest that the Interim Estimates alters the legal regime to which agencies are

---

[8] *See, e.g.*, E.O. 12291 (President Reagan); E.O. 12866 (President Clinton); E.O. 13422 (President Bush); E.O. 13563 (President Obama); E.O. 13771 (President Trump); E.O. No. 13783 (President Trump); E.O. 13990 (President Biden).

subject.").   And there is no necessary connection between the use of the Interim Estimates and how impactful any given federal regulation will be.

Similarly, Plaintiffs' suggestion that estimating the social costs of greenhouse-gas emissions "is inherently a matter of policy and value judgments," Compl. ¶ 86, is no cause for concern—indeed, the need for such judgments would "only sharpen[]" the argument for ensuring "that the Executive Branch is overseen by a President accountable to the people." *Seila Law LLC*, 140 S. Ct. at 2207; *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 34 (D.C. Cir. 2019) ("Presidential administrations are elected to make policy."), *cert. denied*, 140 S. Ct. 789 (2020).   And if anything, the increased significance of any particular cost or benefit would seem to militate *in favor* of a President requiring its inclusion in agency analysis, given the general "understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis omitted).

In sum, an Executive Order requiring the estimation of the social costs of greenhouse-gas emissions is nothing like the sort of unprecedented and direct "encroachment" on the lives of vast numbers of Americans that the Supreme Court sometimes has found to be an exercise of "powers of vast economic and political significance." *NFIB*, 2022 WL 120952, at *3.   So, even on its own terms, the major questions doctrine cannot be applied here to diminish the President's constitutional authority to issue an order like E.O. 13990.

### III.   The Current Status of the Interim Estimates

As for "the current status of the final estimates," Order, ECF No. 82, after consulting with relevant officials within the Executive Branch, undersigned counsel's understanding is as follows:

**a.**   After considering the comments received during the first comment period (including Plaintiffs'), the Working Group is currently working to prepare revised social-cost estimates.   The Working Group intends to publish its proposed final estimates within the next two months.   Upon publication of the proposed final estimates, there will then be an additional comment period, as well as a scientific peer-review process.   Based on the public comments and the results of peer review, the Working Group then intends to publish Final Estimates later in 2022 (likely during the summer of 2022).

Defendants continue to believe that their motion to dismiss can (and should) be granted now, on the basis of the papers already before the Court.   Alternatively, however, now that the process of preparing Final Estimates is approaching its final stages, the Court may wish to exercise its discretion to await publication of those Final Estimates before resolving the parties' pending motions.   That is because publication of the Final Estimates is likely to significantly alter the landscape of this litigation, in several different ways.

First, it is possible that the Final Estimates will be different from the Interim Estimates (either higher or lower), which might affect Plaintiffs' substantive arguments that the Interim Estimates are arbitrary and capricious under the APA,

and would require analysis of a different administrative record (that is, setting aside all of the jurisdictional problems with Plaintiffs' claims).  Second, Plaintiffs' notice-and-comment claims will be moot upon publication of the Final Estimates, which will have gone through two dedicated comment periods.  Third, and perhaps most importantly, Plaintiffs' central legal objection to the Interim Estimates is that the Executive Order *requires* agencies to use them, at least in certain circumstances, as evidenced by use of the word "shall."  E.O 13990 § 5(b)(ii)(A) ("publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies *shall* use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions *until final values are published*") (emphases added).  The relevant portion of the Executive Order that calls for creation of the Final Estimates, by contrast, does *not* use the word "shall."  *See id.* § 5(b)(ii)(B) ("publish a final SCC, SCN, and SCM by no later than January 2022").  Accordingly, the landscape is likely to change dramatically in the coming months, and all of Plaintiffs' claims will either be moot, or at least will raise different legal questions.

**b.**  The Executive Order also requires the Working Group to "provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied."  *Id.* § 5(b)(ii)(C).  Those recommendations have not yet been submitted to the President, but counsel's understanding is that they are currently being drafted, and at least some of the recommendations contemplated by the Executive Order may be submitted to the

President soon.   The President will then consider the Working Group's recommendations, and may ultimately take further action that clarifies or changes the contexts in which the social-cost estimates should (or should not) be used.

As Defendants have explained, this ongoing uncertainty regarding the areas other than cost-benefit analysis for proposed rulemakings—if any—in which agencies should use the Interim Estimates, contributes to the ripeness problem with all of Plaintiffs' claims.   *See, e.g.*, MTD at 28-29; *see also supra* at 11-13 (explaining that NEPA does not require cost-benefit analysis and thus, *a fortiori*, does not require any particular input regarding the social cost of greenhouse gases as part of a cost-benefit analysis).   In any event, this uncertainty offers another reason for the Court to exercise its discretion not to resolve Plaintiffs' claims now, given the significant possibility that some or all of the disputes currently before the Court will soon be overtaken by events, or at least materially altered.   *Cf. Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (discussing "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").

## CONCLUSION

For these reasons, the reasons advanced in Defendants' prior briefs, and the reasons advanced at the hearing in this matter, Defendants' motion to dismiss should be granted, and Plaintiffs' motion for a preliminary injunction should be denied.   In the alternative, the court may wish to defer a decision on the parties' motions, pending further developments regarding the Final Estimates.

Dated: January 21, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRANDON BONAPARTE BROWN
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

/s/   *Stephen M. Pezzi*
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division,
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Email: cody.t.knapp@usdoj.gov

*Attorneys for Defendants*

26