## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA,<br>By and through its Attorney General,<br>JEFF LANDRY, et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official<br>capacity as President of the United States; et<br>al.,<br><br>DEFENDANTS. | CIV. NO. 2:21-CV-1074-JDC-KK |

**PLAINTIFF STATES' SUPPLEMENTAL MEMORANDUM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................1

ARGUMENT............................................................................................................1

   I.    PLAINTIFF STATES ARE SUFFERING CONCRETE INJURY FROM THE SC-GHG ESTIMATES. ..1

       A.   The Executive Branch is employing the Estimates in agency rulemakings. ...............2

       B.   The Estimates are currently in use in NEPA analyses. ..............................................8

       C.   States are pressured to employ the Estimates in cooperative federalism programs...13

   II.   THE ESTIMATES EXCEED THE PRESIDENT'S AUTHORITY. .................................................16

       A.   The Estimates implicate a matter of major importance............................................17

       B.   The Executive cannot identify any statutory authority for the Estimates. ................20

CONCLUSION......................................................................................................23

ATTACHMENTS

Affidavit of Joel Jundt

Declaration of Elisabeth Daigle

Exhibit 1, EPA, Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74434

Exhibit 2, DOE, General Service Lamps, 86 Fed. Reg. 70755

Exhibit 3, EPA, Oil and Gas New and Modified Sources, 86 Fed. Reg. 63110

Exhibit 4, Bureau of Land Management (BLM) Fact Sheet: Analyzing the effects of fossil fuel leasing and development on greenhouse gases

Exhibit 5, DOE, Manufactured Housing, 86 Fed. Reg. 59042

Exhibit 6, Federal Acquisition Regulatory Council (FAR), Minimizing Climate Change in Federal Acquisitions, 86 Fed. Reg. 57404

Exhibit 7, Council on Environmental Quality (CEQ), NEPA Implementing Regulations Revisions, 86 Fed. Reg. 55757

Exhibit 8, EPA, Phasedown of Hydrofluorocarbons, 86 Fed. Reg. 55116

Exhibit 9, EPA, Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs)

Exhibit 10, National Highway Traffic Safety Administration (NHTSA), 2024-2026 Passenger Cars and Light Trucks Emission Standards, 86 Fed. Reg. 49602

Exhibit 11, Department of Transportation, Maritime Administration, Bluewater Texas
     Terminal Deepwater Port Project Draft Environmental Impact Statement

Exhibit 12, Bureau of Land Management (BLM), Wyoming First Quarter Oil and Gas Lease
     Sale Environmental Analysis

Exhibit 13, Nicole Pollack, Less than half of proposed Wyoming oil and gas leases
     recommended for upcoming sale, Casper Star Tribune

Exhibit 14, BLM, Montana-Dakotas First Quarter Oil and Gas Lease Sale Environmental
     Analysis

Exhibit 15, BLM, Utah First Quarter Oil and Gas Lease Sale Environmental Analysis

Exhibit 16, DOE, Notice of Intent To Prepare a Supplemental Environmental Impact
     Statement for the Alaska LNG Project, 86 Fed. Reg. 35280

Exhibit 17, Alaska LNG Project LLC, DOE/FE Order No. 3643-B, FE Docket 14-96-LNG,
     Order on Rehearing

Exhibit 18, Comment of EPA, North Baja XPress Pipeline, FERC Docket No. CP20-27-000

Exhibit 19, Comment of EPA, Evangeline Pass, FERC Docket Nos. CP20-50-000 and CP20-
     51-000

Exhibit 20, Comment of EPA, Alberta Xpress, FERC Docket No. CP20-484-000

Exhibit 21, Comment of EPA, Kern River, FERC Docket No. CP21-197-000

Exhibit 22, Comment of EPA, East 300 Upgrade, FERC Docket No. CP20-493-000

Exhibit 23, Withdrawal of Prior Notice of Adelphia Gateway, LLC, FERC Docket No. CP21-
     14-000

Exhibit 24, Columbia Gulf Transmission, LLC, Resource Report 5: Socioeconomics, East
     Lateral Express Project2, Docket No. CP20-527-000

Exhibit 25, Final Environmental Impact Statement for the Plaquemines LNG and Gator
     Express Pipeline Project, FERC Docket Nos. CP17-66-000 and CP17-67-000

Exhibit 26, James Broughel, Comment: The Interagency Working Group on the Social Cost of
     Greenhouse Gases should be transparent about the value judgments behind its estimates
     and acknowledge their cost, George Mason Univ. Mercatus Center

Exhibit 27, Peter Howard & Jason Schwartz, Think Global: International Reciprocity as
     Justification for a Global Social Cost of Carbon

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
 141 S. Ct. 2485 (2021) .................................................................................................20

*Boelens v. Redman Homes, Inc.*,
 748 F.2d 1058 (5th Cir. 1984) .....................................................................................18

*Bond v. United States*,
 572 U.S. 844 (2014) .....................................................................................................18

*BST Holdings, L.L.C. v. OSHA*,
 17 F.4th 604 (5th Cir. 2021) ..................................................................................18, 19

*Catholic Health Initiatives v. Sebelius*,
 617 F.3d 490 (D.C. Cir. 2010) .....................................................................................22

*Department of Transportation v. Public Citizen*,
 541 U.S. 752 (2004) .......................................................................................................5

*F.C.C. v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) .......................................................................................................3

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) .....................................................................................................18

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) .....................................................................................................18

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
 968 F.3d 454 (5th Cir. 2020) .......................................................................................20

*King v. Burwell*,
 576 U.S. 473 (2015) .....................................................................................................17

*Louisiana v. Biden*,
 2021 WL 2446010 (W.D. La. June 15, 2021) .......................................................1, 4, 8

*Louisiana v. Biden*,
 Louisiana v. Biden, 2021 WL 5986815 (W.D. La. Dec. 16, 2021) ...............................5

*Massachusetts v. E.P.A.*,
 549 U.S. 497 (2007) .....................................................................................................17

*NFIB v. OSHA*,
 2022 WL 120952 (U.S. Jan. 13, 2022)...................................................................passim

*Paul v. United States*,
    140 S. Ct. 342 (2019) ...................................................................................16

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .......................................................................16

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ................................................................16, 22

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ................................................................12, 15

*Tiger Lily, LLC v. HHS*,
    5 F.4th 666 (6th Cir. 2021) ..................................................................18, 19

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020) .................................................................................20

*United States v. Bass*,
    404 U.S. 336, 349 (1971) .............................................................................18

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................16, 19

*Vecinos Para El Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ...................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579, 637 (1952) .............................................................................21

**Statutes**

30 U.S.C. §187 ...........................................................................................................21

42 U.S.C. §264(a) .....................................................................................................20

42 U.S.C. §6295 ........................................................................................................17

42 U.S.C. §7401(b)(1) ..............................................................................................20

42 U.S.C. §7609 ........................................................................................................10

43 U.S.C. §1332(3) ...................................................................................................21

49 U.S.C. §32902 .........................................................................................17, 20, 21

**Other Authorities**

Arden Rowell, *Foreign Impacts and Climate Change*,
   39 Harv. Envt'l L. Rev. 371, 373 (2015).................................................................15

James Broughel, *Comment: The Interagency Working Group on the Social Cost of Greenhouse
   Gases should be transparent about the value judgments behind its estimates and acknowledge
   their cost*, George Mason Univ. Mercatus Center, at 2 (June 11, 2021).................................14

Nicole Pollack, *Less than half of proposed Wyoming oil and gas leases recommended for
   upcoming sale*, Casper Star Tribune (Dec. 7, 2021)...................................................8

Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a
   Global Social Cost of Carbon*, 42:S Colum. J. of Envt'l Law 203,
   219-20 & appx. A (2017)...........................................................................15

**Regulations**

40 C.F.R. §1500.3 ...............................................................................7, 10

46 Fed. Reg. 18026 ..................................................................................7

86 Fed. Reg. 35280 ..................................................................................9

86 Fed. Reg. 49602 ..................................................................................6

86 Fed. Reg. 55116 ..................................................................................5

86 Fed. Reg. 55757 ..................................................................................5

86 Fed. Reg. 57404 ..................................................................................4

86 Fed. Reg. 59042 ..................................................................................4

86 Fed. Reg. 7037 ...................................................................................1

86 Fed. Reg. 70755 ..................................................................................2

86 Fed. Reg. 74434 ..................................................................................2

## INTRODUCTION

The Executive Branch is using the SC-GHG Estimates across agency rulemakings, NEPA analyses, and cooperative federalism programs. It's doing so now and injuring Plaintiff States in their sovereign and parens patriae capacities now. And despite ranking among the most significant regulatory actions in history, the Estimates are not sanctioned by a shred of congressional authorization. Plaintiff States need immediate relief to avoid further irreparable harm.

## ARGUMENT

### I.   PLAINTIFF STATES ARE SUFFERING CONCRETE INJURY FROM THE SC-GHG ESTIMATES.

Section 5 of Executive Order 13990 is unambiguous. It directs that agencies "shall use" the SC-GHG Estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions." 86 Fed. Reg. 7037, 7040 (Jan. 25, 2021), Doc. 55-26 at 4. Two things about this text are key. First, the Order's mandatory language leaves agencies no discretion. *See Louisiana v. Biden*, 2021 WL 2446010, at *19 (W.D. La. June 15, 2021) ("[T]he Court notes the wording in the Executive Order, which states, 'To the extent consistent with applicable law,' but also notes the wording 'shall pause.' This does not leave the agency free to exercise discretion unless they disobey a Presidential Executive Order."). Second, the Order applies to both agency rulemaking *and* "other relevant agency actions." 86 Fed. Reg. at 7040, Doc. 55-26 at 4. Consistent with that unambiguous text, the Biden Administration's agencies have been applying the SC-GHG Estimates in rulemakings, NEPA review, and cooperative federalism programs, concretely harming Plaintiff States.

1

A.     **The Executive Branch is employing the Estimates in agency rulemakings.**

Agencies across the Executive Branch are using the Estimates in a range of rulemakings across statutory regimes. Consider the following selected examples.

**EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74434 (Dec. 30, 2021) (Daigle Decl. Ex. 1).** Here, EPA published a final rule imposing unprecedented costs on the American auto industry. It explicitly and extensively used the SC-GHG Estimates in analyzing its proposed revised GHG emissions standards for light-duty vehicles. *Id.* at 74504 ("We estimate the global societal benefits CO2, CH4, and N2O emission reductions expected from the final rule using the SC–GHG estimates presented in the February 2021 Technical Support Document (TSD): Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under E.O. 13990."). EPA relied on the Estimates to find "significant social benefits including $130 billion in climate benefits." *Id.* at 74443. EPA's estimate of benefits "include[d] climate-related economic benefits from reducing emissions of GHGs that contribute to climate change" based on the SC-GHG Estimates. *Id.* In fact, this rule alone refutes Defendants' suggestions that the SC-GHG Estimates will typically not affect the choice of which rule to adopt:

> *An essential factor* that EPA considered in determining the appropriate level of the standards is the reductions in emissions that would result from the program. This primarily includes reductions in vehicle GHG emissions, given the increased urgency of the climate crisis. ... Public health benefits through 2050 from reducing these pollutants are estimated to total $8.1 billion to $19 billion.

*Id.* at 74498 (emphasis added). This eliminates all doubt: the federal government has used the Estimates in a final rule to impose massive, transformative costs on the economy.

**DOE, *General Service Lamps*, 86 Fed. Reg. 70755 (Dec. 13, 2021) (Daigle Decl. Ex. 2).** The Department of Energy proposed a rule under the Energy Policy and Conservation Act

(EPCA) regulating general service lamps. The proposed rule is a significant departure from the previous Administration's approach because it explicitly employs the SC-GHG Estimates in calculating benefits. *See id.* at 70768.

**EPA,** *Oil and Gas New and Modified Sources***, 86 Fed. Reg. 63110 (Nov. 15, 2021) (Daigle Decl. Ex. 3).** EPA also used the SC-GHG Estimates in proposing stricter standards on GHG emissions for the oil and gas industry. This is one of the most significant rulemakings in the federal government and poses an existential threat to industry. The proposed rule's monetized benefits overwhelmingly consisted of estimated "climate benefits" based on the SC-GHG Estimates. *Id.* at 63123.  Particularly given the billions of dollars of compliance costs involved, the cost-benefit calculus would have been radically different, and quite possibly would have led to a different cost-benefit conclusion (i.e., costs outweigh the benefits), if EPA had employed the SC-GHG figures used under the Trump Administration. Indeed, the Estimates are dispositive in this rulemaking because they are being employed to depart from specific factual findings of the previous Administration. Without them, it would be more difficult, if not impossible, for EPA to justify its departure. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when agency "rests upon factual findings that contradict those which underlay its prior policy," it is required to provide a "more detailed justification" than the initial finding).

**Bureau of Land Management (BLM),** *Fact Sheet: Analyzing the effects of fossil fuel leasing and development on greenhouse gases* **(Oct. 29, 2021) (Daigle Decl. Ex. 4).** BLM issued a fact sheet and announced a "[s]tandardized methodology for consideration of the social cost of greenhouse gases in lease sales." *Id.* at 1. The fact sheet puts its reliance on the Estimates and Executive Order beyond question:

> The BLM is incorporating the social cost of greenhouse gases (carbon, nitrous oxide and methane) into the environmental analysis of fossil fuel leasing and

development. The social cost is an estimate of the monetized damages associated with incremental increases in greenhouse gas emissions and provides a useful measure of the benefits of greenhouse gas emission reductions to inform agency decision-making. The social cost of greenhouse gas estimates are based on complex models describing how greenhouse gas emissions affect global temperatures, sea level rise and other biophysical processes; how these changes affect society through agricultural, health, and other impacts; and monetary estimates of the market and nonmarket values of these impacts. Executive Order 13990: Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis, emphasized the importance of ensuring federal agencies "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account," and established an Interagency Working Group on the Social Cost of Greenhouse Gases (IWG). BLM's analysis uses the interim estimates of the social costs of carbon, methane and nitrous oxide published by the IWG in February 2021.

*Id.* at 2. This means that the Estimates will directly affect the amount of revenue that States will be entitled to under the Mineral Leasing Act. *Louisiana v. Biden*, 2021 WL 2446010, at *5 (discussing the MLA).

**DOE,** *Manufactured Housing***, 86 Fed. Reg. 59042 (Oct. 26, 2021) (Daigle Decl. Ex. 5).** DOE employs the estimates heavily throughout its manufactured housing conservation standards supplemental notice of proposed rulemaking. DOE explicitly relies on the Executive Order and Estimates in determining whether the rule is justified: "DOE calculates the value of the reduced emissions of CO2, CH4, and N2O (collectively, greenhouse gases or GHGs) using a range of values per metric ton of pollutant, consistent with the interim estimates issued in February 2021 under Executive Order 13990." *Id.* at 59043.

**Federal Acquisition Regulatory Council (FAR),** *Minimizing Climate Change in Federal Acquisitions,* **86 Fed. Reg. 57404 (Oct. 15, 2021) (Daigle Decl. Ex. 6).** FAR has released an advanced notice of proposed rulemaking stating that it is considering the SC-GHG Estimates in promulgating a new regulation that would evaluate federal acquisition contracts based on the IWG's SC-GHG Estimates. *Id.* at 57405. This action is particularly harmful to

Louisiana because it and its state entities regularly contract with the federal government and have countless federal contracts and partnerships. *See* Dismukes Decl., Doc. 57 ¶¶18, 26. For example, Louisiana routinely oversees contracts implementing federally funded projects for hurricane and flood resiliency and recovery, housing and community development funding, health care funding, education funding, and research through its three university systems. *Louisiana v. Biden*, 2021 WL 5986815, at *6 (W.D. La. Dec. 16, 2021). This regulatory action confirms the testimony of Plaintiff States' expert witness Professor David Dismukes:

> Louisiana will suffer harm because of the use of the SC-GHG estimates in federal procurement. When competing for federal sales and contracts, Louisiana businesses will be at a disadvantage compared to businesses in states where a larger share of electricity comes from renewable generation. In 2018, Louisiana was the 49th ranked state by share of energy from renewables as renewables accounted for 3.5 percent of Louisiana energy consumption.

Doc. 57, ¶26.

**Council on Environmental Quality (CEQ),** *NEPA Implementing Regulations Revisions*, **86 Fed. Reg. 55757 (Oct. 7, 2021) (Daigle Decl. Ex. 7).** CEQ issued a proposed rule repealing the previous Administration's final NEPA implantation-regulation revisions that brought the concept of effects more into line with the Supreme Court's holding in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004). The proposed rule specifically directs agencies to the SC-GHG Estimates, *Id.* at 55763 n.25, which, as explained in Plaintiff States' preliminary injunction briefing, employs an approach (considering global effects over a 300-year timeframe) fundamentally incompatible with *Public Citizen*'s proximate-cause standard, *see* Doc. 63 at 34.

**EPA,** *Phasedown of Hydrofluorocarbons,* **86 Fed. Reg. 55116 (Oct. 5, 2021) (Daigle Decl. Ex. 8).** EPA issued a final rule seeking to phase down hydrofluorocarbons. This rule imposes massively increased regulatory costs upon the myriad of products that rely on HFCs,

including refrigeration, air-conditioning, building insulation, and aerosols. That EPA finalized this rule during this litigation refutes Defendants' repeated assertions that agencies are not using the Estimates in setting agency action. *See, e.g.*, Doc. 68 at 24-28. In prior briefing, Defendants suggested that EPA did not employ the Estimates in creating this rule. Doc. 67 at 4. But the final rule puts any doubt to bed. EPA relied on the same models, methodologies, and assumptions as the Working Group's SC-GHG Estimates, and specifically cited the Working Group's "interim" Technical Support Document as authority. *See, e.g.*, 86 Fed. Reg. at 55119. That the EPA adapted the SC-GHG Estimates for use in the context of hydrofluorocarbons (as opposed to the gases covered in the Working Group's document, *i.e.*, carbon, methane, and nitrous oxide) is immaterial. *See* EPA, Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs) at 103-15 (Sept. 2021) (**Daigle Decl. Ex. 9**).

**National Highway Traffic Safety Administration (NHTSA),** *2024-2026 Passenger Cars and Light Trucks Emission Standards*, **86 Fed. Reg. 49602 (Sept. 3, 2021) (Daigle Decl. Ex. 10).** NHTSA issued a proposed rule revising vehicle emission standards finalized by the previous Administration. This is a significant increase in regulation of the American automobile industry. And it extensively employs the Estimates: "With the social cost of carbon (SCC) discounted at 2.5 percent and other benefits and costs discounted at 3 percent, for the three affected model years NHTSA finds $65.8 billion in benefits attributable to the proposed standards and $37.4 billion in proposed costs so that present net benefits could be $28.4 billion." *Id.* at 49605. NHTSA has thus used the SC-GHG Estimates to calculate and include "benefits" of reduced GHG emissions in a proposed rulemaking that to impose more costly and burdensome fuel economy standards. And NHTSA used those "benefits" of avoided GHG emissions to offset

the costs its more stringent fuel economy standards will impose on regulated industries and consumers.

**Dep't of the Interior (DOI), Secretarial Order No. 3399,** *Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process* **(Apr. 16, 2021) (Doc. 55-28).** The Secretary of the Interior issued an order directing component agencies, including BLM (administering onshore oil and gas lease sales) and the Bureau of Ocean Energy Management (administering offshore oil and gas lease sales), to employ the Estimates as "an essential tool" in their cost-benefit analysis whenever they "determine[] that a monetized assessment of socioeconomic impacts is relevant." Doc. 55-28 at 4. The Order specifically cites EO 13990. *Id.* at 1.

***

Plaintiff States' injuries are not speculative. These rules, proposed rules, and other agency action impose direct fiscal harms on Plaintiff States. The FAR Climate rule will directly harm Plaintiff States' ability to contract with the federal government. The vehicle regulations will increase the prices Plaintiff States must pay for vehicles for official use. CEQ's NEPA regulations revision will harm Plaintiff States in their sovereign capacity by pressuring them to change their approach to NEPA analysis in their capacity as joint lead agencies. DOI and BLM's activities are depressing the States' statutorily entitled proceeds from lease sales and production by artificially reducing both the number of parcels available and the activities that can be conducted on those parcels. All of this will harm Plaintiff States in their parens patriae capacity by imposing significant regulatory costs and driving up prices on everything from cars to air conditioning.

**B.     The Estimates are currently in use in NEPA analyses.**

CEQ's NEPA regulations bind all federal agencies, including independent agencies such as FERC. *See* 40 C.F.R. §1500.3; *see also* 46 Fed. Reg. 18026, 18036 (Mar. 23, 1981). Now that CEQ has telegraphed that agencies should look to the SC-GHG Estimates in NEPA review, it is unsurprising that both independent and traditional Executive Branch agencies have been using the SC-GHG Estimates to evaluate projects throughout the country under NEPA.

**Department of Transportation, Maritime Administration,** ***Bluewater Texas Terminal Deepwater Port Project Draft Environmental Impact Statement*** **(Oct. 2021) (Daigle Decl. Ex. 11).** DOT used the SC-GHG Estimates to examine the Bluewater Texas Deepwater port project in the draft environmental impact statement. The SC-GHG Estimates were used to analyze both the construction and emissions phases of the project. *See id.* at 3-323. This project is in Plaintiff State Texas.

**Bureau of Land Management (BLM),** ***Wyoming First Quarter Oil and Gas Lease Sale Environmental Analysis*** **(Nov. 1, 2021) (Daigle Decl. Ex. 12).** BLM used the SC-GHG Estimates in its environmental analysis of the First Quarter oil and gas lease sale for Wyoming. BLM stated that it was acting "[i]n accordance with th[e] direction" of EO 13990 to estimate staggering cost estimates for holding the lease sale. Ex. 12 at 34. This action emphatically demonstrates the impact of the Estimates. BLM considered three alternatives—Alternative 1 was no sale; Alternative 2 was a full sale of all available 459 parcels; Alternative 3 was a sale of only 195 parcels. BLM explicitly employed the Estimates to examine the three alternatives. *Id.* at 34-35. It selected Alternative 3 (the smaller sale) over Alternative 2 (the full sale) after comparing the estimated greenhouse gas emissions between them. *Id.* The State of Wyoming will imminently lose significant resources from this decision; because it is entitled to bonus bids for

each parcel, which are immediately paid when the bid is selected, Wyoming immediately stands to lose bonus bids from the 239 parcels that were deferred based on the SC-GHG Estimates (to say nothing of future production royalties). *Louisiana v. Biden*, 2021 WL 2446010, at \*5; *see also* Nicole Pollack, *Less than half of proposed Wyoming oil and gas leases recommended for upcoming sale*, Casper Star Tribune (Dec. 7, 2021) (**Daigle Decl. Ex. 13**). This sale is located in Plaintiff State Wyoming.

**BLM,** *Montana-Dakotas First Quarter Oil and Gas Lease Sale Environmental Analysis* **(Oct. 27, 2021) (Daigle Decl. Ex. 14).** BLM used the SC-GHG Estimates in analyzing alternatives for the First Quarter 2022 North Dakota oil and gas lease sale held under the MLA. *Id.* at 41-43.

**BLM,** *Utah First Quarter Oil and Gas Lease Sale Environmental Analysis* **(Nov. 1, 2021) (Daigle Decl. Ex. 15).** BLM used the SC-GHG Estimates in analyzing alternatives for the First Quarter 2022 Utah oil and gas lease sale held under the MLA. Ex. 15 at 40-43.

**DOE,** *Notice of Intent To Prepare a Supplemental Environmental Impact Statement for the Alaska LNG Project***, 86 Fed. Reg. 35280 (July 2, 2021) (Daigle Decl. Ex. 16).** In August 2020, under the previous Administration, DOE granted authorization to Alaska LNG Project LLC "to export LNG produced from Alaskan sources to any country with which the United States has not entered into a free trade agreement (FTA) requiring national treatment for trade in natural gas, and with which trade is not prohibited by U.S. law or policy (non-FTA countries)." *Id.* at 35280. In April 2021, the Biden Administration reopened this authorization by granting a rehearing petition. In the order granting rehearing, DOE expressly stated that it was granting "Sierra Club's Rehearing Request for the purpose of conducting two Alaska-specific environmental studies and related public process (collectively, the Alaska environmental study

proceeding), in light of Executive Order (E.O.) 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, and other legal and policy considerations." *Alaska LNG Project LLC, DOE/FE Order No. 3643-B*, FE Docket 14-96-LNG, Order on Rehearing (Apr. 15, 2021) (**Daigle Decl. Ex. 17**). It then issued a notice of intent that specifically cites Executive Order 13990 to prepare an entirely new Supplemental Environmental Impact Statement. 86 Fed. Reg. at 35281.

**Federal Energy Regulatory Commission & EPA, Comments on Pending FERC Projects.** EPA has been using the D.C. Circuit's holding in *Vecinos Para El Bienestar de la Comunidad Costera v. FERC* as a cudgel to threaten agencies into using the SC-GHG Estimates. 6 F.4th 1321 (D.C. Cir. 2021). Although the D.C. Circuit's holding does not compel FERC to use the SC-GHG Estimates, EPA has used it in comment letters to build a record that would effectively make it impossible for FERC to move forward without considering the Estimates. By enlisting the courts, EPA is using these comments letters to achieve what the Executive Order 13990 could not—requiring independent agencies to use the Estimates. And EPA's threats are not confined to relying on the courts. EPA has the authority under the Clean Air Act to refer agencies to CEQ, which has already indicated that it believes SC-GHG is appropriate in NEPA analysis, for any agency action it deems unsatisfactory. 42 U.S.C. §7609. Though FERC is an independent agency, in the NEPA context it must abide by CEQ. 40 C.F.R. §1500.3. Examples of EPA using SC-GHG in FERC comment letters include:

- Comment of EPA at 4, North Baja XPress Pipeline, FERC Docket No. CP20-27-000 (Nov. 24, 2021) (**Daigle Decl. Ex. 18**). EPA urges FERC use SCC for both upstream and downstream emissions and estimates that those costs for a 25-year period would be $14.1 billion. EPA also demands that FERC include conditions

in its certificate to mitigate these costs. These costs imperil approval of the project.

- Comment of EPA at 5, Evangeline Pass, FERC Docket Nos. CP20-50-000 and CP20-51-000 (Nov. 15, 2021) (**Daigle Decl. Ex. 19**) (suggesting $31.2 billion in climate damages). This project is located in Plaintiff States Louisiana and Mississippi.

- Comment of EPA at 5, Alberta Xpress, FERC Docket No. CP20-484-000 (Dec. 6, 2021) (**Daigle Decl. Ex. 20**) (suggesting $4.8 billion in climate damages). This project is located in Plaintiff State Louisiana.

- Comment of EPA at 7, Kern River, FERC Docket No. CP21-197-000 (Sept. 27, 2021) (**Daigle Decl. Ex. 21**) (suggesting $4 billion in climate damages).

- Comment of EPA at 2, East 300 Upgrade, FERC Docket No. CP20-493-000 (Nov. 1, 2021) (**Daigle Decl. Ex. 22**) (suggesting $3 billion in climate damages).

EPA is thus using the SC-GHG Estimates to exacerbate the already historic delay in project approvals under the Natural Gas Act. At least one project sponsor has already canceled a natural gas project due to delays associated with heightened scrutiny of Greenhouse Gas emissions. Withdrawal of Prior Notice of Adelphia Gateway, LLC, FERC Docket No. CP21-14-000, (Oct. 12, 2021) (**Daigle Decl. Ex. 23**) (withdrawing application to construct natural gas infrastructure project under the Natural Gas Act due to the delays from "extension of the environmental review" and "significant uncertainty regarding when an order will issue").

***

The Administration's use of the SC-GHG Estimates in NEPA reviews is currently harming Plaintiff States' concrete interests. Most obviously, using the Estimates to analyze the climate impacts of oil and gas lease sales under the MLA directly affects the States' statutorily vested rights to proceeds from MLA oil and gas lease sales, which must be held quarterly. By using the Estimates to artificially drive up the cost estimates of lease sales, fewer parcels are being leased, meaning the States will receive less in bonus bids, ground rents, and production royalties. *See supra*.

Additionally, EPA's throttling of FERC using the Estimates has exacerbated delays in project approval. This injures Plaintiff States. If new or expanded pipelines are not constructed, property taxes benefiting the Plaintiff States would be lost. The East Lateral Xpress project is one of just numerous examples. The project, located in Louisiana, would have a construction payroll of over $96 million, generate an estimated $45 million in local spending (resulting in more than $3.6 million in sales tax revenue), and pay over $1.2 million in property taxes per year.  Columbia Gulf Transmission, LLC, Resource Report 5: Socioeconomics, East Lateral Express Project at 5-9 to 5-12, Docket No. CP20-527-000 (Sept. 24, 2020) (**Daigle Decl. Ex. 24**). Further, the project feeds a liquefied natural gas terminal, which represents billions in physical plant investment and is expected to provide $166.1 million in tax revenues from construction, plus $21 million in annual payroll during operations. Final Environmental Impact Statement for the Plaquemines LNG and Gator Express Pipeline Project at 4-135, FERC Docket Nos. CP17-66-000 and CP17-67-000 (May 3, 2019) (**Daigle Decl. Ex. 25**). Delays to such projects are exacerbated by the Estimates and are occurring now. Delayed judicial relief cannot remedy this harm—injunctive relieve is needed immediately.

C.     **States are pressured to employ the Estimates in cooperative federalism programs.**

As Plaintiff States have extensively detailed, they will be "compelled to participate in . . . invalid administrative process[es]" in their capacities as cooperative-federalism regulators. *Texas v. United States*, 497 F.3d 491, 496-97 (5th Cir. 2007). That includes processes for establishing State Implementation Plans under the Clean Air Act. Doc. 54-2 at 44. It also includes NEPA reviews in which States act as joint lead agencies.  In short, States will be forced to use, and participate in administrative processes based on and tainted by, an illegal methodology. By itself, that's a legally cognizable injury to sovereign States. The evidence of this harm is overwhelming.

**Affidavit of Joel Jundt, Secretary of the South Dakota Department of Transportation (SDDOT).** Secretary Jundt oversees the construction and maintenance of the State highway system in South Dakota. Highway project environmental review is a quintessential cooperative federalism program. Secretary Jundt is charged with ensuring compliance with federal conditions and requirements for receiving federal funds for highway projects in South Dakota. Jundt Aff. ¶3. In September 2021, SDDOT received a request from the Federal Highway Administration that the State "develop a methodology to analyze and report the direct, indirect, and cumulative greenhouse gas emissions and climate effects (cumulatively GHG Analysis) into the environmental review process for federally-funded highway projects." *Id.* ¶5. SDDOT is currently performing GHG analysis on several highway construction processes. *Id.* ¶6. The federal government has made clear that a GHG analysis will be requested for federal funding on highway construction process as part of the federal environmental review process. *Id.* ¶5. This analysis will drain State resources. *Id.* ¶¶6-10. And the analysis specifically

requires "consideration of mitigating factors to offset the social cost of greenhouse gas emissions." *Id.* ¶12.

Finally, Secretary Jundt reports that "[b]ecause mitigation factors are less feasible and impactful for a sparsely populated rural state like South Dakota, SDDOT expects to be at a disadvantage in comparison to many other states in obligating and expending federal highway funding that is tied to GHG Analysis." *Id.* ¶17. The federal government is thus already making it clear to the States that they will have to conform their environmental reviews to the SC-GHG Estimates. It is forcing the State to choose between its highway funding and maintaining its current environmental review practices.

**EPA, Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23054 (Apr. 30, 2021) (Doc. 55-30).** Under the National Ambient Air Quality Standards good-neighbor provisions, the Biden Administration issued a final rule that imposed federal implementation plans (FIP) upon several States, including Louisiana and Kentucky. 86 Fed. Reg. at 23054. Federal implementation plans are imposed only if EPA rejects a state implementation plan (SIP). In analyzing the appropriateness of the FIPs it was imposing upon the States, EPA expressly and extensively relied upon the SC-GHG Estimates. 86 Fed. Reg. at 23061, 23153-155 ("We emphasize the importance and value of considering the benefits calculated using all four SC-CO2 estimates. As discussed in Chapter 5 of the RIA and in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (IWG 2021), a consideration of climate benefits calculated using discount rates below 3 percent, including 2 percent and lower, are also warranted when discounting intergenerational impacts.").

***

14

In too many unfortunate ways, the Biden Administration's actions detailed above mimic the rote, mechanical way that the Obama Administration's agencies applied SC-GHG Estimates. Under President Obama, agencies used the SCC estimates, and later SCM and SCN, in rulemakings across the board to justify unprecedented regulatory costs. *See* James Broughel, *Comment: The Interagency Working Group on the Social Cost of Greenhouse Gases should be transparent about the value judgments behind its estimates and acknowledge their cost*, George Mason Univ. Mercatus Center, at 2 (June 11, 2021) (**Daigle Decl. Ex. 26**). As Professors Howard and Schwartz documented, agencies used the Estimates in actions ranging from NEPA review to appliance efficiency standards to automobile design regulations. *See* Peter Howard & Jason Schwartz, *Think Global: International Reciprocity as Justification for a Global Social Cost of Carbon*, 42:S Colum. J. of Envt'l Law 203, 219-20 & appx. A (2017) (as of mid-2016, the SC-GHG was employed in "at least eighty-three separate regulatory or planning proceedings conducted by six different federal agencies [that] have used the SCC or SCM in their analyses") (**Daigle Decl. Ex. 27**). And agencies simply applied the Estimates without regard to statutory authority and did not give commenters the ability to contest the Estimates' legality. *See* Arden Rowell, *Foreign Impacts and Climate Change*, 39 Harv. Envt'l L. Rev. 371, 373 (2015) ("Perhaps emboldened by [the IWG's] general dismissal of statutory constraints, agencies using the globally scoped SCC have appeared to ignore the question of statutory authority entirely.").

So it continues today. The Biden Administration's agencies are subjecting Plaintiff States to the SC-GHG Estimates now. Plaintiffs are being "compelled to participate in . . . invalid administrative process[es]" such as NEPA reviews, FIPs based on SC-GHG, and SC-GHG Estimate–tainted review of highway projects—each a cognizable injury. *Texas*, 497 F.3d at 496-97. As Secretary Jundt makes clear, at least one Plaintiff State is currently expending funds and

15

time to figure out how to comply with the SC-GHG. *See Texas*, 809 F.3d at 152-53 (costs of processing applications resulting from allegedly unlawful federal action was injury-in-fact). Those injuries are irreparable because (1) no monetary relief is available, and (2) after-the-fact equitable relief cannot undo the fact that the States will have been forced to participate in these invalid administrative processes. Nor can after-the-fact equitable relief remedy the administrative costs and burdens of participating in these unlawful processes, which are a separately cognizable injury.

Similarly, no after-the-fact relief can change the reality that the States are being pressured to change their laws and policies in traditional areas of state regulation (e.g., energy policy) now, and will continually be subject to that pressure unless and until reliance on the SC-GHG Estimates is enjoined. Again, as Secretary Jundt demonstrates, States are being pressured to change their policies and practices to comply with the Administration's approach to GHG. This pressure, in itself, "constitutes an injury" to the States' "sovereign interest[s]," whether or not States actually change their policies, *Texas v. EEOC*, 933 F.3d at 446-47 (internal quotation marks omitted), and that continuing harm cannot be erased or remedied through after-the-fact relief, *see Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021) ("Our court noted that Texas's injuries in that case largely depended on its 'need to hire employees, purchase equipment, and obtain office space'—'steps that would be unnecessary' with smaller numbers of new applicants.").

## II.   THE ESTIMATES EXCEED THE PRESIDENT'S AUTHORITY.

Because the federal government is one of limited and specifically enumerated powers and does not possess a general police power, the Major Questions Doctrine ensures that agencies do not impose new obligations of "vast 'economic and political significance'" upon private parties

and States unless Congress "speaks clearly." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The major questions doctrine consists of two steps. First, the Court must determine if the assertion of Executive authority implicates matters of "vast 'economic and political significance.'" *See id*. Second, the Court must determine if Congress has "expressly and specifically" delegated authority over the issue to the Executive. *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) (collecting cases); *NFIB v. OSHA*, 2022 WL 120952, at *3 (U.S. Jan. 13, 2022). The Major Questions Doctrine enforces the Nondelegation Doctrine by "protect[ing] the separation of powers and ensur[ing] that any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands." *NFIB*, 2022 WL 120952, at *6 (Gorsuch, J., concurring).

### A.     The Estimates implicate a matter of major importance.

The SC-GHG Estimates are no "everyday exercise of federal power." *NFIB*, 2022 WL 120952, at *3. They are amongst the most significant regulatory actions in the Nation's history. The Estimates drive up the cost side of every energy-related regulatory action, making it difficult if not impossible to justify anything but the most stringent energy regulations. They also make it more difficult to approve new oil and natural gas projects under NEPA review. And they reach into the internal affairs of every State that accepts federal highway funds or participates in any cooperative federalism projects.

The Estimates reach every aspect of everyday life—"from Frisbees to flatulence." *Massachusetts v. E.P.A.*, 549 U.S. 497, 558 n.2 (2007) (Scalia, J., dissenting). They are used to determine the shape of stoves and refrigerators under EPCA's appliance efficiency program, 42 U.S.C. §6295; the size and shape of cars under the CAFE standards program, 49 U.S.C. §32902; the design of lightbulbs and air conditioners under EPCA, 42 U.S.C. §6295; the design of

manufactured housing, *id.* §17071; whether a power plant can be built or modified, *id.* §7411; and whether the production of concrete to build and repair roads and bridges is too emissions-heavy, *id.* §4331. There is simply no part of American life that the Estimates do not touch. They are the definition of a contested public policy choice of "deep economic and political significance." *King v. Burwell*, 576 U.S. 473, 486 (2015).

The Estimates will impose significant costs on the economy. Ex. 26, at 2 ("The total cost of these 83 regulatory actions [using social costs] is estimated to be between $447 billion and $561 billion (in 2020 dollars."); Doc. 57 ¶¶14-26. Courts have found that less costly and far-reaching regulations have triggered the Major Questions Doctrine. For example, the Fifth Circuit recently held that the OSHA Vaccine Mandate, which imposed almost $3 billion in compliance costs, triggered the Major Questions Doctrine. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021); *see also id.* at 617-18 (citing *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994) (declining to hold that the FCC could eliminate telecommunications rate-filing requirements); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000) (declining to hold that the FDA could regulate cigarettes); *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (declining to allow DOJ to ban physician-assisted suicide). The SC-GHG Estimates have earned their nickname as "the most important number you've never heard of." Cass R. Sunstein, *Arbitrariness Review (with special reference to the social cost of carbon)* (2021), https://bit.ly/3rk2hZC.

The Estimates also trigger the Major Questions Doctrine because they alter the federal-state balance in cooperative federalism programs. Congress will "not be deemed to have significantly changed the federal-state balance" unless it "conveys its purpose clearly." *United States v. Bass*, 404 U.S. 336, 349 (1971); *see Boelens v. Redman Homes, Inc.*, 748 F.2d 1058,

1067 (5th Cir. 1984) ("Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance."). Because Congress has not clearly conveyed such a purpose, the federal-state balance has not shifted as dramatically as the Defendants necessarily claim. *See Bond v. United States*, 572 U.S. 844, 857-58 (2014) ("'[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'").

The Estimates also trigger the clear statement rule because they create serious issues under the Nondelegation Doctrine. Congress lacks authority to delegate "virtually unlimited power" over the American economy to an executive agency. *BST Holdings*, 17 F.4th at 617; *see also Tiger Lily, LLC v. HHS*, 5 F.4th 666, 672 (6th Cir. 2021). To avoid creating constitutional issues, courts require clear statutory authorization before assuming that Congress has delegated an agency power "to decide major policy questions." *See Tiger Lily*, 5 F.4th at 672 ("[T]o put 'extra icing on a cake already frosted,' the government's interpretation of § 264(a) could raise a nondelegation problem.").

Finally, the novelty of the Estimates also suffices to trigger the Major Questions Doctrine, which applies when an agency suddenly discovers "in a long-extant statute an unheralded power to regulate a significant portion of the American economy." *Util. Air Regul. Grp.*, 573 U.S. at 324. Apart from the Obama Administration's foray, the Executive has never attempted to consider either *global* costs or the discount rates provided by the Estimates. It has never elevated global concerns above domestic in regulatory decisionmaking. And it has never dictated a specific legislative rule regarding climate change from the presidential level. "This 'lack of historical precedent,' coupled with the breadth of authority that the [Executive] now

19

claims, is a 'telling indication' that the [Estimates] extend[] beyond the [President's] legitimate reach." *NFIB*, 2022 WL 120952, at *4.

***

In sum, because the Estimates impose massive costs, raise serious federalism and nondelegation questions, are unprecedented, and purport to resolve "one of today's most hotly debated political issues," they must be authorized by a specific grant from Congress. *BST Holdings*, 17 F.4th at 617.

**B.      The Executive cannot identify any statutory authority for the Estimates.**

Because the SC-GHG Estimates trigger the Major Questions Doctrine, the Executive bears the burden to identify clear statutory authorization. *NFIB*, 2022 WL 120952, at *3. But during this litigation, they have not even tried to do so. And when it comes to locating statutory authority, Defendants' repeated "nothing-equals-something" arguments are barred by Fifth Circuit precedent. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) ("This nothing-equals-something argument is barred by our precedent."). Defendants' silence on where Congress has spoken *at all*—never mind clearly—in granting statutory authority for one of the most consequential restructurings of the administrative state in history is deafening. *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1848-49 (2020) ("[W]hen Congress wishes to 'alter the fundamental details of a regulatory scheme,' as respondents contend it did here through delegation, we would expect it to speak with the requisite clarity to place that intent beyond dispute."). Indeed, setting this case apart from even the OSHA Mandate and Eviction Moratorium cases, Defendants do not even try to point to arguable statutory authority that can be stretched to read as congressional authorization. *NFIB*, 2022 WL 120952, at *3-4 (rejecting OSHA's assertion that 29 U.S.C. §655(c) authorized

20

Vaccine Mandate); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2488-89 (2021) (rejecting CDC's assertion that 42 U.S.C. §264(a) authorizes Eviction Moratorium).

That's not surprising. Every time Congress has addressed the issue of whether agencies can consider global or domestic effects, it has emphatically expressed that agencies may only consider effects to our Nation. EPCA directs the Executive to consider the need for *national* energy and water conservation," 42 U.S.C. §6295(o)(2)(B)(i) (emphasis added), and "the need of *the United States* to conserve energy," 49 U.S.C. §32902(f) (emphasis added). The Clean Air Act directs the Executive "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. §7401(b)(1) (emphasis added). NEPA directs agencies to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. §4331(b)(2) (emphasis added). The MLA directs the Executive to consider the "public welfare" of the United States in conducting oil and gas lease sales. 30 U.S.C. §187. OCSLA, in turn, directs the Executive to make the Outer Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3).

The Executive's power here is thus at its lowest ebb. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."). Recognizing that conundrum, Defendants have sought to defend the SC-GHG

Estimates under the President's inherent power. *See, e.g.*, Doc. 68 at 45. But their analogies to Executive Order 12866 and Circular A-4 are deeply flawed.

Executive Order 12866 sets out a process for agencies to use in regulatory decisionmaking. *See* Doc. 55-1. It instructs them to conduct cost-benefit analysis and sets out general principles. *Id.* It does not mandate outcomes. And it does not dictate specific numbers to use on the cost or benefit side. Similarly, Circular A-4 sets out guidelines for agencies to use but does not direct them to employ specific cost or benefit numbers. Doc. 55-5. Under this regime, which has been in force since the Clinton Administration, agencies come up with the costs and benefits of regulation and determine how to weigh them under their statutory authority. Doc. 56 at 4. EO 12866 and Circular A-4 thus establish a framework—a scale. This is the system that Presidents Clinton and Bush used; that President Obama began to dismantle with the first round of Social Cost of Carbon estimates; and that President Trump restored by directing agencies to apply Circular A-4 rather than a dictate of the Interagency Working Group.

By contrast, EO 13990 and the SC-GHG Estimates predetermine nearly all outcomes by mandating massive numbers for cost side of the scale. Unlike EO 12866, they are not mere tools to set up internal Executive Branch decisionmaking processes. Rather, they are a legislative rule that dictates specific numerical values for use across all agency decisionmaking affecting private parties. *See, e.g.*, *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) ("Judge Friendly wrote that when an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking."). And the Estimates alter rights and obligations and remove agency discretion. *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) ("[I]f a statement denies the [agency] discretion in the area of its coverage[,] then the statement is binding, and creates rights

or obligations."). Unlike EO 12866 and Circular A-4, the Estimates direct agencies to use specific social cost numbers. Doc. 55-27 at 5-6, 24-25. And Defendants gloss over the fact that the EO directs agencies to apply the Estimates not only in rulemaking, but in "other relevant agency actions," such as project-level NEPA reviews. Doc. 55-26 at 5. This is a significant departure from EO 12866 and Circular A-4, which apply to rulemakings only, not project-level NEPA review. Doc. 55-1 at 4-5.

***

The President has inherent power to structure Executive Branch decisionmaking authority. But he lacks inherent power to promulgate fundamentally transformative legislative rules in areas of vast political, social, and economic importance. *See NFIB*, 2022 WL 120952, at *6 (Gorsuch, J., concurring) ("If administrative agencies seek to regulate the daily lives and liberties of millions of Americans, the [Major Questions] doctrine says, they must at least be able to trace that power to a clear grant of authority from Congress.").

## CONCLUSION

For the foregoing reasons, and those set out by Plaintiffs States in their briefing and oral presentation, this Court should grant their motion for preliminary injunction and deny Defendants' motion to dismiss.

Respectfully submitted,

  /s/ Elizabeth B. Murrill

JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL (LSBN 20685)
  Solicitor General
JOSEPH S. ST. JOHN (LSBN 36682)
  Deputy Solicitor General
BENJAMIN WALLACE (LSBN 39516)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov
wallaceb@ag.louisiana.gov

TYLER R. GREEN
DANIEL SHAPIRO
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for Plaintiff States*

24