### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

**STATE OF LOUISIANA ET AL**                 **CASE NO. 2:21-CV-01074**

**VERSUS**                                             **JUDGE JAMES D. CAIN, JR.**

**JOSEPH R BIDEN JR ET AL**              **MAGISTRATE JUDGE KAY**

### <u>MEMORANDUM RULING</u>

Before the Court is a "Motion for Preliminary Injunction" (Doc. 53) filed by the States of Louisiana, Alabama, Florida, Georgia, Kentucky, Mississippi, South Dakota, Texas, West Virginia, and Wyoming (collectively referred to as the "Plaintiff States"). The Plaintiff States move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction against Defendants Joseph R. Biden, Jr., Cecilia Rouse, Shalanda Young, Kei Koizumi, Janet Yellen, Deb Haaland, Tom Vilsack, Gina Raimondo, Xavier Becerra, Pete Buttigieg, Jennifer Granholm, Brenda Mallory, Michael S. Regan, Gina McCarthy, Brian Deese, Jack Danielson, U.S. Environmental Protection Agency, U.S. Department of Energy, U.S. Department of Transportation, U.S. Department of Agriculture, U.S. Department of Interior, National Highway Traffic Safety Administration, and the Interagency Working Group on Social Cost of Greenhouse Gases (hereinafter collectively referred to as "Defendants").

Plaintiff States also move to make the Order effective immediately and to remain in effect pending the final resolution of this case, or until further orders of this Court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court.

## I.  BACKGROUND

On April 22, 2021, the Plaintiff States filed a Complaint [doc. 1] against the Government Defendants seeking declaratory and injunctive relief as a result of Executive Order 13990 ("EO 13990"). EO 13990 reinstated the Interagency Working Group ("IWG") on Social Costs of Greenhouse Gas Emissions ("SC-GGE") and ordered the IWG to publish Interim Estimates for the Social Cost of Carbon, Nitrous Oxide, and Methane (collectively referred to as "SC-GHG Estimates") for agencies to use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions.  EO 13990 provides as follows:

### Accounting for the Benefits of Reducing Climate Pollution

(a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account.  Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions.  They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b)  There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"). The Chair of the Council of Economic Advisers, Director or OMB, and Director of the office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

   (i)    Membership.  The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on

Environmental Quality; the Administrator  of the Environmental Protection Agency; the Assistant to the President and National Climate advisor; and the Assistant to the President for Economic Policy and director of the National Economic council.

(ii)     Mission and Work.   The Working Group shall, as appropriate and consistent with applicable law:

(A)     Publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B)     Publish a final SCC, SCN, and SCM by no later than January 2022;

(C)     Provide recommendations to the President, by no later than September 1, 2021, regarding areas of decisions-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

(D)     Provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E)     Provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

(iii) Methodology. In carrying out its activities, the working Group shall consider the recommendations of the National Academies of Science, Engineering, and Medicine as reported in Value Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide (2017) and other pertinent scientific literature; solicit public comment; engage with the public and stakeholders; seek the advice of ethics experts; and ensure that the SCC, SCN, and SCM reflect the interests of future generations in avoiding threats posed by climate change.

### 1.    ISSUES BEFORE THE COURT

The Plaintiff States seek injunctive and declaratory relief on three grounds. First, they assert that the SC-GHG Estimates violate the procedural requirements of the Administrative Procedure Act ("APA") as a substantive rule that did not undergo the requisite notice-and-comment process. *See* 5 U.S.C. § 553. Second, the Plaintiff States claim that President Biden, through EO 13990, and the IWG lack the authority to enforce the estimates as they are substantively unlawful under the APA and contravene existing law. *See* 5 U.S.C. § 706(2)(A)–(C). Third, the Plaintiff States maintain that the Government Defendants acted beyond any congressional authority by basing regulatory policy upon global considerations.

The Plaintiff States request a preliminary injunction: (1) ordering Defendants to disregard the SC-GHG Estimates and prohibiting them from adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group ("IWG"); (2) enjoining Defendants from independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons; and (3) ordering Defendants to return to the guidance of Circular A-4, *explained infra,* in conducting regulatory analysis.

The issues presently before the Court are: (1) whether the Plaintiff States satisfy the doctrine of standing; (2) whether the Plaintiff States assert claims subject to judicial review under the APA; and (3) whether the Plaintiff States satisfy the requirements to obtain a preliminary injunction.

To be clear, the Court is ruling only on the actions of the federal agencies and whether the agencies, by implementing the estimates and considering global effects—violate the APA and whether President Biden upon signing EO 13990, violated the separations of powers clause of the United States Constitution. The Court has the authority to enjoin federal agencies from implementing a rule—mandated by an executive order or not—that violates the APA or violates the separation of powers clause. Importantly, the Court is not opining as to the scientific issues regarding greenhouse gas emissions, their effects on the environment, or whether they contribute to global warming.

### 2.   HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT AND CIRCULAR A-4

### (i)   The Administrative Procedure Act and Circular A-4

The Administrative Procedure Act ("APA") is one of the foremost checks on the "growth of the Executive Branch [.]" *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). The APA mandates that agencies take action only pursuant to express legal authority, in a transparent manner, with opportunity for public input, in a nonarbitrary manner, and with judicial review. See *Texas v. U.S.*, 809 F.3d 134 (5th Cir. 2015).

Another check on the growth of the Administrative State is the consensus on cost/benefits analysis required by Presidents Nixon, Ford, Carter, Reagan and Clinton. See Nina A. Mendelson & Jonathan B. Wiener, *Responding to Agency Avoidance of OIRA*, 37 Harv. J.L & Pub. Pol'y 447, 454–57 (2014).  President Clinton issued Executive Order 12866, which instructs agencies to "assess all costs and benefits of available regulatory

alternatives, including the alternative of not regulating" when "deciding whether and how to regulate." [1]

In 2003, President George W. Bush's Office of Management and Budget issued Circular A-4 to implement EO 12866 and ensure agencies use a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions."[2] Circular A-4 has become the cornerstone of regulatory analysis in the Executive Branch.[3]

Circular A-4 provides "highly detailed guidance to the agencies on the key elements of a 'good regulatory analysis' under EO 12866—specifically it includes a clear baseline for comparative purposes, specifically states assumptions, an assessment of the sensitivity of the analytical results to changes in those assumptions, and attention to ancillary impacts." Mendelson & Wiener, *supra,* at 457—58. Relevant to this litigation, Circular A-4 contains two key instructions: (1) agencies are to use both 3 and 7 percent discount rates when conducting regulatory cost/benefit analysis; and (2) agencies are to consider domestic, rather than global, costs and benefits.[4]

Discount factors are used to adjust the estimated benefits and costs for differences in timing.  The further in the future the benefits and costs are expected to occur, the more they should be discounted.[5] "When, and only when, the estimated benefits and costs have been discounted, they can be added to determine the overall value of net benefits."[6]

---

[1] Plaintiffs' exhibit 1 attached to St. John Declaration Doc. 55.
[2] *Id.* attached as exhibit 5, Circular A-4, p. 1.
[3] Anne E. Smith, Ph.D. Declaration, ¶¶ 18-19, Doc. 56.
[4] Plaintiff's exhibit 5, Circular A-4.
[5] *Id.* p. 32.
[6] *Id.*

Prior to Circular A-4, the Executive Branch used a 7 percent discount rate because it "reflects the returns to reals estate and small business capital as well as corporate capital"[7] and "approximates the opportunity cost of capital, and it is the appropriate discount rate whenever the main effect of a regulation is to displace or alter the use of capital in the private sector."[8] In certain circumstances a lower discount rate may be appropriate, therefore Circular A-4 instructs agencies to "provide estimates of net benefits using both 3 and 7 percent."[9]

The second instruction in Circular A-4 requires agencies to make domestic effects the basis of their analysis.[10] See *Wyoming v. United States Dep't of the Interior*, 2020 WL 7641067 at *21 (D. Wyo. Oct. 8, 2020) (noting that Circular A-4 mandates a national focus): *States v. Bureau of Land Mgmt.*, 286 F.Supp.3d 1054, 1069 (N.D. Cal. 2018) ("While Plaintiff argue that the same Circular directs BLM to encompass 'all the important benefits and costs likely to result from the rule,' including 'any important ancillary benefits,' it does not specifically mandate that agencies consider global impacts.")

### (ii)    The Social Cost of Greenhouse Gases

Carbon dioxide, methane, and nitrous oxide, also referred to as greenhouse gases[11] are ever-present byproducts that are produced by activity from energy production to agriculture to waste disposal.

---

[7] *Id.*
[8] *Id.*
[9] *Id.* at p. 34.
[10] "Your analysis should focus on benefits and costs that accrue to citizens and residents of the United States. Where you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately." *Id.* at p. 15.
[11] Gases that trap heat in the atmosphere are called greenhouse gases. Exhibit 42 attached to Plaintiffs' exhibit 1, p. 2, St. John Declaration. Doc. 55-42.

Carbon dioxide is produced from burning fossils fuels such as coal, natural gas, and oil, and solid wastes, trees, chemical reactions,[12]  and other biological materials.[13] Carbon dioxide is removed from the atmosphere when it is absorbed by plants as part of the biological carbon cycle.[14]

Methane is emitted during the production and transport of coal, natural gas, and oil. Methane emissions also result from livestock and other agricultural practices, land use and by the decay of organic waste in municipal solid waste landfills.[15]

Nitrous oxide is emitted during agricultural practices, land use, industrial activities, combustion of fossil fuels and solid waste, as well as during treatment of wastewater.[16]

Fluorinated gases include hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride, and nitrogen trifluoride. They are synthetic, powerful greenhouse gases emitted from a variety of industrial process. These gases are typically emitted in smaller quantities, but because they are potent greenhouse gases, they are sometimes referred to as High Global Warming Potential ("High GWP gases").[17]

Each gas's effect on climate change depends upon: (1) how much is in the atmosphere; (2) how long they stay in the atmosphere; and (3) how strongly they impact the atmosphere.[18]

---

[12] E.g., manufacture of cement.
[13] Exhibit 42 attached to Plaintiffs' exhibit 1, St. John Declaration.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

### (iii)    President Obama's role

In 2009, President Obama convened an Interagency Working Group ("IWG") to establish estimates of the social cost of carbon ("SCC") that all agencies must use in their regulatory cost/benefit analysis. In the Spring of 2010, the IWG presented final SCC estimates which purported to use Circular A-4 as its starting point but rejected two of its fundamental tenets—the 3 and 7 percent discount rates, and the domestic effects as the basis of their analysis. In 2016, the IWG issued estimates for the Social Cost of Methane ("SCM") and the Social Cost of Nitrous Oxide ("SCN").

The IWG established by the Obama administration was dismantled by the Trump administration,[19] and reinstated by the Biden administration through Executive Order 13990, issued on January 20, 2021.

### (iv)    President Biden's Executive Order 13990

On January 20, 2021, President Biden issued Executive Order 13990. 86 Fed. Reg. 7037 (Jan. 20, 2021). Section 5 of EO 13990 directs federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." 86 Fed. Reg. at 7040. Section 5(b)(ii)(A) further provides that "the Working Group shall . . . publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in

---

[19] In 2017, the Trump administration disbanded the IWG, rescinded its technical support documents, and directed agencies to return to Circular A-4's guidance when analyzing the value of changes in greenhouse gas emissions. Exec. Order No. 13783, 82 Fed. Reg. 16093 (Mar. 28, 2017).

greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published." Exec. Order No. 13990, 86 Fed. Reg. 7037, 7040 (Jan. 20, 2021).

On February 26, 2021, the IWG announced the SC-GHG Estimates as directed by EO 13990 ("Current SC-GHG Estimates"). The Current SC-GHG Estimates are identical to those issued by the Obama Administration in the 2016 Technical Support Document and addendum, adjusted for inflation.

### (v)      Relief sought

Plaintiff States move to enjoin and restrain Defendants from:

(1) Adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group, including without limitation, any and all Social Cost of Greenhouse Gas estimates published by the Interagency Working Group;

(2) Adopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects or that otherwise fails to comply with applicable law;

(3) Adopting, employing, treating as binding, or relying upon any estimate of Social Cost of Greenhouse Gases that does not utilize discount rates of 3 and 7 percent or that otherwise does not comply with Circular A-4; and

(4) Relying upon or implementing Section 5 of Executive Order 13990 in any manner.

## II.    STANDING

The Court must first address the threshold question regarding whether the Plaintiff States have standing to bring this suit.

Article III of the Constitution limits the federal courts' jurisdiction to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S. Ct. 2130, (1992). One "essential and unchanging part of the case-or-controversy requirement" is the doctrine of standing. *Id.* at 560. The party invoking federal jurisdiction bears the burden of establishing standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 133 S. Ct. 1138, 1148, 185 (2013). "In the preliminary-injunction context, plaintiffs must make a 'clear showing' of standing" to obtain relief. *Tex. Democratic Party v. Abbott,* 978 F.3d 168, 178 (5th Cir. 2020) *cert. denied,* 141 S.Ct. 1124 (2021); *see Tex. All. for Retired Ams. v. Hughs,* 976 F.3d 564, 567 n.1. (5th Cir. 2020) (contrasting the ordinary showing of standing as opposed to what is required to maintain a preliminary injunction"). Accordingly, plaintiffs must satisfy the three elements that constitute "the irreducible constitutional minimum of standing": (1) injury in fact; (2) causal connection (the injury has to be fairly traceable to the challenged action); and (3) redressability (the injury must be likely, as opposed to merely speculative that it will be redressed by a favorable decision). *Lujan*, 504 U.S. at 560. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2, 126 S. Ct. 1297 (2006). Yet, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is

sought." *Town of Chester v. Laroe Estates, Inc.*, __ U.S. __, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

Importantly, "states are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 526, 127 S. Ct. 1438 (2007). Accordingly, the presumption of "special solicitude" may be available to a state "exercising a procedural right created by Congress and protecting a quasi-sovereign interest." *Texas v. United States*, 809 F.3d 134, 162 (5th Cir. 2015).

### 1.  Injury in fact

To satisfy the injury-in-fact requirement, the Plaintiffs must show that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural and hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560. Allegations of "future injury may suffice if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S. Ct. 1138 (2013)).

Plaintiff States allege direct injury to their sovereign, fiscal, procedural, and *parens patriae* interests. As to their sovereign interests, Plaintiff States claim that they are directly injured by the Government Defendants' alteration of cooperative federalism programs. Specifically, they contend that the SC-GHG Estimates impose new obligations on them when they *participate in* cooperative federalism programs. The Fifth Circuit has recognized that this type of "increased regulatory burden typically satisfies the injury in

fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015).

To establish direct injury, Plaintiff States assert that: (1) they are substantial producers of energy and rely upon tax revenue from energy production to perform their sovereign duties; (2) the SC-GHG Estimates will impose additional duties upon Plaintiff States when they implement cooperative federalism programs; and (3) the SC-GHG Estimates will harm Plaintiff States' ability to purchase affordable energy to carry out their sovereign functions.

Plaintiffs States argue that the increased SC-GHG Estimates will necessarily cause regulatory standards for air quality, energy efficiency, and power plant regulation to become more stringent and result in significant costs increases.[20] Moreover, this increased stringency will directly harm the economies and revenues of Plaintiff States.

For example, the SC-GHG Estimates will directly harm Louisiana's energy, chemical manufacturing, and agricultural industries by increasing their regulatory burdens and driving up the price of electricity that these businesses need to stay in business and continue to employ Louisianians and contribute to tax revenues.[21] The SC-GHG Estimates will harm Louisiana, the nation's number two oil producer and a top five national natural

---

[20] See Smith Decl. ¶¶ 85092; Dismukes Decl. ¶ 23 ("The use of unsupported SC-GHG estimates in NEPA and other regulatory analysis will result in the approval of new regulations that will impose significant costs on Louisiana's economy and business that are not justified by an accurate assessment of their costs and benefits.")
[21] Dismukes Decl. ¶¶ 22-26.

gas producer,[22] resulting in significantly reduced royalties from leasing sales under Outer Continental Shelf Act ("OCSLA").

The SC-GHG will directly harm Kentucky's economic welfare,[23] as demonstrated by the Obama Administration's SCC-justified Clean Power Plan by making a new CPP justifiable under cost/benefit analysis principles. The SC-GHG will harm Alabama's ability to exploit its energy resources and harm its industrial sector, and Florida's tourism industry by driving up the transportation costs and energy prices.[24]

Plaintiff States also allege that the SC-GHG Estimates impose additional duties on them when *carrying out* cooperative federalism programs because they are compelled to employ the IWG's methodology as a condition of approving significant funding and State environmental implementation plans. For example, states must comply with federal standards in programs such as the National Ambient Air Quality Standards ("NAAQS"), 42 U.S.C. § 7410. Under that statute, it is the states' burden "to propose plans adequate for compliance with NAAQS." *E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498, 134 S. Ct. 1584 (2014). Plaintiff States assert that the EPA has instructed that NAAQS are now required to be set based on the IWG's SC-GHG Estimates.[25] Likewise, the states must use the SC-GHG Estimates or risk having their state implementation plans disapproved. Yet, even if a state implementation plan is disapproved by the EPA, the EPA

---

[22] See U.S. Energy Info. Admin., "Louisiana: State Profile and Energy Estimates" (updated Apr. 15, 2021). (St. John Dec. Ex. 30).
[23] Kentucky is one of the top coal-producing states. See U.S. Energy Information Administration, "Coal FAQ" (St. John Decl. Ex. 32).
[24] See U.S. Energy Info. Admin., "Florida: State Profile and Energy Estimates" (updated Nov. 19, 2020) (St. John Decl. Ex. 33).
[25] *See* Doc. 1 at 45–46, ¶124.

will impose a federal implementation plan upon the state—which also must be based upon the SC-GHG Estimates. [26]

Defendants challenge Plaintiff States assertion of the use of the SC-GHG Estimates by the NAAQS, and argue that there are no NAAQS for greenhouse gases, *see Utility Air REgul. Grp. v. EPA*, 573 U.S. 302, 308 (2014) (listing the "six pollutants" for which "EPA has issued NAAQS").  Plaintiff States offer no explanation of how the SC-GHG Estimates would be used in setting or revising NAAQS for non-greenhouse-gas pollutants.

The SC-GHG Estimates will directly harm Georgia's industrial sector by increasing stationary source regulatory stringency.[27] The SC-GHG Estimates will directly harm Mississippi's energy infrastructure including its petroleum refinery, natural gas processing plant and LNG terminal.[28] The SC-GHG Estimates will directly harm South Dakota's industrial and agricultural capacities.[29] The SC-GHG Estimates will directly harm Texas, the nation's leading energy producer.[30] The SC-GHG Estimates will be fatal to West Virginia's economy, the fifth-largest energy producer in the nation—specifically  its coal industry as realized by the Obama administration's CPP.[31] The SC-GHG will directly harm

---

[26] Doc. 1 at 45–46, ¶¶123–125.

[27] See U.S. Energy Info. Admin., Georgia: State Profile and Energy Estimates" (updated Nov. 19, 2020) (St. John Dec. Ex. 34).

[28] See U.S. Energy Info. Admin., "Mississippi: State Profile and Energy Estimates" (updated July 16, 2020) (St. John Decl. Ex. 35).

[29]  See U.S. Energy Info. Admin., South Dakota: State Profile and Energy Estimates" (updated Apr. 16, 2020) (St. John Dec. Ex. 36).

[30] See U.S. Energy Info. Admin., "Texas: State Profile and Energy Estimates" (updated Apr. 15, 2021) (St. John Decl. Ex. 37).

[31] See U.S. Energy Info. Admin., "West Virginia: State Profile and Energy Estimates" (updated Oct. 15, 2020) (St. John Decl. Ex. 38).

Wyoming, the largest net energy supplier in the nation and a major producer of coal, natural gas, and oil.[32]

The Plaintiff States argue that the harms to these States are imminent and directly traceable to EO 13990 and the SC-GHG Estimates.  The Plaintiff States remark that the chain of causation is clear and confirmed by history: agencies will apply EO 13990's unambiguous command to apply the IWG's unlawful SC-GHG Estimates in a manner that will harm Plaintiff States' legally cognizable interests.

Defendants maintain that Plaintiff States have failed to affirmatively show an Article III injury to establish standing. Plaintiff States insist that the Executive Branch is employing the SC-GHG Estimates in a range of rulemaking across statutory regimes. Plaintiff States provide the following examples of final rules using the SC-GHG to increase costs in various industries:

- EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74434 (Dec. 30, 2021).[33] Defendants remark that EPA explained that it "is not required to conduct formal costs benefit analysis to determine the appropriate standard under Section 202" of the Clean Air Act, and that "analysis of monetized GHG was not material to its decision. In summation, "the decisions reached and standards put in place do not depend on the 2021 SC-GHG interim estimates." EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Response to Comments* (Dec. 2021), https://perma.cc/RX8S-FFPJ.

- DOE, *General Service Lamps*, 86 Fed. Reg. 70755 (Dec. 13, 2021).[34]

---

[32] See U.S. Energy Info. Admin., "Wyoming: State Profile and Energy Estimates" (updated Mar. 18, 2021) (St. John Decl. Ex. 39).
[33] Plaintiff's exhibit 1, Daigle Decl. (This rule will impose unprecedented costs on the American auto industry; specifically, the EPA's estimate of benefits "include[d] climate-related economic benefits from reducing emissions of GHG's that contribute to climate change" based on the SC-GHG Estimates). *Id.* at 74443.
[34] Plaintiffs' exhibit 2, Daigle Decl. at 70768. (This proposed rule employs the SC-GHG Estimates in calculating benefits).

- EPA, *Oil and Gas New Modified Sources,* 86 Fed. Reg. 63110 (Nov. 15, 2021).[35]

- Bureau of Land Management (BLM), *Fact Sheet: analyzing the effects of fossil fuel leasing and development on greenhouse gases* (Oct. 29, 2021).[36]

- DOE, *Manufactured Housing*, 86 Fed. Reg. 59042 (October 26, 2021).[37]

- Federal Acquisition Regulatory Council (FAR), *Minimizing Climate Change in Federal Acquisitions*, 86 Fed. Reg. 57404 (October 15, 2021).[38]

- Council on Environmental Quality (CEQ), *NEPA Implementing Regulations Revisions*, 86 Fed. Reg. 55757 (Oct. 7, 2021).[39]

- EPA, *Phasedown of Hydrofluorocarbons*, 86 Fed. Reg. 55116 (Oct. 5, 2021).[40] Defendants contend that EPA did not rely on the SC-GHG Estimates, and the proposed rule explained that it would implement an explicit congressional command in the American Innovation and Manufacturing Act of 2020,  Pub. L. No. 116–260, 134 Stat. 1182 (codified at 42 U.S.C. § 7675), which "directs EPA to address HFCs by providing new authorities" to "phase down the production and consumption of listed HFCs" on a "schedule prescribed by Congress." 86 Fed.Reg. at 27,153, 27,159.

The Court is concerned that Defendants' arguments are somewhat misleading considering that the following statement is made in the *Regulatory Impact*

---

[35] Plaintiffs' exhibit 3, Daigle Decl. (EPA uses SC-GHG Estimates in proposing stricter standards on GHG emissions for the oil and gas industry; the effect is billions of dollars of compliance costs).

[36]  Plaintiffs' exhibit 4, Daigle Decl. (The BLM issues a fact sheet and announced a "[s]tandardized methodology for consideration of the social cost of greenhouse gases in lease sales." *Id.*, at 1. The fact sheet relies on the SC-GHG Estimates and the Executive Order—"BLM's analysis uses the interim estimates of the social costs of carbon, methane and nitrous oxide published by the IWG in February 2021.) *Id.* at 2.

[37] Plaintiffs' exhibit 5. (DOE explicitly relies on the Executive Order and Estimates in determining whether the rule is justified; "DOE calculates the value of the reduced emissions of CO2, CH4, and N20 (collectively, greenhouse gases of GHGs) using a range of values per metric ton of pollutant, consistent with the interim estimates issued in February 2021 under Executive Order 13990.") *Id.* at 59043.

[38] Plaintiffs' exhibit 6, Daigle Decl. (FAR released an advanced notice of proposed rulemaking stating that it is considering the SC-GHG Estimates in promulgating a new regulation that would evaluate federal acquisition contracts based on the IWG's SC-GHG Estimates.) *Id.* at 57405.

[39] Plaintiffs' exhibit 7. (CEQ issued a proposed rule repealing the previous Administration's final NEPA implantation-regulation revisions. The proposed rule specifically directs agencies to use the SC-GHG Estimates. *Id.* at 55763, n.5.)

[40] Plaintiffs' exhibit 8. (EPA issued a final rule seeking to phase down hydrofluorocarbons ("HFCs") which imposes massively increased regulatory costs on the myriad of products that rely on HFCs, including refrigeration, air-conditioning, building insulation, and aerosols. The EPA relied on the same models, methodologies, and assumptions as the Working Group's SC-GHG Estimates, and specifically cited the Working Group's "interim" Technical Support Documents as authority. See, *e.g.,* 86 Fed. Reg. at 55119; see also EPA, *Regulatory Impact Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HCFs)* at 103-15 (Sept. 2021), Plaintiffs' exhibit 9, Daigle Decl.

*Analysis for Phasing Down Production and Consumption of Hydrofluorocarbons (HFCs),*[41]

> These SC-HFC estimates were developed using methodologies that are consistent with the methodology underlying the social cost of carbon, methane, and nitrous oxide estimates presented in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (IWG 2021). The social cost of GHG estimates presented in IWG (2021) are interim values developed under E.O. 13990 for use in benefit-cost analyses until an improved estimate of the impacts of climate change can be developed based on the best available science and economics. Therefore, EPA views the SC-HCF estimates used in analysis to be appropriate for use in benefit-cost analysis until improved estimates of the social cost of other GHGs are developed.[42]

- National Highway Traffic Safety Administration (NHTSA), *2024-2026 Passenger Cars and Light Trucks Emissions Standards,* 86 Fed. Reg. 49602 (Sept. 3, 2021).[43]

- Dep't of the Interiors (DOI), Secretarial Order no. 3399, *Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decisions-Making Process* (April 16, 2021).[44]

Plaintiff States maintain that: (1) the FAR Climate rule will directly harm Plaintiff States' ability to contract with the federal government; (2) the vehicle regulations will increase the prices Plaintiff States must pay for vehicles for official use; (3) CEQ's NEPA regulation revisions will harm Plaintiff States in their sovereign capacity by pressuring them to change their approach to NEPA analysis in their capacity as joint lead agencies; (4) DOI and BLM's activities are depressing the Plaintiff States' statutorily entitled

---

[41] Doc. 91-11.
[42] *Id.* at p. 104.
[43] Plaintiffs' exhibit 10, Daigle Decl. (NHTSA used SC-GHG estimates to calculate and include "benefits" of reduced GHG emissions in a proposed rulemaking to impose more costly and burdensome fuel economy standards).
[44] Doc. 55-28. (Secretary of the DOI issues an order directing agencies, including BLM and the Bureau of Ocean Energy Management (BOEM) to employ the SC-GHG Estimates as "an essential tool" in their cost-benefit analysis whenever they "determine[] that a monetized assessment of socioeconomic impacts is relevant" specifically citing EO 13990.*Id.* at 1 and 4).

proceeds from lease sales and production by artificially reducing both the number of parcels available and the activities that can be conducted on those parcels.

Plaintiff States have submitted evidence to posit that the SC-GHG Estimates are currently in use in NEPA analyses.  Examples include the following:

- Department of Transportation, Maritime Administration, *Bluewater Texas Terminal Deepwater Port Project Draft Environmental Impact Statement* (Oct. 2021).[45]

- Bureau of Land Management (BLM), *Wyoming First Quarter Oil and Gas Lease Sale Environmental Analysis* (Nov. 1, 2021).[46]

- BLM, *Utah First Quarter Oil and Gas Lease Sale Environmental Analysis* (Nov. 1, 2021).[47]

- DOE, *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Alaska LNG Project,* 86 Fed. Reg. 35280 (July 2, 2021).[48]

First, the Plaintiff States have asserted a concrete and particularized injury: mandatory implementation of the SC-GHG Estimates imposes new obligations on the states and increases regulatory burdens when they participate in cooperative federalism

---

[45] Plaintiffs' exhibit 11, Daigle Decl. (DOT used the SC-GHG Estimates to examine the Bluewater Texas Deepwater port project in the draft environmental impact statement, in both the constructions and emissions phases of the project.). *Id.* at 3-323.

[46] Plaintiffs' exhibit 12, Daigle Decl. (BLM used the SC-GHG Estimates in "accordance with th[e] direction" of EO 13990 to estimate staggering cost estimates for holding the lease sale. *Id.* at 34, resulting in a smaller sale causing the States of Wyoming a significant loss of revenue.) See also Nicole Pollack, *Less than half of proposed Wyoming oil and gas leases recommended for upcoming sale,* Casper Star Tribune (Dec. 7, 2021). Plaintiffs' exhibit 13.

[47] Plaintiffs' exhibit 15 (BLM used the SC-GHG Estimates in analyzing alternative for the First Quarter 2022 Utah oil and gas lease sale held under the MLA.) *Id.* at 40-43.

[48] Plaintiffs' exhibit 16, Daigle Decl. (In light of E.O 13990, the Biden Administration reopens a previously granted authorization to Alaska LNG Project LLC "to export LNG produced from Alaska sources to any country with which the United States has not entered into a free trade agreement (FTA) requiring national treatment for trade in natural gas, and with which trade is not prohibited by U.S. law or policy (non-FTA countries.") *Id.* at 35280. In the order (*Alaska LNG Project LLC, DOE/FE Order No. 3643-B,* FE Docket 14-96-LNG, Order on Rehearing (Apr. 15, 2021) (Plaintiffs' exhibit 17) granting the rehearing, the DOE expressly relied on E.O. 13990 and subsequently issued a notice of intent, citing E.O. 13990 to prepare an entirely new Supplemental Environmental Impact Statement.) 86 Fed. Reg. at 35281.

programs. Second, the Plaintiff States have shown that the alleged injury is both actual and imminent. The injury is "actual" as to the executive agencies that have already employed the SC-GHG Estimates, such as the EPA in disapproving state implementation plans under the NAAQS good neighbor provisions and imposing federal implementation plans on several Plaintiff States including Louisiana, Kentucky, and Texas. 86 Fed. Reg. 23054, 23061 (Apr. 30, 2021). In addition, future injury is imminent and certainly impending because other agencies engaged in cooperative federalism programs with the states are required to employ the SC-GHG Estimates, and as shown by the NAAQS example, the states are confronted with a forced choice: either they employ the Estimates in developing their state implementation plan, or the EPA subjects them to a federal plan based on the SC-GHG Estimates.[49]

To be sure, the Administration's use of the SC-GHG's Estimates in NEPA reviews to analyze the climate impact of oil and gas lease sales under the MLA directly causes harm to the Plaintiff States' statutorily vested rights to proceeds from MLA oil and gas leases. In other words, the SC-GHG Estimates artificially increase the cost estimates of lease sales, which in effect, reduces the number of parcels being leased, resulting in the States receiving less in bonus bids, ground rents, and production royalties.

Plaintiff States suggest that the EPA's mandate that the FERC use the SC-GHG Estimates has caused significant delays in project approvals causing the Plaintiff States to lose property tax revenues.[50]

---

[49] 86 Fed. Reg. 23054, 23061, 23153-155.
[50] Plaintiffs' exhibit 24, Daigle Dec., Columbia Gulf Transmissions, LLC, Resource Report 5: Socioeconomics, East Lateral Express Project at 5-9 to 5-12, Docket No. CP20-527-000 (Sept. 24, 2020).

The Court is persuaded that the Biden Administration's agencies are using the SC-GHG. The Court finds that the Plaintiff States have established injury-in-fact.

### 2.      Causal link

To establish causation, the plaintiffs must demonstrate that the injury is "fairly traceable" to the challenged conduct of the defendant rather than the result of "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S. Ct. 1917, 1926 (1976)).

Defendants argue that because Plaintiff States' alleged harm is so speculative, one cannot know in advance whether that harm would have any causal connection to E.O. 13990 or the SC-GHG Estimates. In other words, there is no way to predict how the SC-GHG Estimates will affect an agency's analysis. The Court respectfully disagrees.  Plaintiff States have clearly established that: (1)  the SC-GHG Estimates create a new cost measure the Plaintiff States must use when running cooperative federalism programs or risk serious consequences; (2) the SC-GHG Estimates significantly increase cost numbers that directly harm Plaintiffs' revenues; (3) the Plaintiff States have been deprived of the right to submit comments which prevented Plaintiff States from raising important reliance interests and other flaws that directly affect the States;  and (4) the SC-GHG Estimates create a new GHG cost measure that agencies must use in their regulatory actions that has caused greater regulatory burdens and harm to Plaintiff States' citizens' economic well-being.

The Court is persuaded that the SC-GHG Estimates are being applied and are increasing regulatory costs. Thus, Plaintiff States have met their burden of alleging that

their injury is "fairly traceable" to the challenged act.  *Jindal v. U.S. Dep't of Educ.,* 2015 WL 854132, at *5 (M.D. La. Feb. 26, 2015).

### 3.  Redressability

Lastly, the doctrine of standing demands that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 96 S. Ct. 1917, 1926, (1976)).

Plaintiff States maintain that an injunction and eventual vacatur will result in the prior regulatory regime based on Circular A-4 to retake effect and redress Plaintiff States' injury. The Court agrees with Plaintiff States that the remedy they seek will redress their injury.

Plaintiff States also maintain that even if they did not have standing under the traditional analysis, they have standing under "special solicitude." "States may have standing based on … federal assertions of authority to regulate matters they believe they control." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).  Plaintiff States argue that the SC-GHG Estimates "affect[] the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their" practices and laws to remain in compliance with federal standards. *Id.* at 153.  The Court finds that the Plaintiff States also have standing as they are entitled to special solicitude in the standing inquiry. *See also Texas v. United States* 2021 WL 2096669, at *20 (S.D. Tex. Feb. 23, 2021) ("Although the record demonstrates no express intention of any party to convince Texas to change its detention

or education budgets, the pressure exerted on Texas to reconfigure its budget in those areas is just as 'direct' and 'substantial' as the pressure on the States in *Texas v. United States.*")

## III.   REVIEWABILITY

In addition to finding that the Plaintiff States have standing, the Court must ensure that the asserted claims are reviewable under the APA. The APA provides for judicial review of agency action. *See* 5 U.S.C. § 702. Indeed, there is a "strong presumption" favoring reviewability of administrative action. *Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 670, 106 S. Ct. 2133 (1986). This review is restricted, however, by four factors. First, the challenged conduct must constitute a "final agency action." 5 U.S.C. § 704. Second, the states must satisfy the zone-of-interests test. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, __ U.S. __, 132 S. Ct. 2199, 2210, 183 (2021). Third, the APA makes agency action unreviewable if the organic statute "precludes judicial review." 5 U.S.C. § 701(a)(1). Fourth, the APA makes agency action unreviewable if the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[51]

The Plaintiff States assert three claims under the Administrative Procedures Act ("APA"). First, they claim that the defendants violated the APA by failing to comply with the notice-and-comment procedures required by 5 U.S.C. § 553. Second, they claim that the Defendants failed to engage in reasoned decision making rendering the SC-GHG Estimates arbitrary and capricious under 5 U.S.C. § 706(2)(A). Third, they claim that the SC-GHG Estimates contravene the Energy Policy and Conservation Act ("EPCA"), Clean

---

[51] No argument has been made by Defendants as to this criteria, therefore it will not be addressed.

Air Act ("CAA"), National Environmental Policy Act ("NEPA"), Mineral Leasing Act ("MLA"), and Outer Continental Shelf Lands Act ("OCSLA") by directing agencies to consider the global effects of greenhouse gas emissions.

### 1.  Final Agency Action

"Agency action" is defined as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has articulated two conditions for an agency's action to qualify as "final." First, the action may not be "merely tentative or interlocutory" in nature; rather, it "must mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154 (1997) (internal citations omitted). Second, the action "must be one by which rights or obligations have been determined, or from which legal consequences flow." *Id.*

Defendants contend that all the Plaintiff States' claims fail for the lack of any "final agency action." As to the first *Bennett* condition, Defendants maintain that the SC-GHG Estimates do not "mark the consummation of the agency's decisionmaking process" because "they have no significance unless and until they are actually used in some future rulemaking."[52] Referring to the Estimates as "interim," Defendants further explain that the SC-GHG Estimates "mark only the (potential) *beginning* of dozens of separate regulatory processes, which may eventually culminate in the issuance of regulations that *are* final agency action." *Id.* (emphasis in original/emphasis added)

---

[52] Doc. 31-1, at 38.

The Plaintiff States argue that the Interim Estimates are legislative rules, and thus, automatically constitute final agency action.[53] Even still, the Plaintiff States contend the SC-GHG Estimates also meet the two-part test for "final agency action." The Court agrees.

The first prong is analyzed by determining "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue," or is "only the ruling of a subordinate official, or tentative." Here, the SC-GHG Estimates were issued by the IWG under the authority of EO 13990 and were the culmination of the IWG's consideration of the issue of how to account for the social costs of greenhouse gas emissions in regulatory cost-benefit analyses. The label "interim" does not alter the inherent finality of the rule for purposes of APA review. "As long as an agency has completed its decisionmaking on the challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test." *Louisiana v. Biden*, 2021 WL 2446010 at *1, *13 (W.D. La. June 15, 2021).

The "interim" SC-GHG Estimates are the final directive from the IWG on how agencies are to conduct their cost-benefit analyses until a different, "permanent" rule is issued. Significantly, during the pendency of this suit, the Office of Information and Regulatory Affairs announced that the target date for publishing the next set of SC-GHG Estimates is January 2022. Indeed, the "interim" Estimates have already been utilized by executive agencies, indicating that the agencies interpret the SC-GHG Estimates as final and binding. As noted above, Plaintiff States have provided numerous instances where

---

[53] Doc. 48, at 39.

agencies are using the SC-GHG Estimates that this Court finds are causing a direct harm to the Plaintiff States in increased costs, delayed projects and the loss of Plaintiff States' revenues. As a result, the "Interim" SC-GHG Estimates are indeed final; the next set of SC-GHG Estimates was due to be finalized in January 2022. As of this date, they have yet to be finalized and the Defendants inform the Court that they will probably not be finalized until the summer of 2022.[54] Accordingly, the IWG's SC-GHG Estimates constitute a final agency action under the APA.

### 2.    Zone of Interests

Next, the Plaintiff States must satisfy the zone-of-interests test to pursue claims under the APA. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, __ U.S. __, 132 S. Ct. 2199, 2210 (2021). Specifically, the Plaintiff States must show that the interest asserted is "arguably within the zone of interests to be protected or regulated by the statute" claimed to be violated. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827 (1970). The Supreme Court has emphasized that this standard "is not meant to be especially demanding" and is evaluated in keeping with the underlying presumption of reviewability. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians,* 132 S. Ct. at 2210 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S. Ct. 750 (1987)). Furthermore, "the benefit of any doubt goes to the plaintiff," and suit should be foreclosed "only when 'a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably

---

[54] Defendant Supplemental Memorandum, p. 23, Doc. 90.

be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Sec. Indus. Ass'n*, 479 U.S. at 399–400, 107 S. Ct. 827).

Here, the interests the Plaintiff States seek to protect undoubtedly fall within the zone of interests embodied in the statutes they claim to be violated by Defendants—the APA, EPCA, CAA, NEPA, MLA, and OCSLA.

### 3. Statutory Preclusion of Judicial Review

The APA exempts agency action from judicial review if the organic statute "precludes judicial review." 5 U.S.C. § 701(a)(1). Considering the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," an intent to preclude such review will be found "only if presented with 'clear and convincing evidence.'" *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63–64, 113 S. Ct. 2485 (1993) (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 111 S. Ct. 888 (1991); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S. Ct. 1507 (1967)). Establishing unreviewability is an onerous burden, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351, 104 S. Ct. 2450 (1984).

This Court has not found, nor have Defendants cited any statute(s) indicating an intent to preclude judicial review of the Plaintiff States' claims. Accordingly, the claims are not excluded from judicial review under Section 701(a)(1).

**(IV)   LAW AND ANALYSIS**

To obtain a preliminary injunction, Plaintiff States must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013).

      **1.**      **Plaintiff States Likelihood of Success on the Merits**

The Plaintiff States argue that they are likely to succeed on the merits because (1) the President and the IWG lack authority to promulgate and enforce the SC-GHG Estimates, or consider the global effects in domestic regulatory policymaking, (2) the SC-GHG Estimates were promulgated without complying with the APA's notice and comment requirements, (3) the SC-GHG Estimates are arbitrary and capricious under the APA, and (4) the SC-GHG Estimates are contrary to law.

The Plaintiff States suggest that in effect, the President and the IWG's decision to drop the 7 percent discount rate and increase the time frame of relevant effects to three centuries, will fundamentally transform regulatory analysis and the national economy. The Plaintiff States argue that the Executive Branch does not have the authority to issue Executive Order 13990 because it causes "an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.,* 573 U.S. at 324.

### (i)      The President and the IWG lack authority

"In order for an executive or independent agency to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States,* 140 S.Ct. 342 (2019) (citing *Util. Air Regulatory Grp. v. E.P.A.,* 573 U.S. 302 (2014); *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000); *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.,* 512 U.S. 218 (1994); Stephen A. Breyer, *Judicial Review of Questions of Law and Policy,* 38 Admin. L. Rev. 363, 370 (1986)).

The Executive cannot "bring about an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.,* 573 U.S. at 324; *see also Brown & Williamson Tobacco Corp.,* 529 U.S. at 159. (Rejecting executive claim to "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization.) The Supreme Court "expect[s] Congress to speak clearly if it wishes to assign to an agency, decisions of vast 'economic and political significance." *Util. Air Regulatory Grp. v. E.P.A.,* 573 U.S. at 324.

Defendants argue that Article II of the United States Constitution supplied President Biden the authority to issue EO 13990. Defendants contend that EO 13990 is a routine exercise of traditional presidential control over subordinates as part of supervising

subordinates' actions. In other words, the issuance of EO 13990 falls within the President's authority—and duty—to "supervise and guide" agencies "in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Sierra Club v. Costle,* 657 F.2d 298, 406 n. 524 (D.C. Cir. 1981)).

Defendants also rely on the text from EO 13990, that "[n]othing in this order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." *Id.* § 8(a)(i); see also *Id.* § § 5(b)(ii), 8(b) ("This order shall be implemented in a manner consistent with applicable law.")

Defendants suggest that the "major questions doctrine" has no bearing on the President's authority to issue EO 13990 because the President is not a creature of statute. Plaintiff States argue that the SC-GHG Estimates implicate a matter of major importance and there is no statutory authority for the Executive branch to issue the SC-GHG Estimates.

The major questions doctrine ensures that agencies do not impose new obligations of "vast 'economic and political significance'" upon private parties and States unless Congress "speaks clearly." *Util. Air Reg. Grp.*, 573 U.S. at 324 (2014). The major questions doctrine consists of two steps for the Court to determine: (1) if the assertion of Executive authority implicates matters of "vast 'economic and political significance,'" and (2) if Congress has "expressly and specifically" delegated authority over the issue to the Executive. *Paul v. United States*, 140 S.Ct. 342 (2019) (statement of Kavanaugh, J.,

respecting denial of certiorari) (collecting cases); *NFIB v. OSHA,* 2022 WL 120952, at *3 (U.S. Jan. 13, 2022).

The major questions doctrine enforces the Nondelegation Doctrine by "protect[ing] the separation of powers and ensur[ing] that any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands." *NFIB*, 2022 WL 120952, at *6 (Gorsuch, J., concurring).

Plaintiff States assert that the SC-GHG Estimates will impose significant costs on the economy.[55] "The total cost of these 83 regulatory actions [using social costs] is estimated to be between $447 billion and $561 billion (in 2020 dollars)."[56] Courts have found that less costly and far-reaching regulations have triggered the major questions doctrine.  For example, the Fifth Circuit recently held that the OSHA Vaccine Mandate, which imposed almost $3 billion in compliance costs, triggered the major questions doctrine. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021); *see also Id.* at 617–18 (citing *MCI Telecomms. Corp. v. AT&T,* 512 U.S. 218, 2131 (1994) (declining to hold that the FCC could eliminate telecommunications rate-filing requirements); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–160 (2000) (declining to hold that the FDA could regulate cigarettes); *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (declining to allow DOJ to ban physician-assisted suicide).

Additionally, Plaintiff States contend that Defendants have failed to identify clear statutory authorization for issuing EO 13990. "[W]hen Congress wishes to 'alter the

---

[55] Plaintiffs' exhibit 26, p.2.
[56] Doc. 57 ¶ ¶ 14-26.

fundamental details of a regulatory scheme,' . . . we would expect it to speak with the requisite clarity to place that intent beyond dispute." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n* 140 S.Ct. 1837, 1848–49 (2020). "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952).

Specifically, Plaintiff States challenge the SC-GHG Estimates' consideration of global effects as opposed to national or domestic effects.  Plaintiff States assert that Congress has addressed the issue of whether agencies can consider global or domestic effects and informs the Court that Congress has emphatically articulated that agencies may only consider effects to our Nation. To support their position, Plaintiff States note that (1) EPCA directs the Executive "to consider the need for *national* energy and water conservation," 42 U.S.C. § 6295(o)(2)(B)(i) (emphasis added), (2) "the need of the *United States* to conserve energy," 49 U.S.C. § 32902(f) (emphasis added), (3) the Clean Air Act directs the Executive "to protect and enhance the quality of *the Nation's* air resources so as to promote the public health and welfare and the productive capacity of its population," 42 U.S.C. 7401(b)(1) (emphasis added), (4) NEPA directs agencies to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings," U.S.C. § 4331(b)(2) (emphasis added), (5) the MLA directs the Executive to consider the "public welfare" of the *United States* in conducting oil and gas lease sales, 30 U.S.C. § 187 (emphasis added), and (6) the OCSLA directs the Executive to make the

Outer Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other *national* needs." 43 U.S.C. § 1332(3) (emphasis added).

Plaintiff States argue that EO 13990 and the SC-GHG Estimates mandate outcomes with massive numbers for the cost side of the scale, unlike EO12866 and Circular A-4, which provided a framework for agencies to calculate the costs and benefits of regulation and determine how to weigh them under their statutory authority. Thus, EO 13990 and the SC-GHG Estimates are a legislative rule that dictates specific numerical values for use across all decisionmaking affecting private parties. *See e.g., Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) ("Judge Friendly wrote that when an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking.")

Plaintiff States also maintain that the SC-GHG Estimates alter rights and obligations and remove agency discretion. *See Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) ("[I]f a statement denies the [agency] discretion in the area of its coverage[,] then the statement is binding, and creates rights or obligations.")  Plaintiff States note that the SC-GHG Estimates direct agencies to use specific social cost numbers, not only in rulemaking, but in "other relevant agency actions," such as project-level NEPA reviews. Doc. 55-27, pp. 5-6, 24-25; Doc. 55-26, p. 5.

The Court finds that EO 13990 contradicts Congress' intent regarding legislative rulemaking by mandating consideration of the global effects.  The Court further finds that the President lacks power to promulgate fundamentally transformative legislative rules in

areas of vast political, social, and economic importance, thus, the issuance of EO 13990 violates the major questions doctrine.

### (ii)     The SC-GHG Estimates were promulgated without complying with the APA's notice and comment requirements

Next, the Plaintiff States maintain that the SC-GHG were promulgated without complying with the APA's notice and comment requirements. The Plaintiff States remark that the SC-GHG Estimates are a legislative rule because they prescribe valuations, costs or accounting, or practices bearing on any of the foregoing. 5 U.S.C. § 551(4).

Agency legislative rules must go through the APA's notice-and-comments procedures. 5 U.S.C. § 553; *see also Texas v. United States,* 2021 WL 723856, at *43 (S.D. Tex. Feb. 23, 2021). Consequently, the SC-GHG Estimates were required to go through the APA's notice and comment procedures. *See Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) ("When an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking."); *see also Hoctor v. U.S .Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996) ("When agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking, a procedure that is analogous to the procedure employed by legislatures in making statutes.")

In addition, Plaintiff States maintain that the SC-GHG Estimates effectively repeal key provisions of two regulatory actions that went through the notice and comment procedure—the 7 percent discount rate and focus on domestic effects. *Clean Water Action v. United States Envtl. Prot. Agency,* 936 F.3d 308, 312 (5th Cir. 2019) (an agency must

"follow the same process to revise a rule as it used to promulgate it") (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015)).

Next, the SC-GHG Estimates revise CEQ's recent NEPA final rule's causation standard. Specifically, the CEQ's rule requires agencies to exclude effects that "are remote in time, geographically remote, or the product of a lengthy causal chain," 85 Fed. Reg. 43304, 43375 (July 16, 2020); the SC-GHG Estimates require agencies to consider remote effects which contradicts the CEQ's rule.[57]

The Plaintiff States note that the Administration was entitled to amend the rules but was required to "use the same procedures" in amending as it "used to issue the rule in the first instance." *Clean Water Action,* 936 F.3d at 313–14 (quoting *Perez,* 575 U.S. at 101). However, the SC-GHG Estimates were promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D). The Court finds that EO 13990 was promulgated without complying with the APA's notice and comment requirements.

### (iii).   The SC-GHG Estimates are arbitrary and capricious under the APA

The Plaintiff States further maintain that the SC-GHG Estimates are arbitrary and capricious under the APA. Under the APA, courts are to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A). "Federal administrative agencies are required to engage in 'reasoned decisionmaking,'" *Texas v. United States*, 2021 WL 723856, at *39, meaning

---

[57] The CEQ's rule was published only after complying with the APA's notice and comment procedure.

that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.*

The Plaintiff States argue that the Biden SC-GHG Estimates are based on a fundamentally flawed methodology that does not take into account statutory considerations, ignores decades of best regulatory practices, and *sub silentio* depart from regulatory documents that remain in force. *Cf. California v. Bernhardt*, 472 F.Supp.3d 573, 600–01 (N.D. Cal. 2020) ("While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration. The APA requires reasoning, deliberation, and process.  These requirements exist in part, because markets and industries rely on stable regulations.") In other words, the SC-GHG Estimates are neither "reasonable" nor "reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021). The Plaintiff States present numerous arguments as to why the SC-GHG Estimates are arbitrary and capricious.

- The SC-GHG Estimates fail to consider the positive externalities of energy production.

- The IWG failed to consider whether "there was 'legitimate reliance' on the" prior administration's method of focusing on domestic effects and using higher discount rates. *Dep't of Homeland Security. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

- The SC-GHG Estimates ignore specific factual findings made by the previous Administration justifying its reliance on Circular A-4 in regulatory proceedings.

- There is a "significant mismatch" between the SC-GHG Estimates' conclusions and the administrative record.[58]

---

[58] The Plaintiff States remark that the IWG acknowledged that its SC-GHG Estimate was based on antiquated models, needed updating and was based largely on guesswork, but instead of allowing for the comment period for

- The IWG fails to justify the SC-GHG's use of a global rather than domestic scope in calculating costs.

- The SC-GHG arbitrarily departs from decades of prior Executive Branch cost/benefit practice regarding discount rates.[59]

- The SC-GHG Estimates are based on the same three inherently flawed models that produced the Obama SCC, SCM, and SCN.

- The SC-GHG Estimates reject recent standards set by the Council on Environmental Quality ("CEQ") concerning the National Environmental Policy Act ("NEPA") regulations.[60]

- The IWG relied upon statutorily impermissible factors by considering global rather than domestic effects.

- The IWG ignores significant federalism costs caused by the SC-GHG Estimates, an important aspect of regulatory analysis.[61] Specifically, the IWG neglected to consider the effect the SC-GHG Estimates will have upon State revenues; the Biden SC-GHG Estimates will result in significantly fewer tracts of land being made available for lease sales.[62]

**(iv).   The SC-GHG Estimates are contrary to law**

The Plaintiff States maintain that the SC-GHG Estimates are contrary to law because they direct agencies to consider factors Congress did not authorize. Specifically, the Plaintiff States assert that the SC-GHG contravenes (1) the Energy Policy and Conservation Act ("EPCA") because the EPCA unambiguously precludes the consideration of global effects, (2) the Clean Air Act ("CAA"),  which does not authorize the  Administrator of the EPA to consider global effects in setting air pollution standards

---

outside input, the IWG issued the SC-GHG in a month in order to comply with Biden's EO 13990's demand to impose more stringent regulation.
[59] Prior Executive Branch agencies utilized standard discount rates of 3 and 7 percent as embodied in Circular A-4.
[60] 85 Fed. Reg. 43304, 43375 (July 16, 2020).
[61] EO 13132, 64 Fed. Reg. 43255, 43256 (August 4, 1999).
[62] See, *e.gl.,* Dep't of Interior, Secretarial Order No. 3399 (Apr. 16, 2021) (noting intent to employ SC-GHG).

for new motor vehicles and stationary sources, (3) the NEPA, wherein the CEQ's regulation implementing NEPA precludes both the SC-GHG Estimates' consideration of global effects and approach to causation, (4) the Mineral Leasing Act ("MLA") because it prevents the Secretary of the Interior's duty to ensure the expeditious development of public land, and (5) the OCSLA by disrupting its statutory leasing program which promotes the development of resources on the Outer Continental Shelf[63] and by compelling a global effects analysis.

### (v).    The SC-GHG Estimates are subject to APA review

The Plaintiff States maintain that the SC-GHG Estimates are final agency action and thus subject to APA review.  The APA allows judicial review only of a "final agency action," "that (1) mark[s] the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154 (1997).

The Plaintiff States argue that the SC-GHG Estimates mark the consummation of the IWG's decisionmaking process because they are the IWG's last word until at least 2022 and because there are no further steps in the process; thus, the SC-GHG Estimates for 2021 meet the finality test. See *Louisiana*, 2021 WL 2446010, at *12 ("As long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test.") (citing *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020)).

---

[63] 43 U.S.C. §§ 1332, 1337, 1340, 1344, 1345, and 1351.

As to the second prong, the Plaintiff States argue that the SC-GHG Estimates bind the entire Executive Branch to a particular numerical measure of the social cost of greenhouse gases. Furthermore, the SC-GHG Estimates "denies the decisionmaker discretion in the area of its coverage[,] then the statement is binding, and creates rights or obligations." *Texas*, 809 F.3d at 171.

The Plaintiff States maintain that the IWG is an "agency" for purposes of the APA because it has been granted authority by EO 13990 to act "with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 48 F.2d 1067, 1073 (D.C. Cir. 1971). Specifically, the IWG has been granted authority to create SC-GHG Estimates that will be binding on executive agencies. *See Pac Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980) (The power to "issue guidelines to federal agencies for the preparation of" regulatory review is a hallmark of an APA agency.)

Lastly, the Plaintiff States maintain that they have an *ultra vires* cause of action to challenge Section 5 of EO 13990 because it is not authorized by any statute and is in direct conflict with several statutes. *Ultra vires* review is available to review "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,* 801 F.Supp.2d 383, 406 (D.Ma. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Associated Builders & Contractors of SE Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 216) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing

the Guidance incorporated by reference in the new Rule.  Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds.") (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

The Plaintiff States thus argue that they have demonstrated multiple independently sufficient grounds to vacate the SC-GHG Estimate and therefore have shown a strong likelihood of success on the merits. The Court agrees and finds that the Plaintiff States have shown a strong likelihood of success on the merits.

### 2.      Irreparable Harm

The Plaintiff States maintain that they easily meet the threshold requirement that if an injunction is not issued, they will suffer inevitable and irreparable harm. Plaintiff states must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365 (2008). For their injury to be sufficiently "irreparable," the Plaintiff States need only show it "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

Defendants contend that Plaintiff States' alleged harm is speculative at best because no specific agency action has caused them injury. Or, better yet, it is speculative to assume that EO 13990 will dictate policy outcomes that concretely harm Plaintiff States.  In other words, Plaintiff States' injury-in-fact assumes that they will be harmed by future hypothetical agency actions. Additionally, Defendants contend that it is unknowable in

advance if any harm caused by future regulations is causally connected to EO 13990 and the SC-GHG Estimates.

The Plaintiff States submit that they are substantial producers of energy and rely upon tax revenues from energy production to perform their sovereign duties. As such, the increased SC-GHG Estimates will cause regulatory standards affecting air quality, energy efficiency, power plant regulation to increase in stringency, which will directly harm the economies and revenues of Plaintiff States. As noted above, the Plaintiff States maintain that Texas, Louisiana, Kentucky, Florida, Georgia, South Dakota, Mississippi, Alabama, West Virginia, and Wyoming and their citizens will all be imminently harmed by EO 13990 and the SC-GHG Estimates by causing increased energy costs. The Plaintiff States argue that the chain of causation is clear and confirmed by history.

Plaintiff States also contend that the SC-GHG Estimates will impose additional duties upon Plaintiff States when they implement cooperative federalism programs, as well as the harm to the Plaintiff States' ability to purchase affordable energy to carry out their sovereign functions. Furthermore, the SC-GHG Estimates will adversely impact Plaintiff States' revenues and Louisiana's coastline will be threatened by directly reducing the funds necessary to maintain the state's coastal lands.

The Plaintiff States remark that the IWG's failure to employ notice and comment divested them of their procedural rights under the APA and various other federal statutes to be consulted and offer views regarding administrative actions impacting concrete State interests. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A] 'persons who

has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'")

Finally, the Plaintiff States argue that they have *parens patriae* standing to vindicate the economic injuries the SC-GHG Estimates will impose on their citizens. *See Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (*parens patriae* standing appropriate when based on State's "interest in the health and well-being—both physical and economic—of its residents in general").

As noted by Defendants, EO 13990 instructs agencies that "[i]t is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account," and that "[a]n accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions." EO 13990 § 5.  The EO is not a recommendation, nor is it guidance; EO 13990 directs that agencies "shall use" the SC-GHG Estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions." *Id.*

Plaintiff States have sufficiently identified the kinds of harms to support injunctive relief. Moreover, the Court finds that the Plaintiff States have made a clear showing of an injury-in-fact, and that such injury "cannot be undone through monetary remedies," *Louisiana v. Biden*, 2021 WL 2446010, at *21 (W.D. La. June 15, 2021), such that they need immediate relief now, lest they be unable to ever obtain meaningful judicial relief in the future. *See Texas v. United States*,  809 F.3d 134, 186 (5th Cir. 2015) (financial injury

irreparable); *Louisiana v. Biden,* 2021 WL 2446010, at *21 (financial and *parens patriae* harm irreparable); *State v. Biden*, 2021 WL 3603341, at *26 (N.D. Tex. Aug. 13, 2021) (financial injuries irreparable); *Texas v. United States*, 2021 WL 2096669, at *47 (S.D. Tex. Feb. 23, 2021) (same); *see also e.g., Texas*, 2021 WL 3683913, at *59 (injuries to Plaintiff States' sovereign powers are irreparable); *Nevada v. U. S. Dep't of Lab.*,218 F.Supp.3d 520, 532 (E.D. Tex. 2016).

## 2. Will the threatened injury if the injunction is denied outweigh any harm that will result if the injunction is not issued?

Plaintiff States maintain that the harms to their States and their citizens' economic well-being more than suffice to establish standing and the possibility of irreparable harm. As previously noted, the SC-GHG Estimates will harm Plaintiff States' ability to purchase affordable energy to carry out their sovereign functions as the directive to use the SC-GHG Estimates will significantly drive up costs while simultaneously significantly decrease States revenues resulting in the inability of the Plaintiff States to carry out their sovereign duties to their citizens.[64] Specifically, Louisiana will be directly harmed by the reduction of funds necessary to maintain the state's coastal lands. See *Massachusetts,* 549 U.S. at 519 & n. 17. (State's "independent interest 'in all the earth and air within its domain'" and "well-founded desire to preserve its sovereign territory" supports standing).[65] In addition,

---

[64] See Dismukes Decl. ¶ ¶ 17-26.
[65] Plaintiff States note that the deprivation of those funds directly harms Louisiana's territory. Louisiana is losing swaths of coastal land—nearly two thousand square miles and counting—due to follow-on effects from environmental catastrophes. See *Louisiana,* 2021 WL 2446010, at *21 (noting irreparable harm form "damages for reduced funding to the Coastal Master Plan, which would reduce proceeds that are used in Louisiana's coastal recovery and restoration program")

the implementation of SC-GHG Estimates without complying with the APA and the notice and comment period have divested Plaintiff States of their procedural rights.

The Court finds that the balance of the injuries weighs substantially in favor of the Plaintiff States.

### 3.      Will the Injunction Harm Defendant or Disserve the Public Interest?

The Plaintiff States maintain that the public interest and balance of equities weigh in favor of granting a preliminary injunction because Defendants "have no legitimate interest in the implementation of [the] unlawful" SC-GHG Estimates. *See Texas*, 2021 WL 7236, at *49. The Plaintiff States argue that the public has an overriding interest in ensuring that vast regulatory programs are implemented lawfully, in compliance with the constitutional separation of powers and the APA, whereas the Defendants would suffer no harm from an injunction. Thus, the Plaintiff States maintain that the public interest and balance of harms weigh heavily in Plaintiff States' favor. The Court agrees that the public interest and balance of equities weigh heavily in favor of granting a preliminary injunction.

## V. <u>CONCLUSION</u>

For the reasons set forth hereinabove, the Motion for Preliminary Injunction will be granted in its entirety.

**THUS DONE AND SIGNED** in Chambers on this 11th day of February, 2022.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**