**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

THE STATE OF LOUISIANA, *et al.*,

        Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States,
*et al.*,

        Defendants.

Case No. 2:21-cv-01074-JDC-KK

# <u>EXHIBIT 1:</u>

# Declaration of Dominic J. Mancini

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

THE STATE OF LOUISIANA, *et al.*,

             Plaintiffs,

     v.                                         Case No. 2:21-cv-01074-JDC-KK

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States, *et al.*,

             Defendants.

**DECLARATION OF DOMINIC J. MANCINI SUBMITTED IN**
**SUPPORT OF DEFENDANTS' MOTION FOR A STAY PENDING APPEAL**

Pursuant to 28 U.S.C. § 1746, I, Dominic J. Mancini, declare the following to be true
and correct:

    1.  I am the Deputy Administrator of the Office of Information and Regulatory
Affairs (OIRA) of the Office of Management and Budget (OMB), which is an office
within the Executive Office of the President.  I have held the position of Deputy
Administrator since 2013.  As part of my duties, in the absence of a confirmed
Administrator of OIRA, I have often been delegated the duties of the Administrator,
and I am currently serving in the capacity.  In addition, I have held various positions
with OIRA, including serving as Branch Chief for natural resources and the
environment, and as the Economist for health, transportation, and general
government.  Prior to joining OIRA, I worked as an economist at the Food and Drug

1

Administration, preparing regulatory impact analyses for economically significant regulations.  I have degrees in economics and finance from the University of Florida, and a PhD in economics from the University of North Carolina at Chapel Hill.

2. I understand that, in the above-captioned case, the Court has entered a Preliminary Injunction that, among other things, prohibits federal agencies "from adopting, employing, treating as binding, or relying upon" the work product of the Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group" or "IWG"), and any estimates of the social cost of greenhouse gases that are based on "global effects" or that "do[] not utilize discount rates of 3 and 7 percent."  I submit this declaration in support of the Defendants' motion for a stay pending appeal in the above-captioned case.  I make the statements herein based upon my personal knowledge and information made available to me in my official capacity.

<u>BACKGROUND</u>

3. The Office of Information and Regulatory Affairs ("OIRA") is a statutory part of the Office of Management and Budget ("OMB") within the Executive Office of the President.  OIRA is the Federal Government's central authority for, among other things, the review of Executive Branch regulations.

4. Executive Order ("EO") 12866, issued on September 30, 1993, assigned OIRA the responsibility of coordinating interagency Executive Branch review of significant regulations before publication.  This ensures agency compliance with the principles in EO 12866, which include providing meaningful public comment opportunities, considering alternatives to the rulemaking, and assessing both costs and benefits.

OIRA review helps to ensure that agencies disclose and carefully consider the consequences of rules, including both benefits and costs, before they proceed.

5.  Specifically, EO 12866 established a detailed regulatory-review process to be coordinated by OMB and OIRA in which all agencies, except "independent regulatory agencies," must participate.  EO 12866 § 3(b).  For significant regulatory actions, EO 12866 requires an assessment of the anticipated costs and benefits of the agency's proposal.  *See id.* § 6(a)(3)(B), (C).  The Executive Order directs an agency to provide OIRA with a written explanation of why it opted for the proposed action and how it best meets the need for the action.  *See id.* § 6(a)(3)(B)(i)–(ii), (C)(iii).  OIRA then reviews the agency's action.  *See id.* § 6(b)(2).  If an agency proposes or finalizes a significant rule that requires a more-detailed analysis of costs and benefits, one product of this process, often called a Regulatory Impact Analysis ("RIA"), is published alongside it.  *See id.* § 6(a)(3)(E).

6.  Such regulatory analysis provides a formal means of organizing the evidence on the key effects—both good and bad—of the various alternatives that should be considered in developing regulations.  Among the purposes are (1) to learn if the quantitative and qualitative benefits of an action are likely to justify the costs; (2) to promote accountability to the public; and (3) to discover which of various possible alternatives would produce the highest net benefits, both in a formal, quantitative manner, as well as when taking qualitative effects into account.  Sometimes careful analysis can show that a less stringent alternative is best; sometimes more stringency will be shown to be justified; sometimes a creative option will emerge.

<u>CIRCULAR A-4</u>

7.   OMB guidance, in particular Circular A-4, "is designed to assist analysts in the regulatory agencies by defining good regulatory analysis" when developing RIAs that comply with EO 12866.  Office of Mgmt. & Budget, *Circular A-4*, at 1 (2003).  Among other things, Circular A-4 emphasizes that agencies "should monetize quantitative estimates whenever possible."  *Id.* at 27.  Furthermore, as Circular A-4 explains, a good cost-benefit analysis will monetize more than just direct effects:  Agencies should include "any important ancillary benefits and countervailing risks."  *Id.* at 26.  In addition, and importantly, Circular A-4 emphasizes that agencies "cannot conduct a good regulatory analysis according to a formula.  Conducting high-quality analysis requires competent professional judgment.  Different regulations may call for different emphases in the analysis, depending on the nature and complexity of the regulatory issues and the sensitivity of the benefit and cost estimates to the key assumptions."  *Id.* At 3.

8.   In circumstances where estimated   costs and benefits of regulations may accrue well into the future, Circular A-4 describes how agencies should adjust the estimated impacts, taking into account these longer time horizons for future effects— namely, by choosing appropriate discount rates (including those that account for "intergenerational effects")[1] and selecting an end point "far enough in the future to encompass all the significant benefits and costs likely to result from the rule."  *Id.* at 31–32.

---

[1] A discount rate is an interest rate used to convert future monetary sums into present-value equivalents.  *See* OMB, *Circular A-4*, at 31–32.

9.  Circular A-4 specifically recommends that agencies provide estimates of costs and benefits using both a 3% and 7% discount rate.[2]   Though Circular A-4 recommends agencies consider a consumption-based discount rate of 3% and a capital-based discount rate of 7% as "default . . . approximation[s]," Circular A-4 first explains that the "analytically preferred method" for discounting "is to adjust all the benefits and costs to reflect their value in equivalent units of consumption and to discount them at the rate consumers and savers would normally use." *Id.* at 33.  Since 2010, the Interagency Working Group has noted that its estimates of climate damages are in "consumption-equivalent units" and that a "consumption rate of interest," like 3%, "is the correct discounting concept to use when future damages from elevated temperatures are estimated in consumption-equivalent units."  IWG, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis* 23 (2010).  In other words, the "analytically preferred method" for discounting the social cost of greenhouse gases, where the integrated assessment models used in the calculation express their results in consumption units, is to focus on consumption-based rates and *not* to use the capital-based 7% rate.

10. This is especially true for rules with intergenerational effects, for which Circular A-4 recommends agencies consider further sensitivity analysis assessing

---

[2] A consumption-based rate reflects the value at which society trades off present for future consumption, and is thought to be most appropriate when regulations primarily and directly affect private consumption, such as through higher consumer prices for goods and services.  The rate of return on long-term government debt is often used as an approximation for the social rate of time preference and the consumption-based discount rate.  A capital-based rate reflects the opportunity cost of capital and is thought to be most appropriate if regulatory requirements crowd out private investment opportunities and potential future returns on such investments.  An average before-tax rate of return to private capital in U.S. markets is often used as an approximation.  *Circular A-4* at 33.

impacts "using lower but positive discount rate[s]." *Circular A-4*, at 36.  Specifically, Circular A-4 discusses the many reasons why it may be appropriate for analyses to include the presentation of long-term impacts using lower discount rates, and also explicitly discusses the circumstances in which rates at or lower than 3% could be appropriate for RIAs.  These include, as discussed in the Circular, ethical considerations for intergenerational analysis and the impact of discount-rate uncertainty across time that could lead to an emphasis on lower or declining rates.  *Id.* at 35-36.  While not discussed directly with respect to discount rates, A-4 also points out that the "uncertain knowledge of how some economic activities might affect future climate change" is a likely source of such longer-term uncertainty.  *Id.* at 38.  In short, for the many reasons cited in Circular A-4, RIAs that include analyses using discount rates of lower than 3% may be appropriate.

11. Circular A-4 also provides guidance to agencies on how to determine the proper scope of analysis for a given regulatory action.  The default recommendation is for agencies first to "focus on benefits and costs that accrue to citizens and residents of the United States." *Id.* at 15.  Circular A-4 also gives agencies the discretion to evaluate the global impacts of regulation, however, stating that "[w]here you choose to evaluate a regulation that is likely to have effects beyond the borders of the United States, these effects should be reported separately."  *Id.* at 15.  In addition, in the section in Circular A-4 calling for analysis showing that Federal regulation is appropriate, it states that "the role of Federal regulation in facilitating U.S. participation in global markets should also be considered.  Harmonization of U.S. and

international rules may require a strong Federal regulatory role.  Concerns that new U.S. rules could act as non-tariff barriers to imported goods should be evaluated carefully." *Id.* at 6.  In short, similar to discount rates that vary from the 3 and 7 percent defaults, RIAs that include an analysis of global impacts are consistent with Circular A-4.

12. In addition, in the case of climate change, it is reasonable for agencies to conclude that the global impacts of greenhouse gases—a global pollutant which is being regulated around the world; where non-U.S. emissions affect U.S. citizens; and where U.S. emissions affect assets owned by U.S. companies abroad, the millions of U.S. citizens living abroad, U.S. military personnel stationed abroad, U.S. companies' key foreign trading partners and international supply chains, and geopolitical security—would be a legitimate and appropriate focus for analysis, under the criteria established in Circular A-4.

13. Although Circular A-4 constitutes OMB's guidance on best practices for regulatory analysis, that content of Circular A-4 is not mandated by any statute or regulation.[3]  Circular A-4 outlines recommendations and a set of standardized methods for agencies conducting RIAs.  In practice, there is necessarily variation on how agencies apply and adapt the methodologies described in Circular A-4 to a particular regulatory action, and Circular A-4 recognizes the need for that variation.

---

[3] The Regulatory Right-to-Know Act requires OMB to issue guidelines to standardize the most plausible measures of costs and benefits for the purposes of accounting of regulatory costs and benefits in OMB's annual reports to Congress on the total costs and benefits of Federal rules and paperwork.  31 U.S.C. § 1105.  Although Circular A-4 addresses that requirement and thus was issued partly pursuant to the Regulatory-Right-to-Know Act, Circular A-4 clarifies in its introduction that its guidance on regulatory analysis (as discussed in text) is provided pursuant to EO 12866.

Regulations take a wide variety of forms and address many different issues; as a result, RIAs will necessarily vary on a case-by-case basis.  By outlining recommended practices, Circular A-4 helps facilitate the analytical procedures called for in EO 12866, which in turn helps bolster the analytical and evidence-based foundations for regulatory policymaking.

14. More specifically, the recommendations set forth in Circular A-4 must always yield to any specific statutory requirements or conditions.  Accordingly, during our reviews of significant regulatory actions, OIRA does not represent or treat Circular A-4's individual provisions as a legally binding requirement on Executive Branch agencies, and I am unaware of any court having previously compelled adherence to Circular A-4 or any particular interpretation of Circular A-4.

15. By restricting agencies' approach to economic analyses, the Preliminary Injunction has the potential to substantially undermine the purposes of regulatory analysis, and undercuts Circular A-4's accommodation and encouragement of the exercise of agencies' expert judgment, including in the choice of discount rate and scope of analysis.  Circular A-4 is meant to support agencies taking a rigorous approach to analyzing the impacts of regulatory actions, which necessarily requires that agencies, in consultation with OIRA, deploy their expertise and judgment in case-specific contexts.  Circular A-4 explains that, because of its "special role in the rulemaking process" as a tool to inform the public and government decisionmakers about the effects of alternative actions, regulatory analysis should meet "minimum quality standards" and be "based on the best reasonably obtainable scientific,

technical, and economic information available." *Circular A-4*, at 17.  Tying agencies' hands and preventing their selection of the best available data and methodological assumptions—including, for example, on the choice of discount rates—has the potential to undermine confidence in the quality of the regulatory analyses.

### IMPACT OF THE COURT'S FEBRUARY 11, 2022 ORDER ON ONGOING EXECUTIVE BRANCH AGENCY ACTIVITIES

#### Impact on Agency Rulemakings And Other Actions

16. The Preliminary Injunction prohibits Defendant agencies from "adopting, employing, treating as binding, or relying upon" any work product by the IWG and any estimates of the social cost of greenhouse gas emissions that are "based on global effects," "do[] not utilize discount rates of 3 and 7 percent," or "otherwise do[] not comply with Circular A-4."  OMB understands this injunction to require all affected RIAs addressing greenhouse-gas effects for pending agency rulemakings and published proposed rules to be re-done so that they either do not employ any estimate of the social cost of greenhouse gas emissions, or so that they use estimates that are developed using the court-ordered parameters.[4]  OMB similarly understands this injunction to require any other affected not yet finalized agency actions relying upon any work product by the IWG to be re-done so that they either do not employ any estimate of the social cost of greenhouse gas emissions, or so that they use estimates that are developed using the court-ordered parameters.

---

[4] OMB understands the injunction to apply prospectively, and therefore not to reach agency actions that have already been finalized.

17. In OIRA's above-described role in coordinating interagency review of significant regulations, I have insight into the effect of the February 11, 2022 Preliminary Injunction ("the Preliminary Injunction") on the ongoing rulemaking and related activities of Executive Branch agencies.  Agencies have also provided to OIRA additional details about the extent of likely effects to their rulemakings and other activities.   In my capacity as OIRA's Deputy Administrator and based on such information, I understand that the Preliminary Injunction would impede a variety of pending agency rulemakings and actions.  In particular, agencies would be required to redirect resources to revise already-drafted proposed rules, regulatory impact analyses, and other analyses in support of other agency actions, including in instances where a draft rule that incorporates the Working Group's Interim Estimates has already been submitted to OMB for review under E.O. 12866.  I understand that a significant number of agency rules and actions would need to be postponed or reworked as a result of the Preliminary Injunction.

18. Based upon information made available to me in my official capacity, the Department of Energy has initially identified approximately twenty-one rulemakings that will be so affected; the EPA has initially identified approximately five; the Department of Transportation has initially identified approximately nine; and the Department of the Interior has initially identified approximately three.   The Department of Transportation has also initially identified approximately sixty records of decision or environmental impact analyses required by the National Environmental Policy Act (NEPA) that will be so affected; and the Department of the

Interior has initially identified approximately twenty-seven such NEPA-mandated analyses.

19.  For example, OIRA is currently reviewing a proposed rule from the Bureau of Land Management ("BLM") on Waste Prevention for oil and gas leases on public lands.[5]  As BLM has explained, the goal of the proposed rule is to reduce the waste of natural gas, and BLM has projected an associated reduction in methane emissions.[6] The proposed rule follows a 2018 rescission of an earlier rule governing the waste of natural gas from onshore Federal and Indian oil and gas leases.  The 2018 rescission rule relied on an estimate of the social cost of methane that considered only "domestic" climate effects occurring strictly within U.S. geographic borders.  83 Fed. Reg. 49,184 (Sept. 28, 2018).  In 2020, the U.S. District Court for the Northern District of California found that the domestic-only estimate of the social cost of methane had arbitrarily "fail[ed] to consider important aspects of the problem" by "ignor[ing]," for example, how methane emissions would affect foreign assets owned by U.S. companies, U.S. citizens and military personnel living or stationed abroad, effects to U.S. companies through foreign trading partners and international supply chains, and geopolitical security.  *California v. Bernhardt*, 472 F. Supp. 3d 573, 613 (N.D. Cal. 2020).  If BLM uses a domestic-only estimate of the social cost of methane, which fails to consider these direct impacts to U.S. welfare that methane emissions will cause through climate effects occurring outside U.S. borders, I understand that BLM would risk violating the California district court's order.

---

[5] *See* https://www.reginfo.gov/public/do/eoDetails?rrid=220412.
[6] *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202110&RIN=1004-AE79.

20. The Department of Energy ("DOE") is under a court-ordered deadline to issue final energy conservation standards for manufactured housing by May 16, 2022. *Sierra Club v. Granholm*, No. 1:cv-17-02700-EGS (D.D.C. Mar. 15, 2021) (order on consent decree). To finalize those standards, DOE must complete its review under NEPA, and the 45-day comment period on the draft environmental impact statement ("EIS") will end in approximately two weeks. 87 Fed. Reg. 2430 (Jan. 14, 2022). In the draft EIS on the alternative standards being considered for manufactured housing, DOE directs the public to review its recent presentations of the various alternatives' climate effects using SC-GHG estimates, to "help the public . . . understand or contextualize the potential impacts of GHG emissions" and to "inform a comparison of alternatives." DOE, *Draft Environmental Impact Statement for Proposed Energy Conservation Standards for Manufactured Housing* at 3-13 (2022). I understand that public commenters specifically requested DOE to present estimates of the SC-GHG in the DEIS to contextualize the alternatives. *Id.* at A-8. Contextualizing alternatives for the public is a key requirement under NEPA. 42 U.S.C. § 4332(2)(C)(iii). If DOE cannot employ the Interim Estimates to help contextualize the climate effects of alternative standards in the final EIS, and needs to develop new, additional analysis to help properly contextualize those effects, I understand it could complicate concluding the environmental review in time to meet the court deadline. Similarly, because the manufactured housing standards will have significant economic costs, cost savings, and other effects, DOE is required by EO 12866 to quantify the costs and benefits of alternatives in an RIA to accompany

publication of the final standards.  If DOE cannot continue to use the Interim Estimates for purposes of its EO 12866 analysis, and in the development of a record to support their rulemaking under DOE's statutory criteria for setting energy efficiency standards, the development of a new adequate presentation of all the relevant costs and benefits could complicate DOE's ability to satisfy its requirements under EO 12866 and statute in time to meet the court-ordered deadline.

21. Similarly, I understand, based on information provided to OIRA, that DOI had already incorporated the Working Group's Interim Estimates into its NEPA analysis associated with several planned and potential oil and gas lease sales.  For some of these lease sales, the NEPA materials had already been subjected to a public comment period, and the agency had finalized its responses to comments and revised its Environmental Assessments to address the public comments as appropriate.  For example, with respect to planned onshore oil and gas lease sales, revising the NEPA analysis would be a burdensome and time-consuming process for the BLM, and, following those revisions, the Agency anticipates subsequently recirculating the revised analyses for 30 days public comment pursuant to agency practice and guidance.  Furthermore, in other related contexts, some federal courts have faulted agencies for not considering the SC-GHG in their NEPA analyses if other costs and benefits, like royalties from coal and oil, have already been monetized.  *E.g.*, *WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955, at *9 (D. Mont. Feb. 3, 2021) (explaining that "although NEPA does not require federal agencies to engage in a cost-benefit analysis, when an agency chooses to quantify the

socioeconomic benefits of a proposed action, it would be arbitrary and capricious for the agency to undervalue the socioeconomic costs of that plan by failing to include a balanced quantification of those costs," including by failing to quantify climate costs); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1190, 1191 (D. Colo. 2014); *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1094–99 (D. Mont. 2017).  Therefore, I understand that BLM risks potentially running afoul of other court precedents if it were to monetize other costs or benefits, such as coal and oil royalties, but not monetize the climate costs. And BLM risks running afoul of the Northern District of California ruling, *supra*, were it to use an estimate of the social cost of greenhouse gases that did not consider key impacts to U.S. welfare resulting from climate impacts that happen to occur beyond U.S. geographic borders.

22. Similarly, under the Mineral Leasing Act, BLM permits drilling for oil and gas extraction by approving Applications for Permits to Drill ("APDs"), after conducting appropriate NEPA analysis and providing for public comment.  I understand that the Injunction has halted work by BLM on APDs for at least 18 wells on federal oil and gas leases in New Mexico, as the NEPA analysis being developed for these applications would have incorporated the now-enjoined estimates.  BLM is still assessing how many other applications are similarly affected.

23. As another example, the Federal Transportation Administration (FTA) oversees a $2-3 billion dollar grant program, called the Capital Investment Grants (CIG) program.  Under FTA's Final CIG Interim Policy Guidance, which was issued

pursuant to notice and comment, applicants must provide environmental analysis based on the Interagency Working Group's 2013 values for the social cost of carbon. I understand that, under the Preliminary Injunction, FTA must revise the Final CIG Interim Policy Guidance to remove reliance on the Interagency Working Group's 2013 values for the social cost of carbon, because those values were based upon the global effects of greenhouse gas emissions.  But any revision requires notice and comment, thus disrupting the CIG program.  FTA has estimated this delay could stretch on for months.

24. The cumulative burden of the Preliminary Injunction is quite significant. Regulatory impact analyses and analyses in support of other agency actions are often very complex and time-intensive studies that agencies can spend months developing and refining.  Changing the value of key parameters such as discount rates, the social cost of greenhouse gases, and other similar numbers would often require agencies to re-run numerical models and simulations that they may be using to develop impact assessments.  Re-doing the regulatory analyses also often would require agencies to restart the long process of intra-agency and inter-agency review of the analysis and regulatory proposals, which can take even more time.  Re-doing the analyses for the non-regulatory actions described above (e.g., NEPA actions, grants guidance) would similarly tax agency resources.  Because agencies have relatively fixed staffing constraints, the human resources needed to re-do an analysis also presents significant opportunity costs that could preclude agencies from conducting analysis and developing policy on other pressing issues called for by statutes and by

Presidential priorities.  Such delays could likely include delaying agencies in their efforts to offer clarifying guidance to regulated entities, states, and other stakeholders; the uncertainty caused by such delays can be costly.

25. In some instances, the burdens imposed by the Preliminary Injunction go well beyond delay and waste of resources.  In particular, in the wake of the Preliminary Injunction, agencies are now struggling to reconcile their conflicting obligations to comply with the Court's order and with the requirements of the APA and other relevant statutes.

26. For example, a conflict may exist between the Preliminary Injunction and agencies' typical analysis of compliance costs.  Agencies typically count all compliance costs, even if they accrue to foreign-based corporations or publicly-traded companies with significant foreign ownership interests.  Yet if agencies are prohibited by the Preliminary Injunction from considering, for example, the global climate benefits of regulatory actions, it may be inconsistent for agencies to continue considering the global compliance costs of those same actions.  Agencies then either may be forced to attempt to redo their cost estimates to subtract out any costs that would fall to foreign shareholders of publicly traded companies—a practically challenging and sometimes unrealistic endeavor that could decrease transparency about total compliance costs— or else risk proceeding with an analysis that counts some non-domestic costs, but restricts the analysis and consideration of global benefits.  In any case, based on my understanding of the issues that agencies are considering, agencies are spending considerable resources and delaying a myriad of regulatory actions as they fully

consider the implications of a changed scope of analyses, due to the Preliminary Injunction.

Impact on Internal Agency Activities and Executive Branch Coordination

27. In addition to prohibiting Executive Branch agencies from "adopting, employing, treating as binding, or relying upon" the work of the IWG and any estimates of the social cost of greenhouse gas emissions based on global effects and discount rates of 3 and 7 percent, the Preliminary Injunction also prohibits agencies from "[r]elying upon or implementing Section 5 of Executive Order 13990 in any manner." The Executive Branch understands this order could be read to prohibit Defendant agencies from using the work of the IWG even in their internal deliberations.

28. Based on my personal knowledge and information made available to me in my official capacity, the Court's February 11, 2022 order has also disrupted the functioning of multiple Cabinet agencies, including in the Office of Management and Budget. In light of the breadth of the Court's order, staff across the affected agencies were suddenly put in the position of having to assess how to stop attending meetings or developing work product that bore some relation to the social cost of greenhouse gases. This range of impacted work included ordinary budgetary discussions, work on proposed regulatory actions, reviews of regulatory actions targeted for publication, and even the agendas of meetings that may have touched on these issues.

29.  For example, as a result of the Preliminary Injunction, agencies including the EPA have cancelled or postponed all-staff webinar training sessions at which the IWG's work or the social costs of greenhouse gases were to be discussed.

30. As another example, to ensure compliance with the Preliminary Injunction, OMB has instructed agencies not to send comments on sections of draft documents that refer to the social cost of greenhouse gas emissions.

31. Federal government scientists and other experts, like those working at DOE's national laboratories, produce a variety of public and internal research reports, and are under multiple obligations to use the best available scientific, economic, and technological findings and otherwise ensure the quality and integrity of all their publications.  *See e.g.,* Dep't of Energy, *Scientific Integrity Policy* (Jan. 4, 2017),[7] OMB, M-19-15, Memorandum on Improving Implementation of the Information Quality Act (Apr. 24, 2019); Presidential Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking (Jan. 27, 2021).  The Preliminary Injunction could prevent federal scientists from citing, referencing, or otherwise using the best available science, including that contained in various IWG work products.  And the Preliminary Injunction suspends EO 13990 implementation, including the process explicitly designed to ensure the SC-GHG estimates are informed by the latest science and economics.  As a result, the Preliminary Injunction could force federal scientists to violate various scientific

---

[7] Available at https://energy.gov/sites/prod/files/2017/01/f34/DOE%20Scientific%20Integrity%20Policy%200111201 7.PDFDOE Scientific Integrity Policy (energy.gov).

integrity policies that require use of the best available information, and so could interfere with the free flow of research information to the scientific community and the public.

32. In addition, based on information made available to me, I understand that the harms to the Executive Branch from the Preliminary Injunction could be particularly acute when it comes to the President's conduct of foreign affairs.  As E.O. 13990 explained, a full accounting of climate impacts "supports the international leadership of the United States on climate issues."  The Preliminary Injunction has interrupted bilateral discussion important to the President's conduct of foreign affairs.

33. For example, in 2016, the United States announced that it would align its estimates of the social cost of carbon with Canada.[8]  Canada has long adapted the IWG's methodology for use in their own analysis, and in fact has long looked to the United States in particular as a partner in advocating for rigorous cost-benefit analysis through our longstanding Regulatory Cooperation Council dialogues.[9]  Canada has recently begun updating its own SC-GHG estimates, *see* IWG, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide—Interim Estimates under Executive Order 13990* at 35 (2021), and the IWG's technical experts had been engaging in regular, ongoing conversations with Canada about these efforts.  In light of the Preliminary Injunction, the IWG's technical experts have ceased

---

[8] *See* https://obamawhitehouse.archives.gov/blog/2016/06/29/economic-benefits-50-percent-target-clean-energy-generation-2025.

[9] *See, e.g.*, https://publications.gc.ca/collections/collection_2016/eccc/En14-202-2016-eng.pdf and https://canadagazette.gc.ca/rp-pr/p1/2020/2020-12-19/html/reg2-eng.html.  And for more general information on Regulatory Cooperation, see https://www.trade.gov/rcc

communication with their counterparts in Canada.  To date, Canada has followed the U.S. IWG's approach and adopted a "global perspective" in its estimates of the SC-GHG, considering how its emissions impact the rest of the world, including U.S. welfare.[10]  However, if the Interagency Working Group is now prohibited from considering global climate effects, were Canada to follow suit and consider Canada-only estimates of the social cost of greenhouse gases—and so ignore the impacts of Canadian emissions to the United States and the rest of the world—U.S. welfare could suffer.

34. The United States also has an interest in engaging in other international discussions involving the SC-GHG. The United States has dozens of bilateral agreements on science and technology with key foreign partners, like Germany,[11] and holds regular discussions with countries on the science, technology, and economics of climate change and energy policy.[12] The Preliminary Injunction threatens to curtail what materials the federal government can rely upon in preparing for such meetings and has the potential to undercut the federal government's ability to fully engage in international dialogues and to advocate for U.S. interests in discussions of climate economics and related topics. Similarly, the United States has an interest in engaging in multilateral discussions, such as on the energy policy reviews conducted by the

---

[10] *See* https://publications.gc.ca/collections/collection_2016/eccc/En14-202-2016-eng.pdf at 1; *see also id.* at 12 ("Key decisions of the U.S. Group, such as the use of global values…were consistent with insights from climate science."); *id.* at 13 ("Although both countries will feel the impacts of climate change differently, the costs included in the Social Cost of Carbon are global in nature.").

[11] *See* https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf.

[12] *E.g.*, https://www.state.gov/us-france-science-technology-cooperation (Dec. 7, 2021).

Asian Development Bank that consider the social cost of carbon.[13]   This raises questions as to whether technical experts can engage in productive dialogues with Canada, Germany, and other international counterparts.

Impact on the Interagency Working Group on Social Cost of Greenhouse Gases

35. In addition, in prohibiting Executive Branch agencies from "[r]elying upon or implementing Section 5 of Executive Order 13990 in any manner," the Preliminary Injunction has effectively shuttered the Interagency Working Group (IWG).   As discussed above, and as clarified in EO 13990, the task of the IWG, which is made up primarily of technical experts from at least 14 different agencies and offices, is to ensure that the information the government considers about climate change is based on the latest economics and science.

36. As a first step in this process, the IWG released a Technical Support Document (interim TSD) on February 26, 2021, which provides an interim update of SC-GHG estimates using identical methods and inputs to those presented in the 2016 version of the TSD, including the same three peer-reviewed integrated assessment models in use since 2010.  *See* IWG, 2021 Interim TSD, *supra*.  The interim TSD also discusses the scientific and economic advances that have been made since the time of the last updates to the SC-GHG estimates.

37. Next, the IWG has requested and received detailed public comment on the interim TSD, including much diverse input and advice on how to best incorporate the latest peer-reviewed science and economics literature into an updated set of SC-GHG

---

[13] *See* https://www.adb.org/sites/default/files/institutional-document/737086/energy-policy-r-paper.pdf at 11.  Note that the United States is a nonregional member of the Asian Development Bank.

estimates.  The goal of the next update is to be reflective of updated science and economics in general, and also to address the 2017 Recommendations of the National Academies of Sciences, Engineering, and Medicine for how to value climate damages.

38. Since that public solicitation, a group of dozens of technical experts had been synthesizing and summarizing that detailed input, running models, summarizing information, and generally working intensely toward the goal of providing updated estimates in the next couple of months.  In addition, Section 5 of EO 13990 calls for recommendations with respect to the use of updated estimates in budgeting and procurement, which an interagency group is also working to provide.

39. Finally, it is important to note that the IWG intends to subject the next set of estimates to additional public comment, as well as peer review.  This means that there will be an additional opportunity for both general and expert input into whatever specific discount rate or rates are chosen, as well as the geographic scope of the updated estimates.  In fact, the process for convening the peer review was already underway: on January 25, 2022, EPA published a request for nominations of experts for the peer review.  87 Fed. Reg. 3801 (Jan. 25, 2022).  Under the Preliminary Injunction, that important process to independently review the IWG's work, including through the selection of experts by an independent contractor hired for that purpose, is now stopped.

40. As a result of the Preliminary Injunction, all this effort has ceased, affecting the ability of the Federal government to avail itself of the latest scientific and economic information in decision making, including by hampering the ability of the

President's advisors to provide him with the most up-to-date information on the impacts of climate change.

41. The Preliminary Injunction would also likely lead to government resource waste related to federal contracting costs.  To manage the IWG's responsibilities under EO 13990, the IWG's technical lead agency has hired four contractors, with a number of associated sub-contractors included in that effort.  Three of the contracts are fixed price and offer technical support to help manage the data-intensive modeling efforts, including use of super-computer resources not available in the federal government.  I understand there is a risk the federal government likely would be responsible for full payment on these contracts, even if the IWG's work is paused. It is therefore further possible that, if the IWG is permitted at some point in the future to resume work on some set of SC-GHG estimates, the federal government may need to commit additional resources to enter into new contracts to complete the work that was left incomplete during this pause.  A fourth contractor, who is managing the public comment and peer review process, bills based on time and materials expended.  The resource costs in that circumstance are related to losses in retaining viable peer review candidates and continuity in the peer review process. Finally, general wasted resources will accrue not only for IWG contractors but also to any federal agency that contracts for RIA or EIS support as a result of pausing and potential restarting of efforts as a result of this injunction.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 19th day of February, 2022

DOMINIC J. MANCINI