# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

THE STATE OF LOUISIANA, *et al.*,

    Plaintiffs,

   v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States,
*et al.*,

    Defendants.

Case No. 2:21-cv-01074-JDC-KK

## DEFENDANTS' MOTION FOR LEAVE TO FILE A 37-PAGE MEMORANDUM OF LAW IN SUPPORT OF THEIR <u>MOTION FOR A STAY PENDING APPEAL</u>

Defendants respectfully request leave to exceed the default page limit set by Local Rule 7.8 and file a 37-page memorandum of law in support of their motion for a stay pending appeal of the Court's February 11, 2022 Order (ECF No. 99), which granted a preliminary injunction in the above-captioned matter. Defendants' proposed memorandum of law is attached as Exhibit 1 to this motion. As good cause for this request, Defendants offer the following:

1.  Plaintiffs, a group of 10 states, filed this action on April 22, 2021. *See* Compl., ECF No. 1. Plaintiffs named twenty-three federal officials, agencies, and entities as Defendants, including Joseph R. Biden, Jr., in his official capacity as the President of the United States. *Id.*

2.     Plaintiffs challenge Section 5 of Executive Order 13990, by which President Biden reconstituted the Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"), as a violation of the Administrative Procedure Act.  *See* Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021).  Plaintiffs also challenge the Working Group's "Interim Estimates" of those costs.  *See id.* § 5(b)(ii)(A).

3.     On June 28, 2021, Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See* ECF No. 31.

4.     On July 27, 2021, Plaintiffs moved for a preliminary injunction.  *See* ECF No. 53.

5.     After multiple rounds of extensive briefing on the important issues in this case, the Court granted Plaintiffs' motion.  *See* ECF Nos. 98, 99.  The Court's Order restrains and enjoins Defendants from:

> (1) adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group ("IWG"); (2) enjoining Defendants from independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons; and (3) ordering Defendants to return to the guidance of Circular A-4 in conducting regulatory analysis;
>
> (2) Adopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects or that otherwise fails to comply with applicable law;
>
> (3) Adopting, employing, treating as binding, or relying upon any estimate of Social Cost of Greenhouse Gases that does not utilize discount rates of 3 and 7 percent or that otherwise does not comply with Circular A-4; and

(4) Relying upon or implementing Section 5 of Executive Order 13990 in any manner.

6.    As explained in greater detail in Defendants' memorandum of law, the Order has caused significant disruption to rulemaking and other proceedings of federal agencies across the Executive Branch.

7.    In order to adequately brief these impacts and the important legal questions raised by the injunction, Defendants respectfully request leave to file a 37-page brief in support of their motion to stay pending appeal, notwithstanding Local Rule 7.8's presumptive limit of 25 pages.  The additional pages would further the parties' and the Court's shared interest in ensuring that the issues involved in this important matter are adequately and thoroughly presented.

8.    The Court has granted several previous page-extension requests from the parties in this case.  *See* ECF Nos. 30, 47, 50, 62, 66, 73.

9.    Before filing this motion, counsel for Defendants conferred with counsel for Plaintiffs, who reported that Plaintiffs oppose the relief requested in this motion.

10.    For these reasons, Defendants respectfully request that the Court grant leave to file a 37-page memorandum of law in support of their motion for a stay pending appeal.

11.    A proposed order is attached.

February 19, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRANDON BONAPARTE BROWN
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

/s/   *Cody T. Knapp*
JULIA A. HEIMAN
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Email:  julia.heiman@usdoj.gov
Email: stephen.pezzi@usdoj.gov
Email: cody.t.knapp@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

THE STATE OF LOUISIANA, *et al.*,

        Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,

        Defendants.

Case No. 2:21-cv-01074-JDC-KK

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRANDON BONAPARTE BROWN
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

JULIA A. HEIMAN
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 4

ARGUMENT ...................................................................................................... 5

I.     Defendants Are Likely To Succeed on Appeal. ................................. 6

       A.     The Court Lacks Subject-Matter Jurisdiction. ....................... 7

       B.     Plaintiffs' Claims Lack Merit ............................................... 11

       C.     Plaintiffs Did Not Establish a Basis for the Preliminary
              Injunction ........................................................................... 15

       D.     At Minimum, Defendants Present a Substantial Case on the
              Merits That, in Combination With Other Factors, Warrants a
              Stay. ................................................................................... 21

II.    The Balance of Equities Overwhelmingly Favors a Stay. ............. 23

       A.     The preliminary injunction has frozen, delayed, or derailed
              numerous activities of federal agencies that would have no
              impact on Plaintiffs. ........................................................... 25

       B.     The preliminary injunction sweeps broadly in its impact on
              internal agency processes. ................................................... 30

       C.     The preliminary injunction impinges on the President's
              authority. ............................................................................ 32

       D.     The preliminary injunction prevents the Working Group from
              refining its methodology ..................................................... 35

CONCLUSION ................................................................................................ 37

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Airlines, Inc. v. Herman*,
176 F.3d 283 (5th Cir. 1999) ...................................................................... 9

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ................................................................................... 33

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ..................................................................................... 19

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) ................................................................. 6, 21

*Atl. Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020) ........................................................................... 2, 11

*Axiall Canada Inc. v. MECS Inc.*,
Case No. 2:20-cv-01535, 2021 WL 6062356 (W.D. La. Apr. 8, 2021) ...... 6

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (2003) ................................................................................... 14

*Bennett v. Donovan*,
703 F.3d 582 (D.C. Cir. 2013) ................................................................... 19

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ..................................................................... 12

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020) ................................................. 11, 27

*Campaign for S. Equal. v. Bryant*,
773 F.3d 55 (5th Cir. 2014) ................................................................... 6, 22

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..................................................................................... 7

*Clean Water Action v. U.S. EPA*,
936 F.3d 308 (5th Cir. 2019) ..................................................................... 15

*Common Cause v. Trump*,
506 F. Supp. 3d 39 (D.D.C. 2020) ............................................................. 12

*Ctr. for Biological Diversity v. NHTSA*,
 538 F.3d 1172 (9th Cir. 2008) ................................................................. 10

*Dayton Bd. of Ed. v. Brinkman*,
 433 U.S. 406 (1977) ................................................................................ 18

*Doe #1 v. Trump*,
 957 F.3d 1050 (9th Cir. 2020) ................................................................. 32

*El Paso Cnty. v. Trump*,
 982 F.3d 332 (5th Cir. 2020);
 *cert. denied, El Paso Cnty. v. Biden,* 141 S. Ct. 2885 (2021) .................... 8

*Elgin v. Dep't of Treasury*,
 567 U.S. 1 (2012) .................................................................................... 11

*FCC v. Pottsville Broad. Co.*,
 309 U.S. 134 (1940) ................................................................................ 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010) .......................................................................... 11, 33

*FTC v. Standard Oil Co. of Cal.*,
 449 U.S. 232 (1980) .......................................................................... 2, 11

*Green Valley Special Util. Dist. v. City of Schertz*,
 969 F.3d 460 (5th Cir. 2020) ................................................................. 16

*Huawei Techs. USA, Inc. v. FCC*,
 2 F.4th 421 (2021) ........................................................................... 16, 21

*In re Murray Energy Corp.*,
 788 F.3d 330 (D.C. Cir. 2015) ............................................................... 18

*Jama v. ICE*,
 543 U.S. 335 (2005) ................................................................................ 33

*John Doe #1 v. Veneman*,
 380 F.3d 807 (5th Cir. 2004) ....................................................... 18, 19, 21

*Maryland v. King*,
 567 U.S. 1301 (2012) .............................................................................. 32

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ............................................................... 8

*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) .............................................. 9

*Missouri v. Biden*,
  --- F. Supp. 3d ----, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021);
  *appeal filed*, 2021 WL 3885590 (8th Cir.) .................................. 2, 9, 12

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ......................................................... 20, 37

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 5

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ............................................................ 31

*Norton v. S. Utah Wilderness*,
  *All.*, 542 U.S. 55 (2004) .................................................. 20, 21

*ODonnell v. Harris Cnty.*,
  892 F.3d 147 (5th Cir. 2018)*; overruled on other grounds*,
  *Daves v. Dallas Cty.*, 22 F.4th 522 (5th Cir. 2022) ...................... 16

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ............................................................ 9

*Peoples Nat. Bank v. Off. of the Comptroller of the Currency of the U.S.*,
  362 F.3d 333 (5th Cir. 2004) ................................................. 9

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) ................................................. 5

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) .............................................. 6, 21

*Ryan v. DOJ*,
  617 F.2d 781 (D.C. Cir. 1980) ................................................ 31

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ............................................................ 33

iv

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020) ................................................................................ 11, 33

*Sierra Club v. EPA,*
   939 F.3d 649 (5th Cir. 2019) ............................................................................. 21

*Texas v. United States,*
   14 F.4th 332 (5th Cir. 2021)................................................................. 11, 26, 32

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ......................................................................................... 11

*U.S. Postal Serv. v. Gregory,*
   534 U.S. 1 (2001) .............................................................................................. 12

*United States v. Baylor Univ. Med. Ctr.,*
   711 F.2d 38 (5th Cir. 1983) .............................................................................. 23

*United States v. Chem. Found., Inc.,*
   272 U.S. 1 (1926) .............................................................................................. 12

*Valentine v. Collier,*
   956 F.3d 797 (5th Cir. 2020) ............................................................................ 27

*Work v. United States ex rel. Rives,*
   267 U.S. 175 (1925) .......................................................................................... 20

*Zero Zone, Inc. v. Dep't of Energy,*
   832 F.3d 654 (7th Cir. 2016) ....................................................................... 10, 14

**Statutes**

5 U.S.C. § 706 ........................................................................................... 13, 19, 20

42 U.S.C. § 7607 .................................................................................................. 10

49 U.S.C. § 5334 .................................................................................................. 29

49 U.S.C. § 5309 .................................................................................................. 28

**Regulations**

87 Fed. Reg. 3801 (Jan. 25, 2022) ....................................................................... 36

**<u>Other Authorities</u>**

Exec. Order No. 13990,
<u>86 Fed. Reg. 7037</u> (Jan. 20, 2021) ....................................................................... *passim*

Final Interim Policy Guidance, Federal Transit Administration
Capital Investment Grants Program (June 2016),
   <u>https://perma.cc/CRU6-EH7M</u> .................................................................. 28

Technical Update of the Social Cost of Carbon for Regulatory Impact
Analysis under Executive Order 12866 (May 2013),
   <u>https://perma.cc/G32W-WZJR</u> ................................................................ 28

vi

## **INTRODUCTION**

On February 11, 2022, this Court issued an order and opinion that granted Plaintiffs' motion for a preliminary injunction, ECF Nos. 98, 99, and lifted any binding obligation on federal agencies that had been imposed by Section 5 of Executive Order 13990's instruction to use the Interagency Working Group's Interim Estimates of the Social Cost of Greenhouse Gases "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions." But the order also does far more. It enjoins Defendants from "adopting, employing, treating as binding, or relying upon the work product of" the Working Group—including work product other than the Interim Estimates that are challenged in the complaint. Order, ECF No. 99, at 1. It enjoins Defendants from "independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons," whether or not doing so is permitted under (or possibly even required by) a federal statute, court order, or the reasoned decision-making requirements of the Administrative Procedure Act (APA). *Id.* at 1-2. And it enjoins Defendants to follow "the guidance of Circular A-4 in conducting regulatory analysis," even though Circular A-4 is internal Executive Branch guidance, which is not judicially enforceable through a private right of action. *Id.* at 2.

The order also enjoins Defendants from "[a]dopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects," or that "do[] not utilize discount rates of 3 and 7 percent," *id.*—regardless of the views of the agency experts that have been explicitly charged by Congress with

the authority and the duty to adopt regulations or other actions, and regardless of the guidance in Circular A-4 itself that alternative approaches may be appropriate to consider in certain circumstances.  And it enjoins Defendants from "[r]elying upon or implementing Section 5 of Executive Order 13990 in any manner," *id.*—whether or not doing so will redress any harm (irreparable or otherwise) of any of the Plaintiff States—shuttering meetings, chilling or freezing ongoing (and purely internal) work throughout the Executive Branch in support of a wide range of matters, and even undermining the President's ability to discuss these important policy matters with his own subordinates, and with foreign allies.

The consequences of the injunction are dramatic.  Pending rulemakings in separate agencies throughout the government—none of which were actually challenged here—will now be delayed.  Other agency actions may now be abandoned due to an inability to redo related environmental analyses in time to meet mandatory deadlines.  Those myriad consequences demonstrate why the law requires a plaintiff to challenge actions of separate agencies in a discrete, concrete context once they have become final, and shows why courts may not intervene to address alleged errors at a preliminary stage of administrative proceedings.  *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980); *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1357 (2020).

Defendants respectfully submit that the Court erred in granting any relief, *see Missouri v. Biden*, --- F. Supp. 3d ----, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021), *appeal filed*, 2021 WL 3885590 (8th Cir.), and so a stay of the injunction is warranted. The injunction now requires Defendants to operate within policymaking boundaries

set by this Court—down to using judicially prescribed discount rates to account for policy impacts on future generations in cost-benefit analyses.   Respectfully, Defendants are aware of no precedent for such judicial micromanagement of Executive Branch policymaking.   And the Court's reasons for imposing it—that, among other things, the President exceeded the authority of his office by seeking to coordinate and harmonize policymaking across the Executive Branch—would call into question the legality of similar presidential efforts to supervise the preparation of cost-benefit analyses within the Executive Branch, including Executive Orders and internal guidance issued by every President since President Nixon.

Accordingly, the Solicitor General of the United States has authorized an appeal, and Defendants now respectfully request a stay pending appeal.  The Court's injunction not only bars any mandatory obligation imposed by Section 5 of Executive Order 13990 for Defendants to use the Interim Estimates when monetizing the social costs of greenhouse gas emissions in regulatory analysis, but also bars Defendants from exercising their authority to operate independently within the policymaking boundaries set by Congress and to agree with the Working Group's analysis to the extent the agency deemed appropriate within its statutory authority.  Notably, the injunction tracks the language of Plaintiffs' proposed order, yet Plaintiffs have never offered any briefing to justify the expansive relief they proposed.  So at a minimum, the injunction should be stayed to the extent it goes beyond barring the treatment of the Working Group's analysis as mandatory or binding in agency actions.

3

Defendants respectfully request that the Court rule on this motion no later than February 28, 2022.  Given the broad impact of the injunction, if the Court does not grant relief by that date, Defendants will seek relief from the United States Court of Appeals for the Fifth Circuit.

## **BACKGROUND**

On February 11, 2022, this Court granted Plaintiffs' motion for a preliminary injunction.  *See* Order at 1.  In doing so, the Court appears to have accepted Plaintiffs' arguments in all substantive respects, finding that Plaintiffs were likely to succeed on the merits of each of their APA and non-statutory claims, that they were facing irreparable harms from the implementation of Section 5 of Executive Order 13990, and that the balance of harms and public interest each weighed in favor of granting a preliminary injunction.  *See generally* Prelim. Inj. Op., ECF No. 98 ("Op.").

The Court's injunction enjoins and restrains all Defendants (except the President) on a nationwide basis from:

> (1) adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group ("IWG"); (2) enjoining Defendants from independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons; and (3) ordering Defendants to return to the guidance of Circular A-4 in conducting regulatory analysis;
>
> (2) Adopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects or that otherwise fails to comply with applicable law;
>
> (3) Adopting, employing, treating as binding, or relying upon any estimate of Social Cost of Greenhouse Gases that does not utilize discount rates of 3 and 7 percent or that otherwise does not comply with Circular A-4; and

4

(4) Relying upon or implementing Section 5 of Executive
Order 13990 in any manner.

*See* Order at 1-2.  The injunction took effect immediately upon entry.  *See id.* at 2.  To

comply with it, federal agencies have been instructed to cease all work "relying upon

the work product of the Interagency Working Group"; implementing Section 5 of

Executive Order 13990; or adopting any estimate of the social costs of greenhouse gas

emissions that is based on global effects or uses discount rates other than 3 and 7

percent.[1]  In addition, the work of the Interagency Working Group, which implements

Section 5 of the Executive Order, has been ordered to halt.

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed

on the merits; (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested

in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S.

418, 434 (2009); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,

734 F.3d 406, 410 (5th Cir. 2013).   When the Government is a party, its interests and

the public interest merge in the balancing of harms.  *See Nken*, 556 U.S. at 435.

A court that has found a likelihood of success on the merits is not required to

reverse that position in order to grant a stay.  Instead, when "a serious legal question

is involved" and "the balance of the equities weighs heavily in favor of granting the

---

[1] Although the injunction applies only to the named Defendants (other than
the President), some Defendants, such as the Director of the Office of Management
and Budget, perform functions across the Executive Branch.

stay," a party seeking a stay pending appeal "need only present a substantial case on the merits." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 438-39 (5th Cir. 2001) (internal quotations and citations omitted); *see also Axiall Canada Inc. v. MECS Inc.*, No. 2:20-cv-01535, 2021 WL 6062356, at *1, n.1 (W.D. La. Apr. 8, 2021) (Cain, J.) (citing *Ruiz*, 666 F.2d at 857). Thus, a stay is appropriate when there is a fair prospect that a district court's injunction may be vacated on appeal, and when such "shift[ing] gears" could create "a lack of continuity and stability in [an] important area of law." *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014).

## I.    Defendants Are Likely To Succeed on Appeal.

From President Nixon on, every President has imposed some internal Executive Branch requirement for federal agencies to assess the costs and benefits of major government actions. Section 5 of Executive Order 13990, which directs the development of rigorous, standardized estimates of the social costs of greenhouse gas emissions for use in regulatory analysis, falls comfortably within this well-established tradition of presidential supervision of Executive Branch policymaking. But in replacing presidential supervision with judicial decree, this nationwide preliminary injunction upends that tradition, unsettles more than five decades of regulatory practice, intrudes upon the President's Article II authority, and casts doubt on the legality of numerous Executive Orders issued to guide agencies in their preparation of regulatory analyses. The injunction further calls into question the authority of the past three Administrations to provide standardized guidance to agencies on appropriate methods of estimating the social cost of greenhouse-gas emissions. And the injunction goes beyond remedying Plaintiffs' (alleged) harms,

including by dictating the future actions of numerous Executive Branch agencies in a manner not permitted by the APA and otherwise beyond this Court's jurisdiction. As to each of these serious legal questions, Defendants respectfully submit that they have at least presented a substantial case, and are likely to succeed on appeal.

**A.    The Court Lacks Subject-Matter Jurisdiction.**

Plaintiffs have not shown the sort of "*certainly* impending" and "concrete, particularized, and actual or imminent" injury necessary to support subject-matter jurisdiction. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The various alleged harms that Plaintiffs rely on—from a variety of separate, independent agency activities like proposed rules, or from Plaintiffs' (alleged) inability to provide public comment—are either non-cognizable under Article III, or would not be redressed by the injunction they have now obtained.[2]

The Court appears to have concluded that Plaintiffs adequately alleged Article III injury through purported obligations associated with their participation in various "cooperative federalism programs." *See* Op. at 19. In particular, the Court seemed to accept Plaintiffs' argument that the States "are compelled to employ the IWG's methodology as a condition of approving significant funding and State environmental implementation plans." *Id.* at 14. But that is incorrect: The Interim Estimates do not impose any regulatory obligation on States.

_____

[2] For instance, Plaintiffs have relied on various agency activities in Utah and Alaska—even though neither Utah nor Alaska is a Plaintiff in this case. *See* Op. at 19. The injunction would bar reliance on or reference to the Interim Estimates and other Working Group analysis in reviewing projects in many other States, for which Plaintiffs have no plausible claim of injury.

Indeed, with respect to Plaintiffs' leading example of this supposed phenomenon—their argument that "states must comply with federal standards in programs, such as the National Ambient Air Quality Standards ('NAAQS')"—the Court's opinion seems to recognize (correctly) that "there are no NAAQS for greenhouse gases," and also acknowledges that Plaintiffs "offer no explanation of how the SC-GHG Estimates would be used in setting or revising NAAQS for non-greenhouse-gas pollutants." *Id.* at 14-15. Given that conclusion, this theory cannot support Article III standing (let alone irreparable harm).

The Court also speculated that "the SC-GHG Estimates will directly harm Louisiana's energy, chemical manufacturing, and agricultural industries." *Id.* at 13. The Court made similar suggestions as to other Plaintiff States. *See id.* at 13-14. But even setting aside the speculation, causation, and traceability problems with this proposition, it is foreclosed by the settled rule that a State does not have *parens patriae* standing to advance the interests of its citizens in a suit against the United Sates, *see Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and by recent Fifth Circuit precedent holding that the "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020), *cert. denied, El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021).

Even if some of Plaintiffs' allegations might *someday* support Article III standing to challenge a particular final rule, issued by a particular agency, that was issued in reliance on the work product of the Working Group, the Court would still lack subject-matter jurisdiction because Plaintiffs' claims are not ripe, unless and

until they challenge such a specific final rule.  *See, e.g.*, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-37 (1998).  As Defendants explained, and as detailed in a decision from the Eastern District of Missouri in a case involving virtually identical claims, ripeness alone was sufficient to dispose of this case.  *See Missouri*, 2021 WL 3885590, at *11-13.  Yet, the Court did not address these arguments in its opinion.

Finally, even if they could show standing and ripeness, Plaintiffs have also failed to identify any applicable cause of action.  Neither Executive Order 13990 nor the Working Group's adoption of the Interim Estimates amounts to final agency action—indeed, it is not even action by an "agency" at all—and so relief is unavailable against the Working Group under the APA.  *See Peoples Nat. Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004); *Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993).  Moreover, Plaintiffs do not challenge any final agency action by an actual APA agency, and therefore have no cause of action against any of the other federal Defendants under the APA.  And because either a specific statutory review procedure or the APA will ultimately provide an adequate opportunity for meaningful review of any individual agency's future use of the Interim Estimates as a basis for issuing a final rule or other final agency action (if Plaintiffs could show actual harm and that they fall within the relevant statute's zone of interests), Plaintiffs' invocation of a non-statutory *ultra vires* cause of action is improper.  *See, e.g.*, *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999).

On the issue of final agency action, the Court reasoned that the Interim Estimates "have already been utilized by executive agencies, indicating that the

agencies interpret the SC-GHG Estimates as final and binding."   Op. at 25. Respectfully, the fact that some agencies have used the Interim Estimates (which are consistent in all material respects with Estimates used by many agencies from 2010 to 2016) says nothing about whether those Estimates are final, nor whether they are binding in any legally relevant sense, nor whether they are properly subject to judicial challenge in this suit outside the context of a challenge to a particular final agency action.  To the contrary, the Interim Estimates could only ever matter if they were in turn used as part of some action by an actual APA agency that is final and binding on the public.  That only underscores why Plaintiffs' premature approach to this litigation is improper.

Of course, as always, if an agency takes some final agency action that causes Plaintiffs actual or imminent harm, and if Plaintiffs are within the relevant zone of interests, then they can sue, in the time and place provided by Congress—which will often be the Court of Appeals.  *See, e.g.*, 42 U.S.C. § 7607(b)(1) (requiring petitions for review of Clean Air Act regulations to be filed directly in federal appellate courts).  As part of such a lawsuit, Plaintiffs may argue that the agency relied upon arbitrary or otherwise unlawful estimates of the social costs of greenhouse gases—as prior litigants have done.  *See, e.g.*, *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1200 (9th Cir. 2008) (requiring estimation of the social cost of greenhouse-gas emissions); *Zero Zone, Inc. v. Dep't of Energy*, 832 F.3d 654, 679 (7th Cir. 2016) (approving use of global, intergenerational social-cost estimates); *California v. Bernhardt*, 472 F. Supp. 3d 573, 614 (N.D. Cal. 2020) (finding agency reliance on

"domestic" SC-GHG estimates was arbitrary and capricious). But Plaintiff cannot properly challenge steps an agency takes in formulating a rule until it issues the final rule. *See Atl. Richfield*, <u>140 S. Ct. at 1357</u>; *FTC*, <u>449 U.S. at 241</u>. And they certainly cannot do so in a district court in circumstances in which jurisdiction to review final agency action is reserved to the courts of appeals. *See Thunder Basin Coal Co. v. Reich*, <u>510 U.S. 200, 216</u> (1994); *Elgin v. Dep't of Treasury*, <u>567 U.S. 1, 23</u> (2012).

### B.    Plaintiffs' Claims Lack Merit.

The Court appears to have adopted Plaintiffs' view that the Executive Order (or the Interim Estimates) amount to a "transformative legislative rule[]" that affects "areas of vast political, social, and economic importance" in a manner that is not clearly authorized by Congress. Op. 33-34. But the individual rulemakings and other proceedings in which an agency might rely upon or refer to the Working Group's analysis have already been authorized by Congress, and the Court's interpretation of the Executive Order cannot be reconciled with its actual text, which explicitly directs agencies to implement it in a manner consistent with applicable law governing each agency's actions. *See* Exec. Order No. 13990 § 8(a)(i), <u>86 Fed. Reg. 7037</u>, 7042 (Jan. 20, 2021); *see also id.* §§ 5(b)(ii), 8(b). That directive is consistent with the President's "active obligation" under Article II of the Constitution to exercise "general administrative control of those executing the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, <u>561 U.S. 477, 492</u>, <u>496</u> (2010) (cleaned up); *see Seila Law LLC v. CFPB*, <u>140 S. Ct. 2183, 2199</u>, <u>2203</u> (2020) ("[E]xecutive officials" are "subject to the ongoing supervision and control of the elected President," to whom "[t]he entire 'executive

Power' belongs" under the Constitution).  And, as with earlier Executive Orders concerning agency cost-benefit analysis, it does not invoke, let alone expand, statutory authority in a novel context on a dramatic scale.  *Accord Missouri*, 2021 WL 3885590, at *9.  To read the Executive Order to require agencies to exceed their statutory authorization, one would have to "ignore [the] repeated and unambiguous qualifiers imposing lawfulness . . . constraints" on the Executive Order's implementation, *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) (citing *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)), as well as the traditional "presumption of regularity [that] attaches to the actions of Government agencies," *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)).  That *counter*-textual and uncharitable interpretation has no legal or factual basis.

Nor is there any notice-and-comment problem here.  The Working Group is a creature and extension of the President, not an administrative agency for purposes of the APA and its rulemaking provisions.  Moreover, the Interim Estimates are simply information for agencies to use in connection with analyzing policy options: They do not regulate private conduct or have any other binding effect beyond internal Executive Branch uses, and thus would not in any event be legislative rules subject to notice-and-comment procedures.  Moreover, they do not themselves drive a particular outcome in any agency decision-making.  Only a final legislative rule that is issued by an agency charged with administering a particular statute and is based on the Interim Estimates would be subject to notice-and-comment rulemaking, and

Plaintiffs would have a fully adequate opportunity to comment on any reliance on the Interim Estimates in that particular proceeding.  Even setting that aside, Plaintiffs have had (and will have again) ample opportunity to comment when estimates of the social cost of greenhouse gas emissions are used in connection with actual and specific agency actions.  So, at the very least, Plaintiffs cannot show "prejudicial error" from any notice-and-comment violation.  5 U.S.C. § 706.

And finally, the Interim Estimates—which are based on a careful combination of widely cited models, themselves derived from peer-reviewed (and Nobel-Prize winning) economic and scientific literature—are a reasonable response to a difficult but important problem: the need to estimate and report the wide-ranging, compounding impacts of greenhouse gas emissions that mix into the Earth's atmosphere and linger for centuries.  To be sure, the Working Group was clear-eyed about its estimates' limitations, acknowledging that, although the underlying models and methodologies are currently the most appropriate for developing estimates for use in regulatory analysis, they are subject to unavoidable uncertainty and could benefit from future updates based on recent technical advances.  *See, e.g.*, Feb. 2021 TSD at 31.  But in adopting the Interim Estimates, the Working Group considered prior comments from the public and balanced known concerns against the "immediate need to have an operational SC-GHG for use in regulatory benefit-cost analyses and other applications that was developed using a transparent process, peer-reviewed methodologies, and the science available at the time of that process."  *Id.* at 3.  It also acknowledged the possibility of other approaches, and it explained where (and why)

its approach differed from that of the previous Administration.  That approach has satisfied arbitrary-and-capricious review before.  *See Zero Zone*, <u>832 F.3d at 677-79</u>. And if the Working Group were an agency, and its substantive decisions thus subject to APA review, then that reasoned approach, which was "based upon [an] evaluation of complex scientific data within [the Working Group's] technical expertise," would be entitled to this Court's "'most deferential'" review.  *BCCA Appeal Grp. v. EPA*, <u>355 F.3d 817, 824</u> (2003); *see also Huawei Techs. USA, Inc. v. FCC*, <u>2 F.4th 421, 452</u> (2021).

The Court's opinion afforded no such deference to the Working Group's expertise.  The opinion does not address the Working Group's 36-page discussion of its methodology and decisionmaking, nor does it acknowledge any of the explanations that the Working Group offered for its substantive decisions to estimate the social cost of greenhouse gas emissions based on global effects and using discount rates below 7 percent, or the judicial decisions previously approving substantially the same estimation methods.  Instead, the opinion identifies Plaintiffs' complaints with the Working Group's approach, *see* Op. 35-37, without explicitly endorsing any of them.[3] Thus, it is unclear what, if anything, the Court found likely to be arbitrary and capricious about the Working Group's development and adoption of the Interim Estimates.  Respectfully, Defendants submit that the Court's opinion is inconsistent

---

[3] In the portion of its opinion dedicated to the availability of judicial review under the APA, the Court "agree[d]" with the vague statement that Plaintiffs "have demonstrated multiple independently sufficient grounds to vacate the SC-GHG Estimate."  Op. 40.

14

with the Fifth Circuit's instruction that a court may not simply "substitute [its] judgment for that of the agency." *Clean Water Action v. U.S. EPA*, 936 F.3d 308, 316 (5th Cir. 2019) (citation omitted).

## C.   Plaintiffs Did Not Establish a Basis for the Preliminary Injunction.

The injunction should not have issued because Plaintiffs did not show any Article III injury, much less an irreparable one, and the balance of equities with respect to preliminary relief heavily favored the government.  By its terms, the injunction applies to government actions and procedures without regard to whether Plaintiffs have any basis for challenging them.  Even if some relief could possibly have been proper in this case, the harm to the government and the public interest from that broad injunction far outweighs the speculative harms alleged by Plaintiffs, and so the injunction was improper.

Also, the Court's injunction sweeps far beyond any remedy available under the APA, which authorizes courts only to "hold unlawful and set aside" agency action.  5 U.S.C. § 706(2).  Instead of simply barring mandatory applications of the Interim Estimates and restoring agencies' discretion to consider estimates other than those prepared by the Working Group, the injunction imposes its own approach to regulatory analysis.  And in addition to prohibiting them from relying on the Interim Estimates to justify final agency action, the Court's order enjoins Defendants from "adopting, employing, treating as binding, or relying upon" *any* work product of the Working Group, "in any manner."  Those restrictions could be read so broadly as to apply even to agencies' deliberative processes, meaning that agency staff are now

chilled from even *discussing* what they consider accurate estimates of the social cost of greenhouse gas emissions.  And the injunction has effectively shut down a Working Group established by the President in part to provide advice to himself and to the broader federal government regarding the uses of estimates of the social cost of greenhouse gas emissions.  Accordingly, the injunction's wholesale adoption of Plaintiffs' proposed order—a proposal that Plaintiffs did not discuss, much less seek to justify, in their briefing to this court—was erroneous.

The injunction is not properly tailored to redress Plaintiffs' alleged injuries.  "A district court abuses its discretion if it issues an injunction that is not narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue."  *ODonnell v. Harris Cnty.*, 892 F.3d 147, 155 (5th Cir. 2018) (internal quotation marks omitted), *overruled on other grounds*, *Daves v. Dallas Cty.*, 22 F.4th 522 (5th Cir. 2022) (en banc).  "[A]n injunction must be vacated if it fails to meet those standards and is overbroad."  *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (cleaned up).

Here, the specific action for which Plaintiffs sought a remedy was the President's directive in Section 5 of the Executive Order that "agencies shall use" the Interim Estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published."  Exec. Order 13990 § 5(b)(ii)(A).  In granting the injunction, the Court appeared to agree with Plaintiffs that it was the "*mandatory implementation*" of the Interim Estimates, which Plaintiffs asserted "imposes new

obligations on the states and increases regulatory burdens when they participate in cooperative federalism programs," that satisfied the Plaintiffs' burden to assert a concrete and particularized injury.  Op. 19-20 (emphasis added).

To the extent this mandatory obligation caused any unlawful harm, it would be fully remedied by an order that simply declared the Interim Estimates to be non-binding.  *See* Defs.' PI Opp'n Br., at 48, ECF No. 68 ("Defs.' PI Opp'n"); Defs.' Mem. in Sup. of Mot. to Dis., at 23-24, ECF No. 31-1 ("MTD").  Even taking into account this Court's conclusion that Executive Order 13990 departed from the Obama and Trump Administrations' approach by using the word "shall," an order rendering the Interim Estimates non-binding would have returned Plaintiffs to the status quo they claimed to desire, in which agencies could approach these issues differently from the start.  Plaintiffs have never contested that such an order would be sufficient to redress their asserted injuries.

The Court's order was far broader in several ways.  First, as discussed above, it imposed *affirmative, mandatory* obligations on Defendants whenever they wish to "adopt[], employ[], . . . [or] rely[] upon any Social Cost of Greenhouse Gas estimates," including by "return[ing] to the guidance of Circular A-4 in conducting regulatory analysis," and by requiring the consideration of only domestic effects and "discount rates of 3 and 7 percent."  *See* Order at 1-2.[4]  The broad language of the Court's order

---

[4] Though the Court's Order could be read to require agencies to conform to Circular A-4 *whenever* they conduct regulatory analysis, Defendants understand the Court's order only to reach those regulatory analyses implicated by Plaintiffs' claims—*i.e.*, regulatory analyses that involve the estimation of a social cost of greenhouse gas emissions.

is also not limited to final agency actions, such that it extends to actions that could not possibly impact Plaintiffs at all. As Defendants have explained, the government may conduct an analysis of the cost of greenhouse gases in many contexts where it will have no impact on regulated parties, including Plaintiffs. For instance, those costs might be included in the regulatory impact analysis of a proposed rule under Executive Order 12866, which Plaintiffs could not challenge in this Court. *See In re Murray Energy Corp.*, 788 F.3d 330, 335 (D.C. Cir. 2015) (Kavanaugh, J.). And the injunction could be read to extend to "reliance" on the estimates or the product of the working group in other, purely internal, operations, such as internal studies, reports, or staff deliberations. None of those activities were properly before the Court, as they do not plausibly cause any harm to Plaintiffs and they fall outside of any applicable waiver of sovereign immunity. *See John Doe #1 v. Veneman*, 380 F.3d 807, 819 (5th Cir. 2004).

The Court's injunction also has halted all activities of the Working Group, a group of advisers convened by the President to provide him with advice on important empirical and policy questions. Certainly, Plaintiffs faced no harm from the general operation of the Working Group, or from actions like the continuation of the peer-review process (and initiation of the notice-and-comment process) for the Working Group's Final Estimates—particularly given that Plaintiffs claim harm from the lack of notice and comment. Yet by prohibiting Defendants from "implementing Section 5 of Executive Order 13990 in any manner," the injunction has entirely stopped the Working Group from operating, thereby depriving the President of his preferred

forum for inter-agency consultation and deliberation.  Even if some injunction were warranted, the Court should have "tailor[ed] a remedy commensurate to" the specific sources of alleged injury that Plaintiffs face. *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977).

In addition, by "ordering Defendants to return to the guidance of Circular A-4 in conducting regulatory analysis" and prohibiting agencies from "[a]dopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects" or that "do[] not utilize discount rates of 3 and 7 percent," *see* Order at 1-2, the Court granted mandatory, affirmative injunctive relief that goes beyond what relief could ever be appropriate in an APA case.  As the Court's opinion recognizes, Plaintiffs brought their claims pursuant to the APA and a residual non-statutory cause of action for review of *ultra vires* action.  *See* Op. 4, 39. Those causes of action generally support only prohibitory injunctions—in other words, they authorize a court to "hold unlawful and *set aside* agency action, findings, and conclusions," 5 U.S.C. § 706(2) (emphasis added), and otherwise to restrict the "absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual," *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).  But even if a Court sets aside an unlawful agency action, "it is the prerogative of the agency to decide in the first instance how best to provide relief," *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013), and to decide what comes next.  *See FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 146 (1940) ("[C]ourts are not charged with general

19

guardianship against all potential mischief in the complicated tasks of government.");
*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159-60 (2010) (holding injunction that restrained agency's options following vacatur was improper).

Although the APA does authorize mandatory injunctive relief under certain circumstances, *see* 5 U.S.C. § 706(1), "the only agency action that can be compelled under [that provision] is action legally *required*," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). Thus, any mandatory injunctive relief ordered in this case could only require the performance of "ministerial" or "non-discretionary act[s]," or require "action upon a matter, without directing *how* [the agency] shall act." *Id.* at 64. And where Congress has left discretion, the Court "has no power to specify what the action must be." *Id.* at 65; *see also Work v. United States ex rel. Rives*, 267 U.S. 175, 177-78 (1925).

The injunction exceeds these well-established bounds. As even Plaintiffs recognize, in the absence of Executive Order 13990, agencies have discretion in their choice of analytical approaches to the problem of estimating the social costs of greenhouse gas emissions. *See* Pls.' Br. 13 (characterizing the Executive Order as having "strip[ped] all federal agencies of discretion when it comes to SC-GHG Estimates"). And by requiring Defendants to adopt a particular analytical approach to that problem and utilize only certain judicially approved methodological inputs when preparing regulatory analyses, the injunction does precisely what Plaintiffs (wrongly) attributed to Executive Order 13990, eliminating the ability of experts within federal agencies to adapt their actions according to the various statutory

frameworks at issue. *Cf. Sierra Club v. EPA*, <u>939 F.3d 649, 680</u> (5th Cir. 2019) (judicial review is at its "'most deferential'" where an agency's decision involves "evaluation of complex scientific data within its technical expertise"); *Huawei*, <u>2 F.4th at 452</u>. Even if it were somehow improper for the President—who is constitutionally charged with oversight of the Executive Branch—to require adherence to the Interim Estimates, it can hardly be proper for a court then to require agencies' mandatory, unwavering adherence to a *different* set of presidential instructions for cost-benefit analysis that likewise do not rest on any particular statute.

Indeed, the injunction appears to rest on a misunderstanding of Circular A-4, which recognizes that when agencies conduct a regulatory analysis, the scope of analysis—*i.e.*, whether the agency will analyze effects globally or on a more limited scale—and the choice of discount rates will depend on the particular context and the features of the policy under consideration. *See* Decl. of Dominic J. Mancini ("Mancini Decl."), Ex. 1 hereto, ¶¶ 8-13. Thus, the requirement to "return to Circular A-4" is arguably inconsistent with an instruction to never incorporate global effects or use discount rates other than 3 and 7 percent, which also renders the injunction improperly vague. *See John Doe #1*, <u>380 F.3d at 818</u>. This incoherence offers a powerful example of why courts cannot "direct[] how" an agency acts in this analytical, policymaking context. *Norton*, 542 at 63.

### D.   At Minimum, Defendants Present a Substantial Case on the Merits That, in Combination With Other Factors, Warrants a Stay.

Defendants recognize that the Court previously rejected many of the arguments above when it decided to grant Plaintiffs' motion for a preliminary

injunction.  But they respectfully submit that those arguments present a substantial case on the merits.  At a minimum, the sweeping overbreadth of the injunction calls out for immediate relief.  And whatever the Court's ultimate view on the merits, this case clearly involves "serious legal question[s]."  *Arnold*, 278 F.3d at 439 (quoting *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir. 1981)).  The climate effects of greenhouse gas emissions are a matter of urgent public concern, and the government's ability to estimate those effects in keeping with the most up-to-date understandings of relevant science and economics is important to a variety of Presidential and agency activities—including, in some instances, to explain and support agency actions taken pursuant to explicit grants of statutory authority.   And more generally, Plaintiffs' unprecedented claims raise fundamental questions about the President's constitutional authority to supervise the Executive Branch.   Thus, "the legal questions presented by this case are serious, both to the litigants involved and the public at large."  *Campaign for S. Equal.*, 773 F.3d at 57.

Moreover, for reasons explained in greater detail *infra* at 23-37, the balance of hardships weighs heavily in favor of Defendants.  By mandating specific court-approved standards for government regulatory analysis and ordering a halt to the work of the IWG, the Court's injunction will hobble the government's efforts to develop rigorous and standardized estimates that reflect what those charged with implementing and overseeing regulatory measures determine to be the true costs of greenhouse-gas emissions—even in contexts in which the estimates would have no implications beyond the Executive Branch, or where there will be no effect on an

agency's ultimate decision.  And compliance efforts are already causing the sort of "shift[ing] gears" and "disruption[s]," *id.* at 58, that warrant a stay (or at least a partial stay).  As detailed *infra* at 25-30, agencies are experiencing significant delays and wastes of resources as they scramble to rehash economic and environmental analyses prepared in connection with a broad array of government actions—all without any corresponding benefit to Plaintiffs.  The propriety of that relief, which hinders the President's efforts to address a national climate crisis, *see* Exec. Order 13990 § 1, surely should at least be subject to "a detailed and in depth examination" on appeal, *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 40 (5th Cir. 1983) (citation omitted), before it is permitted to take effect and cause irreparable harm to the Executive Branch and the public interest.

## II.    The Balance of Equities Overwhelmingly Favors a Stay.

In the single week that has elapsed since the entry of the injunction, its effects have reverberated across multiple federal agencies, reaching all the way from pending agency rules to internal Government deliberations, and even to work in support of the foreign affairs functions reserved to the President.  In light of the scope of the injunction, which deprives Defendants of *any* discretion on an important issue—in contrast to Executive Order 13990, which contemplated deviation from the Interim Estimates when required by another federal statute, including the APA—the harm to the Government, and therefore the public interest, has been palpable.  As detailed below, work surrounding public-facing rules, grants, leases, permits, and other projects has been delayed or stopped altogether so that agencies can assess whether and how they can proceed.  Purely internal agency discussions that would

23

have touched on the IWG's work product have also halted.  Even work with international partners may be adversely affected, as the participants puzzle through whether they can take part in such talks at all if they are enjoined from discussion of the IWG's work product.  And that is so even though the vast majority of those actions do not reflect agency *reliance* on the Interim Estimates in taking final action.  But under the injunction, that appears to be irrelevant—even government processes with no impact on Plaintiffs (or on anyone) have been enjoined.  The Court's order thus deprives agencies of far more discretion than Executive Order 13990 ever did, even though Plaintiffs' legal challenge was purportedly premised on the idea that agencies must be free to operate within the delegations of authority that have been provided by Congress without any constraint from the supervisory powers of the President.  Again, plaintiffs offered this Court no explanation whatsoever for proposing injunctive relief that so clearly suffers from the very defects they claim to see in E.O. 13990.

Against these harms, Plaintiffs can point to no cognizable harm to them if the Court were to grant the stay that Defendants seek.  As discussed above and in Defendants' prior submissions, *see supra* __, all of Plaintiffs' alleged harms will be addressed by an order rendering the Working Group's Interim Estimates non-binding.  Moreover, as noted, such an order "set[ting] aside" any legal effect of the Interim Estimates is all that the APA allows.  Accordingly, there is no countervailing harm that could outweigh the significant hardships enumerated below.

### A. The preliminary injunction has frozen, delayed, or derailed numerous activities of federal agencies that would have no impact on Plaintiffs.

First, the broad injunction irreparably harms the Government—and the public interest—by interfering with an array of ongoing agency rulemakings and other activities. Indeed, the injunction has disrupted the functioning of multiple Cabinet agencies. *See* Mancini Decl. ¶ 28. Because the Order broadly prohibits Defendants from "employing" the Interim Estimates or other work product of the Working Group, no matter the impact (if any) of that action on regulated entities, much less on Plaintiffs, staff across the affected Cabinet agencies have now been suddenly put in the position of having to assess how (and whether) to even schedule *meetings* on this subject, and whether they can comment on proposed rulemakings or draft agency actions. *See id.* This range of affected work includes proposed regulatory actions, reviews of regulatory actions targeted for publication, and even the agendas of meetings that might touch on these issues, *see id.*—none of which have any relationship to the harm alleged by Plaintiffs in this action.

The Office of Information and Regulatory Affairs (OIRA) reports that agencies as varied as the Department of Energy, the Department of Transportation, the Department of the Interior, and the EPA have seen a range of ongoing activities delayed or halted because they in some way *referenced* the Interim Estimates—even if they had not relied upon those estimates as a basis for the agency action at issue. *See* Mancini Decl. ¶¶ 17-23. In particular, unless the injunction is stayed, agencies would be required to redirect resources to revise already-drafted proposed rules and

regulatory impact analyses, including in instances where a draft rule that incorporates the Working Group's Interim Estimates has already been submitted to OMB. *See id.* ¶ 17.  The Department of Energy noted approximately twenty-one initially-identified rulemakings that will be so affected; the EPA has noted approximately five; the Department of Transportation has noted approximately nine; and the Department of the Interior has noted approximately three. *See id.* ¶ 18.

The many Regulatory Impact Analyses (RIAs) for which the injunction would require revision are often complex and time-intensive studies that agencies can spend months developing and refining in advance of a regulatory action. *See id.* ¶ 24. Changing the value of key parameters such as discount rates, the social cost of greenhouse gases, and other similar numbers—as would be required by the injunction—would often require agencies to re-run numerical models and simulations that they may be using to develop impact assessments. *See id.*  Re-doing these assessments also often would require agencies to restart the long process of intra-agency and inter-agency review of the analysis and regulatory proposals, which can take even more time. *See id.*  The process may also require additional public comment periods for certain types of agency actions, thereby further delaying the actions. Because agencies have relatively fixed staffing constraints, the human resources needed to re-do an analysis also presents significant opportunity costs that could preclude agencies from conducting analysis and developing policy on other pressing priorities called for by statutes and by Presidential priorities. *See* Mancini Decl. ¶ 24. Such delays could likely include delaying agencies in their efforts to offer clarifying

guidance to regulated entities, states, and other stakeholders; the uncertainty caused by such delays can be costly.  *See id.*  And, critically, this work would remedy no harm, and provide no benefit whatsoever to the Plaintiff States—who have no stake at all, for example, in the methodology employed in a spreadsheet attached to a draft of a proposed agency action.

The Fifth Circuit has recognized that "[j]udicial interference with a government agency's policies often constitutes irreparable injury." *Texas v. United States*, 14 F.4th 332, 340 (5th Cir. 2021), *opinion vacated on reh'g en banc*, 24 F.4th 407 (5th Cir. 2021) (citing *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)).  All the more so in this case, where rules effectuating so many different policies of a variety of Government agencies have been delayed or suspended.

In some instances, the Court's order would cause even more direct harm. Consider, for example, the Bureau of Land Management's ("BLM") proposed updated rule governing the waste of natural gas, which would also reduce methane emissions. *See* Mancini Decl. ¶ 19.  This updated rule follows a 2020 court order in which a federal court invalidated a prior version of the rule, finding that reliance on a domestic-only estimate of the social cost of methane had arbitrarily "fail[ed] to consider important aspects of the problem" by "ignor[ing]," for example, how methane emissions would affect the billions of dollars of assets owned by U.S. companies abroad, the millions of U.S. citizens living abroad, U.S. military personnel stationed abroad, effects on U.S. companies through foreign trading partners and international supply chains, and geopolitical security.  *California v. Bernhardt*, 472 F. Supp. 3d

573, 613 (N.D. Cal. 2020); *see also* Mancini Decl. ¶ 19.  The injunction in this case places the agency in an untenable position of complying with conflicting obligations.

The impact of the Order extends far beyond agency rulemakings.  As another example, the Federal Transit Administration (FTA) has a multi-billion dollar Capital Investment Grants (CIG) program for which it issued Final Interim Policy Guidance (Policy Guidance) to implement the program—unchallenged here, and published in 2016 after OMB review and public notice and comment.  *See* Final Interim Policy Guidance, Federal Transit Administration Capital Investment Grants Program (June 2016), https://perma.cc/CRU6-EH7M; *see also* Mancini Decl. ¶ 23.[5]  The Policy Guidance includes information on each of the statutory project evaluation criteria, including how they are calculated; and how FTA arrives at an overall project rating, which is a statutory requirement for eligibility for a grant award.  *See* 49 U.S.C. §§ 5309 (d)(2)(A)(iii); (g)(2); (h)(4), (6).  It applies the social cost of carbon estimates developed by the Working Group in its prior iteration, *see* Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866 (May 2013), https://perma.cc/G32W-WZJR, to capture the monetary value of changes in GHG emissions, as a sub-factor for FTA's project rating for one of the several statutory criteria.  *See* Final Interim Policy Guidance, at 20.  Because the injunction prohibits FTA from applying the Policy Guidance to conduct the statutorily required rating of projects, it has effectively frozen the advancement of multi-million dollar

_____

[5] The CIG program is a multi-year, multi-step process that proposed transit construction projects must go through to be eligible for and receive discretionary CIG program funding, including statutorily required project ratings.

transit projects (there currently are more than 50 projects in the CIG pipeline) through the CIG process while the agency figures out a plausible, and perhaps lengthy, alternative path forward. The Policy Guidance was published after notice and comment as required by 49 U.S.C. § 5334(k), and therefore, immediate changes are most likely not feasible. *See* Mancini Decl. ¶ 23. This disruption comes even though the possible future distribution of grant money cannot possibly have caused any Article III harm to the Plaintiffs, let alone harm attributable to Executive Order 13990.

The Department of Transportation has also identified approximately sixty records of decision or environmental impact analyses required by the National Environmental Policy Act (NEPA) that discuss the Working Group's work product in some measure, and therefore now would require revision under the preliminary injunction. *See* Mancini Decl. ¶ 18. The Department of the Interior has identified approximately twenty-seven such NEPA-mandated analyses. *See id.* For example, BLM had already incorporated the Working Group's Interim Estimates into its NEPA analysis associated with several planned onshore oil and gas lease sales. *See id.* ¶ 21. Those materials had already been subjected to a public comment period; and the agency had finalized its responses to comments and revised its Environmental Assessments to address the public comments as appropriate. *See id.* BLM had prepared the work necessary for those anticipated sales, but the Preliminary Injunction foreclosed its ability to proceed. *See id.* Revising the NEPA analysis—

and thereby potentially returning to square one the public notice and comment process—would be a burdensome and time-consuming process for the agency. *See id.*

In each of these examples, revision of the agency's analysis would cause delay and take agency resources away from other projects. Delay could undermine an agency's project altogether. And in the vast majority of instances, the time and resources spent on revision will provide no benefit whatsoever, and redress no harm, to Plaintiffs.

In addition, by intruding into a broad array of separate rulemakings and other proceedings, and imposing the injunction's rigid prohibitions and requirements for them, this Court has deprived countless members of the public of the opportunity to address the injunction's approach to estimating the social costs of greenhouse gas emissions, in the individual agency proceedings Congress and the agencies concerned have adopted for that purpose. Those proceedings include, for example, numerous projects outside the Plaintiff States or otherwise in circumstances where Plaintiffs would have no legally valid basis to object.

## B. The preliminary injunction sweeps broadly in its impact on internal agency processes.

By broadly prohibiting Executive Branch agencies from "employing . . . or relying upon the work product" of the IWG or even "relying on the IWG's methodology independently," the preliminary injunction irreparably harms the federal government—and therefore the public interest—by chilling the free exchange of ideas in internal government deliberations regarding the social cost of greenhouse gas emissions. The Supreme Court has long recognized that the uninhibited flow of

30

information is critical to the creation of sound government policy, and that constraining candid pre-decisional discussions will work an injury to the very "quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, <u>421 U.S. 132, 151</u> (1975); *see also Ryan v. DOJ*, <u>617 F.2d 781, 790</u> (D.C<u>. Cir. 1980</u>).

Yet the sweeping terms of the preliminary injunction mean that, in some instances, agency staff will avoid internal discussion about any drafts that refer to the Working Group's conclusions, examining the Working Group's recommendations with the benefit of their own expertise, or debating the merits of various approaches to monetizing the costs of greenhouse gas emissions, insofar as that discussion might be understood to "employ" the Working Group's work product or methodology. For example, to ensure compliance with the preliminary injunction, OMB has instructed agencies not to send comments on sections of draft documents that refer to the social cost of greenhouse gas emissions. *See* Mancini Decl. ¶ 30. Furthermore, the sweeping terms of the injunction have interfered even with internal agency training efforts. For example, agencies including the Environmental Protection Agency have cancelled or postponed all-staff webinar training sessions at which the IWG's work or the social costs of greenhouse cases were to be discussed. *See id.* ¶ 29. To chill federal agencies even from discussing or considering recommendations formed with the benefit of such inputs is to significantly impoverish their deliberations, and to work an injury to the public as a result. Plaintiffs, by contrast, have not alleged that they might suffer any harm from such purely internal deliberations. In this respect, too, the balance of harms strongly favors a stay of the injunction.

31

## C. The preliminary injunction impinges on the President's authority.

The injunction also irreparably harms the Government by usurping the President's authority to supervise the Executive Branch and to obtain the advice of his subordinates.  In establishing the Working Group, the President twice noted that its efforts would be "essential" to facilitate Executive agencies' sound decisionmaking when conducting cost-benefit analyses of regulatory and other actions.  Exec. Order No. 13990, 86 Fed. Reg. 7037, § 5(a) (Jan. 20, 2021).  Yet the injunction renders the Working Group's methodology and conclusions wholly unavailable to the President's subordinates, and prevents it from doing further work to ensure the alignment of the monetization of the social costs of greenhouse gas emissions with current scientific literature.  Though the injunction purports to exclude the President from its scope, an order enjoining agencies from conducting the inter-agency consultation envisioned by the President in convening the Working Group strikes at the President's authority.  This injury "is irreparable in the basic sense of the word; there is no way to recover the time when [the President's] exercise of discretion is being enjoined during the pendency of the appeal." *Texas*, 14 F.4th at 341; *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury") (citing *Maryland v. King*, 567 U.S. 1301 (2012)).  Such irreparable harms are particularly unjustified because, as discussed, the President is not only constitutionally empowered, but constitutionally *required*, to supervise the activities of the Executive Branch.  *See Seila Law LLC*, 140

32

S. Ct. at 2199; *Free Enter. Fund*, 561 U.S. at 492, 496.[6]

The harm to the President's authority is especially acute with respect to foreign policy matters, for which the President has "unique responsibility" under Article II. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (quoting *Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 188 (1993)); *see also, e.g., Jama v. ICE,* 543 U.S. 335, 348 (2005) (noting the Supreme Court's "customary policy of deference to the President in matters of foreign affairs" that "may implicate our relations with foreign powers . . . requir[ing] consideration of changing political and economic circumstances").

In creating the Working Group, the President explained that its work would "support[] the international leadership of the United States on climate issues."  Exec. Order No. 13990, § 5(a).  He went on to explain in the same Executive Order that the climate crisis "must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory."  *Id.* § 6(d).  The injunction threatens to work immeasurable harm to the country's global leadership on this issue as the country's representatives may now avoid even engaging in discussions that touch on the IWG's work product.

This is so because, in the context of bilateral meetings with international partners, the injunction chills representatives of the United States from discussing the Working Group's estimates and methodology, even where a foreign partner may

---

[6] In light of this Court's reliance in its opinion on the need for congressional approval of the actions at issue in this case, *see* Op. 29, Defendants do not understand the injunction to preclude them from requesting legislation from Congress on this topic, including legislation to permit use of the Interim Estimates, or budgetary requests to Congress to authorize the Working Group to continue operating.

have embraced and incorporated the Working Group's work product into its own policies *See* Mancini Decl. ¶¶ 32-33.  Indeed, the Preliminary Injunction already has interrupted bilateral discussions important to the President's conduct of foreign affairs; in light of the Preliminary Injunction, the IWG's technical experts have ceased communication with their counterparts in Canada.  *See id.*  Previously, in 2016, the United States had announced that it would align its estimates of the social cost of carbon with Canada.  *See id* ¶ 33.  Canada has long adapted the IWG's methodology for use in their own analysis.  *See id.*  Canada has recently begun updating its own social cost of greenhouse gas emissions estimates, and the IWG's technical experts had been engaging in regular, ongoing conversations with Canada about these efforts.  *See id.*  The injunction has halted those conversations.  *See id.*

Coordination between countries' estimates of the SC-GHG is a key aspect of foreign policy on climate change.  To date, Canada has followed the U.S. IWG's approach and adopted a "global perspective" in its estimates of the SC-GHG, considering how its emissions impact the rest of the world, including U.S. welfare.[7] *See id.*  However, if the Interagency Working Group is now prohibited from considering global climate effects, were Canada to follow suit and consider Canada-only estimates of the social cost of greenhouse gases—and so ignore the impacts of Canadian emissions to the United States and the rest of the world—U.S. welfare

---

[7] En14-202-2016-eng.pdf (publications.gc.ca) at 1; *see also id.* at 12 ("Key decisions of the U.S. Group, such as the use of global values…were consistent with insights from climate science."); *id.* at 13 ("Although both countries will feel the impacts of climate change differently, the costs included in the Social Cost of Carbon are global in nature.").

could suffer. *See id.* The United States also has an interest in engaging in other multilateral discussions involving the SC-GHG, such as on the energy policy reviews conducted by the Asian Development Bank that consider the social cost of carbon. *See* Mancini Decl. ¶ 34. By raising questions as to whether technical experts can engage in productive dialogues with Canada and other international counterparts, the Preliminary Injunction undermines the President's ability to coordinate an effective foreign policy on climate change and energy issues, *see id.*, interfering with the President's Article II powers to direct foreign policy on this key issue, and thereby injuring members of the public and the global community by foreclosing productive dialogue aimed at addressing the climate crisis.

### D. The preliminary injunction prevents the Working Group from refining its methodology.

Finally, the injunction, which prohibits Defendants from "[r]elying upon or implementing Section 5 of Executive Order 13990 in any manner," short-circuits the work of the Interagency Working Group.

At the time the injunction issued, the Working Group had been preparing an update to its interim Technical Support Document ("interim TSD") previously released on February 26, 2021, which had, *inter alia*, provided its Interim Estimates. *See* Mancini Decl. ¶¶ 36-39. The Working Group has requested and received detailed public comment on the interim TSD, including much diverse input and advice on how to best incorporate the latest peer-reviewed science and economics literature into an updated set of SC-GHG estimates. *See id.* ¶ 37. Since that public solicitation, a group of dozens of technical experts had been synthesizing and summarizing that detailed

35

input, running models, summarizing information, and generally working intensely toward the goal of providing updated estimates in the next couple of months. *See id.* ¶ 38. The injunction suspended that work. *See id.* ¶ 40.

The injunction also suspended the Working Group's efforts to prepare to subject its forthcoming updated estimates to additional review. *See id.* ¶¶ 39-40. The Working Group's intention had been to provide an additional opportunity for both general and expert input into whatever specific discount rate or rates are chosen, as well as the geographic scope of the updated estimates. *See id.* ¶ 39. In fact, the process for convening the peer review was already underway: on January 25, 2022, EPA published a request for nominations of experts for the peer review. 87 Fed. Reg. 3801 (Jan. 25, 2022). *See* Mancini Decl. ¶ 39. Under the injunction, the effort to facilitate independent review of the Working Group's work, including through the selection of experts by an independent contractor hired for that purpose, is now suspended. *See id.*[8]

---

[8] The injunction's suspension of the Working Group's work is also likely to result in a waste of government resources because, *inter alia*, it seems likely that, even if the Working Group's work is paused, the federal government will be responsible for full payment to certain contractors for their services. *See* Mancini Decl. ¶ 41. It is therefore further possible that, if the Working Group is permitted at some point in the future to resume work on some set of social cost of greenhouse gas emissions estimates, the federal government may need to commit additional resources to enter into new contracts to complete the work that was left incomplete during this pause. *See id.*

Additionally, another contractor who is managing the public comment and peer review process bills based on time and materials expended. The resource costs in that circumstance are related to losses in retaining viable peer review candidates and continuity in the peer review process. *See id.*

By stopping the Working Group in its tracks, the injunction prevents the Working Group from recommending a process for reviewing and updating the social costs of greenhouse gas emissions "to ensure that these costs are based on the best available economics and science," and from revising the current interim estimates. *See* Exec. Order No. 13990, §5(b)(ii).  Thus, as in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), "the broad injunction entered here essentially pre-empts the very procedure by which the [Working Group] could determine" whether any changes to its work product were warranted.  *Id.* at 164.

This prohibition against the Working Group's consideration of "pertinent scientific literature," "solicit[ation of] public comment," and "engage[ment] with the public and stakeholders," Exec. Order No. 13990, §5(b)(iii)—all of which Plaintiffs claim to support—is against the public interest.  It prevents the Working Group from taking measures to tackle the climate crisis, as Executive Order 13990 was designed to do.  It inhibits the functioning of the Executive Branch, impairing the ability of the President to coordinate policymakers across the executive branch.  And it undermines the democratic accountability so critical to our constitutional system.  The injunction thus does substantial harm to the public interest.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court stay its preliminary-injunction order pending appeal.   In the alternative, Defendants respectfully request a stay to the extent the injunction extends beyond barring any mandatory obligation for agencies to use the Interim Estimates.

Dated: February 19, 2022          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRANDON BONAPARTE BROWN
United States Attorney

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

*/s/ Cody T. Knapp*
JULIA A. HEIMAN
STEPHEN M. PEZZI
CODY T. KNAPP
Trial Attorneys
United States Department of Justice
Civil Division,
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Email:  julia.heiman@usdoj.gov
Email: stephen.pezzi@usdoj.gov
Email: cody.t.knapp@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.*,<br><br>             Plaintiffs,<br><br>     v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>             Defendants. | Case No. 2:21-cv-01074-JDC-KK |

### [PROPOSED] ORDER

Upon consideration of Defendants' motion for an extension of the page limits applicable to Defendants' memorandum in support of their motion for a stay pending appeal, any response thereto, and the entire record herein, it is hereby

**ORDERED** that Defendants' motion is **GRANTED**; and it is further

**ORDERED** that Defendants may file a 37-page memorandum in support of their motion to stay pending appeal.

**SIGNED** and **ORDERED** in Chambers on this ___ day of _____, 2022.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**