No. 22-30087

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATES OF LOUISIANA, ALABAMA, FLORIDA, GEORGIA, KENTUCKY,
MISSISSIPPI, SOUTH DAKOTA, TEXAS, WEST VIRGINIA, and WYOMING,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States;
CECILIA ROUSE, in her official capacity as Chairwoman of the Council of Economic Advisers;
SHALANDA YOUNG, in her official capacity as Acting Director of the Office of Management
and Budget; KEI KOIZUMI, in his official capacity as Acting Director of the Office of Science
and Technology Policy; JANET YELLEN, in her official Capacity as Secretary of the
Treasury; DEB HAALAND, in her official capacity as Secretary of the Interior; TOM
VILSACK, in his official capacity as Secretary of Agriculture; GINA RAIMONDO, in her
official capacity as Secretary of Commerce; XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services; PETE BUTTIGIEG, in his official capacity as
Secretary of Transportation; JENNIFER GRANHOLM, in her official capacity as Secretary of
Energy; BRENDA MALLORY, in her official capacity as Chairwoman of the Council on
Environmental Quality; MICHAEL S. REGAN, in his official capacity as Administrator of the
Environmental Protection Agency; GINA MCCARTHY, in her official capacity as White House
National Climate Advisor; BRIAN DEESE, in his official capacity as Director of the National
Economic Council; JACK DANIELSON, in his official capacity as Executive Director of the
National Highway Traffic Safety Administration; U.S. ENVIRONMENTAL PROTECTION
AGENCY; U.S. DEPARTMENT OF ENERGY; U.S. DEPARTMENT OF
TRANSPORTATION; U.S. DEPARTMENT OF AGRICULTURE; U.S. DEPARTMENT OF
THE INTERIOR; NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION;
INTERAGENCY WORKING GROUP ON SOCIAL COST OF GREENHOUSE GASES,

Defendants-Appellants.

## EMERGENCY MOTION FOR STAY PENDING APPEAL
## UNDER CIRCUIT RULE 27.3

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

BRANDON BONAPARTE BROWN
*United States Attorney*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

MICHAEL S. RAAB
JEFFREY E. SANDBERG
THOMAS G. PULHAM
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-532-4453*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ...................................................................1

STATEMENT ..........................................................................................................3

A.    LEGAL BACKGROUND .............................................................................3

    1.    Presidential Oversight of Rulemaking ...............................................3

    2.    Social Cost of Greenhouse Gases .........................................................4

    3.    Executive Order 13990 and the Interim Estimates .......................6

B.    PROCEDURAL HISTORY .........................................................................8

ARGUMENT .........................................................................................................10

I.    DEFENDANTS WILL LIKELY SUCCEED IN REVERSING THE INJUNCTION ..................................................................................11

    A.    The District Court Lacked Jurisdiction .........................................11

        1.    Plaintiffs Lack Standing. ......................................................11

            a.    Plaintiffs Have Not Shown Injury In Fact. .............12

            b.    Plaintiffs Have Not Shown Causation Or Redressability. ................................................................14

        2.    Plaintiffs' Claims Are Unripe. ..............................................16

    B.    Plaintiffs Lack Any Viable Claims .................................................18

        1.    Plaintiffs Have No Cause Of Action. ...................................18

        2.    Plaintiffs' Claims Lack Merit. ..............................................19

    C.    Plaintiffs Face No Irreparable Harm.............................................22

II.    AT A MINIMUM, AN IMMEDIATE PARTIAL STAY IS NECESSARY TO NARROW THE INJUNCTION ...........................23

III.    EQUITABLE FACTORS OVERWHELMINGLY FAVOR A STAY................................................................................................................26

CONCLUSION.................................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENTS:

   Exhibit A (District Court Opinion)

   Exhibit B (District Court Order)

   Exhibit C (Executive Order 13,990)

   Exhibit D (February 2021 Interim Estimates)

   Exhibit E (OIRA Guidance)

   Exhibit F (Mancini Declaration)

   Exhibit G (*Missouri v. Biden* Slip Opinion)

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) (per curiam)...................................................................19

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014) ........................................................................ 18-19

*American Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) ...............................................................................19

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989) .............................................................................................15

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) ........................................................................12, 27

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) (per curiam)...................................................................27

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................18

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ..............................................................................22

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020).........................................................17, 26

*California v. Texas*,
  141 S. Ct. 2104 (2021) ........................................................................................14

*Center for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) .......................................................................14, 15

*Center for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008) .......................................................................5, 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .....................................................................................11, 12

*Collins v. Mnuchin,*
  938 F.3d 553 (5th Cir. 2019) (en banc),
  *aff'd in part, rev'd in part,* 141 S. Ct. 1761 (2021) ..........................................20

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) ..............................................................13

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ..............................................................15

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
  710 F.3d 579 (5th Cir. 2013) ..............................................................22

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ..............................................................22

*DHS v. Regents of Univ. of California,*
  140 S. Ct. 1891 (2020) ..............................................................24

*El Paso County v. Trump,*
  982 F.3d 332 (5th Cir. 2020) ..............................................................13

*E.T. v. Paxton,*
  19 F.4th 760 (5th Cir. 2021) ..............................................................27

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..............................................................18

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010) ..............................................................20

*Freedom From Religion Found. v. Mack,*
  4 F.4th 306 (5th Cir. 2021) ..............................................................27

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ..............................................................11

*Government of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) ..............................................................13

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) (per curiam) ..............................................................23

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...................................................................11

*Lujan v. National Wildlife Fed'n,*
   497 U.S. 871 (1990) ...................................................................24

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) .............................................18

*Missouri v. Biden,*
   No. 4:21-cv-287, __F. Supp. 3d __, 2021 WL 3885590
   (E.D. Mo. Aug. 31, 2021) .......................................... *passim* (Ex. G)

*National Park Hosp. Ass'n v. Department of the Interior,*
   538 U.S. 803 (2003) ...................................................................16

*Nken v. Holder,*
   556 U.S. 418 (2009) ...........................................................10, 26

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998) ...................................................................17

*Palisades Gen. Hosp. v. Leavitt,*
   426 F.3d 400 (D.C. Cir. 2005) ...............................................24

*Peoples Nat'l Bank v. Office of Comptroller of Currency,*
   362 F.3d 333 (5th Cir. 2004) .................................................18

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020) .............................................................20

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Envtl. Quality,*
   968 F.3d 419 (5th Cir. 2020) .................................................12

*Sierra Club v. EPA,*
   939 F.3d 649 (5th Cir. 2019) .................................................22

*Sierra Club v. Peterson,*
   228 F.3d 559 (5th Cir. 2000) (en banc) ...............................19

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966) ...................................................................13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................12, 14

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .....................................................11, 12

*United States v. Johnson*,
  632 F.3d 912 (5th Cir. 2011) ............................................................ 21

*Walmart v. U.S. Dep't of Justice*,
  21 F.4th 300 (5th Cir. 2021).............................................................17

*WildEarth Guardians v. Bernhardt*,
  No. 17-cv-80, 2021 WL 363955 (D. Mont. Feb. 3, 2021)................................17

*Wyoming v. U.S. Dep't of the Interior*,
  493 F. Supp. 3d 1046 (D. Wyo. 2020)...............................................17

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
  832 F.3d 654 (7th Cir. 2016) .........................................6, 17, 21, 26

## Constitution:

U.S. Const. art. II, §§ 1-2 .....................................................................26

## Executive Orders:

Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sep. 30, 1993) ......................... 3-4

Exec. Order No. 13783, 82 Fed. Reg. 16,093 (Mar. 28, 2017) ............................6

Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021) ........ *passim* (Ex. C)

## Other Authorities:

86 Fed. Reg. 24,669 (May 7, 2021) .....................................................7

Interagency Working Group on Social Cost of Greenhouse Gases,
*Technical Support Document: Social Cost of Carbon, Methane,
and Nitrous Oxide, Interim Estimates Under Executive
Order 13990* (Feb. 2021) ......................................................7 (Ex. D)

Office of Info. & Regulatory Affairs (OIRA), Social Cost of
Greenhouse Gas Emissions: Frequently Asked Questions
(FAQs) (June 3, 2021) ....................................................7, 21 (Ex. E)

Office of Mgmt. & Budget (OMB), Circular A-4 (2003),
https://perma.cc/CVU2-QUCE ..................................................4, 25

## INTRODUCTION AND SUMMARY

The preliminary injunction entered here presents an unprecedented, completely unjustified interference with Executive Branch operations. Defendants respectfully seek a stay pending appeal or, at minimum, an immediate partial stay insofar as the injunction goes beyond enjoining mandatory use of the Interim Estimates challenged by Plaintiffs. Because of the injunction's broad impact and resulting pressing need for relief, a ruling is requested by March 15, 2022.

This case centers not on any final agency action, but on a tool of regulatory cost-benefit analysis. Following in predecessors' footsteps, the President issued an Executive Order instructing agencies on compliance with longstanding regulatory-review requirements. The Order directed an interagency Working Group to disseminate temporary estimates for the social costs of certain greenhouse gases to be used in internal regulatory analyses. These accounting metrics neither bind States nor impose direct regulatory burdens on anyone. Louisiana and nine other States nonetheless attack the Interim Estimates in the abstract, wholly apart from whether they are used to justify any particular agency action.

Another court recently dismissed a parallel challenge to the Interim Estimates, explaining that judicial review is available if and when the Interim Estimates are ever used to justify some regulation. *See Missouri v. Biden*, __ F. Supp. 3d __, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021), *appeal pending*, No. 21-3013 (8th Cir.). Yet the district court here, without ruling on the government's motion to dismiss, entered a government-wide preliminary injunction against any use of the Interim Estimates. *See* Exhibit A (Op.).

Even more strikingly, the court adopted—without explanation— plaintiffs' proposed injunction. *See* Exhibit B (Order). The injunction not only vacates the Interim Estimates, but suspends the Working Group; disables agencies from "employing" or "relying on" *any* of the Working Group's past analyses; and imposes specific methodological restraints that lack any statutory basis. Plaintiffs could not obtain that relief at final judgment, and never offered any briefing to support those unprecedented demands.

The injunction should be immediately stayed. Plaintiffs lack standing and their claims are unripe and not currently actionable under the APA. Review is proper if and when the Interim Estimates are used to justify imposing some concrete burden on Plaintiffs. Unless and until that occurs,

Plaintiffs suffer no cognizable harm—let alone *irreparable* harm—from the Estimates' mere existence.

At a minimum, the injunction should be immediately stayed to the extent it goes beyond enjoining the Interim Estimates' alleged mandatory effect. The injunction usurps the President's authority to supervise the Executive Branch, engages in impermissible *ex ante* control of rulemaking, and interferes with agencies' ability to comply with statutory requirements and court orders—while doing nothing to prevent any harm to Plaintiffs.

## STATEMENT

### A.  Legal Background

### 1.  Presidential Oversight of Rulemaking

The President has long exercised oversight of policymaking and rulemaking processes within the Executive Branch. Since the early 1970s, every President has required some form of centralized review. And since 1993, Executive Order 12866 has mandated a prepublication review process involving cost-benefit analysis for all "economically significant" regulations. Analyses prepared under E.O. 12866 are advisory documents without legal effect and not directly subject to judicial review.

Office of Management and Budget (OMB) Circular A-4, a 2003 guidance not required by any statute, advises agencies how to conduct cost-benefit analysis that "monetize[s] quantitative estimates" of all direct and indirect benefits and costs. OMB Circular A-4, at 27 (2003), https://perma.cc/ CVU2-QUCE. Among other topics, Circular A-4 explains that agencies should mathematically discount future-accruing benefits and costs. It suggests default discount rates of 3 and 7 percent, but endorses rates of "1 to 3 percent" in cases affecting the welfare of future generations. *Id.* at 35-36. It also instructs agencies to account "separately" for effects on "citizens and residents of the United States" and those on other countries. *Id.* at 15. But it disclaims any particular "formula," emphasizing that agencies must "exercise professional judgment" in a context-sensitive manner using the best evidence available. *Id.* at 2-3, 17; *see* Mancini Decl. ¶¶ 7-15 (Exhibit F).

### 2. Social Cost of Greenhouse Gases

Since the George W. Bush Administration, cost-benefit analyses under E.O. 12866 have considered impacts of emissions of greenhouse gases— carbon dioxide, methane, and nitrous oxide—known to affect global climate change. Agencies have quantified these impacts with scientific models that estimate the effects of emissions on various factors (such as net changes in

4

agricultural productivity, sea-level rise, and human health) and aggregate them into dollar estimates per ton of gas emitted, known as the social cost of greenhouse gases (SC-GHG).

In 2008, a court of appeals invalidated a fuel-economy standard because the agency failed to "monetize the benefit of carbon emissions reduction[s]." *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1203 (9th Cir. 2008). Agencies thereafter began to account for carbon emissions using varying social-cost estimates. In 2009, to encourage consistency and use of the best-available science, an interagency group of technical experts was convened to develop a scientifically robust, legally defensible method for quantifying marginal costs of carbon emissions.

In 2010, this interagency Working Group developed a methodology that synthesizes three independent models (one yielding a Nobel Prize) that were the most widely accepted, peer-reviewed frameworks for translating GHG emissions into climate impacts. In ensuing years, OMB sought public comment on the methodology and resulting estimates and obtained multiple forms of outside expert review, including by the National Academies of Sciences, Engineering, and Medicine.

Though agencies were not expressly required to employ the estimates in rulemaking, many chose to do so.  In 2016, the Seventh Circuit upheld consideration of the 2013 estimates—including their quantification of global benefits—in the context of a federal energy-efficiency rule for commercial-refrigeration equipment.  *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677-78 (7th Cir. 2016).

In 2017, President Trump disbanded the Working Group and withdrew its analyses.  Exec. Order No. 13783, § 5(b).  He nonetheless expected that agencies would continue to "monetiz[e] the value of changes in greenhouse gas emissions," and directed that agencies ensure "to the extent permitted by law" that "any such estimates are consistent with the guidance contained in OMB Circular A-4."  *Id.* § 5(c).

### 3.  Executive Order 13990 and the Interim Estimates

President Biden issued E.O. 13990 in January 2021 (Exhibit C). Section 5 stated the President's determination that use of global SC-GHG estimates "facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues."  *Id.*  It also reconvened the Working Group to formulate revised SC-GHG estimates, targeted for January 2022.  In the

6

interim, Section 5 directed the Working Group to publish "interim" SC-GHG estimates "within 30 days," and stated that "agencies shall use" those estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions," to the extent "consistent with applicable law." *Id.* § 5(b)(ii)(A).

Accordingly, in February 2021, the Working Group issued a Technical Support Document containing the Interim Estimates at issue here (Exhibit D). These Estimates were identical to prior 2016 estimates, adjusted for inflation, which the Working Group found to be better justified methodologically than more recent estimates. OMB invited public comment on the Estimates' methodology. 86 Fed. Reg. 24,669 (May 7, 2021).

In June 2021, Office of Information and Regulatory Affairs (OIRA) guidance confirmed that agencies using the Interim Estimates must do so "subject to applicable law." OIRA Guidance 1 (Exhibit E). Thus, "[w]hen an agency conducts benefit-cost analysis pursuant to specific statutory authorities," those requirements "must dictate whether and how the agency monetizes changes in greenhouse gas emissions in th[at] context." *Id.* It also instructed agencies to solicit and respond to public comment on the Interim Estimates as part of any rulemaking. *Id.*

## B. Procedural History

1.  Plaintiffs brought this suit preemptively challenging the Interim Estimates.  Plaintiffs name as defendants 23 federal entities or officials, including the President, and claim that the Interim Estimates are procedurally invalid, arbitrary and capricious, inconsistent with various agency-specific statutes, and statutorily *ultra vires*.

Defendants moved to dismiss, explaining that Plaintiffs lack standing and their claims are unripe and currently nonactionable because any alleged injuries would result from hypothetical future regulations, not the Interim Estimates.  Plaintiffs eventually moved for a preliminary injunction.  The government opposed, explaining that Plaintiffs failed to show irreparable harm and that the relief they sought was overbroad.

2.  On February 11, without ruling on the motion to dismiss, the district court granted Plaintiffs' motion and adopted their proposed order.

The district court rejected some (though not all) of the government's threshold objections.  Op. 11-27.  The court allowed Plaintiffs to invoke *parens patriae* standing; credited Plaintiffs' assertions that the Interim Estimates would result in increased regulatory burdens; and accepted Plaintiffs' incorrect premise that States themselves are bound to apply the

Interim Estimates in "cooperative-federalism" programs. The court further concluded that the Interim Estimates constituted final agency action.

The district court also concluded that Plaintiffs would likely succeed on their claims. It apparently recognized that federal agencies are authorized (if not required) by existing statutes to monetize GHG emissions, yet nonetheless concluded that the Working Group was precluded by the "major questions doctrine" from providing coordinative assistance. Op. 29-34. The court also concluded that the Interim Estimates were procedurally invalid; substantively incompatible with certain agency-specific statutes; and "arbitrary and capricious" based on "numerous arguments" pressed by Plaintiffs, which the court listed in bullet points but did not further discuss. Op. 34-38.

The district court then concluded that an injunction was warranted. It stated, without elaboration, that Plaintiffs' asserted harms could not be avoided through "meaningful judicial relief in the future," and it found that other equitable factors weighed in their favor. Op. 42-44. The district court ordered that all Defendants except the President are "ENJOINED and RESTRAINED from":

> (1) adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group ("IWG");

9

(2) enjoining Defendants from independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons; and (3) ordering Defendants to return to the guidance of Circular A-4 in conducting regulatory analysis; [*sic*]

(2)   Adopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects or that otherwise fails to comply with applicable law;

(3)   Adopting, employing, treating as binding, or relying upon any estimate of Social Cost of Greenhouse Gases that does not utilize discount rates of 3 and 7 percent or that otherwise does not comply with Circular A-4; and

(4)   Relying upon or implementing Section 5 of Executive Order 13990 in any manner.

Order 1-2.  The court provided no explanation for imposing that relief, for which Plaintiffs likewise failed to provide any briefing.

**3.**   Defendants promptly appealed and moved in district court for a stay pending appeal, requesting a ruling by February 28.  The court has not yet ruled, but requested Plaintiffs' response by March 4.

## ARGUMENT

A motion for stay pending appeal is governed by the four-factor test in *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Each factor supports a stay here.

## I.    DEFENDANTS WILL LIKELY SUCCEED IN REVERSING THE INJUNCTION

Plaintiffs cannot meet any, much less all, of the requirements for a preliminary injunction. *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

## A.    The District Court Lacked Jurisdiction

This suit is incompatible with Article III. Plaintiffs do not challenge particular actions that "caus[e] them harm," but instead attack a "generalized level of Government action" in a misguided effort to preemptively restructure rulemaking processes across the Executive Branch. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992).

### 1.    Plaintiffs Lack Standing.

Plaintiffs fall well short of establishing standing. States, though afforded "special solicitude" in some circumstances, nevertheless "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And plaintiffs seeking injunctive relief cannot rest on *allegations*, but rather, must make a "'clear

11

*showing'* that they have standing to maintain the preliminary injunction."

*Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (emphasis added).

### a. Plaintiffs Have Not Shown Injury In Fact.

Plaintiffs have not alleged—much less shown—any injury that is

"concrete, particularized, and actual or imminent." *Texas*, 809 F.3d at 150.

An injury is "imminent" only when it is "*certainly impending*"; "allegations

of *possible* future injury are not sufficient." *Barber*, 860 F.3d at 357 (quoting

*Clapper*, 568 U.S. at 409) (emphases in original; brackets omitted).

E.O. 13990 and the Interim Estimates are not directed to, and do not

impose any burden upon, Plaintiffs or the public. Plaintiffs instead

hypothesize that the Estimates will somehow, someday be used to justify

burdensome regulations. But Article III requires Plaintiffs to identify a

specific, sufficiently imminent injury. *See, e.g.*, *Summers v. Earth Island

Inst.*, 555 U.S. 488, 493-97 (2009) (plaintiffs could not rely on "statistical

probability" of harm from operation of agency regulations that "neither

require[d] nor forb[ade] any [particular regulatory] action," but instead

prescribed "standards and procedures" for federal "project planning");

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Envtl. Quality*, 968

F.3d 419, 424-25 (5th Cir. 2020) (rejecting "concept of 'probabilistic standing'

based on a non-particularized 'increased risk'"); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

The district court mistakenly credited Plaintiffs' assertion that States "must use" the Estimates in administering "cooperative-federalism" programs. Op. 19, 21, 41. E.O. 13990 and the Estimates expressly apply *only* to federal "executive departments and agencies." E.O. 13990, § 1. And to the extent Plaintiffs contend that federal agencies might apply the Interim Estimates in cooperative-federalism programs in an arbitrary-and-capricious manner, their remedy is to seek review of those specific actions.

The district court compounded its error by allowing *parens patriae* standing. A "State [does not] have standing as the parent of its citizens" to sue "the Federal Government." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *see Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179-83 (D.C. Cir. 2019). Nor does "loss of general tax revenues as an indirect result of federal policy" constitute "a cognizable injury." *El Paso County v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020).

The district court further erred in finding that Plaintiffs were injured by alleged "depriv[ation] of the right to submit comments" on the Interim Estimates. Op. 21. Being "denied the ability to file comments" is

13

"insufficient to create Article III standing," *Summers*, 555 U.S. at 496; rather a "procedural-rights" plaintiff must also show "concrete" injury from the "substantive government action" at issue. *Center for Biological Diversity v. EPA*, 937 F.3d 533, 543-44 (5th Cir. 2019). Here, Plaintiffs were not harmed by the Interim Estimates' mere issuance, and have not even suffered procedural injury: Plaintiffs will have the opportunity to comment when it matters—if agencies propose to rely on the Interim Estimates to issue rules—and in turn to seek judicial review.

### b. Plaintiffs Have Not Shown Causation Or Redressability.

Likewise, Plaintiffs' claimed injuries are not "fairly traceable" to the Interim Estimates or redressable by legally available relief. *California v. Texas*, 141 S. Ct. 2104, 2113 (2021).

First, neither E.O. 13990 nor the Interim Estimates require any agency to promulgate any particular regulation. *See Missouri* op. 19 (Exhibit G). Instead, they impose a procedural condition that *if* agencies propose regulations requiring cost-benefit analysis under E.O. 12866, and *if* they monetize GHG emissions in that analysis, then the agencies must use the Interim Estimates (and not others) unless contrary to law.

Second, there are countless reasons why agencies might issue new regulations. Agencies undertake "policy judgment[s] committed to the[ir] broad and legitimate discretion," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989)), and the reasoning they ultimately adopt will control the scope of any judicial review. "[C]ourts cannot presume either to control or to predict" whether agencies will rely on cost-benefit analyses that monetize GHG emissions to justify any particular regulation. *ASARCO*, 490 U.S. at 614-15.

Third, an agency's monetization of GHG emissions may make no bottom-line difference. A rule may be found justified in cost-benefit terms based on other factors, such as health and safety improvements, wholly apart from climatic effects. Plaintiffs can establish causation only if they "demonstrate that the [regulations] that will cause their assumed injuries will be [justified] pursuant to the [Interim Estimates], and not pursuant to some other authority." *Center for Biological Diversity*, 937 F.3d at 544.

Fourth, even if an agency does justify regulation based on GHG emission reductions, it might not rely on the Interim Estimates, which are expressly temporary. Once superseded, the Interim Estimates no longer

15

"shall [be] use[d]" by agencies, and Plaintiffs could not be harmed by them. E.O. 13990, § 5(b)(ii)(A).

Finally, the legally available relief for Plaintiffs' APA claims—setting aside the Interim Estimates—would not redress their claimed injury. Plaintiffs have never disputed that, absent the Estimates, agencies would remain free to—and may be required to—consider GHG emissions in their cost-benefit analyses, and they would remain free to propose and promulgate the very regulations that Plaintiffs claim will injure them.

### 2. Plaintiffs' Claims Are Unripe.

The injunction is also improper because, as the government argued but the district court failed to address, this suit concerns "abstract disagreements over administrative policies" foreclosed by ripeness doctrine. *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807-08 (2003). The Estimates do not regulate primary conduct, and Plaintiffs have not shown an "immediate[]" impact on "their day-to-day affairs." *Id.* Indeed, their objections to the Interim Estimates are untethered from any particular agency action. The ripeness problem is underscored by Plaintiffs' indiscriminate assertion of claims against 23 agencies and officials; the distinct statutory contexts in which those Defendants might take action; and

the many "discrepancies" between Plaintiffs' assertions about the Interim Estimates and the government's "materially different" and "unequivocally expressed" positions on those same questions. *Walmart v. U.S. Dep't of Justice*, 21 F.4th 300, 311-12 (5th Cir. 2021).

Until now, every court to consider SC-GHG estimates has done so in the context of specific agency actions, and for good reason.[1] Some statutes require cost-benefit analysis; others forbid it; and others afford discretion. Claims like Plaintiffs' cannot be addressed "*en masse.*" *Missouri* op. 28.

Meanwhile, Plaintiffs face no cognizable hardship. They "will have ample opportunity to bring legal challenges to particular regulations if those regulations pose imminent, concrete, and particularized injury" by pursuing "the normal review process under the APA." *Missouri* op. 25-26. Plaintiffs may prefer "to mount one legal challenge" rather than pursue "case-by-case review, but Article III and prudential considerations foreclose that strategy. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734-35 (1998).

---

[1] *See Zero Zone*, 832 F.3d at 677; *Center for Biological Diversity*, 538 F.3d at 1203; *WildEarth Guardians v. Bernhardt*, No. 17-cv-80, 2021 WL 363955, at *10 (D. Mont. Feb. 3, 2021); *Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1078-81 (D. Wyo. 2020); *California v. Bernhardt*, 472 F. Supp. 3d 573, 611-14 (N.D. Cal. 2020).

**B.    Plaintiffs Lack Any Viable Claims**

Plaintiffs' claims are unreviewable and in any event lack merit.

**1.    Plaintiffs Have No Cause Of Action.**

Plaintiffs have not identified any available cause of action.  First, neither the President nor the Working Group are "agenc[ies]" under the APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  The Working Group is an ad hoc assemblage of presidentially convened experts, not a statutorily created body that wields "'substantial independent authority.'"  *Meyer v. Bush*, 981 F.2d 1288, 1297 (D.C. Cir. 1993).

Second, the Interim Estimates are not "final" agency action, *i.e.*, action that is both the "consummation of [an] agency's decisionmaking process" and "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Estimates can "affect [Plaintiffs'] rights [only] on the contingency of future administrative action" by a regulatory agency.  *Peoples Nat'l Bank v. Office of Comptroller of Currency*, 362 F.3d 333, 337 (5th Cir. 2004).  If and when an agency does take action in reliance on the Interim Estimates, Plaintiffs may seek review at that time.  *See, e.g., Alabama-Coushatta Tribe*

*of Tex. v. United States*, 757 F.3d 484, 490-91 (5th Cir. 2014); *Sierra Club v. Peterson*, 228 F.3d 559, 565-67 (5th Cir. 2000) (en banc).

Third, Plaintiffs cannot invoke a nonstatutory *ultra-vires* cause of action, because the APA or other special statutory-review procedures already provide for meaningful review at the appropriate time. *See, e.g.*, *American Airlines, Inc. v. Herman*, 176 F.3d 283, 293-94 (5th Cir. 1999).

## 2. Plaintiffs' Claims Lack Merit.

Plaintiffs' legal theories reflect a fundamental misunderstanding of administrative law and presidential regulatory oversight.

The district court's principal basis for decision (Op. 30-34) is that the Interim Estimates implicate "major questions" and that courts should "expect Congress to speak clearly" before allowing an agency to make decisions "of vast economic and political significance." *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) (quotation marks omitted). That proposition has no application here. Agencies are *already* permitted by statute to consider GHG emission effects in their cost-benefit analyses, and they have done so throughout the last four Presidential Administrations. A "major questions"

19

doctrine has never been invoked to prevent the President from supervising and coordinating agencies' exercise of existing statutory authorities.

Indeed, though the district court sought to vindicate "separation-of-powers" principles (Op. 5), its ruling raises substantial constitutional concerns. The Constitution vests in the President, alone, "[t]he entire 'executive Power'" to "take Care that the Laws be faithfully executed." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). That power embraces both the authority and the duty to maintain "general administrative control of those executing the laws." *Id.* at 2197-98. Courts have repeatedly invalidated efforts to insulate Executive Branch officials from presidential oversight and control. *See, e.g.*, *id.* at 2203 (Executive officials must "remain[] subject to the ongoing supervision and control of the elected President"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010) (same); *Collins v. Mnuchin*, 938 F.3d 553, 587-88 (5th Cir. 2019) (en banc), *aff'd in part, rev'd in part*, 141 S. Ct. 1761 (2021). And every President since Nixon has invoked that power to require centralized supervision of agency rulemaking, including by imposing requirements and standards for cost-benefit analysis. The district court identified no reason why E.O. 12866 and

Circular A-4 are valid, but Section 5 of E.O. 13990 and the Interim Estimates are not.

Plaintiffs' procedural claim also fails. Even assuming the Working Group were an "agency," the Interim Estimates are not legislative rules requiring notice and comment because they do not directly regulate anyone, and their future use will be subject to notice and comment in other rulemakings. *See* OIRA Guidance 2. In any event, the claim fails under the APA's harmless-error provision, *see United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011), because the Estimates are simply the same inflation-adjusted estimates that previously underwent multiple rounds of notice and comment, including in agency rulemakings.

Plaintiffs' substantive criticisms of the Interim Estimates are likewise baseless. Again, agencies already may (or must) account for climate impacts in cost-benefit analysis. The Interim Estimates—built upon a rigorous methodology incorporating the best available science and economics (including a Nobel-Prize-winning model)—are, at a minimum, a reasonable response to the pressing need for guidance in that endeavor. The Estimates' inclusion of global effects is permissible for the reasons recognized by the Seventh Circuit. *See Zero Zone*, 832 F.3d at 679. And their use of various

discount rates to account for uncertainty and intergenerational-equity concerns is reasonable and, moreover, consistent with Circular A-4. The district court seriously erred in failing to afford "most deferential" review to the Working Group's "evaluation of complex scientific data within [its] technical expertise." *Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019).

## C.    Plaintiffs Face No Irreparable Harm

In any event, Plaintiffs have not shown any harm that is "irreparable." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). The Interim Estimates do not require Plaintiffs to do (or not do) anything. And if they are later relied upon to Plaintiffs' detriment, Plaintiffs have an "adequate remedy": they may seek review, in the appropriate court and at the appropriate time, of any such agency action. *Id.*; *see Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (harms addressable "in the ordinary course of litigation" are not irreparable); *Building & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (vacating injunction against executive order because even if "some agency might [invoke it to] make a legally suspect decision," "an aggrieved party may seek redress" at that time).

## II. AT A MINIMUM, AN IMMEDIATE PARTIAL STAY IS NECESSARY TO NARROW THE INJUNCTION

At a minimum, the injunction should be immediately stayed to the extent it goes beyond enjoining the Interim Estimates' alleged mandatory effect. Not only is the injunction overbroad—going well beyond appropriate APA relief—but its specific substantive provisions are illogical, unreasonable, and unlawful.

Initially, the injunction is an abuse of discretion because its scope is entirely unexplained. The district court did not find its various provisions necessary to redress irreparable harm to Plaintiffs, and Plaintiffs never attempted to justify them, either (even though Defendants clearly challenged Plaintiffs' proposed scope of relief). This Court recently entered a partial stay where the district court gave "little justification" for the scope of injunctive relief, *Louisiana v. Becerra*, 20 F.4th 260, 263-64 (5th Cir. 2021) (per curiam); here, none was given at all.

Indeed, there can be no justification for this plainly overbroad relief. As an equitable and constitutional matter, a "remedy must be 'limited to the inadequacy that produced [Plaintiffs'] injury in fact.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Plaintiffs brought suit to challenge the President's directive in Section 5 of E.O. 13990 that "agencies shall use" the Interim

Estimates "when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions." That is the only "action" the district court could properly set aside (or enjoin). "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action." *Palisades Gen. Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). The APA does not permit a plaintiff to demand "programmatic improvements," *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990), or a court to "substitute its judgment for that of the agency," *DHS v. Regents of Univ. of California*, 140 S. Ct. 1891, 1905 (2020).

Even on their own terms, the injunction's provisions are illogical and unreasonable. If there were any merit to Plaintiffs' claim that it was unlawful for the President to direct "mandatory implementation" of the Interim Estimates (Op. 19-20), that claim would be fully remedied by an order that declared the Interim Estimates to be nonbinding. Yet the injunction, rather than restoring agencies' discretion, imposes its own approach to regulatory analysis, requiring adherence to specific discount rates (3% and 7%) and forbidding agencies from considering the global

24

impacts of GHG emissions.  That judicially prescribed, one-size-fits-all approach—which, unlike E.O. 13990, leaves no room for compliance with contrary statutory directives—commits the very error that Plaintiffs (wrongly) attribute to the Interim Estimates.

The injunction is similarly illogical in mandating a "return to the guidance of Circular A-4."  Order 2.  Circular A-4 is an advisory guidance document, not mandated by any statute, used for intra-Executive-Branch regulatory analysis.  It is unprecedented for a federal court to direct an agency to adhere to it, much less to a particular (mis)interpretation of its terms.  Indeed, Circular A-4 does not require exclusive focus on the discount rates or geographic scope that the injunction now mandates.  It instead contemplates that agencies may consider global costs and benefits and expressly encourages use of lower discount rates to account for intergenerational-equity concerns.  *See Circular* A-4 at 15, 35-36.

Moreover, by enjoining Defendants from "implementing Section 5 of Executive Order 13990 in any manner," Order 2, the injunction shuts down an interagency Working Group established by the President to advise him on important empirical and policy questions.  Plaintiffs have never asserted any harm from the Working Group's general operation, its public consultations

(in which Plaintiffs have participated), or any other action aside from issuance of the Interim Estimates. Yet the injunction suspends the Working Group, in stark disregard of the President's Article II authority to supervise and seek advice from his subordinates. *See* U.S. Const. art. II, §§ 1-2.

Finally, the injunction conflicts with other federal court decisions. The Seventh Circuit has held that the Department of Energy acted reasonably in considering global effects: because "climate change 'involves a global externality' …. those global effects are an appropriate consideration when looking at a national policy." *Zero Zone*, 832 F.3d at 679. And in another suit—in which Wyoming (a plaintiff here) intervened—the court set aside an agency rule that "focus[ed] solely on domestic effects" to the exclusion of, *inter alia*, "impacts on 8 million United States citizens living abroad." *California v. Bernhardt*, 472 F. Supp. 3d 573, 613 (N.D. Cal. 2020). The injunction here would override those decisions *sub silentio*.

## III. EQUITABLE FACTORS OVERWHELMINGLY FAVOR A STAY

The district court's injunction presents clear and irreparable harm to Defendants and the public interest. *Nken*, 556 U.S. at 435. As discussed at length in the attached Declaration of Dominic Mancini, OIRA Deputy Administrator, the injunction's effects have already reverberated across the

Executive Branch, including to work supporting the President's foreign-affairs functions. At numerous agencies, work surrounding various public-facing rules, grants, leases, permits, and other projects—including potential oil-and-gas projects in Louisiana—has been delayed or stopped altogether. In some cases, missed statutory deadlines may preclude agencies' ability to act at all. Even some internal discussions have halted, lest they run afoul of the injunction's prohibition against "relying upon" Working Group materials "in any manner." Order 2. The inability of the President and federal officials to carry out their public duties clearly constitutes "irreparable injury." *Cf. E.T. v. Paxton*, 19 F.4th 760, 769-70 (5th Cir. 2021).

That the injunction does not simply restore the pre-January 2021 state of affairs, but instead "judicial[ly] alter[s] the status quo" by mandating adherence to particular regulatory-analysis principles, further weighs in favor of a stay. *Freedom From Religion Found. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). So, too, does Plaintiffs' many-month delay in seeking injunctive relief in the first place. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam). If this Court does not direct dismissal altogether, *cf. Barber*, 860 F.3d at 357, it should at least halt Plaintiffs' effort to judicially micromanage the Executive Branch's operations via injunction.

# CONCLUSION

This Court should immediately stay the preliminary injunction, or at a minimum, grant a partial stay.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB
/s/ Jeffrey E. Sandberg
JEFFREY E. SANDBERG
THOMAS G. PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-532-4453*

Counsel for Defendants-Appellants

MARCH 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point CenturyExpd BT, a proportionally spaced font. I further certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,198 words, according to the count of Microsoft Word.

I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by telephone calls to the Clerk's Office on February 28, 2022 and to the offices of opposing counsel on February 28, 2022, advising of the intent to file this emergency motion. I further certify that the facts supporting emergency consideration of this motion are true and complete.

 /s/ Jeffrey E. Sandberg
Jeffrey E. Sandberg
Counsel for Defendants-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that, on March 1, 2022, I electronically filed the foregoing emergency motion for stay pending appeal with the Clerk of Court by using the appellate CM/ECF system.  I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

_/s/ Jeffrey E. Sandberg_____
Jeffrey E. Sandberg
Counsel for Defendants-Appellants