# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

THE STATE OF LOUISIANA,
By and through its Attorney General,
JEFF LANDRY, et al.,

PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States; et al.,

DEFENDANTS.

CIV. NO. 2:21-CV-1074-JDC-KK

## PLAINTIFF STATES' OPPOSITION TO MOTION TO STAY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 1

STANDARD OF REVIEW ............................................................................................................ 3

ARGUMENT .................................................................................................................................. 4

    I.    MOVANTS SUFFER NO IRREPARABLE HARM. ...................................................................... 4

        A.    The Executive Branch Suffers No Irreparable Harm From the Injunction of Unlawful Actions. ............................................................................................................. 5

        B.    The Injunction Is Appropriately Tailored. ................................................................. 7

        C.    An Injunction Preventing Unlawful Executive Actions Does Not Impinge the Separation of Powers. ............................................................................................. 8

        D.    Because the Working Group's Ambit Is Inherently Unlawful, the Injunction Appropriately Prevents its Activities. ........................................................................ 9

        E.    Any Harm to Movants Is Outweighed by Harms to Plaintiff States and to the Public Interest. ............................................................................................................. 9

    II.    DEFENDANTS ARE UNLIKELY TO SUCCEED ON APPEAL. ................................................. 10

        A.    This Court Has Subject Matter Jurisdiction. .......................................................... 11

        B.    Plaintiff States Established Multiple Independently Sufficient Grounds Upon Which the SC-GHG Estimates Are Unlawful. ................................................................. 14

        C.    The Injunction Is Appropriately Tailored to Address Plaintiff States' Harms. ........ 17

        D.    This Court Should Reject Movants' Nothing-Equals-Something Argument. ........... 19

CONCLUSION ............................................................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Am. Great Lakes Ports Ass'n v. Schultz,*
   962 F.3d 510 (D.C. Cir. 2020) ................................................................................. 17

*Axiall Canada Inc. v. MECS Inc.,*
   2021 WL 6062356 (W.D. La. Apr. 8, 2021) ....................................................... 3, 19

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*
   17 F.4th 604 (5th Cir. 2021) ................................................................................. 10

*Catholic Health Initiatives v. Sebelius,*
   617 F.3d 490 (D.C. Cir. 2010) ............................................................................... 15

*Chamber of Com. of the United States of Am. v. Hugler,*
   2017 WL 1062444 (N.D. Tex. Mar. 20, 2017) ...................................................... 19

*DeJoria v. Maghreb Petroleum Expl., S.A.,*
   935 F.3d 381 (5th Cir. 2019) ................................................................................. 11

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ........................................................................................... 16

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) .............................................................................. 4, 7

*El Paso Cty., Texas v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ................................................................................. 12

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) .................................................................................... 16

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) ................................................................................... 3

*Louisiana v. Biden,*
   543 F. Supp. 3d 388 (W.D. La. 2021) ................................................................... 17

*Massachusetts v. E.P.A.,*
   549 U.S. 497 (2007) .................................................................................................. 8

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) ............................................................................................... 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
  142 S. Ct. 661 (2022) ........................................................................... 15

*Pac Legal Found. v. Council on Envtl. Quality*,
  636 F.2d 1259 (D.C. Cir. 1980) ..................................................... 13, 15

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) ............................................................. 3, 4

*Republic of Ecuador v. Connor*,
  708 F.3d 651 (5th Cir. 2013) ................................................................. 5

*Ruiz v. Estelle*,
  650 F.2d 555 (5th Cir. 1981) ............................................................... 19

*State of La. v. Dep't of Energy*,
  507 F. Supp. 1365 (W.D. La. 1981) ..................................................... 12

*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ......................................................... passim

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ............................................................... 16

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ............................................................... 13

*Texas v. United States*,
  14 F.4th 332 (5th Cir. 2021) ................................................................. 7

*Texas v. United States*,
  24 F.4th 407 (5th Cir. 2021) ................................................................. 7

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ................................................................. 4

*U.S. Navy Seals 1-26 v. Biden*,
  2022 WL 594375 (5th Cir. Feb. 28, 2022) ............................... 4, 6, 9, 10

*United States v. Johnson*,
  632 F.3d 912 (5th Cir. 2011) ............................................................... 16

*United States v. Riccardi*,
  989 F.3d 476 (6th Cir. 2021) ............................................................... 15

*Weingarten Realty Investors v. Miller*,
661 F.3d 904 (5th Cir. 2011) ................................................................... 3

**Other Authorities**

11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2021) ...................... 8

Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy Conservation Standards for Variable Refrigerant Flow Multi-Split Air Conditioners and Heat Pumps*, 87 Fed. Reg. 11335, 11348 (**Mar. 1, 2022**) ................................................................ 18

## INTRODUCTION

Before this motion was filed, Defendants consistently maintained that the Executive Branch does not rely on the SC-GHG Estimates to justify administrative actions. Now, however, they are singing a very different tune. Now they say enjoining the Estimates will have dramatic consequences and interfere with the entire Executive Branch's ability to function. Both assertions cannot be true.

The extent of the contradiction between Movants' stay brief and their prior representations—*and even between parts of Movants' stay brief*—is striking. To demonstrate they are likely to succeed on the merits, Movants must argue that the Estimates are not in use and do not raise major questions. But to try to prove irreparable harm, Movants must concede that the Estimates *are* in use and *do* represent major questions. Plaintiff States agree that the Estimates are in use across the Executive Branch and also that this use represents questions of major political, economic, and social importance. Indeed, the Movants' assertions only prove the point. That is precisely why the injunction must not be stayed despite Movants' nebulous and unsubstantiated allegations of irreparable harm to the Executive Branch. In fact, the government's entire motion can be answered in one sentence: "[T]he Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take." *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021).

## BACKGROUND

On January 20, 2021, President Biden issued Executive Order 13990, which created an agency—the "Interagency Working Group"— out of whole cloth and vested it with authority to fundamentally transform the American economy and way of life. EO13990 tasked the IWG with issuing a rule known as the "Social Cost of Greenhouse Gases" to serve as an ordering measure

1

for all government activities and impositions on the private sector and States. After the IWG issued immediately binding SC-GHG Estimates, a coalition of States sued to challenge the Executive Order and the Estimates.

After extensive briefing, evidentiary submissions, and oral argument, this Court issued a preliminary injunction on February 11, 2022. Doc. 99. The Court initially determined that it had jurisdiction to adjudicate Plaintiff States' challenge to Executive Order 13990 and to the Estimates. Doc. 98 at 11-27. The Court then held that Executive Order 13990 and the Estimates likely exceeded the Executive Branch's authority because they are not authorized by any statement of congressional authority. *Id.* at 29-34. The Court also held the Estimates are likely unlawful under the Administrative Procedure Act because they were not promulgated after notice and comment procedures, are arbitrary and capricious, and violated several statutory provisions. *Id.* at 34-38. The Court next found that the Executive Order and Estimates irreparably harm Plaintiff States by reducing their tax revenues, harming their citizens' economic welfare, imposing additional duties on the States and State agencies in cooperative federalism programs, and divesting the States' procedural rights under the APA. *Id.* at 40-43. Finally, the Court determined that the balance of harms and public interest "weigh heavily in favor of granting a preliminary injunction." *Id.* at 44. In light of these findings and conclusions, the Court issued an order enjoining Defendants from:

> (1) adopting, employing, treating as binding, or relying upon the work product of the Interagency Working Group ("IWG"); (2) enjoining Defendants from independently relying upon the IWG's methodology considering global effects, discount rates, and time horizons; and (3) ordering Defendants to return to the guidance of Circular A-4 in conducting regulatory analysis;

> (2) Adopting, employing, treating as binding, or relying upon any Social Cost of Greenhouse Gas estimates based on global effects or that otherwise fails to comply with applicable law;

(3) Adopting, employing, treating as binding, or relying upon any estimate of Social Cost of Greenhouse Gases that does not utilize discount rates of 3 and 7 percent or that otherwise does not comply with Circular A-4; and

(4) Relying upon or implementing Section 5 of Executive Order 13990 in any manner.

Doc. 99 at 1-2. On February 19, Defendants moved to stay the Court's preliminary injunction, or, alternatively, to stay the injunction "to the extent it goes beyond barring the treatment of the Working Group's analysis as mandatory or binding in agency actions." Doc. 103-1 at 3.[1]

## STANDARD OF REVIEW

A stay "is not a matter of right." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). Courts look to four factors in determining whether a stay is warranted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure other parties interested in the proceedings; and (4) whether public interest favors a stay." *Axiall Canada Inc. v. MECS Inc.*, 2021 WL 6062356, at *1 (W.D. La. Apr. 8, 2021) (quoting *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011)). Movants "bear[] the burden on all four factors, and the first two are the most critical." *Id.* Moreover, irreparable harm is a necessary, but not sufficient, condition of granting a stay. *Planned Parenthood*, 734 F.3d at 410 ("A stay 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'"); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) ("*Nken* held that if the petitioner has not made a certain threshold showing

---

[1] On Tuesday, Feb. 28, 2022, the Movants filed for an Emergency Stay in the Fifth Circuit, although the Plaintiffs deadline had not yet passed to respond to the district court motion, nor did they seek expedited treatment of the stay motion filed in this Court or contest the deadline for a response set by this Court.  The Fifth Circuit set a deadline for the Plaintiffs to respond to that motion by Friday, March 11, 2022.

regarding irreparable harm ... then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors.").

## ARGUMENT

### I.   MOVANTS SUFFER NO IRREPARABLE HARM.

Movants bear the burden of demonstrating irreparable harm. A stay cannot issue without that showing. *Planned Parenthood*, 734 F.3d at 410. And the posture here is critical: because Movants want a stay pending appeal, "the relevant question is whether the Government will be irreparably harmed *during the pendency of the appeal*." *Biden*, 10 F.4th at 559. Whether "long-term compliance with the district court's injunction would cause irreparable harm" is irrelevant if Movants "present[] no reason to think that [they] cannot comply with the district court's requirement of good faith while the appeal proceeds." *Id.*

Movants come nowhere close to meeting this standard. Rather than pointing to a specific and irreparable harm, they rely only on nebulous, speculative separation-of-powers harms. Such unspecific references to infringements upon executive power routinely find no warrant in the Fifth Circuit and courts around the nation. *See, e.g.*, *U.S. Navy Seals 1-26 v. Biden*, 2022 WL 594375, at *12 (5th Cir. Feb. 28, 2022) (rejecting Executive Branch claim of irreparable harm to Navy from judicial interference in "deployment, assignment, and other operational decisions"); *Biden*, 10 F.4th at 558 (rejecting Executive Branch claim of irreparable harm from judicial interference in immigration enforcement and foreign affairs); *Texas v. United States*, 787 F.3d 733, 767-68 (5th Cir. 2015) (rejecting Executive Branch claim of irreparable harm to "separation of powers and federalism"); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1058-59 (9th Cir. 2020) (rejecting Executive Branch claim of irreparable harm based preventing "the President from taking action effectuating an Act of Congress"). Indeed, it is the SC-GHG Estimates that disrupt the separation of powers—not this Court's order rebuffing the Executive's attempt to seize legislative power.

4

Simply put, the Fifth Circuit's recent holding in *State v. Biden* is dispositive here: "[T]he Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take." 10 F.4th at 558. Movants' attempt to manufacture injury does not overcome this basic rule.[2]

A. **The Executive Branch Suffers No Irreparable Harm From the Injunction of Unlawful Actions.**

At every stage of this litigation, Movants have insisted that the SC-GHG Estimates are not in use in the Executive Branch, or that to the extent they are used, they make no difference in analysis and decisionmaking. Suddenly, however, Movants now maintain that the Executive Branch *cannot function* without the Estimates. *See, e.g.*, Doc. 103-1 at 23 ("In the single week that has elapsed since the entry of the injunction, its effects have reverberated across multiple federal agencies, reaching all the way from pending agency rules to internal Government deliberations, and even to work in support of the foreign affairs functions reserved to the President."). This Court should treat Movants' new directly contradictory statements with a jaundiced eye. *Cf. Republic of Ecuador v. Connor*, 708 F.3d 651, 654 (5th Cir. 2013) (noting the need to "protect the integrity of judicial proceedings by preventing litigants from asserting contradictory positions for tactical gain").

Take the Mancini Declaration, which purports to detail the extent of Executive Branch reliance on the Estimates. Doc. 104. This is *precisely* the type of information that—if it were correct—Defendants should have submitted in response to the Court's order for supplemental

---

[2] Contrary to Movants' misrepresentation (at 24), Plaintiff States' challenge is not "premised on the idea that agencies must be free to operate within the delegations of authority that have been provided by Congress without any constraint from the supervisory powers of the President." It is premised on the idea that the Executive cannot fundamentally transform the administrative state and American economy without a shade of statutory authorization.

briefing. *See* Doc. 82 ("It is ordered that the parties file no later than January 7, 2022 memoranda to specifically address and/or submit evidence of agency use of the interim estimates as well as specific evidence of the interim estimates actually being utilized."). But instead of filing that declaration, Defendants responded to the Court's Order—over the course of two supplemental briefs—by methodically citing agency actions that explicitly relied upon the Estimates and attempting to explain how each action did not actually rely upon the Estimates in any material way. *See, e.g.*, Doc. 90 at 4 ("EPA did not 'rel[y] upon' the Interim Estimates in that proposal."); Doc. 95 at 10 ("BLM was careful to emphasize their limits in this context and to indicate that the monetization of greenhouse-gas impacts would not control its ultimate decision.").

Movants now *also* claim (at 30) that the Estimates and Executive Order implicate "a broad array of separate rulemakings and other proceedings." But they previously *expressly disclaimed* that the Estimates had a major impact on Executive Branch decisionmaking. They stated that "[n]either E.O. 13990, nor the approach to cost estimation that it adopts, invoke or apply statutory authority in a novel context on a dramatic scale," Doc. 90 at 21, and represented that "there is no necessary connection between the use of the Interim Estimates and how impactful any given federal regulation will be," *id.* at 22.

Despite Movants' conflicting arguments, Plaintiff States agree that the Estimates are in use across the Executive Branch and represent a major initiative with wide ranging implications. *That's exactly why it's necessary to enjoin them.* It is a foundational remedies tenet that halting an illegal measure works no irreparable harm to the Executive. *Biden*, 10 F.4th at 558. And Movants "remain able to make decisions based on other neutral factors"—*i.e.*, factors that are actually authorized by statute. *U.S. Navy Seals 1-26*, 2022 WL 594375, at *12. Movants' argument that the Executive suffers irreparable harm when it is enjoined from acting to further what it perceives to

be the public interest would mean that "no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction." *Doe #1*, 957 F.3d at 1059. "That cannot be so." *Id.*; *accord Biden*, 10 F.4th at 558. Because this Court was exactly right to hold that the Executive Order and Estimates exceed the Executive Branch's authority, its injunction works no irreparable harm on Movants.[3]

## B.     The Injunction Is Appropriately Tailored.

Movants contend (at 31) that the injunction chills internal agency deliberation. In other words, the Executive Branch is telling the Court that it wishes to *discuss* the Estimates in agency decisionmaking, but not *employ* them. This slices the apple far too thin. The point of an injunction against relying upon unlawful factors in agency decisionmaking is to prevent agencies from considering unlawful factors in decisionmaking. Or in other words, from exceeding its authority. It is unclear why Movants seek this Court's blessing to discuss a factor that the Court has held is an unlawful consideration in agency decisionmaking. In any case, "the harm of such a perceived institutional injury is not 'irreparable,' because the government 'may yet pursue and vindicate its interests in the full course of this litigation.'" *Doe #1*, 957 F.3d at 1059; *accord Biden*, 10 F.4th at 559.

Even accepting that the injunction could disrupt Executive Branch deliberations, such harm is self-inflicted. *Biden*, 10 F.4th at 558 ("[A] party may not satisfy the irreparable harm requirement

---

[3] Defendants find (at 27) only one case for the proposition that "judicial interference" with an Executive Branch policy "often constitutes irreparable injury." *Texas v. United States*, 14 F.4th 332, 340 (5th Cir. 2021). But the *en banc* court vacated that panel opinion. *See Texas v. United States*, 24 F.4th 407, 408 (5th Cir. 2021) ("[A] majority of active judges in service and not disqualified has determined that the panel opinion issuing a stay pending appeal should be vacated."). The binding standard remains that "the Government cannot claim an irreparable injury from being enjoined against an action that it has no statutory authorization to take." *Biden*, 10 F.4th at 558.

if the harm complained of is self-inflicted." (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2021))). Movants have been on notice of the dubious legality of the Executive Order and the Estimates for nearly a year now. Yet the Executive Branch has persisted with numerous actions taken in express reliance on the Estimates. *Cf. id.* (self-inflicted injury because "'Texas filed suit challenging the suspension of enrollments in MPP ... nearly two months before DHS purported to terminate the program entirely in the June 1 Memorandum.'"). Accordingly, the "self-inflicted nature" of Movants' asserted harms "severely undermines" their claim of irreparable harm. *Id.*

### C.   An Injunction Preventing Unlawful Executive Actions Does Not Impinge the Separation of Powers.

This Court's order does not prevent the President from supervising the Executive Branch. It prevents the President from violating the law—from creating an agency without statutory authority, vesting that agency with legislative rulemaking authority, and directing that agency to promulgate a binding rule directing all other agencies to employ a measure unauthorized by statute and directly contrary to several laws. It is telling that the only authorities Movants can muster (at 32) to support their argument that requiring the Executive Branch to comply with the law is an irreparable harm are a vacated Fifth Circuit decision and an out-of-circuit dissent.

Movants' foreign policy concerns (at 33-35) are overwrought and have been recently rejected by the Fifth Circuit. Movants based their concern on the speculative possibility that *Canada* will not be able to create its own SC-GHG Estimates, thereby somehow harming American welfare, and that the injunction of an unlawful measure will undermine American leadership. Such amorphous foreign policy considerations do not justify disregarding the law. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 534 (2007) ("[W]hile the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws."). And

Movants could have prevented any foreign policy "disruptions by simply informing [Canada] that" the Estimates "would be subject to judicial review." *Biden*, 10 F.4th at 559. "Insofar as the Government failed to do that, again, its injury is self-inflicted." *Id.*

D.    **Because the Working Group's Ambit Is Inherently Unlawful, the Injunction Appropriately Prevents its Activities.**

Movants assert (at 35-37) that the injunction "short-circuits the work of the interagency Working Group." But they do not explain how preventing an unlawfully constituted agency from issuing an unlawful but binding rule establishes irreparable harm. And to the extent that the federal government has expended funds on this unlawful endeavor, this is yet another self-inflicted injury. Movants could have "avoided this problem by waiting" to implement the Estimates "until this litigation was resolved." *Biden*, 10 F.4th at 558; *see also id.* ("The self-inflicted nature of the government's asserted harm 'severely undermines its claim for equitable relief.'"). The Executive Branch cannot expend money on unlawful actions and then invoke those expenses to preclude reviewing or enjoining those actions. The Country's debt problems loom large enough without blessing that new path to avoiding judicial review.

E.    **Any Harm to Movants Is Outweighed by Harms to Plaintiff States and to the Public Interest.**

Movants assert (at 5) that "its interests and the public interest merge in the balancing of harms." "That is mistaken. Those factors merge 'when the Government is the opposing party[,]' *i.e.*, when the government is not the party applying for a stay." *U.S. Navy Seals 1-26*, 2022 WL 594375, at *13 (quoting *Nken*, 556 U.S. at 435). And it ignores that Plaintiff States are separate sovereigns. Accordingly, Movants have it exactly backwards—as governmental entities opposing a stay, Plaintiff States' interests and the public interest merge.

9

The public interest and balance of harms weigh heavily against a stay. Most obviously, Movants "'have no legitimate interest in the implementation of [the] unlawful' SC-GHG Estimates." Doc. 98 at 44; *see also Biden*, 10 F.4th at 559 ("[T]he 'public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations.'"). And the "public interest favors maintenance of [an] injunction" that "maintains the separation of powers." *Texas*, 787 F.3d at 768; *see also Biden*, 10 F.4th at 559. Finally, the injunction prevents major violations of the Tenth Amendment and "the public interest plainly lies in not allowing" Movants "to circumvent those federalism concerns." *Biden*, 10 F.th at 559. Simply put, "[t]he public interest is also served by maintaining our constitutional structure ... even, or perhaps particularly, when those decisions frustrate government officials." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618-19 (5th Cir. 2021).[4]

The irreparable harm Plaintiff States would suffer in the absence of an injunction puts the public interest and balance of harms beyond doubt. As discussed below, this Court correctly held that Plaintiff States and their citizens are subject to a litany of irreparable harms in the absence of an injunction. Any harm to Movants' nonexistent interest in furthering an illegal policy is easily outweighed by Plaintiff States' irreparable harms.

## II. DEFENDANTS ARE UNLIKELY TO SUCCEED ON APPEAL.

Movants bear the burden of making a "strong showing that they are likely to succeed on the merits." *U.S. Navy Seals 1-26*, 2022 WL 594375, at *10. But their only substantive arguments on this point regurgitate what this Court has explicitly rejected. It bears repeating: "a stay 'is not a

---

[4] It is hard to understand Movants' assertion (at 37) that an injunction ordering the Executive Branch to abide by Congress's directive to focus only on domestic effects, rather than following the dictates of an agency not authorized by statute and staffed by unelected bureaucrats, "undermines the democratic accountability so critical to our constitutional system."

matter of right, even if irreparable injury might otherwise result'" and even if the movant is the federal government. *Texas*, 787 F.3d at 747.

> **A.      This Court Has Subject Matter Jurisdiction.**

Movants re-raise several jurisdictional arguments that this Court has already rejected.

*First*, Movants assert (at 7-8) that Plaintiff States have no standing because they suffer no harm from the Executive Order or Estimates. But Movants almost entirely ignore this Court's exhaustive jurisdictional findings. The Court found that: (1) "mandatory implementation of the SC-GHG Estimates imposes new obligations on the states and increases regulatory burdens when they participate in cooperative federalism programs," Doc. 98 at 19-20; (2) executive agencies have "already employed the SC-GHG Estimates, such as the EPA in disapproving state implementation plans under the NAAQS good neighbor provisions and imposing federal implementation plans on several Plaintiff States including Louisiana, Kentucky, and Texas," *id.* at 20; and (3) the Estimates put the Plaintiff States to "a forced choice: either they employ the Estimates in developing their state implementation plan, or the EPA subjects them to a federal plan based on the SC-GHG Estimates," *id.* Movants' brief (at 8) ignores these specific findings and calls them "speculat[ion]." But the Court did not speculate—it made specific jurisdictional factual findings that precisely cited to an extensive record. Far from being mere speculation, such jurisdictional findings are entitled to the highest deference. *See, e.g.*, *DeJoria v. Maghreb Petroleum Expl., S.A.*, 935 F.3d 381, 390 (5th Cir. 2019) ("[J]urisdiction is a legal question. But the facts that underlie a jurisdictional determination are still reviewed only for clear error.").

Movants fail to challenge the vast majority of this Court's independent findings and its holding regarding standing. For example, the Court found that the "SC-GHG Estimates artificially increase the cost estimates of [MLA oil and gas] lease sales, which in effect, reduces the number

of parcels being leased, resulting in the States receiving less in bonus bids, ground rents, and production royalties." Doc. 98 at 20. The Court thus held that the Administration's use of the Estimates in NEPA reviews "directly causes harm to the Plaintiff States' statutorily vested rights to proceeds from MLA oil and gas leases." *Id.* Movants do not challenge the Court's finding that the Bureau of Land Management is employing the Estimates in lease-sale analysis or the Court's holding that such reliance directly harms specific revenue sources for the Plaintiff States.[5] This is fatal to Movants' stay motion because only one basis for standing is needed for the case to proceed to the merits. *Biden*, 10 F.4th at 547-48 (noting importance of government's failure to challenge district court's jurisdictional findings on stay motion).[6]

*Second*, Movants again assert (at 8-9) that Plaintiff States' challenge is not yet ripe. But as this Court recognized, this argument is at war with reality. Doc. 98 at 25-26. And Plaintiff States have extensively explained, Doc. 76 at 16-20, that this is their "only adequate opportunity to challenge the Executive Order itself and the 2021 SC-GHG Estimates themselves," Doc. 76 at 20, because "the lines are drawn, the positions are taken and the matter is ripe for judicial review," *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1372 (W.D. La. 1981), *aff'd sub nom.* 690 F.2d 180 (Temp. Emer. Ct. App. 1982).

---

[5] Movants' reliance (at 8) on *El Paso County v. Trump* aids Plaintiff States, who have identified numerous sources of specific revenue to which they are entitled that will be harmed by the Estimates—including Kentucky's coal severance-tax revenues and MLA oil-and-gas leasing revenues. *See* Doc. 46-2 at 19-20 (collecting examples). As this Court found and held, Doc. 98 at 13, 19 n.46, 20-21, 26, 37, 41, 43, Plaintiff States easily satisfied their burden of identifying "specific tax revenues" directly harmed by the Estimates, *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020).

[6] As Plaintiff States have extensively briefed, Movants' repeated assertion (at 8) that *parens patriae* standing does not lie against the federal government "seems to be rejected by a new Fifth Circuit court every week." Doc. 76 at 7 (collecting cases).

*Third*, Movants persist in claiming (at 9-11) that the Estimates are not final agency action. This assertion is even more facially implausible now in light of Movants' admission that the Estimates are in fact in use across the Executive Branch and that this Court's injunction significantly undermines Executive Branch decisionmaking. That can only be true if the Estimates are final and have binding legal effects.

In any event, the Estimates are final agency action because (1) they represent the consummation of the Executive's decisionmaking process and (2) they have binding legal effects.[7] Defendants assert (at 10) that "the fact that some agencies have used the Interim Estimates ... says nothing about whether those Estimates are final, nor whether they are binding in any legally relevant sense." But under Fifth Circuit precedent, that fact says *everything* about whether the Estimates are final agency action. By urging (at 10) the Court to disregard the evidence that agencies are treating the Estimates as binding, Movants are re-raising their argument that final agency action is "evaluated 'from the regulated parties' perspective,' not 'from the agency's perspective.'" But the Fifth Circuit has emphatically rejected precisely this argument several times: "[T]he idea seems to be that agency action is never final in virtue of its binding effect on agency staff—but instead is final only if the agency as a whole permanently swears off the entirety of its statutory discretion. We are aware of no case from any court that supports that sweeping proposition." *Texas v. Biden*, 20 F.4th 928, 948 (5th Cir. 2021). Instead, the Estimates are "final agency action under the principle that, 'where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency

---

[7] Movants briefly contend (at 9) that IWG is not an "agency" for purposes of the APA. But as this Court recognized, "IWG has been granted authority to create SC-GHG Estimates that will be binding on executive agencies," which is a "hallmark of an APA agency." Doc. 98 at 39 (citing *Pac Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980)).

action' under the APA." *Id.* This Court was thus exactly right to hold that the Estimate are final

agency action. Doc. 98 at 38-39.[8]

### B.      Plaintiff States Established Multiple Independently Sufficient Grounds Upon Which the SC-GHG Estimates Are Unlawful.

Defendants fail to engage with this Court's numerous independently sufficient holdings

about the unlawfulness of the Executive Order and SC-GHG Estimates. For example, the Court

held that by mandating global effects, EO 13990 "contradicts Congress' intent regarding

legislative rulemaking." Doc. 98 at 33. Movants fail to carry their burden of contesting this

holding. By itself, this failure supports a holding that Movants have not made a "strong showing"

that they are likely to succeed on the merits.  Instead, Movants cherry pick three areas to attack

this Court's reasoning. Not one has any merit.

*First*, Movants attack (at 11-12) this Court's holding that the Executive Order and

Estimates violate the Major Questions Doctrine by again suggesting that the Order and Estimates

are routine exercises of Executive supervision over rulemaking. Not true. These actions undermine

decades of bipartisan regulatory review practice by placing a weight so heavy on Executive Order

12866's neutral cost-benefit scale that it collapses. Unlike the *process* established by EO 12866,

EO 13990 and the Estimates dictate a specific *binding rule* to the agencies that predetermine nearly

all outcomes by mandating massive numbers for the cost side of the scale. *See* Doc. 91 at 22-23.

Thus, far from being a mere process, "EO 13990 and the SC-GHG Estimates are a legislative rule

that dictates specific numerical values for use across all decisionmaking affecting private parties."

---

[8] Movants' halfhearted attempt (at 9) to rebuff the Court's *ultra vires* holding is easily answered by the long line of cases holding that "[u]ltra vires review is available to review 'whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action.'" Doc. 98 at 39-40 (collecting cases).

Doc. 98 at 33 (citing *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010)). And Movants cannot simultaneously claim (on page 12 of their brief) that the Executive Order and Estimates do not work "on a dramatic scale" and then later contend (on pages 23 to 35 *of that same brief*) precisely the opposite.

Given the Estimates' transformative effect on the economy, infringement on the legislative power, and usurpation of traditional State powers, the burden is on the Executive Branch to identify clear congressional authorization. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022). Despite having numerous chances, Movants have still not even tried to locate a clear statutory authorization for the Executive Order and Estimates. Doc. 98 at 29-34 (collecting cases). That is because there isn't one.

*Second*, Movants contend (at 12) that the Estimates are not legislative rules requiring notice and comment procedures because (1) IWG is not an agency, (2) the Estimates do not directly regulate private conduct, and (3) the rule of prejudicial error excuses them from compliance with the APA. As this Court recognized, each argument is meritless. First, IWG is an agency because it has been granted authority to create SC-GHG Estimates that will be "binding on executive agencies," which is a "hallmark of an APA agency." Doc. 98 at 39 (citing *Pac Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980)). Second, the question is not whether the Estimates regulate private conduct (which they do by imposing obligations on State agencies), but whether they have binding legal effect. *See* Doc. 98 at 34-35; *see also United States v. Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021) ("Precedent . . . recognizes that a specific numeric amount . . . generally will not qualify as a mere 'interpretation' of general nonnumeric language.") (collecting cases). Third, failing to subject one of the most important rules in regulatory history to public comment is not harmless by any stretch of the term. Had Plaintiff States been allowed to

comment, they would have set forth the extensive record of harms they have presented to this Court. And because the Estimates were actually in effect, Plaintiff States were subject to their harms for months. Movants thus come nowhere near their heavy burden of establishing harmless error. *See United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("An overreaching harmless error doctrine would allow the agency to inappropriately 'avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.'").

*Third*, Movants try (at 13-15) to revive the Estimates' reasonableness. They can do so only by suggesting that the Court must meekly accept the Administration's politicized explanation for the Estimates. But arbitrary-and-capricious review "under the APA is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). And this Court is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). Moreover, this Court is not required to ignore the fevered rush to judgment behind the Estimates. Although Movants claim the Estimates represent the best scientific evidence, they were rushed out in a month without public comment and without peer review. Indeed, Movants take no account of four full years of scientific developments. These facts confirm that the Estimates were rushed out the door for political, not scientific, reasons. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 436 (5th Cir. 2021) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."). Finally, Movants do not even pretend that global effects are within the factors that any statute allows an agency to consider. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658

16

(2007) (action is arbitrary and capricious when agency "has relied on factors which Congress had not intended it to consider").

### C.     The Injunction Is Appropriately Tailored to Address Plaintiff States' Harms.

Movants make much (at 15-21) of the scope of the Court's injunction. But their arguments do not undermine this Court's application of the ordinary remedy for unlawful agency activity. "'[V]acatur is the normal remedy' under the APA." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). So at the preliminary injunction stage, if the Court finds the preliminary injunction factors are met, the ordinary remedy is to restrain Executive officers from complying with the agency action as if it were vacated. Courts routinely do so upon a preliminary finding that agency action is unlawful. *See, e.g.*, *Louisiana v. Biden*, 543 F. Supp. 3d 388, 419 (W.D. La. 2021). What movants are really asking for is a remand without vacatur in the preliminary injunction posture. It is unclear whether this is even appropriate, but even if it is, remand without vacatur is not appropriate here because the Movants do not expressly ask for it. *Cf. Am. Great Lakes Ports Ass'n*, 962 F.3d at 518.

Even if narrower relief were possible, Movants have not demonstrated their entitlement to a narrower injunction. They premise all their arguments on a misrepresentation of the injunction as an affirmative injunction. That is not the case. The injunction prevents the Executive Branch from employing the Estimates in any manner. The natural result is that the still-in-force Circular A-4 would snap back into place to once more cover climate-related cost-benefit analysis. With the Estimates enjoined, agencies are once again bound by Circular A-4, which continues to embody the best regulatory practices.

Moreover, if the Mancini Declaration accurately depicts the depth of the Executive Branch's reliance on the Estimates, that declaration is perhaps the strongest evidence yet that

nothing short of an injunction of this scope will adequately protect Plaintiff States from their use. The Mancini Declaration demonstrates that, contrary to prior representations, the Estimates are ubiquitous in Executive Branch decisionmaking. Anything less than their absolute prohibition would leave endless routes to circumvent the injunction. But the Court need not take Plaintiffs' word for it; Movants previously represented that even in the presence of an injunction, agencies would continue to employ the Estimates: "[W]hether or not the Interim Estimates are binding, agencies are not likely to ignore them, as they reflect years of cutting-edge work from leading experts and academics in and out of government." Doc. 31-1 at 24. Thus, taking Movants at their own word, an injunction simply declaring the Estimates to be nonbinding is insufficient to prevent the harms caused by their use by agencies. Indeed, even *with* the current injunction, there is still a need for vigilance because, as Movants state, "there are many reasons to expect that, given the policy priorities of the President and his Cabinet, agencies will still consider the social costs of greenhouse gases when regulating—even without any binding directive from the President, and even without being able to rely upon the work product of the Working Group." Doc. 31-1 at 24. Indeed, even since the injunction was entered, executive agencies continue to indicate that they will use the Estimates. *See* Dep't of Energy, Proposed Rule, *Energy Conservation Program: Energy Conservation Standards for Variable Refrigerant Flow Multi-Split Air Conditioners and Heat Pumps*, 87 Fed. Reg. 11335, 11348 (**Mar. 1, 2022**) ("DOE uses the social cost of greenhouse gases from the most recent update of the Interagency Working Group on Social Cost of Greenhouse Gases, United States Government (IWG) working group, which are available in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990. The IWG recommended global values be used for

regulatory analysis."). Any relaxation of the injunction only invites more defiance and irreparable harm to Plaintiff States.

>    **D.     This Court Should Reject Movants' Nothing-Equals-Something Argument.**

Finally, Movants ask the Court to stay the injunction, allowing the full measure of the Estimates' irreparable harm to befall Plaintiff States, because climate change is important and the legal questions presented by this case are serious. That is not how stays work.

The ordinary standard for stays requires the movant to make "a strong showing that he is likely to succeed on the merits." *Axiall Canada Inc.*, 2021 WL 6062356, at *1. Movants try (at 22) to invoke an alternative likelihood of success test that allows for a stay if the case involves "serious legal question[s]." But, as this Court has explained, the serious-legal-questions standard applies only when "the balance of equities heavily favors a stay under the other three factors." *Id.* at *1 n.1; *see also Chamber of Com. of the United States of Am. v. Hugler*, 2017 WL 1062444, at *2 (N.D. Tex. Mar. 20, 2017) ("In this Circuit, that standard only applies if there is a serious legal question at issue and the other three factors weigh in the movant's favor." (citing *Ruiz v. Estelle*, 650 F.2d 555, 565-66 (5th Cir. 1981))). As discussed extensively above, the balance of equities, public interest, and irreparable harm factors all weigh heavily against Movants. Accordingly, they can only succeed on the likelihood of success element with a "strong showing." This they have not done.

>    **CONCLUSION**

For the foregoing reasons, this Court should deny Movants' motion for a stay pending appellate review.

Respectfully submitted,

 /s/ Elizabeth B. Murrill

JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL (LSBN 20685)
  Solicitor General
JOSEPH S. ST. JOHN (LSBN 36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

TYLER R. GREEN
DANIEL SHAPIRO
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*Counsel for Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  Attorney General of Alabama
Edmund G. LaCour Jr.*
  Solicitor General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Tel: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCourt@AlabamaAg.gov
*Counsel for the State of Alabama*

ASHLEY MOODY
  Attorney General of Florida
Rachel Siegel*
  Deputy Solicitor General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
Tel: (850) 414-3300
Fax: (850) 410-2672
rachel.siegel@myfloridalegal.com
*Counsel for the State of Florida*

CHRISTOPHER M. CARR
  Attorney General of Georgia
Andrew A. Pinson*
  Solicitor General
Office of the Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3409
apinson@law.ga.gov
*Counsel for the State of Georgia*

DANIEL CAMERON
  Attorney General of Kentucky
Marc Manley*
  Assistant Attorney General
Victor Maddox*
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118

Frankfort, Kentucky
Tel: (502) 696-5330
Marc.Manley@ky.gov
Victor.Maddox@ky.gov
*Counsel for the State of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
Justin L. Matheny*
  Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

Mark Miller**
  General Counsel to South Dakota Governor
Katie Hruska*
  Deputy General Counsel
Office of the Governor-Kristi Noem
500 East Capitol Avenue
Pierre, South Dakota 57501-5070
Mark.Miller@state.sd.us
*Counsel for the State of South Dakota*

KEN PAXTON
  Attorney General of Texas
Eric Hudson*
  Special Counsel
Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 936-2266
Fax: (512) 936-0545
eric.hudson@oag.texas.gov
*Counsel for the State of Texas*

PATRICK MORRISEY
  West Virginia Attorney General
Lindsay S. See*
  Solicitor General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021

Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

BRIDGET HILL
   Attorney General of Wyoming
James Kaste*
   Deputy Attorney General
Travis Jordan*
   Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
james.kaste@wyo.gov
travis.jordan@wyo.gov

*Admitted Pro Hac Vice*